**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MCDERMOTT INTERNATIONAL, INC., *et al.*,[1] | ) | Case No. 20-30336 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO (I) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (II) CONTINUE EMPLOYEE BENEFITS PROGRAMS**

**EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON JANUARY 23, 2020, AT 9:00 A.M. IN COURTROOM 400, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**RELIEF IS REQUESTED NOT LATER THAN JANUARY 23, 2020.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion"):

## Relief Requested

1. The Debtors seek entry of an order, substantially in the form attached hereto, authorizing the Debtors to: (a) pay prepetition wages, salaries, other compensation, and reimbursable expenses and (b) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto.

---

1 A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/McDermott. The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757 North Eldridge Parkway, Houston, Texas 77079.

**Jurisdiction and Venue**

2. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, and rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of Texas (the "Local Rules").

5. On January 21, 2020 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of David Dickson, President and Chief Executive Officer of McDermott International, Inc., in Support of the Chapter 11 Petitions* (the "Dickson Declaration") and the *Declaration of John R. Castellano, Chief Transformation Officer of McDermott International, Inc., in Support of the Debtors' First Day Motions* (the "Castellano Declaration," together with the Dickson Declaration, the "First Day Declarations"), filed contemporaneously with this Motion and incorporated by reference herein.

**The Debtors' Workforce**[2]

6. As of the Petition Date, the Debtors directly and indirectly employ a workforce of approximately 42,820 individuals spread across approximately 40 countries and 95 legal entities,[3] with most of the workforce concentrated in the United States, the United Arab Emirates, and Indonesia. Approximately 37,330 individuals (the "Employees") are directly employed by the Debtors, of which 21,680 Employees are compensated on an hourly or daily basis, while approximately 14,270 Employees are salaried. Approximately 11,630 of the Employees work in the United States (the "U.S. Employees") and approximately 25,710 work outside the United States (the "Non-U.S. Employees"). Up to 10% of the Employees are represented employees pursuant to the Debtors' 16 collective bargaining agreements.

| **Region/Group** | **Total Employees** |
| --- | --- |
| Asia Pacific | 10,660 |
| Middle East/North Africa | 11,640 |
| Europe/Africa/Russia/Caspian | 2,040 |
| North, Central, South America | 12,180 |
| Technology | 820 |
| **Total** | **37,340** |

7. The Employees perform a wide variety of corporate and other job functions—including engineering, fabrication, health and safety oversight, construction, project management,

2 Capitalized terms used but not otherwise defined in this section shall have the meanings given to them in this Motion or the First Day Declarations, as applicable.

3 These 95 legal entities may include non-Debtor and JV entities, however the relief sought under this Motion includes payments made only to individuals that are paid by Debtor entities.

supply chain management, and vessel and marine functions—that are critical to the Debtors' business operations and the administration of these chapter 11 cases. Certain Employees are familiar with local customs, supply base, and transportation infrastructure, and are thus essential to the Debtors' global supply chain operations. In many instances, the Employees are skilled personnel intimately familiar with the Debtors' processes, projects, and systems, many of which are highly technical and require unique training and experience. Without the continued, uninterrupted services of the Employees, the ability of the Debtors to maintain and administer their estates will be materially impaired.

8. In addition to the Employees, the Debtors retain specialized individuals on a temporary or a project basis, including Independent Contractors, workers retained through Staffing Agencies, and labor subcontractors (collectively, the "Independent Contractors") to complete discrete projects and fulfill duties similar to the job functions listed above. As of the Petition Date, the Debtors retained approximately 5,490 Independent Contractors across all business segments.

9. The Employees and Independent Contractors rely on their compensation and benefits to pay their daily living expenses. These individuals could experience significant hardship if the Court does not permit the Debtors to continue paying their compensation and providing them with health and other benefits. The Debtors respectfully submit that the relief requested herein is necessary and appropriate.

**Employee Compensation and Benefits**

10. The Debtors seek authority to: (a) pay and honor certain prepetition claims, if any, relating to, among other things, Wage Obligations, Unpaid Independent Contractor Obligations, Incentive Plans, Relocation Benefits, Withholding and Deduction Obligations, US Employer Payroll Taxes, Wage and Benefit Service Providers, Reimbursable Expenses, Health and Welfare

Coverage and Benefits, Workers' Compensation Claims, CBAs, Defined Benefit Plans, Defined Contribution Plans, Retiree Coverage, Paid Vacation Benefits, Paid Leave Benefits, Severance Obligations, Additional Benefit Programs and certain other benefits that the Debtors provide in the ordinary course (each as defined below, and collectively, the "Employee Compensation and Benefits"); and (b) pay all costs related to or on account of the Employee Compensation and Benefits.

