**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MCDERMOTT INTERNATIONAL, INC., *et al.*,[1] | ) Case No. 20-30336 (DRJ) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY
MOTION FOR ENTRY OF AN ORDER
(I) AUTHORIZING THE DEBTORS TO (A) ENTER INTO,
AND PERFORM UNDER, AMENDED AND RESTATED HEDGE
AGREEMENTS,  (B) ENTER INTO, AND PERFORM UNDER, NEW
HEDGE AGREEMENTS, (C) GRANT SUPERPRIORITY CLAIMS, AND
(D) MODIFY THE AUTOMATIC STAY, AND (II) GRANTING RELATED RELIEF**

> **EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON JANUARY 23, 2020, AT 9:00 A.M. IN COURTROOM 400, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**
>
> **RELIEF IS REQUESTED NOT LATER THAN JANUARY 23, 2020.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion"):

**Preliminary Statement[2]**

1.      The Debtors are a global engineering, procurement, construction and installation company with operations and complex projects around the world.  In light of the global nature of the Debtors' businesses and interest rate exposure under the Debtors' prepetition funded debt

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/McDermott.  The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757 North Eldridge Parkway, Houston, Texas 77079.

[2]     Capitalized terms not defined in the Preliminary Statement have the meanings given to them in the Motion.

facilities, consistent with the Debtors' prepetition hedge risk management practices (the "Hedge Risk Management Policy"), they have historically entered into currency and interest rate hedging obligations that limit their exposure to market volatility and help manage project margin risk. Prior to the Petition Date, the Debtors were party to certain hedging agreements with six counterparties—all of whom are secured lenders, or affiliates thereof, under the Prepetition Superpriority Facility and Prepetition Credit Facilities (as defined in the DIP Orders), and will be DIP Lenders (as defined in the DIP Orders). As of the Petition Date, the Debtors were party to (a) approximately $1.9 billion in notional amount of interest rate hedges with a mark-to-market liability of approximately $66 million and (b) approximately $650 million in notional amount of currency hedges with a mark-to-market liability of approximately $8.5 million.

2.      As described in the First Day Declarations, prepetition, the Debtors entered into a Restructuring Support Agreement (the "RSA") with the support of their senior secured letter of credit issuers, revolving lenders, term lenders, and senior noteholders. A key component of the RSA is that the Debtors' obligations under the entire notional value of the prepetition currency hedges and $500 million in notional value of the prepetition interest rate hedges, will be "rolled-up" into the DIP Facility and together, constitute DIP Roll-Up Hedging Obligations (as defined in the DIP Orders). Such DIP Roll-Up Hedging Obligations will be secured by the same collateral as the obligations arising under the DIP Facility. The RSA also provides that during the pendency of the chapter 11 cases, the Debtors will have capacity to enter into (i) up to $1 billion in notional value of currency hedges (including the notional amount of the portion of DIP Roll-Up Hedging Obligations constituting currency hedge obligations—*i.e.*, approximately $350 million in incremental currency hedging capacity) and (ii) up to $500 million in notional value of interest rate hedges (including the notional amount of the portion of DIP Roll-Up Hedging Obligations

constituting interest rate hedge obligations—*i.e.*, approximately $0 in incremental interest rate hedging capacity) (together with the DIP Roll-Up Hedging Obligations, the "DIP Hedging Obligations").  Consistent with the terms of the RSA, upon emergence from chapter 11, the DIP Hedging Obligations will roll into and be secured by the same collateral as the Super Senior Exit Credit Facility.

3.      Due to the global nature of their enterprise, the Debtors transact in a number of foreign currencies.  It is therefore critical that the Debtors maintain a foreign currency hedging program to protect against currency fluctuation.  The Debtors operate in a highly competitive industry with narrow projected project profit margins, and unhedged exposure to foreign currency fluctuations could squeeze these margins even tighter.  Moreover, as set forth in the RSA, the Debtors expect to emerge from these chapter 11 cases with $500 million in new take-back term loans.  As such, rolling up $500 million notional amount of existing interest hedges will provide a benefit in the form of protecting against future interest rate fluctuations.  As part of the broader set of compromises set forth in the RSA, the Continuing Hedging Lenders (as defined below) have agreed to stand behind the existing currency hedging program and a sufficient portion of the existing interest rate hedging program to cover post-emergence funded debt obligations.  The remaining approximately $1.4 billion in notional value of interest rate hedges (*i.e.*, the portion of prepetition interest rate hedges that will not constitute DIP Roll-Up Hedging Obligations (as defined in the DIP Orders)) will be terminated promptly after the entry of both the Hedging Order and the Interim DIP Order by the Bankruptcy Court (the "Terminated Hedging Positions") and the claims arising therefrom will be treated in accordance with the RSA.  The Amended and Restated Hedge Agreements will include provisions to ensure that the commencement of these chapter 11 cases does not constitute an event of default or termination event thereunder and (ii) the New

Hedge Agreements will include substantially similar provisions to ensure that the commencement (or the continuation if executed after commencement) of these chapter 11 cases, as applicable, does not constitute an event of default or termination event thereunder.

4.      The DIP Roll-Up Hedging Obligations (as defined in the DIP Orders) will provide a material benefit to the Debtors' business and are appropriately sized to reflect the Debtors' post-emergence capital structure.  For these reasons and the reasons set forth below, the Debtors respectfully submit that the Court should grant this Motion.

## Relief Requested

5.      The Debtors seek entry of an order, substantially in the form attached hereto: (a) authorizing the Debtors to:  (i) enter into, and perform under, amended and restated hedge agreements governed by (x) a master agreement substantially in the form attached to the order or (y) a Contrato Global de Derivativos, in a form substantially similar to the form attached to the order (such agreements, the "Amended and Restated Hedge Agreements"), with the DIP Lenders (as defined in the DIP Orders) and/or their affiliates (collectively, the "Continuing Hedging Lenders"), as necessary in the ordinary course of business; (ii) enter into, and perform under, postpetition hedge agreements (the "New Hedge Agreements," and together with the Amended and Restated Hedge Agreements, the "Hedge Agreements") on terms substantially similar to the Amended and Restated Hedge Agreements, with the DIP Agents and the DIP Letter of Credit Lenders (each as defined in the DIP Orders), or any affiliates thereof, or subject to the consent of the DIP LC Agent (as defined in the DIP Orders) in its reasonable discretion, other persons (together with the Continuing Hedging Lenders, the "Postpetition Hedging Lenders") as necessary in the ordinary course of business; and (iii) grant the DIP Hedging Obligations administrative claims, subject to the terms and conditions contained in the DIP Credit Agreement (as defined in the DIP Order) and any order regarding debtor-in-possession postpetition secured

4

financing approved by this Court in these chapter 11 cases (including with respect to any budgets governing or relating to such use) (any such order, a "<u>DIP Order</u>"); and (b) granting related relief.

## Jurisdiction and Venue

6.      The United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The bases for the relief requested herein are sections 363 and 364 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Bankruptcy Rule 6004, and rule 9013-1 of the Local Bankruptcy Rules for the Southern District of Texas (the "<u>Local Rules</u>").

9.      On the date hereof (the "<u>Petition Date</u>"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of David Dickson, President and Chief Executive Officer of McDermott International, Inc., in Support of the Chapter 11 Petitions and First Day Motions* (the "<u>Dickson Declaration</u>") and the *Declaration of John R. Castellano, Chief Transformation Officer of McDermott International, Inc., in Support of the Debtors' First Day Motions* (the "<u>Castellano Declaration</u>," together with the Dickson Declaration, the "<u>First Day Declarations</u>"), filed contemporaneously with this Motion and incorporated by reference herein.

5

**Background**

10.     The Debtors operate in approximately 54 countries around the world.  The Debtors'
revenue is exposed to project margin volatility as a result of market fluctuation across foreign
currencies and interest rates.  To minimize the risk to their business operations caused by such
volatility, consistent with the Hedge Risk Management Policy, the Debtors historically have
entered into financial derivative contracts with various counterparties to hedge their exposure to
foreign currency market risk and have also entered into financial derivative contracts with various
counterparties to hedge interest rate risk associated with financing activities.  By managing project
margin volatility, the Debtors hope to mitigate the potential effects of variability in net cash
provided by operating activities due to fluctuations in the foreign currency and interest rate
markets.

11.     Prepetition, the Debtors hedged a significant portion of the project margins—
approximately 85% in a two-year period across fourteen currencies— with various third-party
financial institutions.[3]  The vast majority of the Debtors' prepetition hedging obligations were
equal in priority to the obligations under, and secured by equal liens in the collateral under, the
Debtors' Prepetition Credit Agreement (as defined in the proposed DIP Order.)  To the extent all
of the Debtors' outstanding prepetition hedging obligations were terminated on the Petition Date,
such terminations would give rise to approximately $75 million in prepetition secured claims
against the Debtors.[4]

12.     Although hedges cannot entirely insulate a company from project margin risk, they
provide a vital measure of protection by stabilizing cash flows during the hedged period.  This

---

[3]     The third-party financial institutions are comprised of the following third-party financial institutions:  Standard
Chartered Bank, J Aron & Company LLC, ING Capital Markets LLC, Crédit Agricole Corporate and Investment

stability benefits the company and its stakeholders by increasing the likelihood that the company will have enough revenues to service its debt and meet its other financial obligations.  Due to the need to protect the Debtors' future projects and cash flow from foreign currency and interest rate volatility, it is critical for the Debtors to obtain the relief necessary to encourage parties to enter Hedge Agreements.

13.     As a key component of the RSA, with the support of the Postpetition Hedging Lenders, the Debtors now seek authority to (i) roll up the DIP Roll-Up Hedging Obligations (as defined in the DIP Orders) and (ii) enter into new hedging obligations with the Postpetition Hedging Lenders, to allow the Debtors to continue to appropriately hedge risks during and upon emergence from these chapter 11 cases.

### Basis for Relief

**I.     Section 363(c) of the Bankruptcy Code Authorizes the Debtors to Continue and Enter Into the Hedge Agreements.**

14.     Section 363(c) of the Bankruptcy Code provides, in relevant part, that a debtor in possession "may enter into transactions . . . in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).   The ordinary course of business standard embodied in this provision is intended to allow a debtor in possession the flexibility to run its business during its chapter 11 proceedings.  *Moore v. Brewer (In re HMH Motor Servs., Inc.)*, 259 B.R. 440, 448–49 (Bankr. S.D. Ga. 2000).

---

Bank, Barclays Bank PLC, and ABN AMRO Bank N.V.—all of whom are secured under the Prepetition Credit Agreement. To be confirmed by Debtors.

4     Calculated as of 12/31/2019.

15.     The Bankruptcy Code does not define "ordinary course of business." *In re Commercial Mortg. & Fin. Co.*, 414 B.R. 389, 393 (Bankr. N.D. Ill. 2009).  However, courts have clarified that the standard is meant "to embrace the reasonable expectations of interested parties of the nature of transactions that the debtor would likely enter in the course of its normal, daily business." *Med. Malpractice Ins. Assoc. v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997) (quoting *In re Watford*, 159 B.R. 597, 599 (M.D. Ga. 1993)); *In re Roth Am., Inc.*, 975 F.2d 949, 952 (3rd Cir. 1992) (stating that section 363 of the Bankruptcy Code is designed to allow a debtor in possession "flexibility to engage in ordinary transactions without unnecessary . . . oversight").  The two tests ordinarily applied by the courts to determine the ordinary course of business are the "horizontal" test and the "vertical" test.  *Denton Cnty. Elec. Co-Op., Inc. v. Eldorado Ranch (In re Denton Cnty. Elec. Coop., Inc.)*, 281 B.R. 876, 882 & n.12 (Bankr. N.D. Tex. 2002); *In re Springfield Contracting Corp.*, 154 B.R. 214, 225–26 (Bankr. E.D.V.A. 1993). "The 'horizontal test' focuses on the way businesses operate within a given industry.  The 'vertical test' focuses on the expectations of creditors."  *Id.*

16.     Maintaining the portion of outstanding prepetition hedging obligations that will constitute the DIP Roll-Up Hedging Obligations (as defined in the DIP Orders), and entry into new postpetition hedging obligations (to the extent of the capacity allowed under the DIP Facility), in each case with Postpetition Hedging Lenders, satisfies both tests.  Under the horizontal test, the hedging arrangements are typical arrangements and ubiquitous among companies in the Debtors' industry.  Accordingly, the Debtors believe maintaining the DIP Roll-Up Hedging Obligations and entry into new hedging obligations fall within the standard, ordinary course practice of companies in the Debtors' industry.

17.     Under the vertical test, creditors' reasonable expectations of a debtor's "ordinary course of business" are based on the debtor's specific prepetition business practices and norms, and the expectation that the debtor will conform to those practices and norms while operating as a debtor in possession. *In re Garofalo's Finer Foods, Inc.*, 185 B.R. 414, 425 (ND. Ill. 1995). Thus, a fundamental characteristic of an "ordinary" postpetition business transaction is its similarity to a prepetition business practice. *Marshack v. Orange Commercial Credit (In re Nat'l Lumber & Supply, Inc.)*, 184 B.R. 74, 79 (9th Cir. B.A.P. 1995); *James A. Phillips*, 29 B.R. at 394. The size, nature and type of business, and the size and nature of the transactions in question, are all relevant to determining whether the transactions at issue are ordinary. *U.S. ex rel. Harrison v. Estate of Deutscher*, 115 B.R. 592, 598 (M.D. Tenn. 1990); *Johns-Manville Corp.*, 60 B.R. at 617. "Accordingly, a postpetition transaction undertaken by the debtor that is similar in size and nature to prepetition transactions undertaken by the debtor would be within the ordinary course of business." *Garofalo's*, 186 B.R. at 426.

18.     It has historically been the Debtors' practice to hedge a substantial percentage of their project margins. The New Hedge Agreements and the new hedging obligations thereunder will be substantively similar to the Debtors' prepetition hedging obligations. Accordingly, the relief requested in the Motion is consistent with the Debtors' own past, ordinary course practice.

19.     Moreover, courts in this and other jurisdictions have authorized debtors in commodities industries to continue or initiate hedging arrangements similar to the arrangements described herein in the ordinary course of business, pursuant to section 363(c)(1). *See*, *e.g.*, *In re Linn Energy, LLC*, Case No. 16-60040 (Bankr. S.D. Texas May 17, 2016) (DRJ); *In re Asarco LLC,* No. 05-21207 (RSS) (Bankr. S.D. Texas May 9, 2006); *In re Penn Va. Corp.*, No. 16-32395 (KLP) (Bankr. E.D. Va. May 13, 2016); *In re Energy Future Holdings Corp.*, No. 14-10979 (CSS)

(Bankr. D. Del. June 30, 2014); *In re Optim Energy, LLC*, No. 14-10262 (Bankr. D. Del. Mar. 6, 2014); *In re Patriot Coal Corp.*, No. 12-12900 (Bankr. S.D.N.Y. Aug. 16, 2012); *In re Calpine Corp.*, No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 21, 2005); *In re NRG Energy, Inc.*, No. 03-13024 (PCB) (Bankr. S.D.N.Y. June 30, 2003).[5]

20.     Accordingly, the Debtors believe continuing the DIP Roll-Up Hedging Obligations and entering into new hedging obligations, as permitted, is within the ordinary course of business and consistent with standard industry practice.  The Debtors submit that authority to maintain certain prepetition hedging obligations and to enter into new hedging obligations is appropriate and in the best interests of the Debtors, their estates, and all parties in interest in these chapter 11 cases and should be permitted.

## II.     The Debtors Should Be Authorized to Grant Liens and Superpriority Claims in Respect of the DIP Hedging Obligations Pursuant to Section 364 of the Bankruptcy Code.

21.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain "credit" on a superpriority or senior secured basis when obtaining such credit on other terms is unavailable. 11 U.S.C. §§ 364(c), (d).  Courts generally afford debtors considerable deference to determine, in their business judgment, the terms under which they obtain postpetition secured credit.  *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981).

22.     The Debtors believe that preserving the value of their operations and businesses requires continuation of their prepetition hedging obligations.  To provide the necessary comfort to the Continuing Hedging Lenders that the Debtors will be able to honor the DIP Roll-Up Hedging

---

[5]     Because of the voluminous nature of the orders cited herein, such orders are not attached to this motion.  Copies of these orders are available upon request of the Debtors' proposed counsel.

Obligations, the Debtors seek to incur obligations that rank equally with the obligations arising under the DIP Facility. Specifically, the Debtors are seeking authority to provide liens and superpriority claims equal in priority to the DIP Facility in respect of the DIP Hedging Obligations.

23. Courts in this and other jurisdictions have approved similar relief. *See, e.g.*, *In re Genon Energy, Inc.*, No. 17-33695 (DRJ) (Bankr. S.D. Tex. June 14, 2017); *In re Vanguard Nat. Res., LLC*, No. 17-30560 (MI) (Bankr. S.D. Tex. June 9, 2017); *In re Linn Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. May 17, 2016); *In re Penn Virginia Corp.*, No. 16-32395 (KLP) (Bankr. E.D. Va. May 13, 2016); *In re Energy Future Holdings Corp.*, No. 14-10979 (CSS) (Bankr. D. Del. June 30, 2014); *In re Aegean Marine Petroleum Network, Inc.*, No. 18-13374 (MEW) (Bankr. S.D.N.Y. Dec. 17, 2018); *In re Calpine Corp.*, No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 21, 2005); *In re NRG Energy, Inc.*, No. 03-13024 (Bankr. S.D.N.Y. June 30, 2003).[6]

24. Granting first-priority liens and superpriority administrative expense claims is not unduly burdensome on the Debtors, and the Debtors believe these grants are necessary to continue the DIP Roll-Up Hedging Obligations and enter into any new postpetition hedging obligations, each of which are essential both to the stability of the Debtors' businesses and the success of the Debtors' restructuring. In light of the foregoing, the Debtors believe that authorizing the Debtors to provide first-priority liens and superpriority administrative expense claims in respect of the DIP Hedging Obligations will preserve the value of the Debtors' estates and is, therefore, appropriate and in the best interests of the Debtors, their estates, and all parties in interest in these chapter 11 cases and should be permitted.

---

[6] Additional information regarding the request to grant the Hedge Administrative Claims is set forth in the DIP Motion and proposed form of orders.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

25.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Reservation of Rights

26.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any

12

particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## Notice

27.     Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Local Rules, and is sufficient under the circumstances.  Without limiting the foregoing, due notice will be afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-in-interest, including:  (a) the Office of the U.S. Trustee for the Southern District of Texas; (b) entities listed as holding the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) Credit Agricole Corporate and Investment Bank, 1301 Avenue of the Americas, New York, New York 10019, Attn: Ronald E. Spitzer, Kathleen Sweeney and Yuri Tsyganov, as proposed DIP LC Agent and as proposed DIP Collateral Agent (each as defined in the DIP Credit Agreement) under the DIP Credit Agreement, as Revolving Administrative Agent and as Collateral Agent (the "Revolving Administrative Agent") under that certain Superpriority Senior Secured Credit Agreement, dated as of October 21, 2019, and as Revolving and LC Administrative Agent and as Collateral Agent (the "Revolving and LC Administrative Agent") under that certain Credit Agreement, dated as of May 10, 2018; (d) Linklaters LLP, 1345 Avenue of the Americas, New York, New York 10105, Attn: Margot Schonholtz, Esq. and Penelope Jensen, Esq., counsel to the proposed DIP LC Agent, the proposed DIP Collateral Agent, the Revolving Administrative Agent and the Revolving and LC Administrative Agent; (e) Bracewell LLP, 711 Louisiana Street, Suite 2300, Houston, Texas 77002, Attn: William A. (Trey) Wood III, Esq., co-counsel to the proposed DIP LC Agent, the proposed DIP Collateral Agent, the Revolving Administrative Agent and the Revolving and LC Administrative Agent; (f) the indenture trustee for each of the Debtors' unsecured notes, and counsel thereto; (g) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285

6th Ave, New York, NY 10019, Attn: Andrew N. Rosenberg and Alice Belisle Eaton, and Brown Rudnick LLP, 7 Times Square, New York, NY 10036, Attn: Robert J. Stark and Bennett S. Silverberg, co-counsel to the Ad Hoc Group of Senior Noteholders; (h) Davis Polk & Wardell LLP, 450 Lexington Ave., New York, NY 10017, Attn: Damian S. Schaible and Natasha Tsiouris, counsel to the Ad Hoc Group of Term Lenders; (i) the United States Attorney's Office for the Southern District of Texas; (j) the Internal Revenue Service; (k) the United States Securities and Exchange Commission; (l) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (m) the state attorneys general for states in which the Debtors conduct business; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank.*]

14

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Houston, Texas
January 22, 2020

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:         mcavenaugh@jw.com
               jwertz@jw.com
               kpeguero@jw.com
               vpolnick@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Christopher T. Greco, P.C. (*pro hac vice* pending)
Anthony R. Grossi (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:         joshua.sussberg@kirkland.com
               christopher.greco@kirkland.com
               anthony.grossi@kirkland.com

-and-

James H.M. Sprayregen, P.C.
John R. Luze (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:         james.sprayregen@kirkland.com
               john.luze@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that on January 22, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh
