# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| MCDERMOTT INTERNATIONAL, INC., *et al.*,[1] | ) Case No. 20-30336 (DRJ) |
|  | ) |
| Debtors. | ) (Joint Administration Requested) |
|  | ) |
|  | ) **Re: Docket No. __** |

## ORDER (I) AUTHORIZING
## THE DEBTORS TO ENTER INTO AND
## PERFORM UNDER (A) AMENDED AND RESTATED
## HEDGE AGREEMENTS AND (B) NEW HEDGE AGREEMENTS,
## (II) GRANTING DIP LIENS AND DIP SUPERPRIORITY CLAIMS,
## (III) MODIFYING THE AUTOMATIC STAY AND (IV) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of an order (this "Order") pursuant to sections 105(a), 362, 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), authorizing:

(a)      the Debtors to:

     (1)      enter into and perform under amended and restated hedge agreements governed by (a) a master agreement substantially in the form attached hereto as **Exhibit 1** or (b) a Contrato Global de Derivativos, in a form substantially similar to the form attached hereto as **Exhibit 1** (such agreements, the "Amended and Restated Hedge Agreements"), with the DIP Lenders (as defined in the DIP Orders) and/or their affiliates identified on **Exhibit 2** hereto (collectively, the "Continuing Hedging Lenders");

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/McDermott. The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757 North Eldridge Parkway, Houston, Texas 77079.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

(2) maintain the portion of outstanding prepetition hedging obligations that will constitute the DIP Roll-Up Hedging Obligations (as defined in the DIP Orders) with the Continuing Hedging Lenders during the pendency of the Cases pursuant to the Amended and Restated Hedge Agreements and subject to the terms of the DIP Orders and terminate, upon agreement with the relevant counterparty, all prepetition hedging obligations that will not constitute DIP Roll-Up Hedging Obligations (as defined in the DIP Orders), such terminations to occur on a pro rata basis across all relevant counterparties based on each counterparty's relevant prepetition hedging obligation notional amount;

(3) enter into postpetition hedge agreements (the "New Hedge Agreements," and together with the Amended and Restated Hedge Agreements, the "Hedge Agreements") on terms substantially similar to the Amended and Restated Hedge Agreements with the DIP Agents and the DIP Letter of Credit Lenders (each as defined in the DIP Orders), or any affiliates thereof, or subject to the consent of the DIP LC Agent (as defined in the DIP Orders) in its reasonable discretion, other persons (together with the Continuing Hedging Lenders, the "Postpetition Hedging Lenders");

(4) enter into new hedging obligations with the Postpetition Hedging Lenders (together with the DIP Roll-Up Hedging Obligations, the "DIP Hedging Obligations") during the pendency of the Cases pursuant to the Hedge Agreements;

(5) perform under and honor, pay, or otherwise satisfy, and guarantee on a joint and several basis, all obligations and indebtedness of the Debtors with respect to the DIP Hedging Obligations as they come due;

(6) grant DIP Liens (as defined in the DIP Orders) to the DIP Agents, for the benefit of the Postpetition Hedging Lenders, to secure all DIP Hedging Obligations; and

(7) grant allowed DIP Superpriority Claims (as defined in the DIP Orders) to the Postpetition Hedging Lenders on account of the DIP Hedging Obligations;

(b) the DIP Agents (as defined in the DIP Orders) to exercise all rights and remedies with respect to the DIP Collateral (as defined in the DIP Orders) for the benefit of the Postpetition Hedging Lenders in accordance with the DIP Orders following the occurrence and during the continuation of an Event of Default (for which one of the Debtors is the Defaulting Party) or a Termination Event (for which any of the Debtors is an Affected Party) under, and as defined in, any of the Hedge Agreements; and

(c) the Postpetition Hedging Lenders to setoff, net, and apply any payment amounts that such Postpetition Hedging Lenders would otherwise be obligated to pay to any Debtor under

any of the Hedge Agreements in accordance with the terms of such Hedge Agreement and to take such other actions as authorized under this Order;

all as more fully set forth in the Motion and upon the First Day Declarations; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Amended Standing Order; this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other or further notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court on January 23, 2020 (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.      The Debtors are authorized, but not directed, to:  (a) enter into and perform under the Amended and Restated Hedge Agreements, in each case only with the Continuing Hedge Lenders, and, subject to the consent of the DIP Agents (acting at the direction of the Requisite DIP Letter of Credit Lenders (as defined in the DIP Orders)), the New Hedge Agreements, in each case only with the DIP Agents and the DIP Letter of Credit Lenders (each as defined in the DIP Orders), or any affiliates thereof, or subject to the consent of the DIP LC Agent (as defined in the DIP Orders) in its reasonable discretion, other persons; (b) honor, pay, or otherwise satisfy all DIP Hedging

Obligations (including guarantees) as they come due; (c) grant DIP Liens to the DIP Agents, for the benefit of the Postpetition Hedging Lenders, to secure the DIP Hedging Obligations; and (d) grant allowed DIP Superpriority Claims to the Postpetition Hedging Lenders on account of the DIP Hedging Obligations.

3.      As security and assurance of payment of the DIP Hedging Obligations, and in exchange for providing benefits to the Debtors in accordance with this Order:

a.      the DIP Agents (for the benefit of the Postpetition Hedging Lenders) are hereby granted, effective as of the Petition Date and in each case automatically perfected without the necessity of the execution by the Debtors (or recordation or other filing) of, including without limitation, security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or by possession or control, DIP Liens on the DIP Collateral to secure the DIP Hedging Obligations, which DIP Liens shall rank *pari passu* with the DIP Liens granted to the DIP Agents, for the benefit of the DIP Secured Parties, pursuant to the DIP Orders;

b.      all DIP Hedging Obligations shall constitute allowed DIP Superpriority Claims against each of the Debtors, jointly and severally; and

c.      the Postpetition Hedging Lenders may exercise any rights, powers and remedies under the Hedge Agreements, including, without limitation, to accelerate, terminate and liquidate transactions and DIP Hedging Obligations and to setoff, net, and apply any payment, settlement payment, termination values, termination payments, and any other amounts that such Postpetition Hedging Lenders would be entitled to receive from any Debtor or otherwise be obligated to pay to any Debtor under any Hedge Agreement in accordance with the terms of each Hedge Agreement, including, but not limited to, setoff, netting, and application of the foregoing against any and all obligations of any Debtor under the Hedge Agreement in accordance with the terms of such Hedge Agreement, *provided*, that upon the occurrence and during the continuation of an Event of Default (for which one of the Debtors is the Defaulting Party) or upon the occurrence of a Termination Event (for which any of the Debtors is an Affected Party) (each as defined in the Hedge Agreements), any Postpetition Hedging Lender may terminate, liquidate, or unwind its Hedge Agreement and setoff and net transactions thereunder upon notice by such Postpetition Hedging Lender to the Debtor that is party to the applicable Hedge Agreement in accordance with the applicable Hedge Agreement, which notice and exercise of rights, powers and remedies shall not be stayed, avoided or otherwise limited by operation of any provision of the Bankruptcy Code.

4.     If any or all of the provisions of this Order or the DIP Orders are stayed, modified in a manner adverse to a Postpetition Hedging Lender, or vacated, or if this Order or the DIP Orders otherwise terminate, then such stay, modification, vacation, or termination will not affect (a) the validity of any indebtedness, obligation, or liability incurred pursuant to or arising from any transaction entered into by the Debtors with any of the Postpetition Hedging Lenders pursuant to the Hedge Agreements before the receipt of written notice by the Postpetition Hedging Lenders of the effective date of such stay, modification, vacation, or termination, (b) the validity or enforceability of the security interests, superpriority administrative claims, and netting, setoff, collection, and termination rights authorized or created hereby or pursuant to the Hedge Agreements, or any related documents, and (c) the rights of the Postpetition Hedging Lenders to exercise remedies as set forth in the Hedge Agreements, and each of the Postpetition Hedging Lenders shall be entitled to the benefits of the provisions of section 364(e) of the Bankruptcy Code for any credit extended pursuant to this Order.

5.     To the extent necessary, the provisions of sections 362 and 553 of the Bankruptcy Code are hereby modified to:

a.     permit exercise and enforcement of rights and remedies by the DIP Agents on behalf of any Postpetition Hedging Lender upon the occurrence of an Event of Default (for which one of the Debtors is the Defaulting Party) or a Termination Event (for which any of the Debtors is an Affected Party) (each as defined in the Amended and Restated Hedge Agreements) and subject to the DIP Orders. Any right or remedy involving foreclosure on the DIP liens shall be exercised only following notice and a hearing, and immediate and unconditional exercise and enforcement of rights and remedies by the Postpetition Hedging Lenders, upon the occurrence of an Event of Default (for which one of the Debtors is the Defaulting Party) or a Termination Event (for which any of the Debtors is an Affected Party) (each as defined in the Amended and Restated Hedge Agreements) under the Hedge Agreements (including, but not limited to, the suspension, termination, liquidation, withholding of performance, or acceleration thereof and setoff, netting, and application of any payment, settlement payment, termination values, termination payments, and any other amounts that such Postpetition Hedging Lender would be entitled to receive from or otherwise be

5

obligated to pay to any Debtor under any Hedge Agreement), and the Postpetition Hedging Lenders' rights thereunder shall not be modified, stayed, avoided, or otherwise limited by order of this Court or any court proceeding under the Bankruptcy Code, including, but not limited to, the right to collect from the Debtors amounts that may be owed to a Postpetition Hedging Lender following such termination and the right to withhold performance pursuant to the terms of any Hedge Agreement. The Debtors waive the right to object to such hearing on short notice; *provided* such hearing is at least three (3) Business Days from such notice, and shall not seek relief, including under section 105(a) or section 549 of the Bankruptcy Code, to the extent that any such relief would in any way restrict or impair the rights of the DIP Agents or the Postpetition Hedging Lenders under the Hedge Agreements, this Order, or the DIP Orders with respect to the DIP Hedging Obligations, including, without limitation, the right of the Postpetition Hedging Lenders to setoff, net, and apply any payment amounts that such Postpetition Hedging Lenders would otherwise be obligated to pay to any Debtor under the Hedge Agreements in accordance with the terms of such Hedge Agreement , as provided in paragraph 4(c) of this Order; *provided*, however, that such waiver shall not preclude the Debtors from contesting whether an Event of Default or Termination Event has occurred under, and as defined in, any Hedging Agreement;

b. permit the DIP Agents, on behalf of the Postpetition Hedging Lenders, to take all actions to validate and perfect the liens and security interests granted hereunder and under the DIP Orders, including by filing or recording financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments in any jurisdiction. For the avoidance of doubt, whether or not the DIP Agents choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted under this Order, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination, as of the Petition Date; and

c. provide that a Postpetition Hedging Lenders' rights, powers, privileges, and remedies under the applicable Hedge Agreement and this Order may not be modified, stayed, avoided, or otherwise limited by further order of the Court or any court proceeding under the Bankruptcy Code.

6. Each Postpetition Hedging Lender shall enjoy the DIP Superpriority Claims, DIP Liens, automatic stay relief, and other protections provided by this Order and the DIP Orders in respect of each such transaction until the earliest of (a) the termination of such Postpetition Hedging Lenders' Hedge Agreement and the satisfaction of the DIP Hedging Obligations owing thereunder

in full in cash, (b) a Postpetition Hedging Lender being secured on a *pari passu* basis with the Super Senior Exit Facility Lenders (as defined in the Exit Facility Term Sheet attached to the RSA) in the security package contemplated by the Exit Facilities Documents (as defined in the RSA), and (c) other arrangements satisfactory to such Postpetition Hedging Lender having been made. Absent the occurrence of (a), (b) or (c) of this paragraph, the relief and protections provided by this Order shall survive any order of the Court that may be entered (i) confirming any plan of reorganization or liquidation in any of the Cases (except pursuant to the order confirming the Plan contemplated under the RSA and only upon the effective date of such Plan), (ii) converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, or (iii) dismissing any of the Cases, and shall be in addition to any and all rights, powers or privileges provided for by the Hedge Agreements or the DIP Orders.

7.      The Debtors shall adhere at all times to the Hedge Risk Management Policy with regard to all trades under the Hedge Agreements. Any determination that any trade under a Hedge Agreement was not entered into pursuant to the Hedge Risk Management Policy shall not affect the obligations of the Debtors arising with respect to such trade. For the avoidance of doubt, any trade under a Hedge Agreement determined not to be entered into pursuant to the Hedge Risk Management Policy or this Order shall remain valid and binding against the Debtors, and the applicable Postpetition Hedging Lender shall be entitled to the protections provided in this Order with respect to such trade.

8.      In addition to and without limiting each Postpetition Hedging Lenders' rights under Section 11 of its respective Hedge Agreement, in further exchange for providing benefits to the Debtors in accordance with this Order, the Debtors shall promptly reimburse each Postpetition Hedging Lender for any documented legal fees, expenses, and disbursements that it has incurred in connection with the review and negotiation of the Hedge Agreements, the negotiation of this Order, and any related documents, to the extent such legal fees, expenses, and disbursements are reasonable

in light of the circumstances and in comparison to other Postpetition Hedging Lenders. Such reimbursement obligation shall constitute a DIP Hedging Obligation, entitled to DIP Liens, allowed DIP Superpriority Claims, and other protections afforded by this Order and the DIP Orders.

9. The Debtors shall maintain a matrix/schedule of DIP Roll-Up Hedging Obligations and DIP Hedging Obligations that are entered into or terminated pursuant to this Order, including the following information: (a) the names of the respective parties to the Hedge Agreements; (b) the operative dates of the DIP Hedging Obligations; (c) the general terms of the DIP Hedging Obligations; and (d) any DIP Hedging Obligation that has been terminated by reason of default or occurrence of a termination event. Debtors shall provide a copy of such matrix/schedule to the U.S. Trustee, advisors to the Consenting Stakeholders, and any statutory committee appointed in these chapter 11 cases.

10. All applicable banks and other financial institutions are authorized, but not directed, to receive, process, honor, and pay all checks presented for payment by the Debtors and to honor all fund transfer requests related to such obligations to the extent that sufficient funds are on deposit and standing in the Debtors' credit in the applicable bank accounts to cover such payments. Such applicable banks and other financial institutions are authorized to accept and honor all representations and instructions from the Debtors as to which check, ACH transfer, draft, wire, or other transfer drawn or issued by the Debtors before the Petition Date should be honored pursuant to any order of this Court. Such banks and financial institutions shall not have any liability to any party for (a) relying on this Order or the representations or instructions by the Debtors as provided for herein or any other order of this Court, or (b) honoring or not honoring any check, ACH transfer, draft, wire, or other transfer in a good-faith belief that the Court has or has not authorized the honoring of such check, ACH transfer, draft, wire, or other such transfer. Without limiting the foregoing, all banks and other financial institutions may rely on the representations of the Debtors with respect to whether any check or other payment order drawn or issued

by the Debtors prior to the Petition Date should be honored pursuant to this or any other order of this Court, and such banks and financial institutions shall not have any liability to any party for relying on such representations by the Debtors as provided for herein.

11. Notwithstanding anything in this Order to the contrary, this Order shall not grant any greater rights to the Postpetition Hedging Lenders in connection with the Terminated Hedging Positions than such Postpetition Hedging Lenders have under the DIP Orders or under the Bankruptcy Code, including but not limited to sections 362, 553 and 561 of the Bankruptcy Code.

12. Notwithstanding the relief granted in this Order, any payment made or to be made by the Debtors pursuant to the authority granted herein shall be subject to and in compliance with the DIP Order. To the extent there is any inconsistency between the terms of the DIP Order and any action taken or proposed to be taken hereunder, the terms of the DIP Order shall control. For the avoidance of doubt, the Debtors are not authorized to make any payments pursuant to this Order to, or on behalf of, a non-debtor affiliate except as permitted by the Approved Budget (as defined in the DIP Order).

13. The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

14. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion, the requirements of Bankruptcy Rule 6004(a) are waived, and the requirements of the Bankruptcy Local Rules are satisfied by such notice.

15. Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014 or otherwise, this Order shall be immediately effective and enforceable upon its entry.

16. The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

17.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated: _____, 2020
      Houston, Texas

_____
DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1**

**Form of Amended and Restated Hedge Agreement**

(Multicurrency – Cross Border)

# ISDA®



International Swaps and Derivatives Association, Inc.

# SCHEDULE

**to the**
**Master Agreement**

**dated as of January [__], 2020**

**between**

**[BANK],**
[_____]
("*Party A*")

**and**

**MCDERMOTT INTERNATIONAL, INC.,**

a corporation incorporated under the laws of Panama, in its individual capacity and as Agent for each other entity listed in <u>Annex I</u> hereto, as such <u>Annex I</u> may be amended from time to time, severally, and not jointly (McDermott International, Inc. in its individual capacity and each such entity listed in <u>Annex I</u> hereto, a "***Party B***")

McDermott International, Inc., a Panamanian corporation ("***McDermott Parent***"), is executing this Agreement in both its individual capacity and as agent for certain subsidiaries thereof, and on their behalf, and McDermott Parent shall have no liability as a principal hereunder except with respect to the Transactions it enters into on its own behalf or except as otherwise expressly set forth in a Credit Support Document to which it is a party (if any) or on account of representations of McDermott Parent expressly set forth herein.  McDermott Parent has been appointed as agent of each subsidiary that has executed the Agency Agreement, dated as of May 10, 2018, a copy of which, together with all amendments, modifications, and supplements thereto, has been provided to Party A (the "***Agency Agreement***").  McDermott Parent, in the case of Transactions it enters into on its own behalf, and each subsidiary of McDermott Parent for which McDermott Parent acts as agent in this Agreement shall be referred to individually as "***Party B***".  It is understood and agreed that (a) this Agreement shall constitute a separate agreement between Party A and each Party B, as if each Party B had executed a separate document naming only itself as Party B (each, a "***Separate Agreement***"), and (b) except as specifically set forth in the Credit Support Document to which a Party B is a party (if any), no Party B shall have any liability for the obligations of any other Party B.  With respect to any particular Party B, (i) only Confirmations of Transactions between Party A and that particular Party B shall be part of the Separate Agreement between Party A and that Party B, (ii) references in this Agreement to the Schedule shall be deemed to refer to the Schedule as prepared for such Party B, and (iii) the term "this Agreement" shall be construed accordingly.  The entities constituting a "Party B" shall be subject to additions from time to time by notice to Party A, subject in all cases to Party A's right of consent based on its credit review and approval of all such Party B entities and provided further than no Party B entities may be removed from Annex I or the obligations of any such Party B limited hereunder without Party A's written consent.  Upon execution of this Agreement, Party A and each Party B shall be deemed to have executed a single 1992 ISDA Master Agreement (Multicurrency-Cross Border) identical to this Agreement (including the Schedule hereto) with the only parties to such single 1992 ISDA Master Agreement (Multicurrency-Cross Border) being Party A and such Party B (a "***Single Entity Agreement***") and with the only differences, if any, in each such Single Entity Agreement being as set forth in <u>Annex I</u> hereto.

# PART 1
## TERMINATION PROVISIONS

In this Agreement:

(a)     "**Specified Entity**" means in relation to Party A for the purpose of:

Section 5(a)(v),   Not Applicable
Section 5(a)(vi),   Not Applicable
Section 5(a)(vii),   Not Applicable
Section 5(b)(iv),   Not Applicable

in relation to Party B for the purpose of:

Section 5(a)(v),   Not Applicable
Section 5(a)(vi),   Not Applicable
Section 5(a)(vii),   Not Applicable
Section 5(b)(iv),   Not Applicable

(b)     "**Specified Transaction**" will have the meaning specified in Section 14 of this Agreement.

(c)     The "**Cross Default**" provisions of Section 5(a)(vi) of this Agreement will apply to Party A and will apply to Party B; provided that (A) the phrase ", or becoming capable at such time of being declared," shall be deleted from clause (1) thereof and (B) Section 5(a)(vi) of this Agreement shall be amended by the insertion of the following provision at the end thereof:

"*provided*, *however*, that notwithstanding the foregoing, an Event of Default will not be deemed to have occurred under clause (2) above if: (a) failure to pay is caused by mistake, oversight, error, omission, or transfer difficulties in the payment of money of an administrative or operational nature; (b) funds or assets to be delivered were available to such party, any Credit Support Provider of such party, or any applicable Specified Entity of such party, as the case may be, to enable it to make the relevant payment when due; and (c) such relevant payment is made, within three (3) Local Business Days after the occurrence or existence of such failure.

If such provisions apply:

"*Specified Indebtedness*" will have the meaning specified in Section 14 of this Agreement, except that such term shall not include obligations in respect of deposits received in the ordinary course of a party's banking business.

"*Threshold Amount*" means, (i) with respect to Party A, an amount equal to three percent (3%) of the total shareholders' equity of Party A as specified from time to time in its most recently published quarterly financial statements or annual audited financial statements, as the case may be, in accordance with accounting principles that are generally accepted for entities of its type in the jurisdiction of its organization or formation, and (ii) with respect to Party B, (A) prior to the Plan Effective Date, (1) zero ($0) in respect of Specified Indebtedness under the DIP Credit Agreement and (2) infinity ($\infty$) in respect of any other Specified Indebtedness; and (B) on and after the Plan Effective Date, an amount equal to the minimum amount of indebtedness capable of triggering a cross-default under the Super Senior Exit Credit Facility.

For purposes of this definition, any Specified Indebtedness denominated in a currency other than the currency in which the financial statements of such party are denominated will be converted into the currency in which such financial statements are denominated at the exchange rate therefor reasonably chosen by the other party or the equivalent thereof in any other currencies.

(d)     The "**Credit Event Upon Merger**" provisions of Section 5(b)(iv) of this Agreement will apply to Party A and Party B, provided that after the Plan Effective Date, no event with respect to Party B shall constitute a Credit Event Upon

Merger with respect to Party B unless it shall also constitute a prohibited change of control under the Super Senior Exit Credit Facility.

(e) The "**Automatic Early Termination**" provision of Section 6(a) of this Agreement will not apply to Party A and will not apply to Party B; provided, that after the Plan Effective Date, where circumstances giving rise to an Event of Default specified in Sections 5(a)(vii)(1), (3), (4), (5), (6) or, to the extent analogous thereto, (8) of this Agreement with respect to a party are governed by a system of law that does not permit termination to take place after the occurrence of the relevant Event of Default, then the Automatic Early Termination provisions of such Section 6(a) will apply to such party.

(f) **Payments on Early Termination**. For the purpose of Section 6(e) of this Agreement:

(i) Market Quotation will apply to all Transactions.

(ii) The Second Method will apply to all Transactions.

(g) "**Termination Currency**" means United States Dollars.

(h) **Additional Termination Event** will apply.

(i) Prior to the Plan Effective Date, the occurrence of any of the following events shall constitute an Additional Termination Event pursuant to Section 5(b)(v) with respect to which Party B is the sole Affected Party and all Transactions are Affected Transactions:

(A) the Bankruptcy Court enters an order with respect to the Chapter 11 Cases, or any Loan Party files an application, motion, or request for an order with respect to the Chapter 11 Cases, for (i) authorization of the sale of substantially all of any Loan Party's assets other than as contemplated under the Restructuring Support Agreement; (ii) confirmation of a plan of reorganization that contemplates the sale of substantially all of any Loan Party's assets other than as contemplated under the Restructuring Support Agreement or does not provide for entry into the Super Senior Exit Credit Facility; (iii) the conversion of any of the Chapter 11 Cases to proceedings under Chapter 7 of the Bankruptcy Code; or (iv) dismissal of the Chapter 11 Cases;

(B) there otherwise occurs a sale of all or substantially all of the assets of any Loan Party pursuant to Section 363 of the Bankruptcy Code, or any other liquidation of any Loan Party under the Bankruptcy Code other than as contemplated under the Restructuring Support Agreement or any order is entered by the Bankruptcy Court that materially adversely affects, materially impairs or materially limits Party A's rights under this Agreement or the Loan Documents;

(C) the Bankruptcy Court fails to enter the Final Hedging Order within 35 days of the Petition Date;

(D) the Bankruptcy Court enters an order invalidating all or any portion of Party A's Superpriority Claim or invalidating the extent, nature or priority of Party A's Liens in connection with collateral provided by Party B under the Hedging Orders, or any Loan Party files an application for the approval of any other superpriority claim in any of the Chapter 11 Cases that is *pari passu* with or senior to the claims of Party A against any Loan Party pursuant to the Loan Documents or the Hedging Orders, or any such *pari passu* or senior superpriority claim arises or is granted (other than as permitted under the Hedging Orders);

(E) Party B or any Credit Support Provider of Party B or any other Loan Party breaches any material provision of the Hedging Orders (and such breach has not been waived by the parties thereto in accordance with the terms thereof) or any Loan Party has an involuntary application, motion or request filed by another Person seeking an order with respect to the Chapter 11 Cases seeking any of the outcomes set out in sub-clauses (A) through (C) above that is not promptly contested by such Loan Party and dismissed or otherwise denied within 45 days of filing (or such other time period as Party A may otherwise agree in writing);

(F) any Loan Party, or another Person acting on its behalf, brings a motion in the Chapter 11 Cases to recover from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code;

(G) the commencement of any adversary proceeding, contested matter or other action by any Loan Party, or any other Person, (i) challenging the amount, validity, enforceability, priority or extent of any of the Indebtedness or any of the Secured Parties' security interests in and liens upon the Collateral, or (ii) otherwise asserting any claims or causes of action against any of the Secured Parties on behalf of the Loan Parties' estates; provided, that any such adversary proceeding, contested matter or other action commenced by a Person (other than a Loan Party or a Person acting on its behalf), continues and is not dismissed by the earlier of (a) 45 days from the date of its commencement and (b) one Local Business Day prior to the commencement of hearings seeking confirmation of the Plan of Reorganization;

(H) subject to the effects of Party B's status as a debtor under the Chapter 11 Cases, at any time, the obligations of Party B hereunder cease to be entitled to a Superpriority Claim and guaranteed at least to the same extent as Party B's obligations with respect to the repayment of loan principal under the Hedging Orders (other than to the extent of any guarantees or security provided under the Hedging Orders by any party that is not an "eligible contract participant" within the meaning of Section 1 a(18) of the U.S. Commodity Exchange Act, as amended ("CEA") at the time such guarantee or security would otherwise become effective with respect to Party B's obligations hereunder);

(I) Party A's lien with respect to the Collateral provided under the Hedging Orders is released in respect of a material portion of the Collateral (other than Liens released in connection with the consummation of the Super Senior Exit Credit Facility) without the prior written consent of Party A or an Affiliate of Party A;

(J) any adversary proceeding, contested matter or other action is commenced by any Loan Party or any other Person challenging, or a Bankruptcy Court order is entered disaffirming, the mutuality of prepetition and postpetition obligations hereunder; provided, that any such adversary proceeding, contested matter or other action commenced by a Person (other than a Loan Party or a Person acting on its behalf), continues and is not dismissed by the earlier of (a) 45 days from the date of its commencement and (b) one Local Business Day prior to the commencement of hearings seeking confirmation of the Plan of Reorganization;

(K) any of the representations given in Part 4(l)(iii) of this Schedule proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(L) all amounts outstanding under the DIP Credit Agreement, including without limitation and for the avoidance of doubt, the Letters of Credit (as defined in the DIP Credit Agreement), have been repaid and all commitments of the Lenders have terminated or expired in accordance with the terms of the DIP Credit Agreement or the DIP Credit Agreement has been terminated in accordance with the terms thereof or ceases to be in full force and effect; or

(M) the Super Senior Exit Credit Facility is not fully executed and effective as of the Plan Effective Date (for the avoidance of doubt, the foregoing documents shall be deemed "executed" if Party A holds the requisite signature pages for execution in escrow to be released on the Plan Effective Date) or the Plan Emergence Conditions are not satisfied as of the Plan Effective Date; and

(ii) On and after the Plan Effective Date, the occurrence of any of the following events shall constitute an Additional Termination Event pursuant to Section 5(b)(v) with respect to which Party B is the sole Affected Party and all Transactions are Affected Transactions:

(A) the Super Senior Exit Credit Facility is not fully executed and effective as of the Plan Effective Date, or Reorganized Party B or any other reorganized Loan Party fails or refuses to fully accept and assume (pursuant to section 365 of the Bankruptcy Code) and be legally bound by and responsible for its duties, liabilities and obligations under this Agreement as were in existence immediately prior to the Plan Effective Date;

(B) neither Party A nor any of its Affiliates is a party to the Super Senior Exit Credit Facility as a Lender;

(C) at any time, the obligations of Party B hereunder fail or cease to be secured by the Collateral in the Super Senior Exit Credit Facility as in effect at such time on a first lien basis and guaranteed at least to the same extent as and on a pro rata and *pari passu* basis with Party B's obligations with respect to the repayment of loan principal under the Super Senior Exit Credit Facility as in effect at such time (other than to the extent of any guarantees or security provided under the Super Senior Exit Credit Facility by any party that is not an "eligible contract participant" within the meaning of Section 1a(18) of the CEA at the time such guarantee or security would otherwise become effective with respect to Party B's obligations hereunder);

(D) all amounts outstanding under the Super Senior Exit Credit Facility have been repaid and all commitments of the Lenders have terminated or expired in accordance with the terms of the Super Senior Exit Credit Facility or the Super Senior Exit Credit Facility has been terminated in accordance with the terms thereof or ceases to be in full force and effect; or

(E) any notice or consent is given or any action is taken without the prior written consent of Party A or an Affiliate of Party A, other than any release permitted without the consent of any Lender, Agent, or Secured Party, pursuant to the Super Senior Exit Credit Facility, that (I) would cause all or substantially all of the Collateral, or the security interest in or Lien on the Collateral to be released, realized upon, liquidated, sold, transferred, conveyed or otherwise disposed of, whether as the result of any repayment of the loan obligations under the Super Senior Exit Credit Facility and the termination thereof or otherwise, or (II) would materially adversely alter or impair any of Party A's rights, interests or benefits in the Collateral under the Super Senior Exit Credit Facility (whether such action is in the form of an amendment, modification, waiver, approval, consent or otherwise).

(F) any amendment, without the written consent of Party A, of any of the financing documents (or equivalent term in the Super Senior Exit Credit Facility) that would materially adversely affect the rights of Party A solely in its capacity as a Hedge Counterparty (as defined in the Exit Credit Facility Term Sheet) under the Super Senior Exit Credit Facility.

(i) **Disapplication of Certain Events of Default**. Prior to the Plan Effective Date, Section 5(a)(vii) (Bankruptcy) of this Agreement shall not apply to Party B or any Credit Support Provider of Party B. Immediately following the Plan Effective Date, Section 5(a)(vii) (Bankruptcy) of this Agreement shall apply to Party B and any Credit Support Provider of Party B in accordance with the terms of this Agreement. For the avoidance of doubt, it is the intention of the parties hereto that any Event of Default or Termination Event under the Agreement that may arise in connection with or as a consequence, directly or indirectly, of, the filing of the Chapter 11 Cases, prior to the Plan Effective Date, shall not constitute an Event of Default under Section 5(a)(vii) of this Agreement with respect to Party B following the Plan Effective Date.

(j) **Condition Precedent**. Section 2(a)(iii) of this Agreement is hereby amended by inserting the words ", or Additional Termination Event under Section 5(b)(v)" after the phrase "Potential Event of Default".

(k) **Failure to Pay or Deliver.** Section 5(a)(i) of this Agreement is hereby amended by replacing the word "third" with "first" in the third line thereof.

**PART 2**
**TAX REPRESENTATIONS**

(a)     ***Payer Representations***.  For the purpose of Section 3(e) of this Agreement, Party A and Party B each makes the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement.  In making this representation, a party may rely on:

(i)      the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement;

(ii)     the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement, and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and

(iii)    the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement;

*provided*, that it will not be a breach of this representation where reliance is placed on clause (ii) above and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)     ***Payee Representations***.

(i)      For the purpose of Section 3(f) of this Agreement, Party A makes the following additional representations to Party B:

(1)      [Bank Payee Representations]

(ii)     For the purpose of Section 3(f) of this Agreement, Party B makes the following additional representations to Party A:

(1)      [Party B Representations]

**PART 3**
**AGREEMENT TO DELIVER DOCUMENTS**

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver to the other party the following documents, as applicable:

(a)     Tax forms, documents, or certificates to be delivered are:

| Party Required to Deliver Document | Form/Document/Certificate | Date by which to be Delivered |
|---|---|---|
| Party A/Party B | IRS Form W-9, W-8BEN-E, W-8ECI or W-8IMY, as applicable, or any successor thereto | Upon execution of this Agreement. |

(b)     Other documents to be delivered are:

| Party Required to Deliver Document | Form/Document/ Certificate | Date by which to be Delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A/Party B | Annual audited financial statements (or of its Credit Support Provider(s), if any) for its most recently ended fiscal year prepared in accordance with accounting principles that are generally accepted for entities of similar type in the jurisdiction in which the party (or its Credit Support Provider(s), as applicable) is organized or formed, as the case may be, and certified by independent public accountants in such form required by the DIP Credit Agreement (as defined herein). | Upon execution of this Agreement and, if requested by the other party, as soon as practicable after execution of any Confirmation of any Transaction | Yes |
| Party B | Quarterly unaudited financial statements (or of its Credit Support Provider(s), if any) for its most recently ended fiscal quarter prepared in accordance with accounting principles that are generally accepted for entities of similar type in the jurisdiction in which the party (or its Credit Support Provider(s), as applicable) is organized or formed, as the case may be in such form required by the DIP Credit Agreement (as defined herein). | When delivered under the Super Senior Exit Credit Facility; provided that if Party A or an Affiliate of Party A is a party to the Super Senior Exit Credit Facility, delivery thereunder shall constitute delivery hereunder | Yes |
| Party B | All Credit Support Documents, if any, specified in Part 4(f) of this Schedule in form and substance reasonably satisfactory to the other party, such Credit Support Document being duly executed, if required. | Upon execution of this Agreement or at such other time as provided in this Agreement; *provided* that delivery of any such Credit Support Documents to Party A pursuant to the DIP Credit Agreement shall be deemed delivery for purposes hereof | Yes |
| Party B | Copies of any resolutions of its board of directors (or equivalent governing body) required to duly authorize its execution, delivery, and performance of this Agreement. | Upon execution of this Agreement. | Yes |
| Party A/Party B | Certified evidence of the authority, incumbency, and specimen signature of each authorized person executing on its behalf this Agreement (including the Schedule and any Confirmation). | Upon execution of this Agreement or any such document, as the case may be. | Yes |

| Party Required to Deliver Document | Form/Document/ Certificate | Date by which to be Delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A/Party B | Copies of its incorporating documents and by-laws (or equivalent constituent documents), certified as of the date of such request as being true and in full force and effect. | Promptly upon request by the other party. | Yes |
| Party B | A copy of the Agency Agreement. | Upon execution of this Agreement. | Yes |
| Party B | Letter evidencing Process Agent's acceptance of appointment | Upon execution of this Agreement | No |
| Party B | Written notice of intent to terminate the Agency Agreement | At least ten (10) days prior to termination of the Agency Agreement | No |
| Party B | Copies of the Interim Hedging Order, the Final Hedging Order, the Super Senior Exit Credit Facility Term Sheet, the Plan of Reorganization and any amendments thereto | Promptly upon availability, provided that if Party B has provided Party A or its Affiliates with copies of the same in its capacity as Lender and consented in writing to the disclosure for purposes hereunder as well, there shall be no requirement to deliver additional copies hereunder | No |
| Party B | After the Plan Effective Date, the party's or, as applicable, its Credit Support Provider's annual audited financial statements (or of its Credit Support Provider(s), if any) prepared in accordance with accounting principles that are generally accepted for entities of similar type in the jurisdiction in which the party (or its Credit Support Provider(s), as applicable) is organized or formed, as the case may be, and certified by independent public accountants in such form required by the Super Senior Exit Credit Facility. | When delivered under the Super Senior Exit Credit Facility; provided that if Party A or an Affiliate of Party A is a party to the Super Senior Exit Credit Facility, delivery thereunder shall constitute delivery hereunder. | Yes |

| Party Required to Deliver Document | Form/Document/ Certificate | Date by which to be Delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party B | After the Plan Effective Date, the party's quarterly unaudited financial statements, consolidated balance sheets and related statements of income (or of its Credit Support Provider(s), if any) each for its most recently ended fiscal quarter prepared in accordance with accounting principles that are generally accepted for entities of similar type in the jurisdiction in which the party (or its Credit Support Provider(s), as applicable) is organized or formed, as the case may be in such form required by the Super Senior Exit Credit Facility. | When delivered under the Super Senior Exit Credit Facility; provided that if Party A or an Affiliate of Party A is a party to the Super Senior Exit Credit Facility, delivery thereunder shall constitute delivery hereunder. | Yes |
| Party B | A certified copy of the Super Senior Exit Credit Facility, any intercreditor agreement (howsoever described) and the other Loan Documents. | Promptly following execution of the Super Senior Exit Credit Facility. | No |
| Party B | An opinion of outside counsel, which opinion shall include, among other things, due authorization of the execution of the Super Senior Exit Credit Facility and the other Loan Documents and the perfection of the security interests granted in the Loan Documents (in form and substance substantially similar to the legal opinion provided to the lenders as required by the Super Senior Exit Credit Facility) or a reliance letter in respect of such legal opinion provided to the lenders as required by the Super Senior Exit Credit Facility. | Promptly following execution of the Super Senior Exit Credit Facility. | No |
| Party B | Notice of any default, acceleration, termination, cancellation of commitments or prepayment under the Super Senior Exit Credit Facility. | At such times as required to be delivered to Lenders or the Administrative Agent under the Super Senior Exit Credit Facility or, if no such time is specified, promptly upon becoming aware of such event or occurrence. | No |

Each document to be delivered pursuant to the provisions of this Part 3 shall be in the English language or accompanied by an English translation thereof, which translation shall be certified as true, complete, and accurate by an authorized officer of the delivering party.

(a)      ***Addresses for Notices***.  For the purpose of Section 12(a) of this Agreement:

       (i)          Addresses for notices or communications to Party A:

                      [Bank Contact Information]

       (ii) Addresses for notices or communications to Party B:

                    McDermott International, Inc.
                    757 N. Eldridge Parkway
                    Houston, Texas 77079
                    Attention: Treasurer

                    *with a mandatory copy to*:

                    McDermott International, Inc.
                    757 N. Eldridge Parkway
                    Houston, Texas 77079
                    Attention: General Counsel

                    *and*

                    Kevin Combs (kevin.combs@cbi.com)
                    John Masterson (john.masterson@cbi.com)
                    Joe Christaldi (joseph.christaldi@cbi.com)
                    Piyush Katiyar (pkatiyar@mcdermott.com)
                    Kevin Hargrove (khargrove@mcdermott.com)

(b)      ***Process Agent***.  For the purpose of Section 13(c) of this Agreement:

       Party A appoints as its Process Agent      [Bank to provide].

       Party B appoints as its Process Agent:          [CT Corporation System
                                      111 Eighth Avenue, 13th Floor
                                      New York, NY 10011]

(c)      ***Offices***.  The provisions of Section 10(a) will apply to this Agreement.

(d)      ***Multibranch Party***.  For the purpose of Section 10(c) of this Agreement:

       Party A [is/is not] a Multibranch Party.

       Party B is not a Multibranch Party.

(e)      ***Calculation Agent***.  The Calculation Agent is Party A, unless Party A is a Defaulting Party, in which case the parties will appoint a mutually agreed independent third party Swap Dealer (as defined by the U.S. Commodity Futures Trading Commission) to act as the Calculation Agent for so long as such Event of Default continues.  All costs and expenses of such independent third party Calculation Agent shall be borne equally by the parties. All calculations and determinations made by the Calculation Agent shall be in good faith and in a commercially reasonable manner.

(f)      ***Credit Support Document***.  Details of any Credit Support Document:

Credit Support Document means, in relation to Party A: Not applicable

Credit Support Document means, in relation to Party B:  Each of the Collateral Documents and each other document delivered by a Loan Party that by its terms secures, guarantees or otherwise supports Party B's obligations hereunder (whether or not this Agreement evidenced hereby is specifically referenced or described therein), as such document(s) may be amended, revised, restated, supplemented or replaced from time to time; *provided that*, no Event of Default shall occur under Section 5(a)(iii) of the Agreement unless an Event of Default has occurred and is continuing under Section 5(a)(vi) of the Agreement, as modified in Part 1(c).

(g)  ***Credit Support Provider***.

Credit Support Provider means in relation to Party A:  Not Applicable

Credit Support Provider means in relation to Party B: Each Guarantor, other than those Guarantors that are not an "eligible contract participant" within the meaning of Section 1a(18) of the CEA, as amended; *provided that*, no Event of Default shall occur as a result of any event or circumstance with respect to a Credit Support Provider unless an Event of Default has occurred and is continuing under Section 5(a)(vi) of the Agreement, as modified in Part 1(c).

(h)  ***Governing Law***.  This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine other than Sections 5-1401 and 5-1402 of the General Obligations Law).

(i)  ***Jurisdiction***.  During the pendency of the Chapter 11 Cases, Section 13(b)(i) of this Agreement is hereby amended by (1) deleting subparagraph (i) in its entirety and replacing the same with "(i) submits to the exclusive jurisdiction of the Bankruptcy Court and any court with jurisdiction to hear appeals from the Bankruptcy Court; and (2) deleting paragraph (iii) thereof. Section 13(b)(i) of this Agreement is hereby amended by deleting in line 2 thereof the word "non-". Following the Plan Effective Date, the following shall be added at the end of Section 13(b): "Nothing in this provision shall prohibit a party from bringing an action to enforce a judgment (1) in the Bankruptcy Court or (2) in any other jurisdiction if (A) the courts of the State of New York or the United States District Court located in the Borough of Manhattan in New York City lacks jurisdiction over the parties or the subject matter of the Proceedings or declines to accept the Proceedings on the grounds of lacking such jurisdiction; (B) the Proceedings are commenced by a party for the purpose of enforcing against the other party's property, assets or estate any decision or judgment rendered by any court in which Proceedings may be brought as provided hereunder; (C) the Proceedings are commenced to appeal any such court's decision or judgment to any higher court with competent appellate jurisdiction over that court's decisions or judgments if that higher court is located outside the State of New York or Borough of Manhattan, such as a federal court of appeals or the U.S. Supreme Court; or (D) any suit, action or proceeding has been commenced in another jurisdiction by or against the other party or against its property, assets or estate (including, without limitation, any suit, action or proceeding described in Section 5(a)(vii)(4) of this Agreement), and, in order to exercise or protect its rights, interests or remedies under this Agreement, the party (1) joins, files a claim, or takes any other action, in any such suit, action or proceeding, or (2) otherwise commences any Proceeding in that other jurisdiction as the result of that other suit, action or proceeding having commenced in that other jurisdiction."

(j)  ***Netting of Payments***.  Subparagraph (ii) of Section 2(c) of this Agreement [will/will not] apply to all Transactions.

(k)  "***Affiliate***" will have the meaning specified in Section 14 of this Agreement.

(l)  ***Representations.***

(i)  ***Amendment of Basic Representation.*** With respect to Party B, Section 3(a)(iii) is amended by inserting the words "(including any restrictions in prepetition contracts that have been assumed under Section 365 of the Bankruptcy Code)" between the words "restriction" and "binding" in such section.

(ii)    ***Additional Representations***. Section 3 of this Agreement is amended by adding the following additional representations as clauses (g), (h), (i), (j), and (k):

"*(g)*    ***Relationship between Parties.***

> *(i)*    ***No Reliance.*** It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction will not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

> *(ii)*    ***Evaluation and Understanding.*** It is capable of evaluating and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the financial and other risks of that Transaction.

> *(iii)*    ***Status of Parties***. The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

*(h)*    ***Eligible Contract Participant.*** Each party represents to the other party at all times hereunder that it is on each date on which a Transaction is entered into, an "eligible contract participant" as such term is defined in the CEA.

*(i)*    ***No Agency.*** It is entering into this Agreement, including each Transaction, as principal and not as an agent of any person or entity.

*(j)*    ***ERISA.*** Each party represents to the other party at all times hereunder that it is not (i) an employee benefit plan as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended **("ERISA"),** or a plan as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the **"Code"),** subject to Title I of ERISA or Section 4975 of the Code, or a plan as so defined but which is not subject to Title I of ERISA or Section 4975 of the Code but is subject to another law materially similar to Title I of ERISA or Section 4975 of the Code (each of which, an **"ERISA Plan"),** (ii) a person or entity acting on behalf of an ERISA Plan, or (iii) a person or entity the assets of which constitute assets of an ERISA Plan."

(iii)    ***Further Representations of Party B.*** Party B represents, warrants, covenants and acknowledges as of each date prior to the Plan Effective Date:

(A)    Party B is in continuing possession of its property and is operating and managing its business, as debtor in possession, pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

(B)    Party B's liabilities pursuant to each Transaction constitute superpriority obligations that rank at least *pari passu* with the obligations to pay principal under the DIP Credit Agreement and are secured by liens coextensive with and at least *pari passu* with those securing such obligations under the DIP Credit Agreement.

(C)    This Agreement and all Transactions hereunder are, and will be, entered into pursuant to, (i) before the issuance of Final Hedging Order, the Interim Hedging Order; and (ii) after the issuance of the Final Hedging Order, the Final Hedging Order, which Hedging Orders have

not been revoked, reversed, stayed or modified, and no further Bankruptcy Court approval is needed. It is authorized to enter into this Agreement and all Transactions hereunder, and to transfer collateral, perform and make payments in connection therewith, in the ordinary course of its business pursuant to Section 363 of the Bankruptcy Code, the Hedging Orders and the DIP Credit Agreement. This Agreement and all Transactions hereunder are "Amended and Restated Hedge Agreements" as that term is defined in the Hedging Orders. Party A is a "Continuing Hedging Lender" as that term is defined in the Hedging Orders. Obligations of Party B to Party A under this Agreement and any Transaction are "Postpetition Hedging Obligations" as that term is defined in the Hedging Orders.

    (D)    Party A's right to terminate, net and set-off obligations under the Transactions (whether entered into prior to or post petition) will not be stayed, avoided, or otherwise limited by Bankruptcy Code Sections 362(a) or 549, or any other provisions of the Bankruptcy Code.

    (E)    Party B's liabilities and any amounts due and owing from Party B pursuant to the Transactions constitute administrative expenses under Section 503(b) of the Bankruptcy Code, and are entitled to Superpriority Claims pursuant to Section 364(c)(1) and Section 507(a)(1) of the Bankruptcy Code and the Hedging Orders during the pendency of the Chapter 11 Cases.

    (F)    The lien with respect to the Collateral in favor of the Administrative Agent for the benefit of Party A provided under the Hedging Orders shall be a perfected lien and security interest with the priority set forth in the Hedging Orders pursuant to Sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code with respect to all collateral provided by Party B under the Hedging Orders during the pendency of the Chapter 11 Cases.

(m)    ***No Breach of Representations.*** Notwithstanding anything contained in this Agreement to the contrary, no breach of Section 3(a) shall constitute a Potential Event of Default or Event of Default to the extent it arises out of or relates to Party B's filing of the Chapter 11 Cases.

(n)    ***Additional Defined Terms.*** As used herein, the following terms shall have the following meanings, and capitalized terms used in this Agreement and not otherwise defined herein shall have, at any time of determination, the meanings attributed to them in the DIP Credit Agreement or the Super Senior Exit Credit Facility as in effect at such time of determination:

"**Administrative Agent**" means, on any date, the Administrative Agent under the DIP Credit Agreement or the Super Senior Exit Credit Facility, as the context may require.

"**Bankruptcy Code**" means Title 11 of the United States Code, 11 U.S.C. Sections 101 et seq., as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas.

"**Chapter 11 Cases**" means the jointly administered cases under chapter 11 of the Bankruptcy Code, captioned as *In re McDermott International, Inc., et al.* Case No. 20-[_____] (_____) (Bankr. S.D. Tex.), pending in the Bankruptcy Court.

"**Collateral**" means, as the context may require, the collateral pledged to the Administrative Agent, for the benefit of the Secured Parties, under the Collateral Documents and the Hedging Orders.

"**Collateral Documents**" means any security, pledge, guaranty, mortgage, account control agreement or other collateral agreements executed and delivered by a Loan Party in connection with the Hedging Orders, DIP Credit Agreement or the Super Senior Exit Credit Facility, as the context may require, in each case as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**Continuing Hedging Lender**" has the meaning set forth in the applicable Hedging Order.

**"DIP Credit Agreement"** means that certain Superpriority Senior Secured Debtor-In-Possession Credit Agreement dated as of January [___], 2020, among McDermott Technology (Americas), Inc., McDermott Technology (US), Inc. and McDermott Technology B.V., as Borrowers, McDermott International, Inc., as Parent, the other Guarantors from time to time party thereto, the lenders and issuers party thereto and Credit Agricole Corporate and Investment Bank, as Revolving Administrative Agent, and Barclays Bank Plc as Term Loan Administrative Agent, and the other parties thereto, as the same may be amended, restated, renewed, supplemented, or otherwise modified, as the case may be, from time to time.

**"Final Hedging Order"** means the final order of the Bankruptcy Court in the Chapter 11 Cases, in substantially the form of the Interim Hedging Order.

**"Guarantors"** means the "Guarantors" as defined in the DIP Credit Agreement, the Super Senior Exit Credit Facility and the Collateral Documents.

**"Hedging Orders"** means the Interim Hedging Order and the Final Hedging Order.

**"Indebtedness"** shall have the meaning set forth in the DIP Credit Agreement or the Super Senior Exit Credit Facility, as the context may require.

**"Interim Hedging Order"** means an order entered by the Bankruptcy Court in the Chapter 11 Cases, which (i) grants Superpriority Claims and Liens to secure the obligations of Party B under this Agreement and (ii) authorizes Party B to pay its obligations under this Agreement, whether they arose prepetition or postpetition, in the ordinary course of business.

**"Lender"** means any "Lender" under the DIP Credit Agreement or the Super Senior Exit Credit Facility, as the context may require.

**"Lien"** means any mortgage, deed of trust, pledge, hypothecation, collateral assignment, charge, deposit arrangement, encumbrance, lien (statutory or other), security interest or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever intended to assure payment of any Indebtedness or the performance of any other obligation, including any conditional sale or other title retention agreement, the interest of a lessor under a Capital Lease (as defined in the DIP Credit Agreement) and any financing lease having substantially the same economic effect as any of the foregoing.

**"Loan"** means any "Loan" under the DIP Credit Agreement or the Super Senior Exit Credit Facility, as the context may require.

**"Loan Documents"** means any "Loan Documents" as defined in the DIP Credit Agreement or the Super Senior Exit Credit Facility, as the context may require, together with each Collateral Document.

**"Loan Parties"** means Party B or Reorganized Party B, as applicable, together with each other "Loan Party" under the DIP Credit Agreement and the Super Senior Exit Credit Facility, as the context may require.

**"Plan Effective Date"** means the effective date of the Restructuring Support Agreement.

**"Plan of Reorganization"** means a plan of reorganization that is prepared and distributed in accordance with the Bankruptcy Code, reflects the terms of the Restructuring Support Agreement in all material respects and is otherwise in form and substance reasonably satisfactory to the Requisite Lenders (as defined in the DIP Credit Agreement).

**"Reorganized Party B"** means the successor entity to the business of Party B pursuant to the Plan of Reorganization.

**"Restructuring Support Agreement"** means that certain Restructuring Support Agreement, dated as of January 21, 2020, among the Company Parties (as set forth in the Restructuring Support Agreement) and the various lenders thereto (as set forth in the Restructuring Support Agreement).

**"Secured Parties"** has the meaning assigned to such term in the DIP Credit Agreement and the Super Senior Exit Credit Facility, as applicable.

**"Superpriority Claim"** has the meaning assigned to such term in the DIP Credit Agreement.

**"Super Senior Exit Credit Facility"** means a credit agreement (A) executed by Party B or Reorganized Party B, as applicable, as borrower, and having the terms and conditions substantially similar to those set forth in the Exit Credit Facility Term Sheet in respect of the Super Senior Exit Credit Facility, as attached to the Restructuring Support Agreement as Exhibit 3 (as such term sheet may be amended, restated, supplemented or otherwise modified with the consent of Party A), (B) as such credit agreement may be amended, restated, amended and restated, supplemented, extended, renewed, refinanced or otherwise modified from time to time.

## PART 5
## OTHER PROVISIONS

(a)   ***ISDA Definitions***.  The (i) 2006 ISDA Definitions (the "***2006 Definitions***") as published by the International Swaps and Derivatives Association, Inc. and as amended from time to time, and (ii) the 1998 FX and Currency Option Definitions (the "***FX Definitions***" and together with the 2006 Definitions, the "***Definitions***"), as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association, and the Foreign Exchange Committee, as amended from time to time, shall be deemed a part of this Agreement as if fully set forth herein.

(i)   The Definitions and the provisions of Section 14 of this Agreement shall be deemed a part of each Confirmation as if set forth in full therein.

(ii)   Any reference to a "Swap Transaction" in the 2006 Definitions is deemed to be a reference to a "Transaction" for purposes of this Agreement or any confirmation, and any reference to a "Transaction" in this Agreement or any Confirmation is deemed to be a reference to a "Swap Transaction" for purposes of the 2006 Definitions.

(b)   ***Interpretation***.  In the event of any inconsistency between the provisions of this Schedule and the Definitions, this Schedule will prevail.  In the event of any inconsistency between the provisions of this Schedule and the printed Agreement of which it forms a part, this Schedule will prevail.  In the event of any inconsistency between the provisions of any Confirmation and this Schedule, such Confirmation will prevail for the purpose of the relevant Transaction.  In the event of any inconsistency between the 2006 Definitions and the FX Definitions, the FX Definitions will prevail with respect to any FX Transaction.

(c)   ***Annexes***.

(i)   The Annexes identified in and attached to this Schedule hereby are expressly incorporated herein by reference and made a part hereof for all purposes, and each reference in this Agreement (including this Schedule and any Confirmation) to the "Schedule" shall mean this Schedule and each of the Annexes hereto.

(ii)   Section 9(b) of this Agreement is amended by adding the following language after "system" in the third (3rd) line thereof:

"; *provided*, that the parties agree that Annex I is subject to supplement by the addition (but not deletion) of other parties from time to time by McDermott Parent and any such supplements to Annex I shall take effect, and this Agreement shall be deemed amended for all purposes to incorporate such revised Annex I, upon (i) the delivery from time to time by McDermott Parent to Party A of a revised Annex I, and (ii)

consent thereto in writing by Party A after exercise of Party A's right of credit review and approval of any entity added to Annex I in any such supplement."

(d) **Consent to Recording.** The parties (i) agree that each may electronically record all telephonic conversations between marketing, trading, and other relevant personnel of the parties and their Affiliates, with or without the use of a warning tone, in connection with this Agreement or any potential Transaction and (ii) agree to obtain any legally required consent of, and give any legally required notice of such recording to, its relevant personnel.

(e) **Transfer.** Section 7 of this Agreement is hereby amended by inserting the following phrase ", which consent shall not be unreasonably withheld or delayed" in the third line thereof after the word "party" and before the word ", except".

Notwithstanding any provision to the contrary contained in this Agreement (including Section 7 of this Agreement), subject to satisfaction of each of the Plan Emergence Hedge Conditions, on the Plan Effective Date, to the extent there exists a Transaction, or Transactions, as the case may be, between Party A and Party B, then in such event, Party B shall be deemed to assign its rights and obligations under this Agreement and each such Transaction to Reorganized Party B and Reorganized Party B will be deemed to, and will confirm in writing, its acceptance and assumption of this Agreement and each Transaction, and all obligations, liabilities, rights and duties in relation thereto. In this regard, subject to the satisfaction of the Plan Emergence Hedge Conditions, Party A consents to the assignment by Party B of its rights, duties, liabilities and obligations under this Agreement and each Transaction to Reorganized Party B subject to the retention of all its rights hereunder.

**"Plan Emergence Hedge Conditions"** means each of the following:

(i) no Event of Default, Potential Event of Default or Termination Event hereunder has occurred and is continuing with respect to Party B;

(ii) Party B (or Reorganized Party B, as applicable) has (1) adhered to the ISDA August 2012 Dodd-Frank Protocol and matched with Party A on ISDA Amend, or executed an analogous bilateral agreement and provided questionnaire responses directly to Party A and (2) adhered to the ISDA March 2013 Dodd-Frank Protocol and matched with Party A on ISDA Amend, or executed an analogous bilateral agreement and provided questionnaire responses directly to Party A; and

(iii) the Super Senior Exit Credit Facility (including, without limitation, with respect to establishment of liens as set forth therein) has been executed by the Loan Parties and is effective as of, the Plan Effective Date.

(f) **Waiver of Jury Trial.** **TO THE FULLEST EXTENT PERMITTED BY LAW, EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY CREDIT SUPPORT DOCUMENT, ANY CONFIRMATION OR ANY TRANSACTION CONTEMPLATED HEREUNDER. AS TO ANY MATTER FOR WHICH A JURY TRIAL CANNOT BE WAIVED, EACH PARTY AGREES NOT TO ASSERT ANY SUCH MATTER AS A CROSS CLAIM OR COUNTERCLAIM IN, NOR MOVE TO CONSOLIDATE THE SAME WITH, ANY LEGAL PROCEEDING IN WHICH A JURY TRIAL IS WAIVED.**

(g) **Right of Set-off.** Each party agrees that the following provision shall be added as Section 6(f) of this Agreement:

"(f) **Setoff.** A new Section 6(f) shall be added to the Agreement as follows:

*"Set-off.* Any amount (the **"Early Termination Amount"**) payable to one party (the **"Payee"**) by the other party (the **"Payer"**) under Section 6(e), in circumstances where there is a Defaulting Party or one Affected Party in the case where a Termination Event under Section 5(b)(iv) has occurred or any other Termination Event in respect of which all outstanding Transactions are Affected Transactions has occurred, will, at the option of the party ("X") other than the Defaulting Party or the Affected Party (and without prior notice to the Defaulting Party or the Affected Party), be reduced by its set-off against any amount(s) (the **"Other Agreement Amount"**) payable (whether at such time or in the future or upon the occurrence of a contingency) by the Payee (or, where the

Payee is "X", any consenting Affiliate of the Payee) to the Payer (or, where the Payer is "X", any consenting Affiliate of the Payer) (irrespective of the currency, place of payment or booking office of the obligation) under any other agreement(s) between the Payee and the Payer (or between the Payee (or any such consenting Affiliate of the Payee) and the Payer (or any such consenting Affiliate of the Payer) (or instrument(s) or undertaking(s) issued or executed by the Payee or any such consenting Affiliate of the Payee to, or in favor of, the Payer or any such consenting Affiliate of the Payer) and the Other Agreement Amount will be discharged promptly and in all respects to the extent it is so set-off. X will give notice to the other party of any set-off effected under this Section 6(f).

For this purpose, either the Early Termination Amount or the Other Agreement Amount (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the rate of exchange at which such party would be able, acting in a reasonable manner and in good faith, to purchase the relevant amount of such currency. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the relevant currency.

If an obligation is unascertained, X may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this Section 6(f) shall be effective to create a charge or other security interest. This Section 6(f) shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise)."

(h) **_Financial Statements_**. Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period:

"_provided, however_ that in the case of financial statements delivered by either party, the only representation being made by either party is that such financial statements fairly present, in accordance with accounting principles that are generally accepted for entities of its type in the jurisdiction in which the relevant party is organized or formed, the financial condition of the relevant party to which they relate as at the date of such financial statements."

(i) **_Scope of Agreement_**. With effect from the date of this Agreement, all Transactions entered into prior to the date hereof between the parties hereto shall be governed by and construed in accordance with this Agreement, notwithstanding the terms of any agreement or Confirmation which states otherwise. Each agreement or Confirmation governing any Transaction entered into prior to the date hereof shall constitute a supplement to, and form a part of, this Agreement, and will be read and construed as one with this Agreement, and all such agreements and Confirmations along with this Agreement constitute a single agreement.

(j) **_Execution_**. Section 9(e)(ii) of this Agreement is deleted and replaced in its entirety with the following provision:

"(ii) **Execution of Transactions**. The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by exchange of electronic messages on an electronic messaging system, facsimile transmissions, or other delivery, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement; _provided_, that only those terms that match and are contained in the messages sent by both parties (or in the audio record related to such Confirmation if there is an additional non-conflicting term in the message of either party) will form the Confirmation of the Transaction. Where a Transaction is confirmed by means of electronic messaging system (including, without limitation, circumstances where such electronic message is printed and faxed or otherwise delivered by one party to the other party) such confirmation will constitute a 'Confirmation' as referred to in this Agreement even where not so specified in the Confirmation. The location, branch, or office of each party to which payment or delivery is required under the terms of a Transaction shall be deemed to be an 'Office' for purposes of Section 10 of this Agreement even where the Confirmation does not expressly identify such location, branch or office as an 'Office'."

(k)     **Service of Process**.  With respect to the provisions of Section 13(c) of the Agreement, the reference therein to Section 12 to the contrary notwithstanding, each of Party A and Party B consents to service of process solely as provided in Sections 12(a)(i) and 12(a)(iv) of this Agreement addressed and sent to such party's address set forth in Part 4(e) of this Schedule, and for the avoidance of doubt no consent is given by either party to service of process by telex, facsimile transmission, or electronic messaging system.

(l)     **Electronic Signatures**.  Party A confirms, and Party B acknowledges, that Party A uses a computer-based system to execute certain Confirmations and that each such Confirmation executed by Party A by means of an electronically-produced signature shall have the same legal effect as if such signature had been manually written on such Confirmation and that each such Confirmation shall be deemed to have been signed for the purposes of any statute or rule of law that requires such Confirmation to be signed.  The parties acknowledge that in any legal proceedings between them respecting or in any way relating to this Agreement, each party expressly waives any right to raise any defense or waiver of liability based upon the execution of a Confirmation by Party A by means of an electronically-produced signature.  This provision shall apply to all Confirmations outstanding as of the date hereof and executed by Party A by means of an electronically-produced signature, and to all Confirmations in respect of Transactions entered into between Party A and Party B after the date hereof.

(m)     **Method of Notice**.  (i) Each of Sections 12(a)(ii) and 12(a)(iii) of this Agreement is deleted in its entirety and replaced with "RESERVED"; and (ii) the parenthetical in line 2 is replaced with the following: "(except that a notice or other communication under Section 5 or 6 may not be given by electronic messaging system or e-mail").

(n)     **McDermott's Parent's Agency Status**.  McDermott Parent is executing this Schedule, and has executed the Agreement dated as of even date herewith, both in its individual capacity and as agent acting for and in the name of and on behalf of each entity listed in Annex I, as applicable, as further set forth in the Agency Agreement.

(o)     **Additional Matters Concerning Party B**.  Party B hereby represents and warrants to (which representations and warranties will be deemed to be repeated at all times until the termination of this Agreement) and agrees with Party A as follows:

(i)     McDermott Parent is, and at all times will be, fully authorized to act as the agent of Party B and to bind Party B with respect to any transaction contemplated hereunder, including without limitation entering into Transactions on behalf of Party B, negotiation and execution of the Agreement and Confirmations on behalf of Party B, delivery of Confirmations on behalf of Party B, and the receipt of payments on behalf of Party B.

(ii)     The appointment by Party B of McDermott Parent as an agent of Party B with the authority to take all actions necessary to enter into and perform  the Transactions hereunder on behalf of Party B does not, and will not, conflict with any agreement, charter, constitutional document, statute, regulation, or other authority to which Party B is subject.

(iii)     In connection with this Agreement, McDermott Parent has, and will have, the power and authority to bind Party B with respect to all the assets of Party B.

(iv)     Party A shall not be concerned to inquire or be under any obligation to inquire as to, the power or authority of McDermott Parent (or any employee or agent of McDermott Parent) to bind Party B.

(v)     Any action taken or purported to be taken by McDermott Parent on behalf of Party B shall be binding on a Party B.

(vi)     All indemnity and repayment obligations due and owing by Party B to McDermott Parent, as agent, under the Agency Agreement are hereby subordinated to Party A's right to payment of amount due and owing by Party B to Party A under this Agreement.

(p)     ***McDermott Parent's Representations***.  McDermott Parent represents to, and covenants and agrees with, Party A on and as of the date hereof and on each date on which a Transaction is entered into and regardless of whether such Transaction or any portion thereof has been finally allocated to any Party B that:

    (i)     McDermott Parent is duly incorporated and validly existing under the laws of Panama.

    (ii)    except with respect to Transactions that McDermott Party enters on its own behalf as Party B, (A) McDermott Parent is entering into this Agreement and each Transaction on behalf of Party B as agent; (B) the persons executing this Agreement on McDermott Parent's behalf have been authorized to do so; and (C) McDermott Parent has the power and the authority to execute and deliver this Agreement as agent for Party B and to bind Party B and to act on its behalf in all matters related to this Agreement.

(q)     ***Severability.***  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of the Agreement or affecting the validity or enforceability of such provisions in any other jurisdiction.  The Parties hereto shall endeavor in good faith negotiations to replace the prohibited or unenforceable provisions with a valid provision, the economic effect of which comes as close as possible to that of the prohibited or unenforceable provision.

(r)     ***Hedging Contract***.  This Agreement shall be deemed to be a Hedging Contract as defined in the DIP Credit Agreement.

(s)     ***Withholding Tax imposed on payments to non-US counterparties under the United States Foreign Account Tax Compliance Act.***  "Tax" as used in Part 2(a) of this Schedule (Payer Tax Representation) and "Indemnifiable Tax" as defined in Section 14 of this Agreement shall not include any U.S. federal withholding tax imposed or collected pursuant to Sections 1471 through 1474 of the U.S. Internal Revenue Code of 1986, as amended (the "***Code***"), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b) of the Code, or any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code (a "***FATCA Withholding Tax***").  For the avoidance of doubt, a FATCA Withholding Tax is a Tax the deduction or withholding of which is required by applicable law for the purposes of Section 2(d) of this Agreement.

(t)     ***Counterparts***.  This Agreement and any Confirmation (and each amendment, modification and waiver in respect thereof) may be executed in two or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  A signed copy of this Agreement or any Confirmation (and each amendment, modification and waiver in respect thereof) or any counterpart hereto or thereto (including .pdf versions od signed copies) delivered by email, facsimile or other electronic means shall be deemed to have the same legal effect as delivery of an original signed copy thereof.

(u)     ***Dodd-Frank Implementation***.  Subject to Section 5(b)(i) of this Agreement, Party A and Party B agree to cooperate in good faith, and to use commercially reasonable efforts, to take such actions as may be reasonably necessary to comply with or facilitate adherence to regulatory requirements (if any) promulgated under the Dodd Frank Wall Street Reform and Consumer Protection Act ("***Dodd Frank***") either prior to or after the date of this Agreement by the U.S. Commodity Futures Trading Commission and to which the parties or the Transactions under to this Agreement are subject.

(v)     ***Dodd Frank Protocol Covered Agreement.***  For purposes of the ISDA August 2012 DF Protocol Agreement published on August 13, 2012, and the ISDA March 2013 DF Protocol Agreement published on March 22, 2013 (collectively, the "***Protocol Agreements***"), the parties acknowledge and agree that, with effect from the date of this Agreement, this Agreement shall constitute a Protocol Covered Agreement as defined under each of the Protocol Agreements.

(w)     ***ISDA 2013 EMIR NFC Representation Protocol.***  The parties agree that, with effect from the date of this Agreement, the provisions set out in the Attachment to the ISDA 2013 EMIR NFC Representation Protocol

published by the International Swaps and Derivatives Association, Inc. on 8 March 2013 (the "***NFC Representation Protocol***") are hereby deemed to apply to this Agreement as if the parties had adhered to the NFC Representation Protocol without amendment and as if the references in the NFC Representation Protocol to "Covered Master Agreement" were references to this Agreement.  Party B confirms that, with effect from the date of this Agreement, the terms of the NFC Representation Protocol shall apply to it as a party making the NFC Representation (as such term is defined in the NFC Representation Protocol).

(x)     ***ISDA 2013 EMIR Portfolio Reconciliation, Dispute Resolution and Disclosure Protocol.***  Party A and Party B hereby confirm that they are each adhering parties to the ISDA 2013 EMIR Portfolio Reconciliation, Dispute Resolution and Disclosure Protocol published by the International Swaps and Derivatives Association Inc. on 19 July 2013 (the "***PDD Protocol***"), and agree that with effect from the date of this Agreement, Parts I and III of the Attachment to the PDD Protocol and Party A and Party B's respective elections under the PDD Protocol are incorporated into and apply to this Agreement as if this Agreement was a "Protocol Covered Agreement" referenced in the PDD Protocol for all purposes hereunder and as if the date of this Agreement were the implementation Date as defined in the PDD Protocol.

(y)     ***USA PATRIOT Act Notice.***  Party A hereby notifies Party B that pursuant to the requirements of the USA Patriot Act (Title Ill of Pub. L. 107-108, signed into law October 26, 2001) (the "***Patriot Act***"), it is required to obtain, verify and record information that identifies Party B,  which information includes the name and address of Party B and other information that will allow Party A to identify Party B in accordance with the Patriot Act.

(z)     ***General Conditions to Payment.*** (i) The condition precedent in Section 2(a)(iii)(1) does not apply to a payment and delivery owing by a party if the other party shall have satisfied in full all its payment or delivery obligations under Section 2(a)(i) of this Agreement and shall at the relevant time have no future payment or delivery obligations, whether absolute or contingent, under Section 2(a)(i) and (ii) in no event shall a party hereto suspend payments or deliveries in reliance on Section 2(a)(iii) for longer than sixty (60) calendar days in respect of any single Event of Default or Additional Termination Event, and following such suspension, all payments and deliveries withheld shall be promptly remitted together with interest at the Non-default Rate.

## PART 6
## ADDITIONAL TERMS FOR FX TRANSACTIONS

(a)     ***Incorporation of 1998 ISDA FX and Currency Option Definitions***.  The FX Definitions are incorporated into any Confirmation with respect to FX Transaction or Currency Options, which supplements and forms part of this agreement, and all capitalized terms used in a Confirmation will have the meaning set forth in the FX Definitions, unless otherwise defined in a Confirmation.

(b)     ***Amendments to Definitions***.

        (i)     [Bank to provide]

(c)     ***Payment Instructions***.  All payments to be made hereunder in respect of FX Transactions and Currency Option Transactions shall be made in accordance with standing payment instructions provided by the parties (or as otherwise specified in a Confirmation).

(d)     ***Confirmation***.  Any FX Transaction or Currency Option into which the parties may before the date of this Agreement have entered, or may in the future enter, where the relevant Confirmation on its face does not expressly exclude the application of this Agreement, will (to the extent not otherwise provided for in this Agreement) be subject to, governed by and construed in accordance with this Agreement (in substitution for any existing terms, whether express or implied).  Each such FX Transaction and Currency Option will be a Transaction and the documents and other confirming evidence (including electronic messaging service) exchanged between the parties confirming such FX Transaction or Currency Option will each be a Confirmation (even where not so specified therein) for the purposes of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement by their duly authorized officers as of the date hereof.

**[BANK]**

**MCDERMOTT INTERNATIONAL INC.,** in its individual capacity and as Agent for each entity listed in Annex I hereto, as such Annex I may be amended from time to time

By:_____

By: _____

Name: _____

Name: _____

Title: _____

Title: _____

By:_____

Name:_____

Title:_____

**ANNEX I**
**TO**
**SCHEDULE**

**Exhibit 2**

**Continuing Hedging Lenders**

ABN AMRO Bank N.V.

Barclays Bank PLC

Credit Agricole Corporate and Investment Bank

Goldman Sachs do Brasil Banco Múltiplo S.A.

J. Aron & Company LLC