**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| MCDERMOTT INTERNATIONAL, INC., *et al.*,[1] | ) | Case No. 20-30336 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' MOTIONS FOR ENTRY OF**
**(A) AN ORDER (I) APPROVING THE STALKING HORSE**
**PROTECTIONS, (II) APPROVING BIDDING PROCEDURES**
**FOR THE SALE OF THE LUMMUS ASSETS AND INTERESTS, AND**
**(III) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES,**
**AND (B) AN ORDER AUTHORIZING THE DEBTORS TO ENTER INTO A DEFINITIVE**
**PURCHASE AGREEMENT SUBJECT TO ENTRY OF THE CONFIRMATION ORDER**

> **EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON JANUARY 23, 2020, AT 9:00 A.M IN COURTROOM 400, 4th FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**
>
> **RELIEF IS REQUESTED NOT LATER THAN JANUARY 23, 2020.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion (this "Motion"):

## Introduction[2]

1.     The Debtors commenced these chapter 11 cases to facilitate a value-maximizing

restructuring transaction on the terms set forth in the Restructuring Support Agreement (the

"RSA"). The transactions set forth in the RSA will substantially deleverage the Debtors' balance

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/McDermott. The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757 North Eldridge Parkway, Houston, Texas 77079.

[2]     Capitalized terms used in this Motion shall have the meanings given to such terms elsewhere in this Motion, the Stalking Horse Purchase Agreement, or the Bidding Procedures, as applicable (both as defined herein).

sheet and provide the go-forward credit support necessary to support the Debtors' business after emergence.  A core component of the RSA (and the Plan) is the sale of the Lummus Assets and Interests, the proceeds of which will be used to fund the Debtors' minimum cash balance at emergence and pay down the funded obligations under the Debtors' debtor-in-possession financing.  The Debtors completed a nearly four month prepetition marketing process for the Lummus Assets and Interests, and ultimately selected Illuminate Buyer, LLC to act as the Stalking Horse Bidder, who has agreed to purchase the Lummus Assets and Interests on the terms of the Stalking Horse Purchase Agreement.  The terms set forth in the Stalking Horse Purchase agreement will be subject to higher and better offers pursuant to the postpetition marketing process described herein.

2.     Consummation of the proposed Sale is key to enabling the Debtors to reorganize around the remainder of its corporate structure, which in turn will maximize recoveries for stakeholders enterprise-wide.  The Debtors have determined, in the exercise of their business judgment, that the best way to maximize the value of their assets for all stakeholders is to market-test the Stalking Horse Bid through an auction process and to expeditiously sell the Lummus Assets and Interests to the highest or otherwise best bidder pursuant to the Plan.  In light of the extensive marketing process completed prepetition, the Debtors respectfully submit that the postpetition marketing process described herein is sufficient to test whether a higher or better bid is available for the Lummus Assets and Interests.

3.     To implement the Sale, the Debtors submit this Motion, seeking for the Court to (a) approve the Bidding Procedures for the sale of the Lummus Assets and Interests, (b) set dates and deadlines in connection therewith (including a bid deadline, objection deadlines, the date of the auction, and the hearing dates), (c) approve procedures for the assumption or assumption and assignment of certain executory contracts and unexpired leases and the resolution of related cure

amounts, (d) approve the form and manner of notice of each of the foregoing, and (e) approve the Stalking Horse Protections.  The Debtors also intend to seek, pursuant to this Motion but at a later date after conclusion of the Auction, the Court's authorization to enter into the Definitive Purchase Agreement with the Successful Bidder subject to the Confirmation Order.  Consummation of the sale will ultimately be subject to entry of the Confirmation Order and the Debtors anticipate the Sale would close contemporaneously with their emergence from chapter 11.

4.      Notwithstanding anything to the contrary in this Motion or in the Bidding Procedures, only if the Stalking Horse Bidder is designated the Successful Bidder, and subject to the terms and conditions of the Stalking Horse Purchase Agreement, the Stalking Horse Bidder shall have the option (the "363 Sale Option"), in its sole discretion upon notice to the Consultation Parties, to require the Debtors to consummate the Sale pursuant to sections 363 and 365 of the Bankruptcy Code and the Sale Order on the terms specified in the Sale Order.

5.      If approved, the proposed Bidding Procedures will enable the Debtors to maximize value to their estates for the benefit of all stakeholders.  As set forth in further detail below, the Stalking Horse Purchase Agreement, the Stalking Horse Protections, the Bidding Procedures, entry into the Definitive Purchase Agreement subject to entry of the Confirmation Order, and the related relief requested in this Motion are in the best interests of the Debtors' estates and their stakeholders.  Accordingly, the Debtors respectfully request that the Court grant this Motion.

## Relief Requested

6.      The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"):

> i.      authorizing and approving the bidding procedures attached to the Bidding Procedures Order as **Exhibit A-1** (the "Bidding Procedures") in connection with the sale free and clear of all liens, claims, interests, and encumbrances (the "Sale") of the right, title, and interest of the Debtors in and to equity

interests (or reorganized equity interests, as applicable) of the Lummus Debtors[3] (as applicable, the "Lummus Assets and Interests");

ii.     approving the terms of the Share and Asset Purchase Agreement dated January 21, 2020 entered into by and among certain of the Debtors and a joint partnership between the Chatterjee Group and Rhône Group ("Illuminate Buyer, LLC"), attached to the Bidding Procedures Order as **Exhibit A-2** (as amended, supplemented, or otherwise modified by the parties thereto, and including the disclosure schedules and exhibits attached hereto, the "Stalking Horse Purchase Agreement"), including approval of the Stalking Horse Protections; and

iii.    approving procedures for the assumption or assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (the "Assumption and Assignment Procedures"), and approving the form and manner of notice thereof, attached as **Exhibit A-3** to the Bidding Procedures Order (the "Cure Notice").

7.      The Debtors also seek entry of an order, substantially in the form attached hereto as **Exhibit B** (the "Sale Order"), approving the Debtors' entry into a definitive purchase agreement substantially in the form that shall be attached to the Sale Order as **Exhibit B-1** (as amended, supplemented, or otherwise modified from time to time, the "Definitive Purchase Agreement"). Unless the Stalking Horse Bidder exercises the 363 Sale Option, if applicable, the consummation of any Sale pursuant to the Definitive Purchase Agreement will be subject to entry of an order confirming the Plan (the "Confirmation Order").

### **Jurisdiction and Venue**

8.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. The Debtors confirm

---

[3]     The "Lummus Debtors" are Lummus Technology LLC; McDermott Technology (2), B.V.; McDermott Technology (3), B.V.; OOO Lummus Technology; CB&I Lummus Engineering & Technology China Co. Ltd.; Lummus Technology Heat Transfer B.V. (Netherlands); Lummus Technology Heat Transfer B.V. (India); Lummus Novolen Technology GmbH; Novolen Technology Holdings C.V.; Lummus Technology B.V.; Lummus Gasification Technology Licensing LLC; Lummus Engineered Products, LLC; Lummus Technology International LLC; Lummus Technology Services LLC; Chemical Research and Licensing, LLC; Lummus Technology Ventures LLC; Catalytic Distillation Technologies; Lummus Technology Overseas LLC; Chevron Lummus Global LLC; and CLG Technical Services, LLC.

their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10.      The bases for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Bankruptcy Rules 2002 and 6004.

11.      On January 21, 2020 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of David Dickson, President and Chief Executive Officer of McDermott International, Inc., in Support of the Chapter 11 Petitions* (the "Dickson Declaration") and the *Declaration of John R. Castellano, Chief Transformation Officer of McDermott International, Inc., in Support of the Debtors' First Day Motions* (the "Castellano Declaration," together with the Dickson Declaration, the "First Day Declarations"), filed contemporaneously with this Motion and incorporated by reference herein.

## The Proposed Sale and Bidding Procedures

### I.      The Prepetition Marketing Process.

12.      The Lummus Assets and Interests have been the subject of an in-depth, nearly four month marketing process that ultimately culminated in the Debtors' entry into the Stalking Horse Purchase Agreement.  Beginning in late September, 2019, the Debtors commenced a two-phase marketing process to ensure the sale of the Lummus Assets and Interests would be on the highest and best terms available.  During Phase I, the Debtors' proposed financial advisor, Evercore L.L.P., interacted with 58 potential buyers, including 34 financial investors and 24

strategic investors.  Of the potential buyers contacted, 28 executed non-disclosure agreements and were provided with a first round due diligence package which included the Confidential Information Memorandum, third-party commercial and financial diligence reports and access to a secure data room.  The Debtors and their advisors were in frequent communication with the potential purchasers, responding to diligence requests and engaging with potential buyers on possible legal and regulatory issues associated with each bid.  Pursuant to Phase I, the Debtors received 14 bids from potential purchasers (7 financial bids and 7 strategic bids), including one bid that was received late during Phase II.

13.     As discussions with the Debtors' key stakeholders progressed and it became clear a sale of the Lummus Assets and Interests would be a key component of any restructuring, the Debtors determined to select a potential buyer to act as a stalking horse bidder and consummate the sale in a chapter 11 case.  To facilitate a potential stalking horse bid, the Debtors distributed a Phase II process letter to 7 potential purchasers and conducted further, in-depth diligence with the potential purchasers.   Phase II ultimately culminated, on December 16, 2019, in 5 potential purchasers submitting refined bids, each of which indicated an interest in serving as a stalking horse bidder in a chapter 11 sale process.  The Debtors' management and advisors evaluated each bid and, after further diligence and negotiations, ultimately selected Illuminate Buyer, LLC to act as the Stalking Horse Bidder.   In the days leading up to the Petition Date, the Debtors and Illuminate Buyer, LLC negotiated the terms of a Stalking Horse Purchase Agreement to serve as a minimum or floor bid on which the Debtors, their creditors, suppliers, vendors, and other bidders may rely.

## II.    Summary of Key Terms of the Stalking Horse Purchase Agreement.

14.    The pertinent terms of the Stalking Horse Purchase Agreement are summarized in

the following table.[4]

| Stalking Horse Purchase Agreement | Summary Description |
|---|---|
| Parties | Sellers:  (i) McDermott Technology (US), Inc., a Delaware corporation, (ii) McDermott Technology (Americas), Inc., a Delaware corporation, (iii) MDRT, and (iv) J. Ray Holdings, Inc., a Delaware corporation (the "Sellers"). |
| | Purchaser:   Illuminate Buyer, LLC, a Delaware limited liability company (the "Purchaser") |
| Purchase Price | In consideration for the Purchased Assets and the other obligations of the Sellers pursuant to the Stalking Horse Purchase Agreement, at the Closing, Purchaser will (i) pay to Sellers (or to such Affiliate(s) of Sellers as Seller Representative may designate in writing prior to the Closing) (and Sellers (or such Affiliate(s)) will receive such amount on behalf of and for the benefit of the Seller Entities) an aggregate of two billion seven hundred twenty-five million Dollars ($2,725,000,000) in cash, *plus* (i) the an amount (which may only be a negative number or zero) equal to (a) the Closing Working Capital *minus* (b) -$13,950,000, *plus* (ii) the Closing Cash Amounts, *minus* (iii) the Closing Funded Debt, *minus* (iv) the Target Entity Transaction Expenses, *minus* (v) the Rollover Value, if applicable, *minus* (vi) Leakage (which will not, for the avoidance of doubt, include Permitted Leakage), *minus* (vii) the EBITDA Adjustment Amount, if any, *plus* (viii) the Ticking Fee, *plus* (ix) the final Contract Capital Amount (which may only be a negative number or zero), *minus* (x) the Lease Obligations; and (ii) assume the Assumed Liabilities (the "Purchase Price") |
| Deposit Escrow | On the date of the Stalking Horse Purchase Agreement, Purchaser will deposit or cause to be deposited in cash with (i) the JPM Escrow Agent, an amount of $43,000,000 and (ii) the RBC Escrow Agent, and amount of $57,000,000 (such aggregate amount, the "Deposit Escrow Amount"), in each case by wire transfer in immediately available Dollars to such account as directed by the relevant Escrow Agent. The Deposit Escrow Amount will be held by the Escrow Agents pursuant to the relevant Escrow Agreement until distributed to the applicable Parties as provided |

[4]    The following summary is provided for convenience purposes only.  To the extent any of the terms described below are inconsistent with the Stalking Horse Purchase Agreement, the Stalking Horse Purchase Agreement shall control in all respects.

| Stalking Horse Purchase Agreement | Summary Description |
|---|---|
| | herein. If the Closing occurs, (a) the Deposit Escrow Amount will be credited towards the Purchase Price payable by Purchaser to the Sellers as provided by Section 2.10(a)(i) of the Stalking Horse Purchase Agreement and (b) Purchaser and Seller Representative will direct the Escrow Agents to distribute the Deposit Escrow Amount to the Sellers in accordance with Section 2.10(a)(xii) of the Stalking Horse Purchase Agreement and Section 2.10(b)(xv) of the Stalking Horse Purchase Agreement, respectively. If the Stalking Horse Purchase Agreement is terminated as expressly contemplated by Section 8.2(b) of the Stalking Horse Purchase Agreement, then the Deposit Escrow Amount will be distributed in accordance with Section 8.2(b) of the Stalking Horse Purchase Agreement. In the event Purchaser is the Successful Bidder, no later than five (5) Business Days following the conclusion of the Auction or otherwise being designated as the Successful Bidder (if the Auction is not held), Purchaser will deposit or cause to be deposited with (i) the JPM Escrow Agent, an amount of $43,000,000, and (ii) the RBC Escrow Agent, and amount of $57,000,000 (which aggregate amount will, once deposited, be included as part of the "Deposit Escrow Amount" for purposes of the Stalking Horse Purchase Agreement and the Deposit Escrow Agreements), in each case by wire transfer in immediately available Dollars to such account as directed by the relevant Escrow Agent. The Deposit Escrow Amount will be held by the Escrow Agents in accordance with the terms of the Stalking Horse Purchase Agreement and the relevant Deposit Escrow Agreement. |
| Purchased Assets | "Purchased Assets" means all of the assets of the Sellers and the Target Entities primarily used or held for use or otherwise primarily relating to the Business, wherever located and of every type, including the Sellers' right, title and interest as of the Closing in the following, less and except the Excluded Assets:<br><br>i. (i) One hundred percent (100%) of the equity interests (the "Purchased Entity Shares") in each of the Purchased Entities, which Purchased Entity Shares may, for the avoidance of doubt, be the equity interests of the Purchased Entities as such entities are reorganized pursuant to the Confirmation Order and section 1141 of the Bankruptcy Code, and (ii) the issued and outstanding equity interests (the "Purchased Venture Equity Interests") held by Sellers or any of their Subsidiaries in each of the Purchased Ventures;<br><br>ii. All Assumed Business Contracts (it being agreed that any such Contracts that are Shared Contracts will be governed by Section 2.13(d) of the Stalking Horse Purchase Agreement); |

| Stalking Horse Purchase Agreement | Summary Description |
|---|---|
| | iii.     The Transferred Intellectual Property; |
| | iv.     The Transferred Owned Real Property and the Transferred Real Property Leases; |
| | v.     Any and all Tangible Personal Property and interests therein owned; |
| | vi.     Any and all Information Technology and interests therein that are primarily related to, or primarily used in, the Business as conducted by the Sellers and their respective Subsidiaries as of the date hereof and as of the Closing; |
| | vii.     Any and all rights to any credits, prepaid expenses and security deposits of the Business or otherwise arising out of or primarily relating to the Assumed Business Contracts, Real Property Leases or Purchased Assets; |
| | viii.     Any and all raw materials, work-in-process, finished goods, supplies and other inventories primarily related to, or primarily used or held for use in, the Business, including any such raw materials, work-in-process, finished goods, supplies and other inventories (i) being held by customers of the Business pursuant to consignment arrangements, (ii) being held by suppliers of the Business under tolling or similar arrangements or (iii) treated as current assets in the calculation of Working Capital (collectively, the "Inventory"); |
| | ix.     All the Transferred Permits, subject to Section 2.13 of the Stalking Horse Purchase Agreement; |
| | x.     Any and all goodwill primarily related to the Business; |
| | xi.     Any and all Accounts Receivable of the Business to the extent included in the final calculation of Closing Working Capital or would be included in the final calculation of Closing Working Capital if the Measurement Time were deemed to be the moment immediately prior to the Closing; |
| | xii.     Any and all claims, demands, causes of action, defenses and rights of offset or counterclaim, right of recovery, bankruptcy claims or proofs of claims or settlement agreements (in any manner arising or existing, whether choate or inchoate, known or unknown, contingent or non-contingent) at any time to the extent arising out of or relating to the Business, the Purchased Assets or the Assumed |

| Stalking Horse Purchase Agreement | Summary Description |
|---|---|
|  | Liabilities (including all rights and claims under any and all warranties extended by suppliers, vendors, contractors, manufacturers and licensors in favor of any Seller or Target Entity in relation to any of the Purchased Assets) and the right to retain all proceeds and monies therefrom, other than any Retained Claim; |

<div style="margin-left:2em">

xiii.     Any and all Transferred Benefit Plans and any and all assets, trust agreements or any other funding and administrative Contracts related to the Transferred Benefit Plans;

xiv.     Cash Amounts included in the final calculation of the Closing Cash Amounts;

xv.     Originals or, to the extent originals are not available, copies of all Transferred Books and Records; provided that, with respect to any such books and records that are Purchased Assets pursuant to this clause (xv), the Sellers will be permitted to keep (i) copies of such books, records and other materials to the extent required to demonstrate compliance with applicable Law or pursuant to *bona fide* internal compliance procedures or that are necessary in connection with financial statement preparation or procedures of Sellers and their respective Affiliates, (ii) copies of such books, records and other materials to the extent related to any Excluded Assets or Sellers' and their respective Affiliates' Retained Liabilities, and (iii) such books, records and other materials in the form of so-called "back-up" electronic tapes in the ordinary course of business consistent with past practice. With respect to any books and records related to any Contract with a third party (or work to be performed under any such Contract or potential Contract), the Transferred Books and Records will include only the books and records, or portions of such books and records, that primarily relate to the Business and copies of the books and records, or portions of such books and records, that otherwise relate to the Business, and the remainder of such books and records will be Excluded Assets;

xvi.     Any and all (i) insurance policies (other than insurance policies related to, or maintained in connection with, any Seller Benefit Plan) to the extent primarily related to the Business and all rights of Sellers and the Target Entities thereunder and all rights to insurance (and the proceeds therefrom) if and only if set forth on Section 2.5(p) of the Seller Disclosure Schedules and (ii) rights to all net insurance proceeds actually received (without deduction for any payments any Seller or its Affiliates is obligated to make to a third-party insurer in connection with self-insurance or co-insurance from Seller or its Affiliates, other than the deductible of the Business as of the date of

</div>

| Stalking Horse Purchase Agreement | Summary Description |
|---|---|
|  | the Stalking Horse Purchase Agreement) from third parties by any Seller or any of its Affiliates under any insurance policy written prior to the Closing with respect to (A) the Purchased Assets prior to the Closing (other than such proceeds to the extent used to purchase replacement assets that are included in the Purchased Assets) or (B) any Assumed Liabilities (the "Purchased Insurance Proceeds");<br><br>xvii.      Any and all confidentiality agreements entered into by any Seller respecting a sale of the Business in connection with the Transaction or that primarily relate to the Business, the Purchased Assets or the Assumed Liabilities (and not the Excluded Assets or Retained Liabilities), solely to the extent of any and all of Sellers' rights to enforce any provision thereof and of any confidentiality agreements entered into by any Seller or any of their Affiliates that relate to the Business against the counterparties thereto and any claims thereunder; and<br><br>xviii.      All other assets, properties, Contracts, rights and claims (i) primarily used or held for use or otherwise primarily relating to the Business or the Target Entities or (ii) reflected in the 2019 Audited Additional Financial Statements (other than those assets, properties, Contracts, rights and claims that (1) have been sold, transferred or otherwise disposed of in compliance with the covenant set forth in Section 5.1(b)(iv)(C) of the Stalking Horse Purchase Agreement, applied as if such covenant were in effect from and after the Measurement Time or (2) have become obsolete in the ordinary course of business (or with respect to rights under Contracts, excluding Contracts that have expired or terminated in accordance with their terms), in each case since the date of the 2019 Audited Additional Financial Statements). |
| Excluded Assets | Anything to the contrary contained in the Stalking Horse Purchase Agreement notwithstanding, the Parties expressly understand and agree that the following rights, properties and assets of the Sellers (collectively, the "Excluded Assets"), will be retained by Sellers, and will be excluded from the Purchased Assets and the Sellers will not grant, assign, transfer or convey to Purchaser:<br><br>i.   Except as expressly included in Section 2.5(m) of the Stalking Horse Purchase Agreement and as set forth in Section 5.8 of the Stalking Horse Purchase Agreement, any and all Seller Benefit Plans, and any and all assets, trust agreements or any other funding and administrative Contracts related to the Seller Benefit Plans; |

| Stalking Horse Purchase Agreement | Summary Description |
|---|---|
| | ii.   Any and all Intellectual Property, other than the Transferred Intellectual Property, including all Know-How and other Intellectual Property of the Sellers (not including the Target Entities) that was (i) transferred to Lummus Technology LLC and its Affiliates pursuant to (A) the Transfer of Proprietary Rights Agreement dated May 10, 2018 between Lummus Technology LLC and J. Ray Holdings Inc., (B) the Transfer of Proprietary Rights Agreement dated May 10, 2018 between McDermott Technology (Americas), Inc., McDermott Technology (US), Inc. and Chicago Bridge & Iron Company and (C) the Transfer of Proprietary Rights Agreement dated May 10, 2018 between Lummus Technology LLC, McDermott Technology (Americas), Inc. and McDermott Technology (US), Inc. and (ii) transferred back to Sellers on December 30, 2019; |
| | iii.   Any and all licenses to or of Intellectual Property rights, other than any such licenses included in the Assumed Business Contracts; |
| | iv.   The Retained Contracts; |
| | v.   Except as expressly included in Section 2.5(d) of the Stalking Horse Purchase Agreement or Section 3.10(b) of the Stalking Horse Purchase Agreement, any and all owned and leased real property and other interests in real property; |
| | vi.   Except as expressly included in Section 2.5(e) of the Stalking Horse Purchase Agreement, any and all Tangible Personal Property; |
| | vii.   Any and all refunds (whether by way of refund, credit, rebate, offset, or otherwise) or credits attributable to Excluded Business Taxes, except to the extent included as a current asset in the final calculation of Working Capital; |
| | viii.   All books and records other than the Transferred Books and Records; |
| | ix.   All causes of action and claims under chapter 5 of the Bankruptcy Code; |
| | x.   Tax Returns and other books and records related to Taxes paid or payable by Sellers or any of their respective Affiliates and not primarily related to Taxes of the Target Entities, the Purchased Assets, Assumed Liabilities or the Business; |

| Stalking Horse Purchase Agreement | Summary Description |
|---|---|
| | xi. Except as set forth in <u>Section 2.5(n)</u> of the Stalking Horse Purchase Agreement, any and all Cash Amounts; |
| | xii. Except as included in <u>Section 2.5(f)</u> of the Stalking Horse Purchase Agreement, Any and all Information Technology of the Sellers; |
| | xiii. Except as included in <u>Section 2.5(p)</u> of the Stalking Horse Purchase Agreement and subject to <u>Section 5.11</u> of the Stalking Horse Purchase Agreement, any and all insurance policies and binders and interests in insurance pools and programs and self-insurance arrangements whether or not related to the Business, for all periods before, through and after the Closing, including any and all refunds and credits due or to become due thereunder and any and all claims, rights to make claims and rights to proceeds on any such insurance policies for all periods before, through and after the Closing; |
| | xiv. Subject to <u>Section 2.13</u> of the Stalking Horse Purchase Agreement, any and all Business Permits and Environmental Permits, other than the Transferred Permits; |
| | xv. Except as set forth in <u>Section 2.5(l)</u> of the Stalking Horse Purchase Agreement, any and all claims, causes of action, defenses and rights of offset or counterclaim, or settlement agreements (in any manner arising or existing, whether choate or inchoate, known or unknown, contingent or non-contingent) at any time to the extent arising out of or related to the Excluded Assets or Retained Liabilities (including all rights and claims under any and all warranties extended by suppliers, vendors, contractors, manufacturers and licensors in favor of any Seller, a Target Entity or any of their respective Affiliates to the extent primarily related to any Excluded Assets), and the right to retain all proceeds and monies therefrom (collectively, the "<u>Retained Claims</u>"); |
| | xvi. The equity of (i) NET Power, LLC and (ii) McDermott Engineering and Construction Nigeria; |
| | xvii. Any and all assets expressly set forth in <u>Section 2.6(q)</u> of the Seller Disclosure Schedules; and |
| | xviii. Except as set forth in <u>Section 2.5(p)</u> of the Stalking Horse Purchase Agreement, (i) all attorney-client privilege and attorney work-product protection of Sellers or associated with the Business arising with respect to legal counsel representation of the Sellers or their Affiliates or the Business in connection with the transactions contemplated by the Stalking Horse Purchase Agreement or |

| Stalking Horse Purchase Agreement | Summary Description |
|---|---|
| | any of the Transaction Documents, (ii) all documents subject to the attorney-client privilege or work-product protection described in clause (i) of this paragraph and (iii) all documents maintained by the Sellers in connection with the transactions contemplated by the Stalking Horse Purchase Agreement or any of the Transaction Documents. |
| Assumed Liabilities | Subject to the terms and conditions of the Stalking Horse Purchase Agreement, from and after the Closing, Purchaser will assume and agrees to pay, discharge and perform the following Liabilities and only the following Liabilities (the "Assumed Liabilities") of the Sellers and the Target Entities: |
| | i.       Subject to Section 2.13 of the Stalking Horse Purchase Agreement, any and all Liabilities relating to or arising out of the Assumed Business Contracts (it being agreed that any Liabilities relating to or arising out of any such Contracts that are Shared Contracts will be governed by Section 2.13(d) of the Stalking Horse Purchase Agreement); |
| | ii.       Any and all Accounts Payable of the Business that arise out of or relate to the Business without limiting adjustments resulting from the final calculation of Closing Working Capital in accordance with the Stalking Horse Purchase Agreement; |
| | iii.       Any of the Stalking Horse Purchase Agreement and all Liabilities with respect to any return, repair, warranty or any other Liabilities to the extent arising from or relating to products and services of the Business that were designed, manufactured, serviced or sold on, prior to or after the Closing Date or that were held in the Inventory as of the Closing Date without limiting adjustments resulting from the final calculation of Closing Working Capital or Closing Funded Debt in accordance with the Stalking Horse Purchase Agreement; |
| | iv.       Except for any Liabilities expressly retained by the Sellers pursuant to Section 5.8 of the Stalking Horse Purchase Agreement, any and all Liabilities (i) in respect of Business Employees to the extent included in the final calculation of Closing Working Capital and, solely to the extent set forth on Section 2.7(d) the Seller Disclosure Schedules, Former Business Employees, whether arising prior to, at or after the Closing, other than the Retained Liabilities set forth in Section 2.8(e) of the Stalking Horse Purchase Agreement; (ii) assumed by Purchaser pursuant to Section 5.8 of the Stalking Horse Purchase |

| Stalking Horse Purchase Agreement | Summary Description |
|---|---|
| | Agreement, or (iii) relating to or arising out of the Transferred Benefit Plans; and |
| |    v.  Except as set forth in <u>Section 2.8</u> of the Stalking Horse Purchase Agreement, any and all Liabilities of the Target Entities to the extent arising out of the Business or the Purchased Assets, whether accruing prior to, on or after the Closing Date, and in each case, whether fixed or contingent, matured or unmatured, arising by Law or by Contract or otherwise; <u>provided</u> that, for any Liabilities required to be set forth on a balance sheet under GAAP, only such Liabilities provided for or otherwise reflected on the 2019 Audited Additional Financial Statements or incurred after the Measurement Time. |
| Retained Liabilities |    Anything to the contrary contained in the Stalking Horse Purchase Agreement notwithstanding, neither Purchaser nor any of its Affiliates (including, following the Closing, the Target Entities) will assume or agree to pay, perform or otherwise discharge, nor will they be or become responsible or otherwise liable, directly or indirectly, for any Liabilities of Sellers or their respective Affiliates other than the Assumed Liabilities (such Liabilities, other than those constituting the Assumed Liabilities, the "<u>Retained Liabilities</u>"). Without limiting the generality of the foregoing, the following Liabilities of the Sellers or any of their respective Affiliates will, from and after the Closing, be retained by Sellers and Sellers hereby agree to pay, discharge and perform all such Retained Liabilities: <br><br>   i. Any and all Indebtedness of any Seller or any of their Affiliates (other than the Target Entities to the extent included in the calculation of Closing Funded Debt); <br><br>   ii. Any and all Liabilities of the Target Entities arising under interest rate or currency swaps, collars, caps and similar hedging obligations; <br><br>   iii. Any and all Liabilities of the Sellers pursuant to the terms of the Stalking Horse Purchase Agreement or any of the Transaction Documents; <br><br>   iv. Any and all Liabilities to the extent arising out of or related to the Excluded Assets or the Excluded Business; <br><br>   v. Except as set forth in <u>Section 2.7(d)</u> of the Stalking Horse Purchase Agreement or assumed by Purchaser pursuant |

| Stalking Horse Purchase Agreement | Summary Description |
|---|---|
|  | to <u>Section 5.8</u> of the Stalking Horse Purchase Agreement, Liabilities relating to or arising under any Seller Benefit Plan;<br><br>vi.  Any and all Liabilities for Excluded Business Taxes, except to the extent any such Liabilities were included as liabilities in calculating Funded Debt or as a current liability in the final calculation of Working Capital;<br><br>vii.  Any and all Liabilities to the extent arising from or relating to the Pre-Closing Reorganization and the Pre-Closing Restructuring, including Tax liabilities relating thereto;<br><br>viii.  Any and all Liabilities under the defined benefits and defined contribution pension plans of Lummus Consultants International Ltd. and any and all pension Liabilities of Lummus Consultants International LLC;<br><br>ix.  Any and all Cure Costs;<br><br>x.  Any and all Transaction Expenses to the extent not included in the calculation of the Final Purchase Price;<br><br>xi.  Any and all Leakage (other than Permitted Leakage) to the extent not included in the calculation of the Final Purchase Price (it being understood and agreed that such Leakage will be deemed to be a Retained Liability);<br><br>xii.  Except as provided in <u>Section 2.7(d)</u> of the Stalking Horse Purchase Agreement, any and all Liabilities in respect of Former Business Employees, whether arising prior to, at or after the Closing;<br><br>xiii.  Any and all Liabilities arising from the ORPIC JV Payable and the AP Delayed Payments, and each such Retained Liability will be paid in full by Sellers prior to the Closing;<br><br>xiv.  Any and all Liabilities arising in connection with any claim or Proceeding by a shareholder of a Seller or any of its Affiliates against any Target Entities;<br><br>xv.  Any and all Liabilities related to or arising out of the Shaw (S&W) Pension Plan; and |

| Stalking Horse Purchase Agreement | Summary Description |
|---|---|
| | xvi.   Except as provided in <u>Sections 2.7(d)(ii) and (iii)</u> of the Stalking Horse Purchase Agreement, any and all ERISA Affiliate Liabilities. |
| Conditions to Each Party's Obligation to Close | The Stalking Horse Purchase Agreement contains as a condition of the Sellers and the Purchaser consummating the Sale on the Effective Date, that no injunctions or final other order or similar ruling or determination of any governmental authority preventing or delaying the consummation of the Sale has been entered and remains in effect, and that no Proceeding by any Governmental Entity seeking any such injunction can be pending. <br><br> The respective obligations of Sellers and Purchaser to effect the Closing also are subject to the satisfaction or waiver at or prior to the Closing of the following conditions: <br><br> • <u>Regulatory Approvals</u>: (i) Any waiting period applicable to the Transaction under the HSR Act must have expired or been terminated; and (ii) other specified Regulatory Approvals specified must have been obtained or any applicable waiting period will have expired or been terminated. <br><br> • <u>Bankruptcy Court Order</u>. The Bankruptcy Court has entered the Sale Order and, unless the Transaction has been consummated following Purchaser's exercise of the 363 Sale Option, the Confirmation Order, and no order staying, reversing, or modifying the Sale Order or Confirmation Order (as applicable) is in effect; *provided* that even if an appeal, notice of appeal, motion to amend or make additional findings of fact or motion for a new trial is timely filed, or the Sale Order or Confirmation Order (as applicable) is otherwise challenged in any respect, such Sale Order or Confirmation Order will be deemed a final order if it provides that it is effective immediately upon entry on the Bankruptcy Court's docket and not subject to any stay notwithstanding Rules 6004(h), 6006(d), or 7062 of the Federal Rules of Bankruptcy Procedure or Rule 62 of the Federal Rules of Civil Procedure. <br><br> • <u>No Violations</u>. No Law will have been enacted, promulgated, enforced or entered by any Governmental Entity after the date of the Stalking Horse Purchase Agreement that makes illegal or otherwise prohibits the consummation of the Transaction. |

| Stalking Horse Purchase Agreement | Summary Description |
|---|---|
| Conditions Precedent to Obligation of Purchaser | The obligation of Purchaser to effect the Closing is subject to the satisfaction (or waiver by Purchaser) at or prior to the Closing of the following additional conditions:<br><br>• <u>Representations and Warranties</u>.  (1) The Sellers Fundamental Representations are true and correct in all respects (other than *de minimis* inaccuracies) as of the date of the Stalking Horse Purchase Agreement and the Closing Date as if made on the Closing Date; (2) the Sellers Sufficiency Representations are true and correct in all respects as of the date of the Stalking Horse Purchase Agreement and as of the Closing Date is if made on the Closing Date, except for such failures to be so true and correct as would not, individually or in the aggregate, reasonably be expected to be material to the Business, the Purchased Assets and the Target Entities, taken as a whole; (3) the representations and warranties of the Sellers (other than the Sellers Fundamental Representations, the Sellers Sufficiency Representations and the representations and warranties of the Sellers regarding the occurrence of a Business Material Adverse Effect) are true and correct in all respects as of the date of the Stalking Horse Purchase Agreement and as of the Closing Date, except for such failures to be true and correct as would not reasonably be expected to have, individually or in the aggregate, a Business Material Adverse Effect; and (4) the representations and warranties of the Sellers regarding the occurrence of a Business Material Adverse Effect will be true and correct in all respects as of the date of the Stalking Horse Purchase Agreement and as of the Closing Date.<br><br>• <u>Performance of Obligations of Sellers</u>.  The covenants and agreements of Sellers to be performed or complied with on or before the Closing Date in accordance with the Stalking Horse Purchase Agreement must have been performed or complied with in all material respects.<br><br>• <u>Officer's Certificate</u>.  Purchaser must have received a certificate, dated as of the Closing Date and executed by an executive officer authorized to sign on behalf of Sellers, stating that the conditions to Closing have been satisfied.<br><br>• <u>Purchased Entities</u>.  Any Purchased Entity that is a debtor in the Chapter 11 Cases must have either (i) been dismissed as a debtor in such Chapter 11 Cases by order of the Bankruptcy Court or (ii) resolved its Chapter 11 Cases pursuant to the Confirmation Order. |

| Stalking Horse Purchase Agreement | Summary Description |
|---|---|
| | • <u>Additional Financial Statements</u>. The 2019 Audited Additional Financial Statements must have been delivered to Purchaser.<br><br>• <u>Closing Deliveries</u>. The Seller Representative must have delivered, or caused to be delivered, all of the deliveries set forth in <u>Section 2.10(b)(x)</u> of the Stalking Horse Purchase Agreement.<br><br>• <u>Sale Order</u>. The Sale Order and the provisions of the Confirmation Order relating to the terms of the Stalking Horse Purchase Agreement and the authorization of the consummation of the Transaction must be in form and substance acceptable to Purchaser and consistent with the terms of the Stalking Horse Purchase Agreement.<br><br>• <u>Seller Guarantee and Joinders</u>. Purchaser must have received (i) a guarantee and joinder agreement in form and substance reasonably acceptable to Purchaser, signed by Reorganized McDermott and, if Reorganized McDermott is not the borrower, the Affiliate of Reorganized McDermott that is the borrower under Reorganized McDermott's senior credit facility that is in effect upon the consummation of the conclusion of the Chapter 11 Cases, pursuant to which Reorganized McDermott and such Affiliate thereof (including their respective successors and assigns) have agreed to jointly and severally guarantee the obligations of and agree to be bound by the same obligations as Sellers under the Stalking Hores Purchase Agreement (including any payments pursuant to <u>Section 9.1</u> of the Stalking Horse Purchase Agreement) and (ii) evidence in form and substance acceptable to Purchaser that any chapter 11 plan and the Sale Order or the Confirmation Order (as applicable) provide for assumption and survival of such guarantee until the later to occur of (i) six (6) years following the Closing and (ii) the final resolution of any claims under <u>Section 9.1</u> of the Stalking Horse Purchase Agreement.<br><br>• <u>Check-the-Box Elections</u>. On or prior to the Closing Date, the Sellers must execute (or cause to be executed) two (2) copies of Internal Revenue Service Form 8832 (or successor form) with respect to each of certain specified Target Entities and deliver such executed forms to Purchaser. |
| Condition Precedent to Obligations of Sellers | The obligation of Sellers to effect the Closing is subject to the satisfaction (or waiver by Sellers) at or prior to the Closing of the following additional conditions: |

| Stalking Horse Purchase Agreement | Summary Description |
|---|---|
| | • <u>Representations and Warranties</u>.  (i) The Purchaser Fundamental Representations are true and correct in all material respects (other than *de minimis* inaccuracies) as of the date of the Stalking Horse Purchase Agreement and as of the Closing Date and (ii) the representations and warranties of Purchaser (other than the Purchaser Fundamental Representations) are true and correct in all respects as of the Closing Date, except for such failures to be true and correct as would not reasonably be excepted to have, individually or in the aggregate, a Purchaser Material Adverse Effect.<br><br>• <u>Performance of Obligations of Purchaser</u>.  The covenants and agreements of Purchaser to be performed or complied with on or before the Closing Date in accordance with the Stalking Horse Purchase Agreement must have been performed or complied with in all material respects.<br><br>• <u>Officer's Certificate</u>.  The Sellers must have received a certificate, dated as of the Closing Date and signed on behalf of Purchaser by an executive officer of Purchaser, stating that the conditions to the Closing have been satisfied. |
| Representations and Warranties | Each Seller will make representations and warranties concerning: organization, standing, power, Target Entities, authority, execution and delivery, enforceability, no conflicts and consents, proceedings, Financial Statements, absence of undisclosed liabilities, absence of changes or events, title, sufficiency of assets, intellectual property, real property, material contracts, compliance with applicable laws, permits, environmental matters, taxes, labor relations, employees and employee benefits plans, Intercompany arrangements, brokers, significant customers, significant suppliers, insurance, related-party transactions and lock-box.<br><br>The Purchaser will make representations and warranties concerning organization, standing and power, authority, execution and delivery, enforceability, no conflicts, consents, financial ability to perform, proceedings, brokers, investigation, acquisition of shares for investment, solvency and adequate assurance regarding executory contracts. |
| Termination Events | The Stalking Horse Purchase Agreement contains customary termination provisions, including:<br><br>• by mutual written consent of the Sellers and the Purchaser; |

| Stalking Horse Purchase Agreement | Summary Description |
|---|---|
| | • by Seller Representative or the Purchaser, if the other party's representations and warranties fail to be true and correct;<br><br>• by Seller Representative or the Purchaser, if the other party breaches or fails to perform in any material respect any of its covenants or other agreements contained in the Stalking Horse Purchase Agreement, and such failure or breach would prevent the satisfaction of a condition of the Closing;<br><br>• by the Purchaser, if the Sellers (i) fail to meet any of the milestones set forth in any of Sections 5.19(a)(i), 5.19(a)(ii), 5.19(a)(iii) or 5.19(a)(v) of the Stalking Horse Purchase Agreement and fail to cure all such failures or breaches (by satisfying such milestones within: (A) five (5) calendar days following the date of the Stalking Horse Purchase Agreement, in the case of clauses (i) and (ii); (B) ten (10) Business Days following forty (40) calendar days following the Petition Date, in the case of clause (iii); (C) ten (10) Business Days following seventy (70) calendar days following the Petition Date, in the case of clause (v); provided that, if (1) on the Petition Date, Sellers fail to file a chapter 11 plan, disclosure statement, and RSA executed by the Required Supporting Stakeholders, in each case consistent with the Transaction, (2) at any time following the Petition Date, any statutory committee is appointed in the Chapter 11 Cases, or (3) at any time on or after the Petition Date, the parties to the RSA do not constitute the Required Supporting Stakeholders, then, then the Sellers will instead have within ten (10) Business Days of sixty (60) calendar days following the Petition Date, in the case of clause (v));<br><br>• by the Purchaser, if (i) A) the Sellers do not hold an Auction as provided in the Bidding Procedures Order in accordance with the milestone set forth in Section 5.19(a)(iv) of the Stalking Horse Purchase Agreement (unless (x) the Auction is cancelled because Purchaser is the Successful Bidder or no competing bid has been submitted or (y) the Auction is adjourned or postponed in accordance with the Bidding Procedures Order); (B) the designation of Purchaser as Stalking Horse Bidder pursuant to the terms of the Stalking Horse Purchase Agreement and the Stalking Horse Protections contemplated in the Stalking Horse Purchase Agreement have not been approved by the Bankruptcy Court within ten (10) Business Days after forty (40) days after the Petition Date; or (C) Sellers withdraw or seek to withdraw a notice or motion to approve the Stalking Horse Protections and does not cure within two (2) Business Days; or (ii) Sellers announce or files a chapter 11 plan: |

| Stalking Horse Purchase Agreement | Summary Description |
|---|---|
| | (A) exclusively contemplating the reorganization or sale of all or any part of Sellers or their Affiliates inconsistent with the Stalking Horse Purchase Agreement or the transactions contemplated hereby or (B) that does not transfer to Purchaser the Purchased Assets free and clear of Liens, other than Permitted Equity Liens (in the case of the Purchased Entity Shares and the Purchased Venture Equity Interests) and Permitted Liens (in the case of all other Purchased Assets) provide an estate release for Purchaser, its Affiliates and Representatives and the Fund Affiliates;<br><br>• by Seller Representative or by Purchaser, if, unless the Transaction has been consummated following Purchaser's exercise of the 363 Sale Option, (i) the Confirmation Order is not entered on or prior to the 185th day following the Petition Date or (ii) following its entry, the Confirmation Order will fail to be in full force and effect or will have been stayed, reversed, modified or amended in any material respect in a manner adverse to Purchaser without the prior written consent of Purchaser;<br><br>• by Seller Representative or by the Purchaser, if the Closing does not occur on or prior to six (6) months following the date of the Stalking Horse Purchase Agreement (the "Outside Date"); provided that (x) if on such date the Marketing Period will have commenced but will not have ended, the Outside Date will be extended at the written election of Purchaser or Seller Representative until four (4) Business Days following expiration of the Marketing Period but in any event not later than seven (7) months following the date of the Stalking Horse Purchase Agreement and (y) if on such date the conditions to Closing set forth in Section 7.1(a) of the Stalking Horse Purchase Agreement will not have been satisfied but all other conditions to Closing must be satisfied or waived (or in the case of conditions which, by their terms, are to be satisfied at the Closing, must be capable of being satisfied by all parties entitled to the benefit of such conditions), such date may be extended until the date that is nine (9) months following the date of the Stalking Horse Purchase Agreement (in which case such date as extended will be the Outside Date) except that if on such date the Marketing Period will have commenced but will not have ended by such date, such date will be further extended at the written election of Purchaser until the earlier to occur of (A) four (4) Business Days following expiration of the Marketing Period, and (B) twenty (20) Business Days following the Outside Date (as such date may be extended pursuant to the first proviso of Section 8.1(g) of the Stalking Horse Purchase Agreement); provided that such right to terminate the Stalking Horse |

| Stalking Horse Purchase Agreement | Summary Description |
|---|---|
| | Purchase Agreement is not available to any Party whose failure to perform any covenant or obligation under the Stalking Horse Purchase Agreement is the primary cause of, or results in, the failure of the Closing to occur on or before such date;<br><br>• by Seller Representative or by Purchaser:<br><br>    • (A) if a permanent injunction or other permanent Judgment issued by a court of competent jurisdiction has become final and nonappealable, preventing or restraining the consummation of the Transaction; <u>provided</u> that this right to terminate the Stalking Horse Purchase Agreement is not available to any Party whose failure to perform any covenant or obligation under the Stalking Horse Purchase Agreement has been the primary cause of, or resulted in, the entry of such permanent injunction or other permanent Judgment, as applicable; or (B) the Bankruptcy Court has not entered the Confirmation Order by the Outside Date;<br><br>    • if (A) the Bankruptcy Court has not entered the Bidding Procedures Order within ten (10) Business Days following forty (40) calendar days following the Petition Date, as such date may be extended by mutual written agreement of Seller Representative and Purchaser; or (B) an order of any court in any jurisdiction will be entered relating to the Chapter 11 Cases, and that remains in effect for thirty (30) days, (x) staying for a period in excess of fourteen (14) days, vacating or reversing the Bidding Procedures Order or (y) amending, supplementing or otherwise modifying the Bidding Procedures Order in a manner that results in the Bidding Procedures Order no longer being substantially in the form set forth in the exhibit attached to the Stalking Horse Purchase Agreement; <u>provided</u> that Seller Representative may not terminate the Stalking Horse Purchase Agreement pursuant to <u>clause (y)</u> if Purchaser approves of any such amendment, supplement or other modification to the Bidding Procedures Order; or<br><br>    • if any of the Chapter 11 Cases are converted to a case under Chapter 7 of the Bankruptcy Code; or<br><br>• by Seller Representative or by Purchaser, if (x) (A) Purchaser is not the Successful Bidder at the Auction and (B) the Bankruptcy Court enters an order approving an Alternative Transaction with that Successful Bidder, or (y) an Alternative Transaction is approved by the Bankruptcy Court other than in connection with the Auction or |

| Stalking Horse Purchase Agreement | Summary Description |
|---|---|
| | pursuant to a plan of reorganization that is in form and substance reasonably acceptable to Purchaser in writing; <u>provided</u> that, notwithstanding anything in the Stalking Horse Purchase Agreement to the contrary, if Purchaser is not the Successful Bidder at the Auction but is the Back-Up Bidder at the Auction, the right to terminate the Stalking Horse Purchase Agreement under this section will not be available to Purchaser until the Back-Up Termination Date. |
| Break-Up and Expense Reimbursement | If:<br><br>• the Stalking Horse Purchase Agreement is terminated by Seller Representative or Purchaser pursuant to any of (x) <u>Sections 8.1(d)</u>, <u>8.1(e)(i)(A)</u>, <u>8.1(e)(ii)</u>, <u>8.1(h)(3)</u> or <u>8.1(i)</u> of the Stalking Horse Purchase Agreement, or (y) <u>Section 8.1(g)</u> of the Stalking Horse Purchase Agreement if at the time of such termination Purchaser could have terminated the Stalking Horse Purchase Agreement in accordance with any of <u>Sections 8.1(d)</u>, <u>8.1(e)(i)(A)</u>, <u>8.1(e)(ii)</u>, <u>8.1(h)(3)</u> or <u>8.1(i)</u> of the Stalking Horse Purchase Agreement, the Sellers will pay to Purchaser a break-up fee of $81,750,000 (the "<u>Break-Up Fee</u>") and reimburse Purchaser for all of its third-party out-of-pocket fees, costs and expenses incurred in connection with or related to the investigation, negotiation and performance of the Transaction Documents and the Transaction up to an aggregate amount of $25 million;<br>• the Stalking Horse Purchase Agreement is terminated by Purchaser (x) due to the Sellers' uncured breach of its representations and warranties or covenants, the Sellers will pay to Purchaser the Expense Reimbursement and (y) if the Sellers enter into a definitive agreement with respect to, or consummate, an Alternative Transaction on or before the 1-year anniversary of such termination, the Sellers will pay to Purchaser the Break-Up Fee.<br><br>Except with respect to any Willful Breach by the Sellers of the Stalking Horse Purchase Agreement or Fraud, to the extent the Break-Up Fee and the Expense Reimbursement are paid to Purchaser, the Break-Up Fee and the Expense Reimbursement are Purchaser's sole remedy under the Stalking Horse Purchase Agreement. |
| Indemnification by Sellers | Subject to the terms, conditions and limitations set forth in this section, from and after the Closing, the Sellers will, jointly and severally, indemnify, defend, reimburse, protect and hold harmless Purchaser and |

| Stalking Horse Purchase Agreement | Summary Description |
|---|---|
| | its Affiliates and their respective directors, officers, employees, managers, members, stockholders, Representatives, agents and the successors and permitted assigns of each of the foregoing (each such person being referred to hereinafter as a "Purchaser Indemnified Person"), from, for and against any and all Losses (without duplication and subject to certain limitations) that they suffer or incur, arising out of, based upon or resulting from any: (i) inaccuracy in or breach of any Sellers Fundamental Representations, (ii) inaccuracy in or breach of the Sellers Sufficiency Representations, (iii) Retained Liabilities, (iv) inaccuracy in or breach of any of the representations and warranties of Sellers contained in Article III of the Stalking Horse Purchase Agreement (other than the Sellers Fundamental Representations and the Sellers Sufficiency Representations) solely to the extent any such inaccuracy or breach relates to the operations of the Business located in Russia and assuming, solely for purposes of applying this section, such representations and warranties of the Sellers contained in Article III of the Stalking Horse Purchase Agreement survived until the date that is three (3) years following the Closing Date (the "Excluded Matters") and (v) inaccuracy in or breach of any of the representations and warranties of Sellers contained in Section 3.6 of the Stalking Horse Purchase Agreement (only if such representations and warranties survive the Closing pursuant to Section 9.1(a)(i) of the Stalking Horse Purchase Agreement; provided, that for purposes of Losses described under clause (ii), notwithstanding anything herein to the contrary, Sellers will, for a period of forty (40) days after the date that Seller Representative has been notified of such Losses, have the opportunity to cure the relevant breach in full satisfaction of Purchaser's claim by conveying to (or, in the case of intangible assets, granting a license or otherwise securing rights to) Purchaser the Purchased Assets that were not delivered as of the Closing, and which failure resulted in such Losses, free and clear and all Liens, other than Permitted Liens; provided further, that with respect to the Excluded Matters, Sellers will only be obligated to indemnify the Purchaser Indemnified Persons for Losses in excess of $13,625,000. |

## III. The Bidding Procedures.

15. The Debtors' entry into the Stalking Horse Purchase Agreement is designed to incentivize potential bidders and thereby maximize the potential value of their assets for the benefit of the Debtors' estates and their various stakeholders. The Debtors request approval and

authorization of the Stalking Horse Purchase Agreement, subject to higher or otherwise better offers in accordance with the procedures set forth in the Bidding Procedures.

16.     The proposed Bidding Procedures are designed to permit a fair, efficient, competitive, and value-maximizing auction process for the Lummus Assets and Interests, consistent with the timeline of these chapter 11 cases, to confirm that the Stalking Horse Bid and the Stalking Horse Bidder is the best offer, or promptly identify any alternative bid that is higher or otherwise better.

17.     The Bidding Procedures will provide potential bidders with ample notice and time to conduct thorough due diligence to submit binding bids in advance of the Auction.  The Stalking Horse Purchase Agreement expressly allows the Debtors to market the Lummus Assets and Interests prior to the Auction.  In creating the Bidding Procedures, the Debtors are seeking to balance their interests in consummating the Sale on a timeline that ensures the Stalking Horse Bidder's willingness to provide a floor offer while at the same time preserving the opportunity to attract the highest or otherwise best offer.  The Bidding Procedures are designed to encourage all prospective bidders to put their best bid forward, bring finality to the Debtors' restructuring process, and create a path towards entry of the Confirmation Order that embodies the highest or otherwise best available recoveries to the Debtors' stakeholders.

18.     Because the Bidding Procedures are attached as **<u>Exhibit A-1</u>** to the proposed Bidding Procedures Order, they are not restated fully herein.   Generally speaking, however, the Bidding Procedures establish, among other things:[5]

   i.    the Debtors will serve the Bidding Procedures Order, the Bidding Procedures, the Sale Notice, and the Cure Notice upon the Notice Parties as soon as practicable after entry of the Bidding Procedures Order;

   ii.   the availability of, access to, and conduct during due diligence by Acceptable Bidders;

   iii.  the requirements that Potential Bidders must satisfy to participate in the bidding process and become Acceptable Bidders;

   iv.   the deadlines and requirements for submitting competing bids and the method and criteria by which such competing bids are deemed to be Acceptable Bids sufficient to trigger the Auction and participate in the Auction;

   v.    the manner in which Acceptable Bids will be evaluated by the Debtors, to determine the starting bid for the Auction, in consultation with the Consultation Parties;

   vi.   the conditions for having the Auction and procedures for conducting the Auction, if any;

   vii.  the criteria by which the Successful Bidder will be selected by the Debtors, in consultation with their advisors and the Consultation Parties; and

   viii. various other matters relating to the sale process generally, including the designation of the Back-Up Bid, return of any Good Faith Deposits, and certain reservations of rights.

19.     Importantly, the Bidding Procedures recognize and comply with the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all Acceptable Bids made at or prior to the Auction, and, as noted, preserve the Debtors'

---

[5]   The following summary is provided for convenience purposes only.  To the extent any of the terms described below are inconsistent with the Bidding Procedures, the Bidding Procedures control in all respects.  Capitalized terms used in this section but not defined herein shall have the meanings given to them in the Bidding Procedures.

right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates, each in consultation with the Consultation Parties.

20.     Following conclusion of the Auction, if any, and the selection of a Successful Bidder, the Debtors shall present the results of the Auction at the Sale Hearing and shall seek entry of the Sale Order.  Such proposed order shall authorize the Debtors to enter into and perform under the Definitive Purchase Agreement (which, for the avoidance of doubt, may be the Stalking Horse Purchase Agreement) and deem the Debtors' selection of the Successful Bid final.  Subject to the designation of any Back-Up Bid, the Debtors shall not solicit and/or accept any further bids or offers to submit a bid after such selection.  Unless the Stalking Horse Bidder exercises the 363 Sale Option, if applicable, the consummation of the Sale shall be subject to entry of the Confirmation Order, and the closing of the Sale shall be a condition to the effective date of the Plan.

**IV.     The Assumption and Assignment Procedures.**

21.     In addition to those procedures set forth above, the Debtors also are seeking approval of the Assumption and Assignment Procedures to facilitate the fair and orderly assumption, assumption and assignment, or rejection of certain of the Lummus Debtors' executory contracts and unexpired leases (each, as applicable, a "Lummus Executory Contract" or "Lummus Unexpired Lease," and, collectively, the "Lummus Executory Contracts and Unexpired Leases"), as may be designated in the Stalking Horse Purchase Agreement or any other Successful Bid. The proposed Assumption and Assignment Procedures are as follows:

     i.     Cure Notice.  After the Auction but no later than (i) fourteen (14) days prior to the Confirmation Hearing or (ii) five (5) days following the exercise by the Stalking Horse Bidder of the 363 Sale Option, if applicable, the Debtors shall file with the Court and serve via first class mail, electronic mail, or overnight delivery the Cure Notice on all non-Debtor contract counterparties to the Lummus Executory Contracts and Unexpired Leases (collectively, the "Contract Parties," and each, a "Contract Party");

ii.    <u>Content of Cure Notice</u>.  The Cure Notice shall notify the applicable Contract Parties that the Lummus Executory Contracts and Unexpired Leases may be subject to assumption or assumption and assignment in connection with the proposed Sale and contain the following information: (a) identification of the applicable Lummus Executory Contracts and Unexpired Leases; (b) the applicable Contract Parties; (c) the Debtors' good faith estimates of the corresponding Cure Amounts required to cure all monetary defaults under the Lummus Executory Contracts and Unexpired Leases; and (d) the deadline by which any Contract Party to a Lummus Executory Contract or Lummus Unexpired Lease may file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto (the "<u>Cure Objection</u>"); *provided* that service of a Cure Notice does not constitute an admission that such Lummus Executory Contract or Lummus Unexpired Lease is an executory contract or unexpired lease, or that such Lummus Executory Contract or Lummus Unexpired Lease will be assumed at any point by the Debtors or assumed and assigned pursuant to the Stalking Horse Purchase Agreement or any other Successful Bid;

iii.    <u>Cure Objections</u>.  Cure Objections, if any, to a Cure Notice must:  (a) be in writing; (b) comply with the applicable provisions of the Bankruptcy Rules, the Local Bankruptcy Rules for the Southern District of Texas (the "<u>Local Rules</u>"), and any order governing the administration of these chapter 11 cases; (c) state with specificity the nature of the Cure Objection and, if the Cure Objection pertains to the proposed Cure Amount, state the cure amount alleged to be owed to the objecting Contract Party, together with any applicable and appropriate documentation in support thereof; and (d) be filed with the Court and served so as to be actually received by counsel to the Debtors and counsel to Stalking Horse Bidder or any other Successful Bidder by Sunday, March 8, 2020 at 4:00 p.m. (prevailing Central Time) (the "<u>Cure Objection Deadline</u>");

iv.    <u>Effects of Filing a Cure Objection</u>.  A properly filed and served Cure Objection will reserve such objecting party's rights against the Debtors only with respect to the assumption or assumption and assignment of the Lummus Executory Contract or Lummus Unexpired Lease at issue and/or objection to the accompanying Cure Amount, as set forth in the Cure Objection, but will not constitute an objection to the remaining relief requested in this Motion;

v.    <u>Dispute Resolution</u>.  Any objection to the proposed assumption or assumption and assignment of a Lummus Executory Contract or Lummus Unexpired Lease or Cure Amount that remains unresolved after the Sale Hearing, shall be heard at the next scheduled omnibus hearing (or at such later date as may be fixed by the Court).  To the extent that any Cure Objection cannot be resolved by the parties, such Lummus Executory Contract or Lummus Unexpired Lease shall be assumed and assigned only

upon satisfactory resolution of the Cure Objection, to be determined in the Stalking Horse Bidder's or other Successful Bidder's reasonable discretion. To the extent a Cure Objection remains unresolved, the Lummus Executory Contract or Lummus Unexpired Lease may be conditionally assumed and assigned, subject to the consent of the Stalking Horse Bidder or other Successful Bidder, pending a resolution of the Cure Objection after notice and a hearing.  If a Cure Objection is not satisfactorily resolved, the Stalking Horse Bidder or other Successful Bidder may determine that such Lummus Executory Contract or Lummus Unexpired Lease should be rejected and not assigned, in which case the Stalking Horse Bidder or other Successful Bidder will not be responsible for any Cure Amounts in respect of such contract;

vi.   <u>Supplemental Cure Notice</u>.  If the Debtors discover Lummus Executory Contracts and Unexpired Leases inadvertently omitted from the Cure Notice or the Successful Bidder identifies other Lummus Executory Contracts or Lummus Unexpired Leases that it desires to assume or assume and assign in connection with the Sale, the Debtors may, in consultation with the Successful Bidder and in accordance with the Stalking Horse Purchase Agreement or as otherwise agreed by the Debtors and the Successful Bidder, at any time before the closing of the Sale supplement the Cure Notice with previously omitted Lummus Executory Contracts and Unexpired Leases or modify a previously filed Cure Notice, including modify the previously stated Cure Amounts associated with any Lummus Executory Contract and Lummus Unexpired Lease (the "<u>Supplemental Cure Notice</u>");

vii.  <u>Objection to the Supplemental Cure Notice</u>.  Any Contract Party listed on the Supplemental Cure Notice may file an objection (a "<u>Supplemental Cure Objection</u>") only if such objection is to the proposed assumption or assumption and assignment of the applicable Lummus Executory Contract and/or Lummus Unexpired Lease or the proposed Cure Amounts, if any. All Supplemental Cure Objections must:  (a) state, with specificity, the legal and factual basis for the objection as well as what Cure Amounts are required, if any; (b) include appropriate documentation in support thereof; and (c) be filed no later than 4:00 p.m. (prevailing Central Time) on the date that is 14 days following the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice;

viii. <u>Dispute Resolution of Supplemental Cure Objection</u>.  If a Contract Party files a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors shall seek an expedited hearing before the Court to determine the Cure Amounts, if any, and approve the assumption and/or assignment of the relevant Lummus Executory Contracts and Unexpired Leases. If there is no such objection, then the Debtors shall obtain an order of this Court fixing the Cure Amount and approving the

assumption and/or assignment of any Lummus Executory Contracts and Unexpired Leases listed on a Supplemental Cure Notice; and

ix.   <u>No Cure Objections</u>.  If there are no objections to a Cure Notice or a Supplemental Cure Notice, or if a Contract Party does not file and serve a Cure Objection or a Supplemental Cure Notice in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Amounts, (a) the Cure Amount, if any, set forth in the Cure Notice (or Supplemental Cure Notice) shall be controlling, notwithstanding anything to the contrary in any Lummus Executory Contracts and Unexpired Leases or any other document, and (b) to the extent the Contract Party's consent is required under applicable law, the Contract Party will be deemed to have consented to the assumption or assumption and assignment of the Lummus Executory Contracts and Unexpired Leases and the Cure Amounts, if any, and will be forever barred from objecting to the assumption or assumption and assignment of such Lummus Executory Contracts and Unexpired Leases and rights thereunder, including the Cure Amounts, if any, and from asserting any other claims related to such Lummus Executory Contracts and Unexpired Leases against the Debtors or the Successful Bidder, or the property of any of them.

## Basis for Relief

I.   **The Bidding Procedures Are Fair, Designed to Maximize the Value Received for the Lummus Assets and Interests, and Are Consistent with the Debtors' Reasonable Business Judgment.**

22.   Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets.  *See, e.g.*, *In re Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc., (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Crutcher Resources Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business but the movant must articulate some business justification for the sale.").

31

23.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the [Bankruptcy Code] [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

24.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions.  *See, e.g., In re Integrated Res., Inc.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates.").

25.     The Debtors have carefully evaluated a number of qualitative and quantitative factors in designing a process that they believe will maximize the value of their estates, and produce maximum recoveries for all stakeholders.  This process includes both the Stalking Horse Purchase Agreement and the Bidding Procedures, which are designed to promote active bidding from seriously interested parties and to elicit the highest or otherwise best offers available for substantially all of the Lummus Assets and Interests, which is a core component of the Debtors' broader restructuring as contemplated by the RSA and Plan.  The Debtors are confident that the

Bidding Procedures will allow the Debtors to solicit additional offers and conduct the sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Lummus Assets and Interests and who can demonstrate the ability to take on the assets, obligations, and liabilities being transferred.  In particular, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

26.     Moreover, it is well-settled that, where there is a court-approved auction process, a full and fair price is presumed obtained for the assets sold, as the best way to determine value is exposure to the market.  *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In Re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction").  This is especially true here, where the Lummus Assets and Interests and related transactions both have been subjected to an extensive prepetition marketing process and intensively scrutinized by the Debtors and their retained advisors.

27.     The Debtors submit that the Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously approved by this district.  *See, e.g., In re Westmoreland Coal Company*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Nov. 15, 2019) (approving similar bidding procedures); *In re Cobalt Int'l Energy, Inc.*, No. 17-36709 (MI) (Bankr. S.D. Tex. Jan. 25, 2018) (same); *In re EMAS CHIYODA Subsea Limited.*, No. 17-31146 (Bankr. S.D. Tex. Apr. 24, 2017) (same); *In re Vanguard Nat. Res., LLC*, No. 17-30560 (MI) (Bankr. S.D. Tex. Apr. 13, 2017) (same); *In re Sherwin Alumina Co.*,

No. 16-20012 (DRJ) (Bankr. S.D. Tex. Mar. 16, 2016) (same); *In re University Gen. Health Sys., Inc.*, No. 15-31086 (LZP) (Bankr. S.D. Tex. Oct. 15, 2015) (same).[6]

28.     Accordingly, for all of the foregoing reasons, the Debtors believe that the Stalking Horse Purchase Agreement and the Bidding Procedures:  (a) will encourage robust bidding for the Lummus Assets and Interests; (b) are consistent with other procedures previously approved by courts in this District; and (c) are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  For these reasons, the Debtors respectfully submit that the Court should enter an order approving the Bidding Procedures.

**II.     The Stalking Horse Protections Have a Sound Business Purpose and Should be Approved.**

29.     The Debtors seek approval of customary bid protections, including the reimbursement of the Stalking Horse Bidders' reasonable and documented out-of-pocket expenses (the "Expense Reimbursement") and a break-up fee for the Stalking Horse Bidder (the "Break-Up Fee" and, together with the Expense Reimbursement and Break-Up Fee, collectively, the "Stalking Horse Protections").  In conjunction with the Bidding Procedures, the Stalking Horse Protections were negotiated at arms'-length, were reasonably calculated to encourage the Stalking Horse Bidder to serve in a stalking-horse capacity during the Debtors' chapter 11 cases, and encouraged the Stalking Horse Bidder to agree to terms that provided the highest or otherwise best value available to the Debtors.    The Debtors submit that cause exists to approve the Stalking Horse Protections as fair and reasonable under the circumstances.

30.     Generally, stalking horse bid protections are a normal and, in many cases, necessary component of significant sales conducted under section 363 of the Bankruptcy Code.  For example,

---

[6]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

"[b]reak-up fees are important tools to encourage bidding and to maximize the value of the debtor's

assets . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can

be necessary to discharge [such] duties to maximize value." *In re Integrated Res., Inc.*, 147 B.R.

at 659–60 (emphasis added).  Specifically, stalking horse bid protections may be necessary to

convince a stalking horse bidder to enter the bidding process by providing some form of

compensation for the risks that it is undertaking. *In re Integrated Res., Inc.*, 147 B.R. at 660–61

(bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not

retract its bid"); *In re Hupp Int'l Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992)

("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid

will be shopped around for a higher bid from another bidder who would capitalize on the initial

bidder's . . . due diligence.").

31.     Courts in the Fifth Circuit analyze the appropriateness of bidding incentives under

the "business judgment rule" standard, and the law is well established in this district that courts

consider whether (a) the incentive hampers, rather than encourages, bidding, and (b) the amount

of the incentive is unreasonable relative to the proposed purchase price. *See In re ASARCO, L.L.C.*,

650 F.3d 593 (5th Cir. 2011) (affirming bankruptcy court's decision to apply the business

judgment rule to evaluate whether an expense reimbursement bid protection was permissible); *see

also In re ASARCO LLC*, 441 B.R. 813, 826 (S.D. Tex. 2010) (explaining three-part test used to

determine whether expense reimbursement was permissible under business judgment rule); *In re

Integrated Res., Inc.*, 147 B.R. at 657-58 (explaining that to evaluate bid protections, courts should

employ the business judgment rule).

32.     The Stalking Horse Protections easily pass muster under this standard.  The Debtors

believe that granting authority to pay the Expense Reimbursement is in the best interests of their

estates.  The Stalking Horse Bidder will expend time and resources negotiating, drafting, and

performing due diligence activities in connection with preparing the Stalking Horse Purchase Agreement and the consummation of the Sale, despite the fact that the bids will be subject not only to Court approval, but to overbidding by third parties. In the absence of reimbursement of expenses, parties may elect not to participate in the process at all to the detriment of the Debtors' estates. Ultimately, the value created for the Debtors' estates will likely greatly outweigh the cost of the Expense Reimbursement paid to the Stalking Horse Bidder.

33.     The Debtors' provision of a customary Break-Up Fee in favor of the Stalking Horse Bidder likewise reflects the Debtors' sound business judgment. The Break-Up Fee encouraged the Stalking Horse Bidder to put its best foot forward to serve in a stalking-horse capacity, invest the requisite time, money, and effort to negotiate with the Debtors, and perform the necessary due diligence attendant to the Sale, despite the inherent risks and uncertainties of the chapter 11 process. The Break-Up Fee also allowed the Debtors to offer additional protection for the Stalking Horse Bid while preserving the Debtors' ability to pursue high and better offers in furtherance of their fiduciary obligations.

34.     The Debtors therefore submit that the Stalking Horse Protections are an exercise of the Debtors' sound business judgment and are in the best interests of the Debtors, their estates, and all stakeholders. Accordingly, the Court should authorize the Stalking Horse Protections.

III.    **The Court Should Approve the Debtors' Entry into the Definitive Purchase Agreement Because the Sale is Supported by a Valid Business Justification.**

35.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if such sale

is based upon "some articulated business justification for using, selling, or leasing the property outside the ordinary course of business." *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (Bankr. D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (Bankr. D. Del. 1991); *In re Trans World Airlines, Inc.*, Case No. 01-00056, 2001 Bankr. LEXIS 980, at *29 (Bankr. D. Del. Apr. 2, 2001).

36.     As noted above, the business judgment rule shields a debtor's management's decisions from judicial second guessing. *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (a "presumption of reasonableness attaches to a debtor's management decisions" and courts generally will not entertain objections to the debtor's conduct after a reasonable basis is set forth).  Once a debtor articulates a valid business justification, the court should review that request under the business judgment rule.  *See In re Gulf Coast Oil Corp.*, 404 B.R. 407, 415 (Bankr. S.D. Tex. 2009) (noting that a debtor in possession has the discretionary authority to exercise business judgment given to an officer or director of a corporation).  The business judgment rule protects certain debtor decisions—such as the Debtors' entry into the Definitive Purchase Agreement—from reevaluation by a court with the benefit of hindsight.  *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F. 2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.").  Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

37.     Based on this rationale, courts have authorized a debtor's sale of assets as a sound exercise of business judgment under section 363 of the Bankruptcy Code.  *See, e.g.*, *In re Westwind*

*Manor Resort Association, Inc.*, No. 19-50026 (DRJ) (Bankr. S.D. Tex. Nov. 22, 2019) (authorizing a sale of the Debtor's assets under section 363 of the Bankruptcy Code as a sound exercise of business judgment); *In re Matra Petroleum U.S.A., Inc.*, Case No. 19-34190 (DRJ) (Bankr. S.D. Tex. Nov. 7, 2019) (same); *In re O'Benco IV, LP*, No. 19-60384 (BP) (Bankr. E.D. Tex. Sep. 3, 2019) (same); *In re SQLC Senior Living Center at Corpus Christi, Inc.*, No. 19-20063 (DRJ) (Bankr. S.D. Tex. Feb. 12, 2019) (same); *In re Burkhalter Rigging, Inc.*, No. 19-30495 (MI) (Bankr. S.D. Tex. Jan. 31, 2019) (same); *In re Mayflower Communities, Inc.*, Case No. 19-30283 (HDH) (Bankr. N.D. Tex. Aug. 2, 2019) (same).

38.     The Sale is a critical component of the Debtors' broader restructuring efforts. Unless the Stalking Horse Bidder exercises the 363 Sale Order, if applicable, the Debtors will seek authority to consummate the Sale in the Confirmation Order and the Sale will close on or prior to the effective date of the Plan.  However, to ensure that Potential Bidders put forward their best and highest bids, the Debtors agreed to seek Court approval to enter into the Definitive Purchase Agreement prior to the Court's ultimate approval of the Sale overall.  This sequencing allows the Debtors to be bound to the Definitive Purchase Agreement during the pendency of these chapter 11 cases while also structuring the Sale pursuant to the terms of the Plan (unless the Stalking Horse Bidder exercises the 363 Sale Option, if applicable), which the Debtors believe will maximize the value of the Sale for the benefit of the Debtors' estates, their creditors, and other parties in interest. Accordingly, the Debtors' decision to enter into the Definitive Purchase Agreement demonstrates a sufficient business justification, and will maximize the value of the Debtors' estates for the benefit of all stakeholders.  The Definitive Purchase Agreement will be signed by the bidder who makes the highest or otherwise best bid, thus appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings and should be approved.

IV.    **The Assumption or Assumption and Assignment of the Lummus Executory Contracts and Unexpired Leases Should Be Approved.**

A.    **The Assumption or Assumption and Assignment of the Lummus Executory Contracts and Unexpired Leases Reflects the Debtors' Reasonable Business Judgment.**

39.    To facilitate and effectuate the Sale, the Debtors are seeking authority to assign or transfer the Lummus Executory Contracts and Unexpired Leases to the Successful Bidder to the extent required by such bidder.  Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assume and assign its executory contracts and unexpired leases, subject to the approval of the court, so long as the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *See, e.g., Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (applying a business judgment standard to debtor's determination to assume an unexpired lease); *In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008) (business judgment test "rather obviously presupposes that the estate will assume a contract only where doing so will be to its economic advantage."); *In re Del Grosso*, 115 B.R. 136, 138 (Bankr. N.D. Ill. 1990) ("[T]he standard to be applied for approval of the assumption [of an executory contract] is the business judgment standard.").

40.    As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption or assumption and assignment of any Assigned Contract be deemed to consent to (a) the assumption or assumption and assignment of the applicable Assigned Contract pursuant to section 365 of the Bankruptcy Code and (b) assignment notwithstanding any anti-alienation provision or other restriction on assignment. *See, e.g., Hargrave v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994)

(by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

41.     Here, the Court should approve the decision to assume or assume and assign the Lummus Executory Contracts and Unexpired Leases in connection with the Sale as a sound exercise of the Debtors' business judgment.   ***First***, the Lummus Executory Contracts and Unexpired Leases are necessary to run the Lummus Debtors' business and, as such, they are essential to inducing the highest or otherwise best offer for the Lummus Assets and Interests. ***Second***, it is unlikely that any purchaser would want to acquire any company or any segment of a company on a going-concern basis unless a significant number of the contracts and leases needed to conduct the business and manage the day-to-day operations were included in the transaction. ***Third***, the Stalking Horse Purchase Agreement provides that the assumption or assumption and assignment of the Lummus Executory Contracts and Unexpired Leases is integral to, and inextricably integrated in, the Sale.   ***Fourth***, the Lummus Debtors' business is focused largely on technology and intellectual property—accordingly the Lummus Debtors' contracts and licenses constitute a substantial portion of the value of the business and, to the extent such contracts or licenses contain enforceable anti-assignment provisions, the Debtors request the ability to deem counterparties to consent upon sufficient notice and in the absence of an objection.   ***Lastly***, the Lummus Executory Contracts and Unexpired Leases will be assumed or assumed and assigned through the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these chapter 11 cases.

42.     Accordingly, the Debtors submit that the assumption or assumption and assignment of the Lummus Executory Contracts and Unexpired Leases by way of the Assumption and Assignment Procedures should be approved as an exercise of their business judgment.

**B.     Defaults Under the Assumed Contracts Will Be Cured in Connection with the Sale.**

43.     Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain."  *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

44.     The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be satisfied because the Assumption and Assignment Procedures provide a clear process by which to resolve disputes over Cure Amounts or other defaults.  Because the Motion provides a clear process by which to resolve disputes over Cure Amounts and other defaults, the Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-debtor parties.

**C.     Non-Debtor Parties Will Be Adequately Assured of Future Performance.**

45.     Similarly, the Debtors submit that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.  The phrase "adequate assurance of future performance" adopted from section 2-609(1) of the Uniform Commercial Code, is "to be given a practical, pragmatic construction" based upon the facts and circumstances of each case.  *In re U.L. Radio Corp.*,

41

19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).  Although no single solution will satisfy every case, the required assurance will "[fall] considerably short of an absolute guarantee of performance." *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

46.     The Debtors believe that they can and will demonstrate that the requirements for assumption or assumption and assignment of the Lummus Executory Contracts and Unexpired Leases to the Successful Bidder will be satisfied.  As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of Potential Bidders before designating such party an Acceptable Bidder or Successful Bidder, including as it relates to such Acceptable Bidder's financial credibility, willingness, and ability to perform under the Lummus Executory Contracts and Unexpired Leases assigned to the Successful Bidder.  Further, the Assumption and Assignment Procedures provide the Court and other interested parties (including the Consultation Parties) ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance and object to the assumption of the Lummus Executory Contracts and Unexpired Leases or proposed Cure Amounts.  The Court therefore will have a sufficient basis to authorize the Debtors to reject or assume and assign the Lummus Executory Contracts and Unexpired Leases as set forth in the Definitive Purchase Agreement with the Successful Bidder.

**Reservation of Rights**

47.      Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the Bidding Procedures Order is intended or should be construed as: (a) an admission as to the validity of any particular claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

48.      To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Notice**

49.      Notice of the hearing on the relief requested in the Motion has been provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Local Rules, and is sufficient under the circumstances.   Without limiting the forgoing, due notice was afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-in-interest, including:   (a) the Office of the U.S. Trustee for the Southern District of Texas; (b) entities listed as holding the 50 largest unsecured claims against the Debtors (on a

consolidated basis); (c) Credit Agricole Corporate and Investment Bank, 1301 Avenue of the Americas, New York, New York 10019, Attn: Ronald E. Spitzer, Kathleen Sweeney and Yuri Tsyganov, as proposed DIP LC Agent and as proposed DIP Collateral Agent (each as defined in the DIP Credit Agreement) under the DIP Credit Agreement, as Revolving Administrative Agent and as Collateral Agent (the "Revolving Administrative Agent") under that certain Superpriority Senior Secured Credit Agreement, dated as of October 21, 2019, and as Revolving and LC Administrative Agent and as Collateral Agent (the "Revolving and LC Administrative Agent") under that certain Credit Agreement, dated as of May 10, 2018; (d) Linklaters LLP, 1345 Avenue of the Americas, New York, New York 10105, Attn: Margot Schonholtz, Esq. and Penelope Jensen, Esq., counsel to the proposed DIP LC Agent, the proposed DIP Collateral Agent, the Revolving Administrative Agent and the Revolving and LC Administrative Agent; (e) Bracewell LLP, 711 Louisiana Street, Suite 2300, Houston, Texas 77002, Attn: William A. (Trey) Wood III, Esq., co-counsel to the proposed DIP LC Agent, the proposed DIP Collateral Agent, the Revolving Administrative Agent and the Revolving and LC Administrative Agent; (f) the indenture trustee for each of the Debtors' unsecured notes, and counsel thereto; (g) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 6th Ave, New York, NY 10019, Attn: Andrew N. Rosenberg and Alice Belisle Eaton, and Brown Rudnick LLP, 7 Times Square, New York, NY 10036, Attn: Robert J. Stark and Bennett S. Silverberg, co-counsel to the Ad Hoc Group of Senior Noteholders; (h) Davis, Polk & Wardell LLP, 450 Lexington Ave., New York, NY 10017, Attn: Damian S. Schaible and Natasha Tsiouris, counsel to the Ad Hoc Group of Term Lenders; (i) the United States Attorney's Office for the Southern District of Texas; (j) the Internal Revenue Service; (k) the United States Securities and Exchange Commission; (l) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (m) the state attorneys general for states in which the Debtors conduct business; (n) counsel to the Stalking Horse Bidder;

(m) all parties who have expressed a written interest in some or all of the Lummus Assets and Interests; (o) all known holders of liens, encumbrances, and other claims secured by the Lummus Assets and Interests; (p) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (q) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding Procedures Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
January 22, 2020

/s/ Matthew D. Cavenaugh

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          mcavenaugh@jw.com
                jwertz@jw.com
                kpeguero@jw.com
                vpolnick@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Christopher T. Greco, P.C. (*pro hac vice* pending)
Anthony R. Grossi (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                christopher.greco@kirkland.com
                anthony.grossi@kirkland.com

-and-

James H.M. Sprayregen, P.C.
John R. Luze (*pro hac* vice pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
Email:       james.sprayregen@kirkland.com
             john.luze@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

      I certify that on January 22, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

<div align="right">

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

</div>