11. Subject to Court approval, the Debtors intend to continue their applicable prepetition Employee Compensation and Benefits in the ordinary course. Out of an abundance of caution, the Debtors further request confirmation of their right to modify, change, discontinue any of their Employee Compensation and Benefits, and to implement new programs, policies, and benefits in the ordinary course of business on a postpetition basis in the Debtors' sole discretion and without the need for further Court approval, subject to applicable law.

## I. Compensation, Withholding, and Expense Reimbursement.

### A. Wage Obligations.

12. In the ordinary course, the Debtors incur obligations to their Employees for base salary (the "Wage Obligations"). The Debtors process hundreds of payrolls per month, and Employees are paid over various time periods ranging from weekly to monthly. The Debtors' current average annual Wage Obligations amount to approximately $1.76 billion.

13. As of the end of the fourth quarter of 2019, the Debtors incurred a monthly average of approximately $146.7 million on account of Wage Obligations. Additionally, as of the Petition Date, the Debtors estimate that they owe $73.9 million on account of accrued but unpaid Wage Obligations (the "Unpaid Compensation"). For the avoidance of doubt, as of the Petition Date, the Debtors do not believe that they owe Unpaid Compensation to any Employee in excess of the statutory cap of $13,650 set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. To

the extent certain Employees are owed Unpaid Compensation in excess of the statutory cap, it is on account of the fact that in certain countries, these Employees are being paid on a monthly basis. Such Employees would not be owed any payments in excess of the statutory cap if they were paid on a bi-weekly basis. Accordingly, the Debtors request authority to pay all outstanding amounts of Unpaid Compensation.

**B. Independent Contractors.**

14. The Debtors retain Independent Contractors either directly, or indirectly through external staffing agencies and labor sub-contractors (the "Staffing Agencies"), and pay them either directly or through the Staffing Agencies. The Employees and the Independent Contractors work side by side with respect to all of the Debtors' business operations, as described above. As of the third quarter of 2019, the Debtors have incurred a monthly average of approximately $14.8 million on account of payments to Independent Contractors. In addition, as of the Petition Date, the Debtors estimate that Independent Contractors are owed approximately $90.0 million (the "Unpaid Independent Contactor Obligations") on account of services rendered and reimbursable expenses.

15. The Debtors believe the authority to pay Unpaid Independent Contractor Obligations and continue paying their Independent Contractors is critical to maintaining and administering their estates. Accordingly, the Debtors seek authority to continue to pay Unpaid Independent Contractor Obligations incurred on account of the Independent Contractors and to continue to make payments on these obligations in the ordinary course of business on a postpetition basis.

### C. Incentive Plans.[4]

16. The Debtors maintain several incentive plans to motivate, reward, and retain certain of their non-insider Employees and Independent Contractors as an additional component of overall compensation (each as defined herein and collectively, the "Incentive Plans"). The Debtors believe the Incentive Plans drive employee performance, align Employees' interests with those of the Debtors generally, and promote the overall efficiency and safety of the Debtors' operations.

17. The Debtors have granted restricted share units, performance share units, and cash based awards to certain Employees and maintain several long-term incentive programs (collectively, the "Long Term Incentive Plans") in which approximately 840 non-insider Employees participate. The Long Term Incentive Plans are distributed at the discretion of the compensation committee of the Debtors' board of directors and are based on factors including individual employee performance targets and the Debtors' overall performance. The next payments under the Long Term Incentive Plans are scheduled to be paid during the first quarter of 2020, for which the Debtors estimate approximately $9.9 million in payments could be earned by Employees.

18. In addition, the Debtors' maintain a short term incentive plan, provide spot bonuses on an ad hoc basis, and project specific incentive programs ("Short Term Incentive Plans"). The short-term incentive plan is initially based on the Debtors' overall performance and then distributed to Employees based on individual employee performance. Spot bonuses are generally capped at 5% of an employee's base salary, require senior management approval, and are only

---

[4] The relief sought under this Motion with respect to the Incentive Plans and Severance Obligations (each as defined herein) does not include the payment of any obligation to an "insider" (as that term is defined in section 101(31) of the Bankruptcy Code, the "Insiders"). The Debtors shall not make any non-ordinary course bonus, incentive, or severance payments to any Insiders (as such term is defined in section 101(31) of the Bankruptcy Code) without further order of this Court.

eligible to non-insider Employees. The Debtors maintain 14 project specific incentive programs, in which Employees are compensated by either participation or project completion. Approximately 1,910 non-insider Employees were paid approximately $36.8 million pursuant to the Short Term Incentive Plans in 2019. The next payments under the Short Term Incentive Plans are scheduled to be paid during the first quarter of 2020, for which the Debtors estimate approximately $6.1 million in payments could be earned by Employees.

19. As of the third quarter of 2019, the Debtors have made approximately $37.9 million in total payments under the Incentive Plans year-to-date. As of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of the Incentive Plans. Out of an abundance of caution, however, to safeguard employee morale and optimize performance during these chapter 11 cases, the Debtors seek authority to honor all fully earned obligations under the Incentive Plans in the ordinary course of business and on a postpetition basis.

**D. Relocation Benefits.**

20. The Debtors provide relocation benefits to approximately 1,390 Employees that were transferred from their current residence in connection with their employment, and are also obligated to provide housing for certain Non-U.S. Employees (the "<u>Relocation Benefits</u>").

21. Depending on their current employment location, certain Employees receive a fixed housing allowance intended to defray or reimburse the Employee for the housing they arrange themselves. Other Employees are offered a choice of leased accommodations, within a given host country housing budget, with the lease paid for by the Debtors. In addition, certain Employees are provided a fixed allowance to address costs associated with utilities, security, communications, education for the Employees' children, and transportation within the host country, as well as costs associated with their return to their home country at the conclusion of their assignment abroad.

22. The Debtors believe that continuation of the Relocation Benefits is essential to ensure the uninterrupted continuation of the Debtor's international operations. The Debtors believe they are authorized to continue the Relocation Benefits in the ordinary course; however, out of an abundance of caution the Debtors seek authority to continue the Relocation Benefits on a postpetition basis in the ordinary course of business (including any prepetition amounts that may be outstanding) and consistent with their prepetition practices.

**E. Withholding Obligations and Deductions.**

23. Certain federal and state laws require that the Debtors withhold certain amounts from U.S. Employees' gross pay related to federal, state, and local income taxes for remittance to the appropriate federal, state, or local taxing authorities. Other amounts are withheld from U.S. Employees as required by statute including garnishments, child support, and Social Security and Medicare taxes (the "U.S. Withholding Obligations"). On average, the Debtors withhold and subsequently remit approximately $21.7 million per month on account of U.S. Withholding Obligations for their Employees in the United States.

24. The Debtors have obligations to foreign taxing authorities for certain Non-U.S. Employees, for example, PAYE taxation in the United Kingdom, Superannuation in Australia, and the *Fundo de Garantia do Tempo e Serviço* in Brazil (the "Foreign Withholding Obligations," and together with the U.S. Withholding Obligations, the "Withholding Obligations"). On average, the Debtors withhold and subsequently remit approximately $3.2 million per month on account of the Foreign Withholding Obligations.

25. The Debtors also routinely deduct certain amounts from Employees' paychecks, including pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed herein, such as an Employee's share of healthcare benefits and insurance premiums, 401(k) contributions, union dues, and miscellaneous deductions (collectively, the "Deductions")

and forward such amounts to various third-party recipients or retain such amounts for any self-insured benefit programs. On average, the Debtors withhold and remit approximately $22.1 million per month on account of Deductions in the United States (the "U.S. Deductions"), and approximately $6.5 million per month on account of Deductions outside the United States (the "Foreign Deductions," and together with the U.S. Deductions and the Withholding Obligations, the "Withholding and Deduction Obligations").

26. As of the Petition Date, the Debtors estimate that they owe approximately $64.5 million that are accrued and unpaid on account of the Withholding and Deduction Obligations. The Debtors seek authority to continue to pay amounts incurred in the ordinary course on account of the Withholding and Deduction Obligations and to continue these programs in the ordinary course of business and consistent with past practices on a postpetition basis.

**F. Employer Payroll Taxes**

27. In addition to the Withholding and Deduction Obligations described above, the Debtors are required by applicable statutory authority to match from their own funds Social Security, Medicare taxes, and other similar statutory obligations (the "US Employer Payroll Taxes"). On average, the Debtors pay and remit approximately $9.1 million per month on account of the US Employer Payroll Taxes.

28. The Debtors estimate that as of the Petition Date approximately $4.6 million of accrued but unpaid US Employer Payroll Taxes have not been remitted to the appropriate taxing authorities (the "Unpaid US Employer Taxes"). The Debtors seek authority to remit the Unpaid US Employer Taxes and to continue to honor and process the US Employer Payroll Taxes on a postpetition basis in the ordinary course of business and consistent with past practices.

**G. Wage and Benefit Service Providers.**

29. The Debtors have relationships with several firms that handle human resources-related administrative functions, including, but not limited to, payroll, processing, withholding, remittance, and reporting of payroll taxes (including the US Employer Payroll Taxes) for the Employees (collectively, the "Wage and Benefit Service Providers"). These relationships with the Wage and Benefit Service Providers allow the Debtors to realize substantial cost savings with respect to the administration of their employee payroll and benefits by not having to employ additional human resources professionals and administer payroll and benefit programs internationally, and allow the Debtors to offer better and broader benefits to their Employees at significantly reduced rates relative to the costs of participating in those programs without third-party intermediaries like the Wage and Benefit Service Providers.

30. The Debtors pay the Wage and Benefit Service Providers for the cost of administering employee Wage Obligations and benefits, as well as fees for these services. As of the Petition Date, the Debtors estimate that they owe $3.5 million to the Wage and Benefit Service Providers. The Debtors intend to continue to utilize the Wage and Benefit Service Providers during these chapter 11 cases and seek authority to pay all outstanding prepetition amounts incurred on account of the Wage and Benefit Service Providers and to continue to make all payments on a postpetition basis in the ordinary course of business on a postpetition basis.

**H. Reimbursable Expenses.**

31. The Debtors have policies whereby Employees seek reimbursement or file expense reports for the Debtors' payment of business related expenses. The expenses are ordinary course expenses that the Employees incur in performing their job functions (the "Reimbursable Expenses"). It is essential to the continued operation of the Debtors' business

that the Debtors continue reimbursing, or making direct payments on behalf of, the Employees for such expenses.

32. The Debtors maintain five American Express Travel Related Services credit card accounts (the "Amex Commercial Card Payment Program") with a yearly average spend of approximately $68.7 million, including a program in which Employees are issued American Express corporate cards pursuant to a certain corporate card account agreement between the Debtors and American Express (the "Reimbursable Expenses Amex Program").[5] Approximately 4,000 cards under the Reimbursable Expenses Amex Program are currently active. For certain Employees, account statements are sent directly from American Express to the Employees, who apply for reimbursement by submitting an expense report. Other Employees are not reimbursed for charges, and American Express is paid directly by the Debtors for these Employees' expenses. In most cases, the Employee is liable for card charges. Reimbursable Expenses under the Reimbursable Expenses Amex Program include expenses such as business travel, hotel accommodations, and meals for which Employees are individually billed and reimbursed (the "Travel Reimbursable Expenses"). Once the Debtors determine that the charges are for Travel Reimbursable Expenses and comply with the Debtors' policies and procedures for travel, the Debtors typically reimburse the Employees.

33. The Debtors' inability to reimburse Reimbursable Expenses could impose a hardship on Employees where such individuals incurred Reimbursable Expenses on the Debtors' behalf and with the understanding that such expenses would be reimbursed. Accordingly, the

5 The Debtors seek similar relief in the *Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and (II) Continue to Perform Intercompany Transactions*, which provides a description of the other four programs in place with Amex, which do not encompass Reimbursable Expenses.

Debtors respectfully request that the Court authorize the Debtors to continue such programs and policies and to pay any prepetition or postpetition claims and fees with respect thereto, in each case, in the ordinary course of business on a postpetition basis. As of the third quarter of 2019, the Debtors have incurred a monthly average of approximately $4.3 million on account of Reimbursable Expenses. Additionally, as of the Petition Date, the Debtors estimate that they owe approximately $6.5 million on account of Reimbursable Expenses. The Debtors seek authority to continue to pay amounts incurred on account of the Amex Commercial Card Payment Programs and to continue these programs in the ordinary course of business on a postpetition basis. For the avoidance of doubt, the Debtors will not seek to pay any outstanding Reimbursable Expenses or fees related thereto in advance of the date they come due.

## II. Health and Welfare Coverage and Benefits.

34. The Debtors offer health and welfare benefits to eligible Employees for medical, prescription, dental, and vision care coverage and certain other welfare benefits, including life, accidental death & dismemberment insurance, and other insurance benefits (collectively, the "Health and Welfare Coverage and Benefits"). As of the third quarter of 2019, the Debtors have incurred a monthly average of approximately $11.7 million on account of the Health and Welfare Coverage and Benefits. Failure to continue the Health and Welfare Coverage and Benefits could cause Employees to experience severe hardship and make it difficult to retain the workforce.

35. The Debtors believe they are authorized to continue the Health and Welfare Coverage and Benefits in the ordinary course; however, out of an abundance of caution the Debtors seek authority to continue the Health and Welfare Coverage and Benefits on a postpetition basis in the ordinary course of business (including any prepetition amounts that may be outstanding) and consistent with their prepetition practices.

**A. Medical and Prescription Coverage.**

36. The Debtors offer self-insured medical coverage to U.S. Employees administered by United HealthCare and prescription drug coverage through OptumRx (the "U.S. Medical Plan"). Approximately 6,840 U.S. Employees are enrolled in the U.S. Medical Plan, under which participants and their eligible dependents (usually spouses; and children, if both parents are Employees) receive coverage for, among other things, preventative care, doctor visits, hospital care, prescription drugs, and wellness. As of the third quarter of 2019, the Debtors have incurred a monthly average of approximately $6.9 million on account of the U.S. Medical Plan, of which approximately $2.2 million is funded by deductions from participating eligible U.S. Employees as applicable.

37. Non-U.S. Employees are generally offered similar medical and prescription coverage under either a Debtor sponsored fully-insured programs (the "Foreign Sponsored Medical Plans") or government sponsored programs. Approximately 9,630 Non-U.S. Employees are enrolled for Foreign Sponsored Medical Plans, administered by various parties.

**B. Dental and Vision Insurance Coverage.**

38. The Debtors provide a self-insured dental plan administered by MetLife Dental (the "U.S. Dental Plan"), and fully-insured vision plan by Vision Services Plan (the "U.S. Vision Plan") for eligible U.S. Employees. Approximately 6,540 U.S. Employees are enrolled in the U.S. Dental Plan and approximately 5,630 in the U.S. Vision Plan. As of the third quarter of 2019, the Debtors have incurred a monthly average of approximately $389,000 on account of the U.S. Dental Plan, of which approximately $278,000 is funded by deductions from participating eligible U.S. Employees as applicable. The U.S. Vision Plan is entirely funded through U.S. Employee Deductions. Approximately 400 Non-U.S. Employees are enrolled in dental plans, administered by various parties, some of which are self-funded.

**C. FSA and HSA.**

39. The Debtors provide U.S. Employees with the opportunity to contribute to flexible spending account (the "FSA") administered by Discovery Benefits, or to a health savings accounts (the "HSA") administered by Optum Bank, to make pre-tax contributions through payroll deductions to pay for certain health and welfare needs.

40. The Debtors deduct an average of $350,000 from each participating U.S. Employee's Wage Obligations on account of the U.S. Employee contributions to the FSA and the HSA on a monthly basis. Currently, approximately 970 U.S. Employees contribute to the FSA and approximately 610 U.S. Employees contribute to the HSA.

**D. Life and AD&D Insurance Coverage.**

41. The Debtors provide basic fully-insured life insurance, AD&D insurance, long- and short-term disability insurance, administered by Prudential, to all active eligible U.S. Employees as well as supplemental, spouse, and child life products offered on a voluntary, Employee-paid basis (the "Life Insurance Coverage"). The Debtors also provide fully-insured life insurance for Non-U.S. Employees, administered by various parties including: MetLife, Sun-Life and Great Eastern Life Assurance.

**E. Other Coverage.**

42. Other voluntary, Employee-paid benefits are offered such as critical illness, medical clinics, hospitalization, identity theft, disability, legal insurance and others.

**III. Workers' Compensation.**

43. The Debtors maintain workers' compensation insurance for their U.S. Employees (the "Workers' Compensation Program") supported with a stop-loss insurance policy (the "Workers' Compensation Insurance Policy") with XL Specialty Insurance.

44. The Debtors must continue the claim assessment, determination, adjudication, and payment pursuant to the Workers' Compensation Program, without regard to whether such liabilities are outstanding before the Petition Date, to ensure that the Debtors comply with applicable workers' compensation laws and requirements. There are approximately 470 open claims (the "Workers' Compensation Claims") under the Workers' Compensation Program. As of the Petition Date, the Debtors estimate that they owe approximately $35.6 million on account of the Workers' Compensation Claims. The Debtors seek authority to continue to pay amounts incurred on account of the Workers' Compensation Program and to continue this program in the ordinary course of business on a postpetition basis.[6]

## IV. Collective Bargaining Agreements.

45. As of the Petition Date, the Debtors were party to 16 unexpired collective bargaining agreements (the "CBAs"). Thirteen of these agreements govern the U.S. and Australia Employees of the Debtors' tanks and pipes business units, while the remaining three CBAs govern Employees in Indonesia, Mexico and Brazil. Taking into account rolling extensions and automatic renewals, none of the CBAs are set to expire prior to 2020. Approximately 3 of the CBAs relate to national unions, 3 relate to local unions, and the remaining 10 CBAs relate to foreign unions. In total, approximately 10% of the Employees are unionized and represented pursuant to the CBAs (the "Represented Employees").

[6] The Debtors' Workers' Compensation Program may change postpetition in the ordinary course due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder. By this Motion, the Debtors request authority to continue the Workers' Compensation Program postpetition, including making any changes to current policies and practices that become necessary.

**V. Retirement Programs.**

**A. Defined Benefit Plans.**

46. The CBAs require contributions to 9 multi-employer pension plans for Represented Employees (the "MEPP Plans"). Four of the MEPP Plans are "active," to which Employees are currently eligible to join; and five are "inactive," and unavailable for Employees, but still impose obligations upon the Debtors. As of December 31, 2018, the Debtors owed approximately $10.0 million on account of the active U.S. MEPP Plans. As of the Petition Date, the Debtors estimate that they owe approximately $18.5 million as a result of a withdrawal from the inactive MEPP Plans.

47. Debtor McDermott International, Inc. and certain of its subsidiaries directly and indirectly sponsor 16 single-employer defined benefit pension plans (the "SEPP Plans," and together with the MEPP Plans, the "Defined Benefit Plans"), of which 6 are currently active and 10 are frozen. As of December 31, 2018, the Debtors owed approximately $250.0 million in the aggregate with respect to the SEP Plans. The Debtors seek authority to continue to pay amounts incurred on account of the Defined Benefit Plans and to continue these programs in the ordinary course of business on a postpetition basis.

**B. Defined Contribution Plans.**

48. As of the Petition Date, the Debtors maintain a retirement savings plan for the benefit of their U.S. Employees that satisfies the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan"). The 401(k) Plan is administered by Fidelity and allows for automatic pre-tax salary deductions of eligible compensation up to the limits set forth by the Internal Revenue Code.

49. The Debtors also match certain Employees' 401(k) contributions dollar for dollar up to a maximum of 6% of eligible pay (the "401(k) Matching Contributions"). 401(k) Matching

Contributions are deposited to each eligible Employee's account at the end of their respective pay period. Eligible employee pay for matching consideration consists of base salary and over-time pay capped at the federal limit of $280,000 annually.

50. As of the third quarter of 2019, the Debtors incurred approximately $27.1 million on account of 401(k) Matching Contributions year-to-date. As of the Petition Date, the Debtors estimate that they owe approximately $3.0 million on account of 401(k) Matching Contributions.

51. The Debtors provide defined contribution plans similar to the 401(k) Plan for Employees in the U.K., the Czech Republic and for Non-U.S. Employees (the "Non-U.S. DC Plans," and together with the 401(k) Plan, the "Defined Contribution Plans"). The Debtors believe they are authorized to continue making payments under the Defined Contribution Plans in the ordinary course; however, out of an abundance of caution the Debtors seek authority to continue the Defined Contribution Plans on a postpetition basis in the ordinary course of business (including any prepetition amounts that may be outstanding) and consistent with their prepetition practices.

**C. Retiree Health Coverage.**

52. In addition, the Debtors also offer several retired former Employees access to their Health and Welfare Coverage and Benefits (the "Retiree Coverage"). The Debtors seek authority to continue to pay amounts incurred on account of the Defined Contribution Plans and Retiree Coverage and to continue these programs in the ordinary course of business on a postpetition basis.

**D. Supplemental Non-Qualified Retirement Programs.**

53. The Debtors also maintain three supplemental retirement plans (the "Supplemental Retirement Plans") designed to provide additional retirement benefits for certain individuals. Approximately 300 Employees participate in these Supplemental Retirement Plans, two of which are currently unfunded. As of the third quarter of 2019, the Debtors estimate that they owe approximately $12.6 million in the aggregate on account of the Supplemental Retirement Plans.

An additional amount of approximately $523,000 will vest postpetition on account of these Supplemental Retirement Plans. The Debtors seek authority to continue to pay amounts incurred on account of the Retiree Coverage and Supplemental Retirement Plans and to continue these programs in the ordinary course of business on a postpetition basis, unless frozen or terminated in accordance with the terms of the applicable Supplemental Retirement Plan.

**VI. Paid Time Off Benefits.**

54. The Debtors provide paid time off to certain Employees for vacation days, often depending on the length of their services with the Company (the "Paid Vacation Benefits"). Most Employees are paid their regular hourly or salaried rate when they elect to use Paid Vacation Benefits. In several countries, including Australia, Brazil, Malaysia, the Philippines, Russia, South Korea, and Vietnam, Employees can receive payments in lieu of vacation days. Terminated Employees, either voluntary or involuntary, are paid for earned but unused Paid Vacation Benefits, and any vacation days taken that exceed the vacation days earned are deducted from their final paycheck. The Debtors seek authority to pay any amounts due with respect to earned but unused Paid Vacation Benefits for terminated Employees and to continue the Paid Vacation Benefits policies in the ordinary course of business on a postpetition basis.

55. The Debtors also provide paid leave benefit programs (the "Paid Leave Benefits") for eligible Employees. U.S. Employees will be paid only for specific types of leaves, including medical leave, maternity leave, and leave while awaiting next assignment, unusual and extreme personal circumstances, and other leaves authorized or required by law. Generally, U.S. Employees have the option to use accrued vacation days concurrently with leaves, and they will not receive a payment for any unused leave days at the end of the year or at termination unless required by law. The Debtors generally provide leave days in foreign jurisdictions as well, including Canada, the Czech Republic, Germany, United Kingdom, India, Indonesia, Mexico, and

the Netherlands in each case in accordance with local customs and statutory requirements. The Debtors seek authority to honor all fully earned obligations under the Paid Leave Benefits and to continue the Paid Leave Benefits in the ordinary course of business on a postpetition basis.

**VII. Severance Obligations.**

56. The Debtors maintain a severance policy, which provides for a one-time payment at termination, depending on the Employee's tenure, for certain Employees in the United States (the "U.S. Severance Policy"). To the best of the Debtors' knowledge, the Debtors do not believe they owe any prepetition amounts on account of the U.S. Severance Policy as of the Petition Date. In addition to the U.S. Severance Policy, the Debtors maintain one discrete severance agreement (the "Severance Agreement"). As of the Petition Date, the Debtors estimate that they have an unpaid amount of approximately $210,000 under the Severance Agreement.

57. In addition, the Debtors are obligated to pay an End-Of-Service Benefit Program in their MENA region (the "EOSB Plan", and together with the U.S. Severance Program and similar existing programs, the "Severance Obligations"), which provides for benefits accrued during the tenure of certain MENA region Employees that become outstanding in the event such Employee ends his or her employment in the region (whether within McDermott but outside of the MENA region or outside of McDermott altogether). As of the Petition Date, the Debtors estimate that they owe approximately $79.8 million on account of the EOSB Plan. The Debtors seek authority to pay any amounts due with respect to the Severance Obligations solely with respect to non-insiders and to continue the Severance Obligations solely with respect to non-insiders in the ordinary course of business on a postpetition basis.

**VIII. Additional Benefit Programs.**

58. In addition to the foregoing, the Debtors offer Employees the opportunity to participate in a range of ancillary benefits, including educational assistance, service awards, a legal

plan, and other employee programs (the "Additional Benefit Programs"). The aggregate cost of the Additional Benefit Programs is *de mimimis*. The Debtors seek authority to pay any amounts due with respect to these programs and policies and to continue them in the ordinary course of business on a postpetition basis.

## Basis for Relief

### I. Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits Obligations.

#### A. Certain of the Employee Compensation and Benefits Are Entitled To Priority Treatment.

59. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the Employee Compensation and Benefits to priority treatment. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims, given priority under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, for (a) wages, salaries or [c]ommissions, including vacation, severance, and sick leave pay earned by an individual and (b) contributions to an employee benefit plan). To the extent that an Employee receives no more than the statutory prescribed limit of $13,650 on account of claims entitled to priority, the relief sought with respect to compensation only affects the timing of payments to Employees and does not have any material negative impact on recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties. Finding, attracting, and training new qualified talent would be extremely difficult and would most likely require higher salaries, guaranteed bonuses, and more comprehensive compensation packages than are currently provided to Employees.

### B. Payment of Certain Employee Compensation and Benefits Is Required by Law.

60. The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party payees. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' wages. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' wages on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d). Further, federal and state laws require the Debtors to withhold certain tax payments from Employees' wages and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request authorization to transmit the Withholding Obligations to the proper parties in the ordinary course of business.

61. Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all obligations related to the Workers' Compensation Program is therefore crucial to the Debtors' continued operations and the success of these chapter 11 cases.

## II. Payment of the Employee Compensation and Benefits and the Relief Sought Herein Is a Sound Exercise of the Debtors' Business Judgment and Necessary to Preserve the Value of the Estates.

62. Courts generally acknowledge that it is appropriate to authorize the payment (or other special treatment) of prepetition obligations in appropriate circumstances. *See, e.g., In re Ionosphere Clubs, Inc.*, 98 B.R. 175 (Bankr. S.D.N.Y. 1989) (granting authority to pay prepetition wages); *see also Armstrong World Indus., Inc. v. James A. Phillips, Inc.*, (*In re James A. Phillips, Inc.*), 29 B.R. 391, 398 (S.D.N.Y. 1983) (granting authority to pay prepetition claims of suppliers who were potential lien claimants). In authorizing payments of certain prepetition obligations, courts have relied on several legal theories, rooted in sections 1107(a), 1108, 363(b), 507, and 105(a) of the Bankruptcy Code.

63. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *Id.* Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The *CoServ* court specifically noted that satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.*

64. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section

363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g.*, *Inst. Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("That is, for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (citation omitted).

65. Section 105(a) of the Bankruptcy Code further provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a). Courts apply section 105(a) pursuant to the "doctrine of necessity," which functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein. *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (recognizing the "doctrine of necessity"); *see also In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation).

66. Moreover, the doctrine of necessity is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("The payment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit

the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment.”).

67. The Debtors submit that the payment of the Employee Compensation and Benefits represents a sound exercise of the Debtors’ business judgment, is necessary to avoid immediate and irreparable harm to the Debtors’ estates, and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code. Paying prepetition wages, employee benefits, and similar obligations will benefit the Debtors’ estates and their creditors by allowing the Debtors’ business operations to continue without interruption. Indeed, the Debtors believe that without the relief requested herein, Employees may seek alternative employment opportunities, perhaps with the Debtors’ competitors. Such a development would deplete the Debtors’ workforce, thereby hindering the Debtors’ ability to operate their business and, likely, diminishing stakeholder confidence in the Debtors’ ability to successfully reorganize. The loss of valuable Employees and the resulting need to recruit new personnel (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to focus on stabilizing their business operations. Accordingly, the Debtors must do their utmost to retain their workforce by, among other things, continuing to honor all wage, benefits, and related obligations, including the prepetition Employee Compensation and Benefits.

68. The majority of Employees rely exclusively on the Employee Compensation and Benefits to satisfy their daily living expenses. Many of the Debtors’ Employees expect and require their wages to arrive on a timely basis. Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor their obligations related thereto expeditiously. Failure to satisfy such obligations will jeopardize Employee morale and loyalty at a time when Employee support is critical to the Debtors’ businesses. Furthermore, if this Court does not

authorize the Debtors to honor their various obligations under the Health and Welfare Coverage and Benefits described herein, Employees will not receive health coverage and, thus, may be obligated to pay certain health care claims that the Debtors have not satisfied. The loss of health care coverage will result in considerable anxiety for Employees (and likely attrition) at a time when the Debtors need such Employees to perform their jobs at peak efficiency. Additionally, as set forth above, Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations at this critical juncture.

69. Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay any prepetition amounts accrued and unpaid on account of the Employee Compensation and Benefits and to continue the Employee Compensation and Benefits on a postpetition basis in the ordinary course of business and consistent with past practices.

## III. The Debtors Seek a Waiver of the Automatic Stay as It Applies to Workers' Compensation Claims.

70. Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title[.]

Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

71. The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit Employees to proceed with their Workers' Compensation Claims in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the automatic stay because staying the Workers' Compensation Claims could have a detrimental effect on the

financial well-being of Employees and Employee morale and lead to the departure of certain Employees who are critical at this juncture. Such departures could cause a severe disruption in the Debtors' businesses to the detriment of all parties in interest.

**Emergency Consideration**

72. Pursuant to Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." As set forth in this Motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

73. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

74. Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of

any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## **Notice**

75. Notice of the hearing on the relief requested in the Motion has been provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Local Rules, and is sufficient under the circumstances. Without limiting the forgoing, due notice was afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-in-interest, including: (a) the Office of the U.S. Trustee for the Southern District of Texas; (b) entities listed as holding the 50 largest unsecured claims against the Debtors (on a consolidated

basis); (c) Credit Agricole Corporate and Investment Bank, 1301 Avenue of the Americas, New York, New York 10019, Attn: Ronald E. Spitzer, Kathleen Sweeney and Yuri Tsyganov, as proposed DIP LC Agent and as proposed DIP Collateral Agent (each as defined in the DIP Credit Agreement) under the DIP Credit Agreement, as Revolving Administrative Agent and as Collateral Agent (the "Revolving Administrative Agent") under that certain Superpriority Senior Secured Credit Agreement, dated as of October 21, 2019, and as Revolving and LC Administrative Agent and as Collateral Agent (the "Revolving and LC Administrative Agent") under that certain Credit Agreement, dated as of May 10, 2018; (d) Linklaters LLP, 1345 Avenue of the Americas, New York, New York 10105, Attn: Margot Schonholtz, Esq. and Penelope Jensen, Esq., counsel to the proposed DIP LC Agent, the proposed DIP Collateral Agent, the Revolving Administrative Agent and the Revolving and LC Administrative Agent; (e) Bracewell LLP, 711 Louisiana Street, Suite 2300, Houston, Texas 77002, Attn: William A. (Trey) Wood III, Esq., co-counsel to the proposed DIP LC Agent, the proposed DIP Collateral Agent, the Revolving Administrative Agent and the Revolving and LC Administrative Agent; (f) the indenture trustee for each of the Debtors' unsecured notes, and counsel thereto; (g) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 6th Ave, New York, NY 10019, Attn: Andrew N. Rosenberg and Alice Belisle Eaton, and Brown Rudnick LLP, 7 Times Square, New York, NY 10036, Attn: Robert J. Stark and Bennett S. Silverberg, co-counsel to the Ad Hoc Group of Senior Noteholders; (h) Davis, Polk & Wardell LLP, 450 Lexington Ave., New York, NY 10017, Attn: Damian S. Schaible and Natasha Tsiouris, counsel to the Ad Hoc Group of Term Lenders; (i) the United States Attorney's Office for the Southern District of Texas; (j) the Internal Revenue Service; (k) the United States Securities and Exchange Commission; (l) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (m) the state attorneys general for states

in which the Debtors conduct business; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the relief requested in this Motion and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
January 22, 2020

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: mcavenaugh@jw.com
jwertz@jw.com
kpeguero@jw.com
vpolnick@jw.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Christopher T. Greco, P.C. (*pro hac vice* pending)
Anthony R. Grossi (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: joshua.sussberg@kirkland.com
christopher.greco@kirkland.com
anthony.grossi@kirkland.com

-and-

James H.M. Sprayregen, P.C.
John R. Luze (*pro hac* vice pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: james.sprayregen@kirkland.com
john.luze@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## **Certificate of Service**

I certify that on January 22, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh