## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

ENTERED
02/24/2020

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MCDERMOTT INTERNATIONAL, INC. *et al.*, | ) | Case No. 20-30336 (DRJ) |
| | ) | |
| Debtors. [1] | ) | (Jointly Administered) |
| | ) | |
| | ) | Re: Docket Nos. 56, 146 |

### FINAL ORDER (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (B) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (C) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (D) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (E) MODIFYING THE AUTOMATIC STAY, AND (F) GRANTING RELATED RELIEF

Upon the motion (the "**DIP Motion**")[2] of McDermott International, Inc. and each of its affiliates that are debtors and debtors-in-possession (each, a "**Debtor**" and collectively, the "**Debtors**") in the above-captioned cases (the "**Chapter 11 Cases**") and pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (together,

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/McDermott. The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 757 North Eldridge Parkway, Houston, Texas 77079.

[2] Capitalized terms used herein and not herein defined have the meaning ascribed to such terms in the DIP Motion.

the "**Local Rules**"), and the Procedures for Complex Chapter 11 Bankruptcy Cases (the "**Complex Case Rules**" and together with the Local Rules, the "**Bankruptcy Local Rules**"), seeking entry of this final order (the "**Final Order**") providing, among other things:

(i)   authorizing McDermott Technology (Americas), Inc., McDermott Technology (US), Inc., and McDermott Technology, B.V. (the "**Borrowers**") to obtain postpetition financing ("**DIP Financing**") pursuant to a senior secured, superpriority debtor-in-possession credit facility (the "**DIP Facility**") subject to the terms and conditions set forth in that certain Superpriority Senior Secured Debtor-in-Possession Credit Agreement attached as **Exhibit 1** to the Interim Order (as amended, supplemented, or otherwise modified from time to time, the "**DIP Credit Agreement**"), in an aggregate principal amount of up to $2.81 billion, consisting of:

> a.   a new money term loan facility in the aggregate principal amount of $1.2 billion (the "**DIP New Money Term Loan Facility**" and the loans issued thereunder, the "**DIP New Money Term Loans**") from the DIP Lenders (as defined below), of which $550 million became available immediately upon entry of the *Interim Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* entered by this Court on January 23, 2020 [Dkt. No. 146] (the "**Interim Order**");

> b.   a new money letter of credit facility (the "**DIP Letter of Credit Facility**") with aggregate commitments to issue up to $543 million of new letters of credit (the "**DIP New Money Letters of Credit**") of which $300 million became available immediately upon entry of the Interim Order (and together with the $550 million of immediately available DIP New Money Terms Loans, the "**Initial Funding**");

> c.   upon entry of this Final Order, term loans in an aggregate principal amount of (x) $800 million equal to the aggregate principal amount of term loans advanced under the Superpriority Credit Agreement (as defined below) and (y) approximately $44 million in respect of Applicable Premium (as defined in the Superpriority Credit Agreement) and $23 million in respect of additional obligations equal to all interest, fees and expenses due in respect of all Prepetition Superpriority Credit Facility Debt (as defined below) (the "**DIP Term Roll-Up Facility**," together with the DIP New Money Term Loan Facility, the "**DIP Term Loan Facilities**") and the loans thereunder, the "**DIP Roll-Up Loans**" (together with the DIP New Money Term Loans, the "**DIP Loans**") shall be rolled into and deemed incurred under the DIP Term Loan Facilities;

d.  upon entry of this Final Order, a letter of credit facility in an aggregate amount of $200 million letters of credit (the "**DIP Roll-Up Letters of Credit**" together with the DIP New Money Letters of Credit, the "**DIP Letters of Credit**") equal to the aggregate face amount of letters of credit outstanding under the Prepetition Superpriority Credit Agreement (as defined below) which shall be rolled into and deemed issued under the DIP Credit Agreement (the "**DIP Roll-Up LC Facility,**" and together with the DIP Letter of Credit Facility, the "**DIP LC Facilities**"); and

e.  upon entry of the Interim Order, hedging obligations (the "**DIP Roll-Up Hedging Obligations**") in respect of (1) all obligations in respect of prepetition secured currency hedging transactions, and (2) obligations in respect of $500 million notional amount of prepetition secured interest rate hedging transactions, in each case, of the Debtors owing to the DIP Agents, the DIP Letter of Credit Lenders (as defined below) or their affiliates (collectively, the "**DIP Hedging Counterparties**") which were rolled up into and deemed incurred under the DIP Facility (such roll-up and deemed incurrence, the "**Prepetition Hedging Roll-Up**") pursuant to the Interim Order and together with any hedging transactions entered into after the Petition Date by the Debtors with a counterparty that is a DIP Agent, a DIP Letter of Credit Lender or any affiliate of the foregoing (or, subject to the consent of the DIP LC Agent (as defined below) in its reasonable discretion, other persons, on to be agreed terms) (together with the DIP Roll-Up Hedging Obligations, the "**DIP Hedging Obligations**");

by and among the Borrowers, as borrowers, the DIP Guarantors (as defined herein), as guarantors, the several banks and other financial institutions or entities from time to time party thereto as Term Lenders (as defined in the DIP Credit Agreement) (the "**DIP Term Loan Lenders**") and as Revolving Lenders (as defined in the DIP Credit Agreement) (the "**DIP Letter of Credit Lenders**" and together with the DIP Term Loan Lenders, the "**DIP Lenders**"), Crédit Agricole Corporate and Investment Bank, as administrative agent for the DIP LC Facilities (in such capacity, together with its successors and permitted assigns, the "**DIP LC Agent**"), Barclays Bank PLC, as administrative agent for the DIP Term Loan Facilities (in such capacity, together with its successors and permitted assigns, the "**Term DIP Agent**" and together with the DIP LC Agent, the "**DIP Administrative Agents**"), Crédit Agricole Corporate and Investment Bank, as collateral agent for the DIP Facility (in such capacity, together with its successors and permitted assigns, the "**DIP Collateral Agent**" and together with the DIP Administrative Agents, the "**DIP Agents,**" together with the DIP Lenders, any issuer of a DIP Letter of Credit (a "**DIP Letter of Credit Issuer**"), and all holders of all other DIP Obligations (as defined below), the "**DIP Secured Parties**");

(ii)  authorizing certain of the other Debtors identified in the DIP Documents (as defined below) (such Debtors, the "**DIP Guarantors,**" and together with the Borrowers, the "**DIP Loan Parties**") to jointly and severally guarantee on a senior secured

superpriority basis the DIP Loans, the DIP LC Facilities and the other DIP Obligations;

(iii)    authorizing the DIP Loan Parties, upon entry of this Final Order, to use the DIP Roll-Up Loans to refinance dollar-for-dollar and discharge the aggregate outstanding amount of all Prepetition Superpriority Credit Facility Debt under the Prepetition Superpriority Term Loan Credit Facility (such refinancing, the "**Prepetition Superpriority Term Loan Debt Refinancing**");

(iv)    authorizing the DIP Loan Parties, upon entry of this Final Order, to deem the letters of credit issued under the Prepetition Superpriority Revolving Credit Facility to have been issued under the DIP Roll-Up LC Facility (such deemed issuance, together with the Prepetition Superpriority Term Loan Debt Refinancing, the "**Prepetition Superpriority Debt Refinancing**");

(v)    authorizing the DIP Loan Parties, upon entry of the Interim Order, to effect the Debtors' Prepetition Hedging Roll-Up under the DIP Facility and allow the DIP Hedging Counterparties to benefit from the liens granted thereunder;

(vi)    authorizing the DIP Loan Parties to execute and deliver the DIP Credit Agreement and other documentation, including credit agreements, security agreements, pledge agreements, control agreements, mortgages, guarantees, promissory notes, certificates, hedging agreements, instruments, intellectual property security agreements, notes, each fee letter entered into by any Loan Party in connection with the DIP Credit Agreement (the "**Fee Letters**"), that certain Engagement Letter, dated as of January 23, 2020, by and among the Term DIP Agent, Royal Bank of Canada, Crédit Agricole Corporate and Investment Bank, ABN AMRO Capital USA LLC, McDermott International, Inc., and the Borrowers (the "**Engagement Letter**"), and such other documentation which may be necessary or required to implement the DIP Term Loan Facilities, the DIP LC Facilities and the DIP Hedging Obligations and perform thereunder and/or that may be reasonably requested by the DIP Agents, in each case, as amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the DIP Credit Agreement, all Loan Documents (as defined in the DIP Credit Agreement), the Interim Order and this Final Order, the "**DIP Documents**");

(vii)    authorizing the DIP Loan Parties to incur loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees (including, without limitation, commitment fees, administrative agency fees and other fees payable pursuant to the Fee Letters and the Engagement Letter), costs, expenses and other liabilities, all other obligations (including indemnities and similar obligations, whether contingent or absolute) and all other Obligations (as defined in the DIP Credit Agreement) due or payable under the DIP Documents including DIP Hedging Obligations, collectively, the ("**DIP Obligations**") and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

(viii)    subject to the Carve Out (as defined herein), granting to the DIP Agents for the benefit of the DIP Secured Parties allowed superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations;

(ix)    granting to the DIP Collateral Agent for the benefit of the DIP Secured Parties valid, enforceable, non-avoidable and automatically perfected liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all prepetition and postpetition property of the DIP Loan Parties' estates (other than certain excluded property as provided in the DIP Documents (the "**Excluded Assets**")) and all proceeds thereof, including, any Avoidance Proceeds (as defined herein), in each case subject to the Carve Out (as defined herein);

(x)    subject to the Carve Out (as defined herein), authorizing the Debtors to waive (a) their right to surcharge the Prepetition Collateral and the DIP Collateral (as defined herein) (together, but excluding any Excluded Assets, the "**Collateral**") pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(xi)    waiving the equitable doctrine of "marshaling" and other similar doctrines (a) with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and (b) with respect to any of the Prepetition Collateral (including the Cash Collateral) for the benefit of any party other than the Prepetition Secured Parties[3];

(xii)    authorizing the Debtors to use proceeds of the DIP Facility solely in accordance with the Interim Order, this Final Order and the DIP Documents;

(xiii)    authorizing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

(xiv)    subject to the restrictions set forth in the DIP Documents, the Interim Order and this Final Order, authorizing the Debtors to use the Prepetition Collateral (as defined herein), including Cash Collateral of the Prepetition Secured Parties under the Prepetition Secured Debt Documents (as defined herein), and provide adequate protection to the Prepetition Secured Parties for any diminution in value of their respective interests in the Prepetition Collateral (including Cash Collateral), resulting from the imposition of the Automatic Stay (as defined below), the Debtors' use, sale, or lease of the Prepetition Collateral (including Cash Collateral), and the

---

[3] "**Prepetition Secured Parties**" means, collectively, the Prepetition Superiority Secured Parties, the Prepetition Credit Facility Secured Parties, the Lloyds Facility Secured Parties and the Barclays Facility Secured Parties (as each term is defined herein).

priming of their respective interests in the Prepetition Collateral (including Cash Collateral);

(xv)    vacating and modifying the automatic stay under section 362 of the Bankruptcy Code (the "**Automatic Stay**") to the extent set forth herein to the extent necessary to permit the Debtors and their affiliates and the Prepetition Secured Parties to implement and effectuate the terms and provisions of the Interim Order, this Final Order and the DIP Documents and to deliver any notices of termination described below and as further set forth herein; and

(xvi)    waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order and this Final Order.

The interim hearing on the DIP Motion (the "**Interim Hearing**") having been held by this Court on January 23, 2020, and a final hearing (the "**Final Hearing**") having been held by this Court on February 24, 2020, and the Court having considered the relief requested in the DIP Motion, the exhibits attached thereto, the *Declaration of Roopesh Shah in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* [Dkt. No. 56, *Exhibit A*] (the "**Shah Declaration**"), the *Declaration of David Dickson, President and Chief Executive Officer of McDermott International, Inc., in Support of the Chapter 11 Petitions* [Dkt. No. 29] (the "**Dickson Declaration**") and the *Declaration of John R. Castellano, Chief Transformation Officer of McDermott International, Inc., in Support of the Debtors' First Day Motions* [Dkt. No. 62] (the "**Castellano Declaration**," together with the Shah Declaration and the Dickson Declaration, the "**First Day Declarations**"), the available DIP Documents, and the evidence submitted and arguments made at the Interim Hearing and the Final Hearing; and due and sufficient notice of the Final Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d),

and all applicable Bankruptcy Local Rules; and the Final Hearing having been held and concluded; and all objections, if any, to the relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the relief requested in the DIP Motion is fair and reasonable and in the best interests of the Debtors and their estates, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor.

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING AND THE FINAL HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[4]

A. *Petition Date*. On January 21, 2020 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Court**"). On January 22, 2020, this Court entered an order approving the joint administration of the Chapter 11 Cases. No trustee or examiner has been appointed in these Chapter 11 Cases.

B. *Debtors in Possession*. The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

---

[4] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.     *Jurisdiction and Venue*.  This Court has core jurisdiction over the Chapter 11 Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012.  Consideration of the DIP Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Chapter 11 Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief sought herein are sections 105, 361, 362, 363(c), 363(e), 363(m) 364(c), 364(d)(1), 364(e), and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, and Bankruptcy Local Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1.

D.     *Committee Formation*.  As of the date hereof, the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") has not appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

E.     *Notice*.  The Final Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Proper, timely, adequate and sufficient notice of the DIP Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Local Rules, and no other or further notice of the DIP Motion or the entry of this Final Order shall be required.

F.     *Debtors' Stipulations*.  Without prejudice to the rights of the Debtors' estates or any other party in interest (but subject to the limitations thereon contained in paragraph 23 below), and after consultation with their attorneys and financial advisors, the Debtors admit, stipulate and agree that:

(i)     *Prepetition Superpriority Credit Facility*.  Pursuant to that certain Superpriority Senior Secured Credit Agreement, dated as of October 21, 2019 (as amended,

restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition Superpriority Credit Agreement**", and collectively with the Pledge and Security Agreement, dated as of October 21, 2019 and the other Loan Documents (as defined in the Prepetition Superpriority Credit Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition Superpriority Loan Documents**"), among (a) McDermott Technology (Americas), Inc., McDermott Technology (US), Inc., and McDermott Technology, B.V., as borrowers (in such capacity, the "**Prepetition Superpriority Borrowers**"), (b) McDermott International, Inc., as parent, (c) Crédit Agricole Corporate and Investment Bank, as revolving administrative agent (in such capacity, the "**Prepetition Superpriority Revolving Agent**") and as collateral agent (in such capacity, the "**Prepetition Superpriority Collateral Agent**"), (d) Barclays Bank PLC, as term loan administrative agent (in such capacity, the "**Prepetition Superpriority Term Loan Administrative Agent**", and together with the Prepetition Superpriority Revolving Agent and the Prepetition Superpriority Collateral Agent, the "**Prepetition Superpriority Agents**"), (e) the Term Lenders (as defined in the Prepetition Superpriority Credit Agreement) party thereto (collectively, the "**Prepetition Superpriority Term Loan Lenders**") and the Revolving Lenders (as defined in the Prepetition Superpriority Credit Agreement) party thereto (collectively, the "**Prepetition Superpriority Revolving Lenders**", and together with the Prepetition Superpriority Term Loan Lenders, the "**Prepetition Superpriority Lenders**") (the Prepetition Superpriority Lenders, collectively with the Prepetition Superpriority Agents, the Prepetition Superpriority Issuers (as defined below) and all other holders of Prepetition Superpriority Credit Facility Debt (as defined below), the "**Prepetition Superpriority Secured Parties**"), (x) (1) the Prepetition

Superpriority Revolving Lenders provided financial accommodations to, and participated in letters of credit for the account of, the Prepetition Superpriority Borrowers pursuant to the Prepetition Superpriority Loan Documents and (2) the Issuers (as defined in the Prepetition Superpriority Credit Agreement) (the "**Prepetition Superpriority Issuers**") provided financial accommodations to, and issued letters of credit for the account of, the Prepetition Superpriority Borrowers pursuant to the Prepetition Superpriority Loan Documents (the "**Prepetition Superpriority Revolving Credit Facility**"), (y) the Prepetition Superpriority Term Loan Lenders provided term loans and other financial accommodations to the Prepetition Superpriority Borrowers pursuant to the Prepetition Superpriority Loan Documents (the "**Prepetition Superpriority Term Loan Credit Facility**" and together with the Prepetition Superpriority Revolving Credit Facility, the "**Prepetition Superpriority Credit Facilities**").  Pursuant to that certain Guaranty Agreement, dated as of October 21, 2019 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time), the Debtors party thereto (the "**Prepetition Superpriority Guarantors**") guaranteed on a joint and several basis the obligations of the Prepetition Superpriority Borrowers under the Prepetition Superpriority Credit Agreement and the other Prepetition Superpriority Loan Documents.

(ii)    *Prepetition Credit Facility*.  Pursuant to that certain Credit Agreement, dated as of May 10, 2018 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition Credit Agreement**", and collectively with the Pledge and Security Agreement, dated as of May 10, 2018 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition Credit Facility Pledge and Security Agreement**") and the other Loan Documents (as defined in the Prepetition Credit Agreement) and any other agreements and documents, executed or delivered in

connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition Credit Facility Loan Documents**"), among (a) McDermott Technology (Americas), Inc., McDermott Technology (US), Inc., and McDermott Technology, B.V., as borrowers (in such capacity, the "**Prepetition Credit Facility Borrowers**"), (b) McDermott International, Inc., as parent, (c) Crédit Agricole Corporate and Investment Bank, as administrative agent for the Revolving Facility (as defined in the Prepetition Credit Agreement) and for the LC Facility (as defined in the Prepetition Credit Agreement) (in such capacity, the "**Prepetition Revolving and LC Administrative Agent**"), (d) Barclays Bank PLC, as term loan administrative agent (in such capacity, the "**Prepetition Term Loan Administrative Agent**"), (e) the Term Lenders (as defined in the Prepetition Credit Agreement) party thereto (collectively, the "**Prepetition Term Loan Lenders**"), the Issuers (as defined in the Prepetition Credit Agreement) party thereto (the "**Prepetition Credit Agreement Issuers**"), the LC Lenders (as defined in the Prepetition Credit Agreement) party thereto (collectively, the "**Prepetition LC Lenders**"), and the Revolving Lenders (as defined in the Prepetition Credit Agreement) party thereto (collectively, the "**Prepetition Revolving Lenders**", and together with the Prepetition Term Loan Lenders and the Prepetition LC Lenders, the "**Prepetition Credit Facility Lenders**") (the Prepetition Credit Facility Lenders, collectively with the Prepetition Collateral Agent (as defined below), the Prepetition Revolving and LC Administrative Agent, the Prepetition Term Loan Administrative Agent, the Prepetition Credit Agreement Issuers and all other holders of Prepetition Credit Facility Debt (as defined below), the "**Prepetition Credit Facility Secured Parties**"), (w) the Prepetition Revolving Lenders provided revolving loans to, participated in letters of credit in support of, and provided other financial accommodations to the Prepetition Credit Facility Borrowers pursuant to the Prepetition Credit

Facility Loan Documents (the "**Prepetition Revolving Credit Facility**"), (x) the Prepetition LC Lenders provided financial accommodations to, and participated in letters of credit supporting the operations of the Borrowers pursuant to the Prepetition Credit Facility Loan Documents (the "**Prepetition Letter of Credit Facility**"), (y) the Prepetition Credit Agreement Issuers provided financial accommodations to, and issued letters of credit supporting the operations of the Borrowers pursuant to the Prepetition Revolving Credit Facility, the Prepetition Letter of Credit Facility, and a cash secured letter of credit facility (the "**Prepetition Cash Secured LC Facility**" and together with the Prepetition Letter of Credit Facility and the Prepetition Revolving Credit Facility, the "**Prepetition LC Credit Facilities**") in each case for the account of, the Prepetition Credit Facility Borrowers pursuant to the Prepetition Credit Facility Loan Documents, and (z) the Prepetition Term Loan Lenders provided term loans to the Prepetition Credit Facility Borrowers pursuant to the Prepetition Credit Facility Loan Documents (the "**Prepetition Term Loan Facility**", and together with the Prepetition Revolving Credit Facility and the Prepetition LC Credit Facilities, the "**Prepetition Credit Facilities**").

(iii)    *Prepetition Lloyds Facility.*  Pursuant to that certain Amended and Restated Master Agreement for Stand-by Letters of Credit, dated May 10, 2018 (such agreement, as amended and modified by that certain letter agreement dated as of January 10, 2020 (the "**Lloyds Letter Agreement**") and as further amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Lloyds Facility Agreement**," and those certain documents executed in connection therewith (the "**Lloyds Facility Documents**")), between Comet II B.V. and CB&I, LLC, as applicants, and Chicago Bridge & Iron Company (Delaware), Chicago Bridge and Iron Company, B.V., CBI Services, LLC, CB&I UK Limited, CBI Constructors PTY LTD, CB&I Group Inc., and Woodlands International Insurance Limited,

as additional parties (collectively, the "**Lloyds Facility Applicants**"), and Lloyds Bank Corporate Markets plc (as successor to Lloyds Bank plc) as lending bank, ("**Lloyds Bank**" or, the "**Lloyds Facility Secured Party**"), the Lloyds Facility Secured Party provided financial accommodations to, and maintained letters of credit (the "**Lloyds Facility Letters of Credit**") for the account of, the Lloyds Facility Applicants and Guarantors pursuant to the Lloyds Facility Agreement.

(iv)     *Prepetition Barclays Facility.* Pursuant to that certain Letter of Credit Agreement dated as of October 30, 2018 (such agreement, as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Barclays Facility Agreement**" and all documents executed in connection therewith, the "**Barclays Facility Documents**"), by and among certain of the Debtors as applicants and guarantors thereto (such applicants and guarantors, the "**Barclays Facility Applicants and Guarantors**"), and Barclays Bank PLC as administrative agent for the LC Facility (as defined in the Barclays Facility Agreement) (in such capacity, the "**Barclays Facility Agent**" and together with each lender participant or other holder of a claim in respect of a letter of credit issued under the Barclays Facility Agreement, the "**Barclays Facility Secured Parties,**" and together with the Prepetition Credit Facility Secured Parties and the Lloyds Facility Secured Party, the "**Prepetition Shared Collateral Secured Parties**") as lending parties, the Barclays Facility Secured Parties provided financial accommodations to, and issued letters of credit (the "**Barclays Facility Letters of Credit**" and together with the letters of credit issued under the Prepetition LC Credit Facilities and the Lloyds Facility Letters of Credit, the "**Prepetition Letters of Credit**") for the account of, the Barclays Facility Applicants pursuant to the Barclays Facility Agreement.  The Prepetition Credit Facility Loan Documents, the Lloyds Facility Documents and the Barclays Facility Documents are

referred to collectively herein as the "**Prepetition Shared Collateral Documents**" and together with the Prepetition Superpriority Loan Documents, the "**Prepetition Secured Debt Documents**."

(v)     *Prepetition Guaranty*.  Pursuant to that certain Guaranty Agreement, dated as of May 10, 2018 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time), the Debtors party thereto (the "**Prepetition Guarantors**") guaranteed on a joint and several basis the obligations under the Prepetition Secured Debt Documents**.**

(vi)     *Prepetition Superpriority Credit Facility Debt*.  As of the Petition Date, the Prepetition Superpriority Borrowers and the Prepetition Superpriority Guarantors were justly and lawfully indebted and liable to the Prepetition Superpriority Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $1.0 billion including (a) $200 million in outstanding principal amount of Revolving Obligations (as defined in the Prepetition Superpriority Credit Agreement), and (b) $800 million in outstanding principal amount of Term Loans (as defined in the Prepetition Superpriority Credit Agreement) (collectively, together with accrued and unpaid interest, outstanding letters of credit, any reimbursement obligations (contingent or otherwise) in respect of letters of credit, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Superpriority Borrowers' or the Prepetition Superpriority Guarantors' obligations pursuant to, or secured by, the Prepetition Superpriority Loan Documents, including all Obligations, (as defined

in the Prepetition Superpriority Credit Agreement), and all interest, fees, prepayment premiums, including, without limitation, the Applicable Premium (as defined in the Prepetition Superpriority Credit Agreement), early termination fees, costs and other charges, the "**Prepetition Superpriority Credit Facility Debt**"), which Prepetition Superpriority Credit Facility Debt has been guaranteed on a joint and several basis by each of the Prepetition Superpriority Guarantors. All of the outstanding Prepetition Superpriority Credit Facility Debt will be converted (or "rolled up") into DIP Obligations upon entry of this Final Order.

(vii)    *Prepetition Credit Facility Debt*.  As of the Petition Date, the Prepetition Credit Facility Borrowers and the Prepetition Guarantors were justly and lawfully indebted and liable to the Prepetition Credit Facility Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $4.757 billion including (a) $801 million in outstanding principal amount of Revolving Loans (as defined in the Prepetition Credit Agreement), (b) $194 million of outstanding Revolving Letters of Credit (as defined in the Prepetition Credit Agreement), $1.257 billion of outstanding LC Facility Letters of Credit and $305 million of outstanding Cash Secured Letters of Credit (each as defined in the Prepetition Credit Agreement), and (c) $2.2 billion in outstanding principal amount of Term Loans (as defined in the Prepetition Credit Agreement) (collectively, together with accrued and unpaid interest, outstanding letters of credit, any reimbursement obligations (contingent or otherwise) in respect of letters of credit, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due,

owing, or chargeable in respect of any of the Prepetition Credit Facility Borrowers' or the Prepetition Guarantors' obligations pursuant to, or secured by, the Prepetition Credit Agreement, including all Obligations (as defined in the Prepetition Credit Agreement), and all interest, fees, prepayment premiums, early termination fees, costs and other charges, the "**Prepetition Credit Facility Debt**") which Prepetition Credit Facility Debt has been guaranteed on a joint and several basis by each of the Prepetition Guarantors.

(viii)   *Prepetition Lloyds Facility Agreement Debt*.  As of the Petition Date, the Lloyds Facility Applicants and the Prepetition Guarantors were justly and lawfully indebted and liable to Lloyds Bank, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $102 million outstanding letters of credit (together with accrued and unpaid interest, outstanding letters of credit, any reimbursement obligations (contingent or otherwise) in respect of letters of credit, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Lloyds Facility Applicants' or the Prepetition Guarantors' obligations pursuant to, or secured by, the Lloyds Facility Agreement, including all Obligations (as defined in the Lloyds Facility Agreement), interest, fees, prepayment premiums, early termination fees, costs and other charges, the "**Lloyds Facility Agreement Debt**") which Lloyds Facility Agreement Debt has been guaranteed on a joint and several basis by each of the Lloyds Facility Applicants and the Prepetition Guarantors.

(ix)   *Prepetition Barclays Facility Agreement Debt*.  As of the Petition Date, the Barclays Facility Applicants and Guarantors and the Prepetition Guarantors were justly and

lawfully indebted and liable to the Barclays Facility Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $228 million of outstanding letters of credit (together with accrued and unpaid interest, outstanding letters of credit, any reimbursement obligations (contingent or otherwise) in respect of letters of credit, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Barclays Facility Applicants' and Guarantors' or the Prepetition Guarantors' obligations pursuant to, or secured by, the Barclays Facility Agreement, including all Obligations (as defined in the Barclays Facility Agreement), interest, fees, prepayment premiums, early termination fees, costs and other charges, the "**Barclays Facility Agreement Debt**") which Barclays Facility Agreement Debt has been guaranteed on a joint and several basis by each of the Barclays Facility Applicants and Guarantors and the Prepetition Guarantors.  The Prepetition Credit Facility Debt, the Lloyds Facility Agreement Debt, and the Barclays Facility Agreement Debt are referred to collectively herein as the "**Prepetition Shared Collateral Secured Debt**" and together with the Prepetition Superpriority Credit Facility Debt, the "**Prepetition Secured Debt**.")

(x)     *Prepetition Superpriority Credit Facility Liens*.  As more fully set forth in the Prepetition Superpriority Loan Documents and the Prepetition Superpriority Intercreditor Agreement (as defined herein), prior to the Petition Date, the Prepetition Superpriority Borrowers and the Prepetition Superpriority Guarantors granted to the Prepetition Superpriority Agents, for the benefit of itself and the other Prepetition Superpriority Secured Parties, a superpriority security

interest in and continuing lien on (the "**Prepetition Superpriority Liens**") substantially all of their assets and property excluding the Prepetition Cash Collateralized LC Collateral (as defined below) (the "**Prepetition Superpriority Collateral**").[5]

(xi)     *Prepetition Shared Collateral Liens.*  Pursuant to the Security Documents (as defined in the Intercreditor and Collateral Agency Agreement (as defined below)), prior to the Petition Date, the Debtors party to the Security Documents in their capacities as Grantors (as defined in the Intercreditor and Collateral Agency Agreement) granted to the Collateral Agent (as defined in the Intercreditor and Collateral Agency Agreement) (the "**Prepetition Collateral Agent**" and together with the Prepetition Superpriority Collateral Agent, the "**Prepetition Collateral Agents**") for the benefit of itself and the Prepetition Shared Collateral Secured Parties first priority security interests in and continuing liens (the "**Prepetition Shared Collateral Liens**") on substantially all of their assets and property excluding the Prepetition Cash Collateralized LC Collateral (the "**Prepetition Shared Collateral**," and together with the Prepetition Superpriority Collateral, the "**Prepetition Collateral**");

(xii)     *Prepetition Cash Collateralized Letters of Credit.* The Prepetition Shared Collateral Agent on behalf of the Cash Secured LC Issuers (as defined in the Prepetition Credit Agreement) has been granted senior ranking and exclusive liens (the "**Prepetition Cash Secured LC Facility Liens**") in respect of the Prepetition Cash Secured LC Cash Collateral and the Lloyds

---

[5] The Cash Collateral (as defined herein) securing (x) the Cash Secured Letters of Credit (as defined in the Prepetition Credit Agreement) (the "**Prepetition Cash Secured LC Cash Collateral**") and (y) the Lloyds Facility Letters of Credit (the "**Prepetition Lloyds LC Cash Collateral**," and together with the Prepetition Cash Secured LC Cash Collateral, the "**Prepetition Cash Collateralized LC Collateral**") is excluded from the Prepetition Superpriority Collateral until such time as the obligations under the Prepetition Cash Secured LC Facility and the Lloyds Facility Agreement have been discharged in full or expired following which the Cash Collateral comprising the Prepetition Cash Collateralized LC Collateral shall be subject to the Prepetition Superpriority Liens.

Facility Secured Party has been granted senior ranking and exclusive liens (the "**Prepetition Lloyds Cash Collateralized LC Liens**" and together with the Prepetition Cash Secured LC Facility Liens, the "**Prepetition Cash Collateralized LC Liens**") in respect of the Prepetition Lloyds LC Cash Collateral, provided that, under the terms of the Collateral Agency and Intercreditor Agreement, cash collateral released from the Prepetition Cash Collateralized LC Liens upon the discharge of the Cash Secured Letters of Credit (as defined in the Prepetition Credit Agreement) or cash collateralized Lloyds Facility Letters of Credit is subject to the Prepetition Shared Collateral Liens.

(xiii)   *Superpriority Intercreditor Agreement.* That certain Intercreditor Agreement, dated as of October 21, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "**Prepetition Superpriority Intercreditor Agreement**"), among McDermott International, Inc., as parent, McDermott Technology (Americas), Inc., McDermott Technology (US), Inc., and McDermott Technology, B.V., as Borrowers, the Prepetition Superpriority Collateral Agent on behalf of the Prepetition Superpriority Secured Parties and the Prepetition Collateral Agent on behalf of the Prepetition Shared Collateral Secured Parties and the other prepetition obligors party thereto is binding and enforceable in accordance with its terms and unless otherwise subsequently modified or amended, the prepetition obligors are not entitled to take any actions that would be contrary to the provisions thereof.

(xiv)   *Collateral Agency and Intercreditor Agreement.* That certain Collateral Agency and Intercreditor Agreement, dated as of May 10, 2018, as joined by that certain Grantor Joinder Agreement dated May 10, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "**Collateral**

**Agency and Intercreditor Agreement**" and together with the Prepetition Superpriority Intercreditor Agreement, the "**Intercreditor Agreements**"), among (a) McDermott Technology (Americas), Inc., McDermott Technology (US), Inc., and McDermott Technology, B.V., as Borrowers, (b) McDermott International, Inc., as parent, the other Grantors (as defined therein) party thereto, (c) the Prepetition Revolving and LC Administrative Agent, the Prepetition Collateral Agent, the Prepetition Term Loan Administrative Agent, the Lloyds Facility Secured Party, and the Barclays Facility Agent (collectively, the "**Prepetition Shared Collateral Facilities Agents**") and (d) the other prepetition obligors party thereto is binding and enforceable against the prepetition obligors in accordance with their terms, and the prepetition obligors are not entitled to take any actions that would be contrary to the provisions thereof.

(xv)     *Validity, Perfection and Priority of Prepetition Superpriority Liens and Prepetition Superpriority Debt*.  The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition Superpriority Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition Superpriority Secured Parties for fair consideration and reasonably equivalent value; (b) other than with respect to the Prepetition Cash Collateralized LC Collateral, the Prepetition Superpriority Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain liens senior by operation of law or otherwise permitted by the Prepetition Secured Debt Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Superpriority Liens as of the Petition Date, the "**Prepetition Superpriority Permitted Prior Liens**"); (c) the Prepetition Superpriority Credit Facility Debt constitutes legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition Superpriority

Loan Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Superpriority Liens or Prepetition Superpriority Credit Facility Debt exist, and no portion of the Prepetition Superpriority Liens or Prepetition Superpriority Credit Facility Debt is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Superpriority Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to the Prepetition Superpriority Credit Facilities; and (f) the Debtors waive, discharge, and release any right to challenge any of the Prepetition Superpriority Credit Facility Debt, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the Prepetition Superpriority Liens securing the Prepetition Superpriority Credit Facility Debt.

(xvi) *Validity, Perfection and Priority of Prepetition Shared Collateral Liens and Prepetition Shared Collateral Secured Debt*. The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition Shared Collateral Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition Shared Collateral Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition Shared Collateral Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (1) other than with respect to the Prepetition Cash Collateralized LC Collateral, the Prepetition Superpriority Liens on the

Prepetition Collateral, which rank senior in priority to the Prepetition Shared Collateral Liens, and (2) certain liens senior by operation of law or otherwise permitted by the Prepetition Secured Debt Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Shared Collateral Liens as of the Petition Date, the "**Prepetition Shared Collateral Permitted Prior Liens**" and together with the Prepetition Superpriority Permitted Prior Liens, the "**Permitted Prior Liens**"); (c) the Prepetition Cash Secured LC Facility Liens were senior in priority over any and all other liens on the Prepetition Cash Secured LC Cash Collateral; (d) the Prepetition Lloyds Cash Collateralized LC Liens were senior in priority over any and all other liens on the Prepetition Lloyds LC Cash Collateral; (e) the Prepetition Shared Collateral Secured Debt constitutes legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition Secured Debt Documents; (f) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Shared Collateral Liens or Prepetition Credit Facility Debt exist, and no portion of the Prepetition Shared Collateral Liens or Prepetition Shared Collateral Secured Debt is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (g) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Shared Collateral Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and

employees arising out of, based upon or related to the Prepetition Shared Collateral Facilities[6]; and (h) the Debtors waive, discharge, and release any right to challenge any of the Prepetition Shared Collateral Secured Debt, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the Prepetition Shared Collateral Liens securing the Prepetition Shared Collateral Secured Debt.

(xvii) *Value of the Prepetition Superpriority Collateral*. As of the Petition Date, the aggregate value of the Prepetition Superpriority Collateral securing the Prepetition Superpriority Credit Facility Debt exceeds the aggregate amount of the Prepetition Superpriority Credit Facility Debt.

(xviii) *No Control*. None of the Prepetition Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Prepetition Secured Debt Documents.

(xix) *No Claims or Causes of Action*. No claims or causes of action are held by the Debtors or their estates exist against, or with respect to, the Prepetition Secured Parties under any agreements by and among the Debtors and any Prepetition Secured Party that is in existence as of the Petition Date.

(xx) *Debtors' Stipulations Regarding Initial Funding*. In accordance with the Interim Order, this Court authorized, among other things, (i) the Borrowers to borrow the Initial Funding, (ii) the roll-up of the DIP Roll-Up Hedging Obligations, (iii) the DIP Guarantors to

---

[6]      "**Prepetition Shared Collateral Facilities**" means the Prepetition Credit Agreement, the Lloyds Facility Agreement and the Barclays Facility Agreement.

jointly and severally guarantee on a senior secured superpriority basis the DIP Loans, the DIP LC

Facilities and the other DIP Obligations, and (iv) the DIP Loan Parties to execute and deliver the

DIP Documents and to incur and to perform all of the DIP Obligations in accordance with, and

subject to, the terms of the Interim Order and the DIP Documents.  On January 23, 2020, the DIP

Credit Agreement was executed, and the Borrowers were authorized to borrow on the terms and

conditions set forth in the DIP Documents and in the Interim Order.

(xxi)   *Debtors' Stipulations Regarding Terminated Hedging Positions*.  As of the

Petition Date, the Debtors were parties to certain hedging agreements with the Continuing Hedging

Lenders (as defined in the Hedging Order[7]).  On January 24, 2020, after entry of both the Hedging

Order and the Interim Order, the secured interest rate hedging transactions that did not constitute

DIP Roll-Up Hedging Obligations were terminated by agreement of the parties resulting in the

termination amounts listed on <u>Schedule A</u> hereto.  Each Continuing Hedging Lender listed on

Schedule A hereto shall have a "Credit Agreement Hedging Claim" under Class 6D of the Chapter

11 Plan[8] and in an amount equal to the termination amount set forth opposite such Continuing

Hedging Lender's name on Schedule A hereto.

(xxii)   *Release*.  Each of the Debtors and the Debtors' estates, on its own behalf

and on behalf of its past, present and future predecessors, successors, heirs, subsidiaries, and

assigns, hereby absolutely, unconditionally and irrevocably release and forever discharge and

acquit the Prepetition Secured Parties, the DIP Secured Parties, and each of their respective

---

[7]        "**Hedging Order**" means the *Order (I) Authorizing the Debtors to Enter Into and Perform Under (A) Amended and Restated Hedge Arrangements and (B) New Hedge Agreements, (II) Granting DIP Liens and DIP Superpriority Claims, (III) Modifying the Automatic Stay and (IV) Granting Related Relief* entered by the Court on January 23, 2020 [Dkt. No. 145].

[8]        "**Chapter 11 Plan**" means the *Amended Joint Prepackaged Chapter 11 Plan of Reorganization of McDermott International, Inc. and its Debtor Affiliates* filed on January 22, 2020 [Dkt. No. 121] and any subsequent modification thereof.

Representatives (as defined herein) (collectively, the "**Released Parties**"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date (collectively, the "**Released Claims**") of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise, arising out of or related to (as applicable) the Prepetition Secured Debt Documents, the DIP Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the deal reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of the Final Order.

        G.     *Cash Collateral*.  All of the Debtors' cash, wherever located and held, including any cash in deposit accounts (whether subject to control agreements or otherwise) constitutes or will constitute "cash collateral" of the Prepetition Secured Parties and DIP Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "**Cash Collateral**").

        H.     *Findings Regarding the DIP Financing and Use of Cash Collateral*.

        (i)     Good and sufficient cause has been shown for the entry of this Final Order and for authorization of the DIP Loan Parties to obtain financing pursuant to the DIP Credit Agreement.

(ii)     The Debtors have a critical need to obtain the DIP Financing and to use Prepetition Collateral (including Cash Collateral) in order to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures, to satisfy other working capital and operational needs and to fund expenses of these Chapter 11 Cases.  The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, the incurrence of new indebtedness under the DIP Documents and other financial accommodations provided under the DIP Documents are necessary and vital to the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

(iii)    The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting to the DIP Secured Parties, the DIP Liens and the DIP Superpriority Claims (as defined herein) and incurring the Adequate Protection Obligations (as defined herein), in each case subject to the Carve Out, under the terms and conditions set forth in this Final Order and in the DIP Documents.

(iv)    The Debtors continue to collect cash, rents, income, offspring, products, proceeds, and profits generated from the Prepetition Collateral and acquire equipment, inventory and other personal property, all of which constitute Prepetition Collateral under the Prepetition Secured Debt Documents that are subject to the Prepetition Secured Parties' security interests as set forth in the Prepetition Secured Debt Documents.

26

(v)     The Debtors desire to use a portion of the cash, rents, income, offspring, products, proceeds and profits described in the preceding paragraph in their business operations that constitute Cash Collateral of the Prepetition Secured Parties under section 363(a) of the Bankruptcy Code.  Certain prepetition rents, income, offspring, products, proceeds, and profits, in existence as of the Petition Date, including balances of funds in the DIP Loan Parties' prepetition and postpetition operating bank accounts, also constitute Cash Collateral.

(vi)     Based on the DIP Motion, the First Day Declarations and the record presented to the Court at the Interim Hearing and the Final Hearing, the terms of the DIP Financing, the terms of the adequate protection granted to the Prepetition Secured Parties as provided in paragraph 15 of this Final Order (the "**Adequate Protection**"), and the terms on which the DIP Loan Parties may continue to use the Prepetition Collateral (including Cash Collateral) pursuant to this Final Order and the DIP Documents are fair and reasonable, reflect the DIP Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(vii)     To the extent consent is required, the Prepetition Secured Parties have consented or are deemed under the Superpriority Intercreditor Agreement, the Collateral Agency and Intercreditor Agreement or any other applicable Prepetition Secured Debt Documents to have consented to the Debtors' use of Cash Collateral and the other Prepetition Collateral, and the DIP Loan Parties' entry into the DIP Documents in accordance with and subject to the terms and conditions in this Final Order and the DIP Documents.

(viii)     The DIP Financing, the Adequate Protection and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the DIP Loan Parties, the DIP Secured Parties, and the Prepetition Secured Parties, and all

27

of the DIP Loan Parties' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Financing and the DIP Documents, including, without limitation: all loans made to, letters of credit issued at the request of, and guarantees issued by the DIP Loan Parties pursuant to the DIP Documents and any DIP Obligations shall be deemed to have been extended by the DIP Agents and the DIP Lenders and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Agents and the DIP Lenders (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(ix)     The Prepetition Secured Parties have acted in good faith regarding the DIP Financing and the DIP Loan Parties' continued use of the Prepetition Collateral (including Cash Collateral) to fund the administration of the DIP Loan Parties' estates and continued operation of their businesses (including the incurrence and payment of the Adequate Protection Obligations and the granting of the Adequate Protection Liens (as defined herein)), in accordance with the terms hereof, and the Prepetition Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of sections 363(m) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(x)      The Prepetition Secured Parties are entitled to the Adequate Protection provided in this Final Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the DIP Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the DIP Loan Parties' prudent

exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of the Prepetition Collateral, including the Cash Collateral; *provided* that nothing in this Final Order or the DIP Documents shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral other than on the terms set forth in this Final Order and in the context of the DIP Financing authorized by this Final Order to the extent such consent has been or will be given, (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior) or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties, subject to any applicable provisions of the Intercreditor Agreements, to seek new, different or additional adequate protection or assert the interests of any of the Prepetition Secured Parties, and the rights of any other party in interest, including the Debtors, to object to such relief are hereby preserved.

(xi)   The deemed incurrence of the DIP Roll-Up Hedging Obligations under the DIP Facility reflected the DIP Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties. The Prepetition LC Lenders and their affiliates that have provided prepetition secured hedging to the Debtors would not have otherwise consented to the use of their Cash Collateral or the subordination of their liens to the DIP Liens (as defined herein), and the DIP Agents and the DIP Letter of Credit Lenders would not have provided the DIP Facility or extended credit to the DIP Loan Parties thereunder without the Prepetition Hedging Roll-Up. The Prepetition Hedging Roll-Up (a) created greater availability under the DIP Facility, (b) benefited the Debtors and their estates because it enabled the Debtors to obtain urgently needed financing critical to administering these Chapter 11 Cases and funded their operations and (c) enabled the

Debtors to maintain hedging obligations to mitigate currency and interest rate risk inherent in the Debtors' operations.

(xii)    The use of the DIP Roll-Up Loans to refinance dollar-for-dollar and discharge all of the Prepetition Superpriority Credit Facility Debt under the Prepetition Superpriority Term Loan Credit Facility and the deemed issuance of letters of credit under the DIP Roll-Up LC Facility reflects the DIP Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties.  The Prepetition Superpriority Secured Parties would not otherwise consent to the use of their Cash Collateral or the subordination of their liens to the DIP Liens (as defined herein), and the DIP Agents and the DIP Lenders would not be willing to provide the DIP Facility or extend credit to the DIP Loan Parties thereunder without the Prepetition Superpriority Debt Refinancing.  The Prepetition Superpriority Debt Refinancing will (a) create greater availability under the DIP Facility, (b) benefit the Debtors and their estates because it will enable the Debtors to obtain urgently needed financing critical to administering these Chapter 11 Cases and funding their operations and (c) enable the Debtors to maintain prepetition letters of credit, which will avoid disruption to the Debtors' business operations.

(xiii)    The Debtors prepared and delivered to the DIP Agents and the advisors to the DIP Lenders an initial budget attached as Schedule 1 to the Interim Order (the "**Initial DIP Budget**").  The Initial DIP Budget reflects the Debtors' anticipated cash receipts and anticipated disbursements for each calendar week during the period from the Petition Date through and including the end of the seventh (7th) month following the Petition Date.  The Initial DIP Budget reflects anticipated DIP Letters of Credit and it is acknowledged that a DIP Letter of Credit will be issued to Lloyds in an amount equal to $25 million pursuant to the Lloyds Letter Agreement. The Initial DIP Budget may be modified, amended and updated from time to time in accordance

with the DIP Credit Agreement, and once approved by the Requisite Lenders (as defined in the DIP Credit Agreement), shall supplement and replace the Initial DIP Budget (the Initial DIP Budget and each subsequent approved budget, shall constitute without duplication, an "**Approved Budget**").  The Debtors believe that the Initial DIP Budget is reasonable under the facts and circumstances.  The DIP Agents and the DIP Lenders are relying, in part, upon the Debtors' agreement to comply with the Approved Budget, the other DIP Documents and this Final Order in determining to enter into the postpetition financing arrangements provided for in this Final Order.

(xiv)   Each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits with respect to any of the Prepetition Collateral.

I.       *Relief Essential; Best Interest*.  Sufficient cause exists for entry of this Final Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Consummation of the DIP Financing and the use of Prepetition Collateral (including Cash Collateral), in accordance with this Final Order and the DIP Documents are in the best interests of the DIP Loan Parties' estates and consistent with the Debtors' exercise of their fiduciary duties.

J.       *Permitted Prior Liens; Continuation of Prepetition Liens*.  Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to, the Debtors, the DIP Agents, the DIP Lenders or the Prepetition Secured Parties to challenge the validity, priority, enforceability, seniority,

avoidability, perfection, or extent of any alleged Permitted Prior Lien and/or security interests. The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien and is expressly subject to the DIP Liens (as defined herein).  The liens and interests granted to the Prepetition Secured Parties (the "**Prepetition Liens**"), and the DIP Liens that prime the Prepetition Liens, are continuing liens and the DIP Collateral is and will continue to be encumbered by such liens in light of the integrated nature of the DIP Facility, the DIP Documents, and the Prepetition Secured Debt Documents.  For the avoidance of doubt, the DIP Liens shall not prime the Prepetition Cash Collateralized LC Liens.

Based upon the foregoing findings and conclusions, the DIP Motion and the record before the Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.     *Motion Granted*.  The relief sought in the DIP Motion is granted, the financing described herein is authorized and approved, and the use of Cash Collateral is authorized, in each case, on a final basis, subject to the terms and conditions set forth in the DIP Documents and this Final Order.  All objections to this Final Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits.

2.     *Authorization of the DIP Financing and the DIP Documents*.

(a)     The DIP Loan Parties were, by the Interim Order, and hereby are authorized to execute, deliver, enter into and, as applicable, perform all of their obligations under the DIP Documents and such other and further acts as may be necessary, appropriate or desirable in connection therewith.  The Borrowers were, by the Interim Order, and hereby are authorized to borrow money, obtain letters of credit, and enter into hedging transactions pursuant to the DIP

Credit Agreement, each DIP Guarantor was, by the Interim Order, and hereby is authorized to provide a guaranty of payment in respect of the Borrower's obligations with respect to such borrowings, subject to any limitations on borrowing under the DIP Documents, which shall be used for all purposes permitted under the DIP Documents, subject to and in accordance with the Approved Budget, including, without limitation, to provide working capital for the DIP Loan Parties and to pay interest, fees and expenses and make adequate protection and other payments in accordance with the Interim Order, this Final Order and the DIP Documents, as set forth in the DIP Documents.

(b)     In furtherance of the foregoing and without further approval of this Court, each Debtor was, by the Interim Order, and hereby is authorized and directed to perform all acts, to make, execute and deliver all instruments, certificates, agreements and documents (including, without limitation, the execution or recordation of pledge and security agreements, mortgages, financing statements and other similar documents), and to pay all fees and expenses in connection with or that may be reasonably required, necessary, or desirable for the DIP Loan Parties' performance of their obligations under or related to the DIP Financing, including, without limitation:

(i)     the execution and delivery of, and performance under, each of the DIP Documents;

(ii)     the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the DIP Loan Parties and the DIP Agents (acting in accordance with the terms of the DIP Credit Agreement), may agree, it being understood that no further approval of this Court shall be required for any authorizations, amendments, waivers, consents or other

modifications to and under the DIP Documents (and any fees and other expenses (including attorneys', accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities and other obligations paid in connection therewith) that do not shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder; *provided* that, for the avoidance of doubt, updates and supplements to the Approved Budget required to be delivered by the DIP Loan Parties under the DIP Documents shall not be considered amendments or modifications to the Approved Budget or the DIP Documents;

(iii)        the non-refundable payment to the DIP Agents and the DIP Lenders, as the case may be, of all fees, whether paid pursuant to the Interim Order or this Final Order, including letter of credit fees, unused facility fees, amendment fees, prepayment premiums, early termination fees, servicing fees, audit fees, liquidator fees, structuring fees, administrative agent's or collateral agent's fees, upfront fees, closing fees, commitment fees, exit fees, closing date fees, upfront fees, backstop fees, exit fees, prepayment fees or agency fees, and professional fees (which fees shall be irrevocable, and shall be, and shall be deemed to have been, approved upon entry of the Interim Order and this Final Order, whether or not the fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, applicable non-bankruptcy law or otherwise) and any amounts due (or that may become due) in respect of the indemnification and expense reimbursement obligations, in each case referred to in the DIP Credit Agreement or DIP Documents (or in any separate letter agreements, including, without limitation, the Engagement Letter and Fee Letters between any or all DIP Loan Parties, on the one hand, and any

of the DIP Agents and/or DIP Lenders, on the other, in connection with the DIP Financing) and the costs and expenses as may be due from time to time, including, without limitation, fees and expenses of the professionals retained by, or on behalf of, any of the DIP Agents or DIP Lenders (including Davis Polk & Wardwell LLP, Latham & Watkins LLP, Linklaters LLP, Bracewell LLP, any local advisor to the DIP Secured Parties, any legal counsel to the DIP Secured Parties in any foreign jurisdictions and any other advisors as are permitted under the DIP Documents), in each case, as provided for in the DIP Documents (the "**DIP Fees and Expenses**"), without the need to file retention motions or fee applications; and

(iv)      the performance of all other acts required under or in connection with the DIP Documents, including the granting of the DIP Liens and the DIP Superpriority Claims and perfection of the DIP Liens and DIP Superpriority Claims as permitted herein and therein.

(c)      The proceeds of the DIP Facility, including DIP Letters of Credit, shall not be used to support any hedging obligations (other than the DIP Hedging Obligations), bilateral letter of credit obligations or surety obligations of the Debtors or to make any payments to trade vendors for penalty interest payments (excluding, for the avoidance of doubt, customary liquidated damages to customers) unless otherwise specified in the Approved Budget or authorized pursuant to this Final Order.  Any postpetition hedging arrangements must be (i) with one of the DIP Agents, the DIP Letter of Credit Lenders or an affiliate thereof, or (ii) subject to the consent of the DIP LC Agent in its reasonable discretion, other persons, and in each case on terms consistent with the Amended and Restated Hedge Agreements (as defined in the Hedging Order).

3.      *DIP Obligations*.  Upon execution and delivery of the DIP Documents, the DIP Documents constituted legal, valid, binding and non-avoidable obligations of the DIP Loan Parties,

enforceable against each DIP Loan Party and their estates in accordance with the terms of the DIP Documents and this Final Order, and any successors thereto, including any trustee appointed in the Chapter 11 Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**").   Upon execution and delivery of the DIP Documents, the DIP Obligations included all loans, letter of credit reimbursement obligations, hedging transactions, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to any of the DIP Agents, the DIP Lenders, the DIP Hedging Counterparties or the Postpetition Hedging Lenders (as defined in the Hedging Order), in each case, under, or secured by, the DIP Documents or this Final Order, including all principal, interest, costs, fees, expenses and other amounts under the DIP Documents (including this Final Order).   The Debtors shall be jointly and severally liable for the DIP Obligations.   The DIP Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease on the Termination Declaration Date (as defined herein) or the occurrence of any event or condition set forth in paragraph 19(b) of this Final Order. Except as permitted by the Interim Order or this Final Order, no obligation, payment, transfer, or grant of security hereunder or under the DIP Documents to the DIP Agents and/or the DIP Lenders (including their Representatives) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or

otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

        4.     *Prepetition Secured Debt Roll-Up.*

        (a)     Under the Interim Order, the DIP Roll-Up Hedging Obligations that were "rolled up" and deemed incurred by the Debtors under the DIP Facility became secured by the DIP Liens subject to the terms and conditions set forth in the DIP Documents. The deemed incurrence and the "roll-up" of DIP Roll-Up Hedging Obligations into DIP Obligations as described in this paragraph 4 were, by the Interim Order, and hereby are deemed indefeasible and are authorized as compensation for, in consideration for, as a necessary inducement for, and on account of the agreement of the DIP Lenders to fund amounts under the DIP Facility and not as payments under, adequate protection for, or otherwise on account of, any Prepetition Secured Debt.

        (b)     The Debtors shall use the DIP Roll-Up Loans to refinance dollar-for-dollar and discharge all of the outstanding principal, interest, fees and other amounts, including the Applicable Premium, of the Prepetition Superpriority Credit Facility Debt under the Prepetition Superpriority Term Loan Credit Facility, which shall be "rolled-up" into DIP Obligations and the corresponding principal, interest, fees and other amounts, including, without limitation, the Applicable Premium, of the Prepetition Superpriority Credit Facility shall be discharged, subject to the terms and conditions set forth in the DIP Documents. The DIP Roll-Up Loans issued under this paragraph 4 shall be deemed indefeasible and the Prepetition Superpriority Credit Facility Debt refinanced thereby shall be discharged. The refinancing dollar-for-dollar and discharge of all of the principal and premiums, including the Applicable Premium, of the Prepetition Superpriority Credit Facility Debt under the Prepetition Superpriority Term Loan Credit Facility by "rolling-up" such amounts into DIP Obligations as described in this paragraph 4 shall be

authorized as compensation for, in consideration for, as a necessary inducement for, and on account of the agreement of the DIP Lenders to fund amounts under the DIP New Money Term Loan Facility and not as payments under, adequate protection for, or otherwise on account of, any Prepetition Superpriority Credit Facility Debt.

(c)     The Debtors shall deem the DIP Roll-Up LC Facility to have been issued under the DIP Facility, and letters of credit with a face amount of $200 million outstanding under the Prepetition Superpriority Credit Agreement shall be "rolled-up" into the DIP Obligations.  The deemed issuance of letters of credit under the DIP Roll-Up LC Facility and the "roll-up" of letters of credit under the Prepetition Superpriority Credit Agreement into DIP Obligations as described in this paragraph 4 shall be deemed indefeasible and shall be authorized as compensation for, in consideration for, as a necessary inducement for, and on account of the agreement of the DIP Lenders to fund amounts under the DIP Letter of Credit Facility and not as payments under, adequate protection for, or otherwise on account of, any Prepetition Superpriority Credit Facility Debt.

5.     *Carve Out.*

(a)     *Carve Out.*  As used in this Final Order, the "**Carve Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $1,000,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363

of the Bankruptcy Code (the "**Debtor Professionals**") at any time before or on the first business day following delivery by the DIP Agents (acting at the direction of the Requisite Revolving Lenders (as defined in the DIP Credit Agreement) or the Requisite Term Lenders (as defined in the DIP Credit Agreement), as applicable) of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Debtor Professionals in an aggregate amount not to exceed $20 million incurred after the first business day following delivery by the DIP Agents (acting at the direction of the Requisite Revolving Lenders or the Requisite Term Lenders, as applicable) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**").  For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agents to the Debtors, their lead restructuring counsel, and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Credit Agreement, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)      *Carve Out Reserves*.  On the day on which a Carve Out Trigger Notice is delivered by the DIP Agents (acting at the direction of the Requisite Revolving Lenders or the Requisite Term Lenders, as applicable) to the Debtors with a copy to the Ad Hoc Group of Term Lenders (as defined below) and the Steering Committee of RCF/LC Lenders (as defined below) (the "**Termination Declaration Date**"), the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed

Professional Fees. The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agents in trust to pay such then unpaid Allowed Professional Fees (the "**Pre-Carve Out Trigger Notice Reserve**") prior to any and all other claims. On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agents in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out Trigger Notice Reserve**" and, together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**") prior to any and all other claims. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of paragraph (a) above (the "**Pre-Carve Out Amounts**"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agents for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of paragraph (a) above (the "**Post-Carve Out Amounts**"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agents for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in

accordance with their rights and priorities as of the Petition Date. Notwithstanding anything to the contrary in the DIP Documents or this Final Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 5, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 5, prior to making any payments to the DIP Agents or the Prepetition Secured Parties, as applicable. Notwithstanding anything to the contrary in the DIP Documents or this Final Order, following delivery of a Carve Out Trigger Notice, the DIP Agents and the Prepetition Agents[9] shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agents for application in accordance with the DIP Documents. Further, notwithstanding anything to the contrary in this Final Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans (as defined in the DIP Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial DIP Budget, Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in this Final Order, the DIP Facility, or in any Prepetition Shared Collateral Facilities, the Carve Out shall be

---

[9]    "**Prepetition Agents**" shall, mean, collectively, the Prepetition Superiority Agents and the Prepetition Shared Collateral Facilities Agents.

senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the 507(b) Claim, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or any obligations under the Prepetition Secured Debt Documents.

(c)     *Payment of Allowed Professional Fees Prior to the Termination Declaration Date*.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)     *No Obligation to Pay Allowed Professional Fees*.  None of the DIP Agents, DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Debtor Professionals incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Final Order or otherwise shall be construed to obligate the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Debtor Professional or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)     *Payment of Carve Out on or After the Termination Declaration Date*.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

6.     *DIP Superpriority Claims*.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the DIP Loan Parties on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the DIP Loan Parties, now existing or hereafter

arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "**DIP Superpriority Claims**") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the DIP Loan Parties (excluding the Prepetition Cash Collateralized LC Collateral) and all proceeds thereof (excluding claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**") but including any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement or otherwise ("**Avoidance Proceeds**")) in accordance with the DIP Documents and this Final Order, subject only to the liens on such property and the Carve Out. The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise. The DIP Superpriority Claims shall be *pari passu* in right of payment with one another and senior to the 507(b) Claims (as defined herein).

7.    *DIP Liens*.  As security for the DIP Obligations, effective and automatically and properly perfected upon the date of the Interim Order and without the necessity of the execution, recordation or filing by the DIP Loan Parties or any of the DIP Secured Parties of mortgages,

43

security agreements, control agreements, pledge agreements, financing statements, notation of certificates of title for titled goods or other similar documents, or the possession or control by the DIP Agents of, or over, any Collateral, the following valid, binding, continuing, enforceable and non-avoidable security interests and liens (all liens and security interests granted to the DIP Collateral Agent, for its benefit and for the benefit of the DIP Secured Parties, pursuant to the Interim Order and the DIP Documents, the "**DIP Liens**") were, by the Interim Order, and hereby are granted to the DIP Collateral Agent for its own benefit and the benefit of the DIP Secured Parties (all property identified in clauses (a) through (c) below being collectively referred to as the "**DIP Collateral**").

(a)     *Liens on Unencumbered Property*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority senior security interest in and lien upon all prepetition and postpetition property of the DIP Loan Parties, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to a valid, perfected and non-avoidable lien or is subject to a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, including, without limitation, any and all unencumbered cash of the DIP Loan Parties (whether maintained with any of the DIP Agents or otherwise) and any investment of cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, goodwill, commercial tort claims and claims that may constitute commercial tort claims (known and unknown), chattel paper, interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries,

wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, of all the foregoing (the "**Unencumbered Property**"), in each case other than the Avoidance Actions (but, for the avoidance of doubt, "Unencumbered Property" shall include Avoidance Proceeds);

(b)    *Liens Priming Certain Prepetition Secured Parties' Liens*.   Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority priming security interest in and lien upon all prepetition and postpetition property of the DIP Loan Parties, regardless of where located, regardless of whether or not any Prepetition Liens on the assets are voided, avoided, invalidated, lapsed or unperfected, including, without limitation, any DIP LC Cash Collateral (the "**DIP Priming Liens**").  The DIP Priming Liens shall prime in all respects the interests of the Prepetition Secured Parties arising from current and future liens of the Prepetition Secured Parties (including, without limitation, the Adequate Protection Liens granted to the Prepetition Secured Parties) (the "**Primed Liens**"). Notwithstanding anything herein to the contrary, the DIP Priming Liens shall be (i) subject and junior to the Carve Out, (ii) junior to the Prepetition Cash Collateralized LC Liens, (iii) senior in all respects to the Prepetition Liens (other than Prepetition Cash Collateralized LC Liens) and (iv) senior to the Adequate Protection Liens, provided that without further order of the Court, the DIP Priming Liens shall, on a rolling basis, attach to any Prepetition Cash Collateralized LC Collateral that is released from the Prepetition Cash Collateralized LC Liens and becomes available as Cash Secured Letters of Credit (as defined in the Prepetition Credit Agreement) or cash collateralized Lloyds Facility Letters of Credit or both have been discharged or expire in accordance with their terms but solely to the extent of the amount of Cash Collateral securing any such expired or discharged letter of credit.  The "released" Prepetition Cash Collateralized LC Collateral shall (x)

45

be delivered by the Prepetition Secured Party that has possession of such "released" Prepetition

Cash Collateralized LC Collateral to the DIP Collateral Agent within one (1) business day of the

expiration of the underlying letter of credit and (y) be deposited by the DIP Collateral Agent in a

cash collateral account which shall only secure DIP Obligations in respect of the DIP Letters of

Credit (the "**DIP Letters of Credit Secured Account**").  Cash in the DIP Letters of Credit Secured

Account (the "**DIP LC Cash Collateral**") may not be released from the DIP Letters of Credit

Secured Account before the effective date of the Debtors' plan of reorganization until the payment

or satisfaction in full in cash of the DIP Obligations in respect of the DIP Letters of Credit;

provided, however, that the DIP LC Cash Collateral may be used to reimburse the DIP Letter of

Credit Lenders for any DIP Letter of Credit that is drawn and not timely reimbursed or to secure

up to $100 million of cash secured DIP letters of credit (the "**DIP Cash Secured LCs**"), including

financial letters of credit issued under the DIP LC Facility, if any.  Each DIP Cash Secured LC

shall be cash collateralized by funds equal to 105% of its face amount.  For the avoidance of doubt,

the DIP Letter of Credit Lenders shall not risk participate as lenders in DIP Cash Secured LCs.

(c)     *Liens Junior to Certain Other Liens*.  Pursuant to section 364(c)(3) of the

Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and

lien upon all tangible and intangible prepetition and postpetition property of each DIP Loan Party

that is subject to either (i) valid, perfected and non-avoidable liens in existence at the time of the

commencement of the Chapter 11 Cases (other than the Primed Liens), (ii) the Prepetition

Superpriority Permitted Prior Liens, (iii) the Prepetition Shared Collateral Permitted Prior Liens,

(iv) the Prepetition Cash Collateralized LC Liens, or (v) any other valid and non-avoidable liens

(other than the Primed Liens) in existence at the time of such commencement that are perfected

subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code, which

shall be (x) junior and subordinate to any valid, perfected and non-avoidable liens (other than the Primed Liens) in existence immediately prior to the Petition Date, and (y) any such valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code; *provided* that nothing in the foregoing clauses (i) and (ii) shall limit the rights of the DIP Secured Parties under the DIP Documents to the extent such liens are not permitted thereunder; and

(d)    *Liens Senior to Certain Other Liens.*  The DIP Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the DIP Loan Parties and their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents or this Final Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties, or (C) any intercompany or affiliate liens of the DIP Loan Parties or security interests of the DIP Loan Parties; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code granted after the date hereof.

8.    *Maintenance of Letters of Credit*.  To the extent permitted by the DIP Documents, the DIP Loan Parties are authorized to maintain and renew letters of credit issued or deemed issued under the DIP Documents, the Prepetition LC Credit Facilities, the Lloyds Facility Agreement, the Barclays Facility Agreement and the Prepetition Superpriority Loan Documents on an uninterrupted basis in accordance with the same practices and procedures and subject to the same documents under which they were issued as were in effect prior to the Petition Date and to take all actions reasonably appropriate with respect thereto on an uninterrupted basis and in accordance

with the same practices and procedures and subject to the same documents under which they were issued as were in effect prior to the Petition Date; provided that the DIP New Money Letters of Credit and the DIP Cash Secured LCs shall be issued only (x) for new projects, (y) for incremental letters of credit with respect to existing projects and (z) to replace any prepetition letters of credit not subject to auto-renewal. Notwithstanding anything herein to the contrary, the Automatic Stay shall be modified to permit the issuers of Cash Secured Letters of Credit (as defined in the Prepetition Credit Agreement) to access and apply the Prepetition Cash Secured LC Cash Collateral to the extent necessary to reimburse the relevant Cash Secured LC Issuer (as defined in the Prepetition Credit Agreement) for any payment or disbursement in respect of any Cash Secured Letter of Credit drawn after the Petition Date. Notwithstanding anything herein to the contrary, the Automatic Stay shall be modified to permit the issuers of letters of credit under the Lloyds Facility Agreement to access and apply the Prepetition Lloyds LC Cash Collateral securing such letters of credit to the extent necessary to reimburse the relevant issuers of such letters of credit for any payment or disbursement in respect of any letters of credit drawn under the Lloyds Facility Agreement after the Petition Date. Notwithstanding anything herein to the contrary, the Automatic Stay shall be modified to permit the issuers of DIP Cash Secured LCs to access and apply the cash collateralizing the DIP Cash Secured LCs to the extent necessary to reimburse the relevant issuers of the DIP Cash Secured LCs for any payment or disbursement in respect of the DIP Cash Secured LCs drawn under the DIP Credit Agreement and to allow the DIP LC Agent to reimburse the DIP Letter of Credit Lenders for any DIP Letter of Credit that is drawn and not timely reimbursed by the Debtors pursuant to the terms of the DIP Credit Agreement. Any letters of credit issued pursuant to the DIP Documents, the Prepetition Superpriority Loan Documents, the Prepetition LC Credit Facilities, the Lloyds Facility Agreement and the Barclays Facility Agreement that

48

automatically renew shall renew on an uninterrupted basis in accordance with their terms.  The Debtors shall not be permitted to renew any letters of credit issued pursuant to the Prepetition Superpriority Loan Documents, the Prepetition LC Credit Facilities, the Lloyds Facility Agreement and the Barclays Facility Agreement that do not automatically renew.  No waiver or amendment of any condition precedent to the issuance of DIP New Money Letters of Credit or DIP Cash Secured LCs pursuant to the DIP LC Facilities shall be permitted without first obtaining written consent of the Requisite Revolving Lenders (as defined in the DIP Credit Agreement).  Any funds drawn under a DIP Letter of Credit or a Prepetition Letter of Credit that are returned to the Debtors or their subsidiaries or affiliates by a beneficiary of a letter of credit shall be placed by the Debtors in a segregated account (the "**Returned LC Proceeds Account**"), unless the Debtor has otherwise paid, in full in cash, the related reimbursement obligations for that draw.  No funds will be utilized, distributed or otherwise released from the Returned LC Proceeds Account absent (x) an agreement among the Debtors, the applicable letter of credit issuer(s) and the Required Consenting Lenders (as defined in the Restructuring Support Agreement) or (y) further order of the Court.

9.      *Protection of DIP Lenders' Rights.*

(a)      So long as there are any DIP Obligations outstanding or the DIP Lenders have any outstanding Commitments (as defined in the DIP Documents) (the "**DIP Commitments**") under the DIP Documents, the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Secured Debt Documents or this Final Order, or otherwise seek to exercise or enforce any rights or remedies against the DIP Collateral, including in connection with the Adequate Protection Liens; (ii) be deemed to have consented to any transfer, disposition or sale of, or release

49

of liens on, the DIP Collateral (but not any proceeds of such transfer, disposition or sale to the extent remaining after payment in cash in full of the DIP Obligations and termination of the DIP Commitments), to the extent the transfer, disposition, sale or release is authorized under the DIP Documents; (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral other than as necessary to give effect to this Final Order other than, (x) solely as to this clause (iii), the DIP Collateral Agent filing financing statements or other documents to perfect the liens granted pursuant to the Interim Order and this Final Order, or (y) as may be required by applicable state law or foreign law to complete a previously commenced process of perfection or to continue the perfection of valid and non-avoidable liens or security interests existing as of the Petition Date; and (iv) deliver or cause to be delivered, at the DIP Loan Parties' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Agents or the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of the DIP Collateral subject to any sale or court-approved disposition.

(b)     To the extent any Prepetition Secured Party has possession of any Prepetition Collateral or DIP Collateral or has control with respect to any Prepetition Collateral or DIP Collateral, or has been noted as secured party on any certificate of title for a titled good constituting Prepetition Collateral or DIP Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agents and the DIP Lenders, and such Prepetition Secured Party and the Prepetition Agents shall comply with the instructions of the DIP Collateral Agent with respect to the exercise of such control.

(c)    Any proceeds of Prepetition Collateral subject to the Primed Liens received by any Prepetition Secured Party, whether in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Collateral or otherwise received by any of the Prepetition Agents, shall be segregated and held in trust for the benefit of and forthwith paid over to the DIP Agents for the benefit of the DIP Secured Parties in the same form as received, with any necessary endorsements.   The DIP Agents are hereby authorized to make any such endorsements as agent for each of the Prepetition Agents or any such Prepetition Secured Parties. This authorization is coupled with an interest and is irrevocable.

(d)    The Automatic Stay is hereby modified to the extent necessary to permit each applicable DIP Agent (acting at the direction of the Requisite Revolving Lenders or the Requisite Term Lenders, as applicable) to take any or all of the following actions, at the same or different time, in each case without further order or application of the Court and immediately upon the occurrence of an Event of Default: (i) deliver a notice of an Event of Default to the Debtors; (ii) declare the termination, reduction or restriction of any further DIP Commitment (including, without limitation, any commitment to issue letters of credit under the DIP Documents) to the extent any such DIP Commitment remains; (iii) declare the termination of the DIP Documents as to any future liability or obligation of the DIP Agents and the DIP Lenders (but, for the avoidance of doubt, without affecting any of the DIP Liens or the DIP Obligations); and (iv) declare all applicable DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the DIP Loan Parties. Following the delivery of such notice, such DIP Agent may file a motion (the "**Stay Relief Motion**") seeking emergency relief from the Automatic Stay on at least five (5) business days' notice to request a further order of the Court permitting such DIP Agent, whether or not the

maturity of any of the DIP Obligations shall have been accelerated, to proceed to protect, enforce and exercise all other rights and remedies provided for in the DIP Documents and under applicable law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in any such DIP Document or any instrument pursuant to which such DIP Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of any of such DIP Secured Parties.  The Debtors shall not object to the fact that the Stay Relief Motion is being heard on such shortened notice.  Until such time that the Stay Relief Motion has been adjudicated by the Court the Debtors may use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of Event of Default) or Cash Collateral to fund operations in accordance with the DIP Credit Agreement and the Approved Budget.

(e)      No rights, protections or remedies of the DIP Agents or the DIP Lenders granted by the provisions of this Final Order or the DIP Documents shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent of any party to the DIP Loan Parties' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the DIP Loan Parties' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the DIP Loan Parties' continued use of Cash Collateral or the provision of adequate protection to any party.

10.      *Limitation on Charging Expenses Against Collateral*.  Except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP

Collateral (including Cash Collateral) or Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agents or the Prepetition Agents, as applicable, and no consent shall be implied from any other action, inaction or acquiescence by the DIP Agent, the DIP Lenders, the DIP Secured Parties, the Prepetition Agents or the Prepetition Secured Parties, and nothing contained in the Interim Order or this Final Order shall be deemed to be a consent by the DIP Agent, the DIP Lenders, the DIP Secured Parties, the Prepetition Agents or the Prepetition Secured Parties to any charge, lien, assessment or claims against the Collateral under section 506(c) of the Bankruptcy Code or otherwise.

11.     *No Marshaling*.  In no event shall the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition Secured Debt, or the Prepetition Collateral.  Further, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Agents or the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of any Prepetition Collateral.

12.     *Payments Free and Clear*.  Any and all payments or proceeds remitted to the DIP Agents by, through or on behalf of the DIP Secured Parties pursuant to the provisions of the Interim Order, this Final Order, the DIP Documents or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including without limitation, any claim or charge arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code, whether asserted or assessed by through or on behalf of the Debtors.

13.     *Use of Cash Collateral*.  The DIP Loan Parties are hereby authorized, subject to the terms and conditions of this Final Order, to use all Cash Collateral; *provided* that (a) the Prepetition Secured Parties are granted the Adequate Protection as hereinafter set forth and (b) except on the terms and conditions of this Final Order, the DIP Loan Parties shall be enjoined and prohibited from at any times using the Cash Collateral absent further order of the Court.

14.     *Disposition of DIP Collateral*.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as otherwise provided for in the DIP Documents or otherwise permitted by an order of the Court.

15.     *Adequate Protection of Prepetition Secured Parties*.  The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, any diminution resulting from the sale, lease or use by the DIP Loan Parties of the Prepetition Collateral, the priming of the Prepetition Liens by the DIP Priming Liens pursuant to the DIP Documents and this Final Order, the payment of any amounts under the Carve Out, and the imposition of the Automatic Stay (the "**Adequate Protection Claim**").  In consideration of the foregoing, the Prepetition Agents for the benefit of the Prepetition Secured Parties were, by the Interim Order, and hereby are granted the following as Adequate Protection for, and to secure repayment of an amount equal to such Adequate Protection Claim, and as an inducement to the Prepetition Secured Parties to consent to the priming of the Prepetition Liens and use of the

Prepetition Collateral (including Cash Collateral) (collectively, the "**Adequate Protection Obligations**"):

(a)      *Prepetition Superpriority Adequate Protection Liens*. The Prepetition Superpriority Collateral Agent, for itself and for the benefit of the other Prepetition Superpriority Secured Parties, was granted by the Interim Order (effective and perfected upon the date of entry of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), and hereby is granted, in the amount of the Prepetition Superpriority Secured Parties' Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the DIP Collateral (other than the Prepetition Cash Collateralized LC Collateral) (the "**Superpriority Adequate Protection Liens**"), in each case subject and subordinate only to (A) the DIP Liens and any liens to which the DIP Liens are junior and (B) the Carve Out.

(b)      *Superpriority Section 507(b) Claims*.  Each of the Prepetition Superpriority Agents, for itself and for the benefit of the other Prepetition Superpriority Secured Parties, was, by the Interim Order, and hereby is granted, subject to the Carve Out, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Prepetition Superpriority Secured Parties' Adequate Protection Claims, with, except as set forth in this Final Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Superpriority 507(b) Claims**") which Superpriority 507(b) Claims shall have recourse to and be payable from all prepetition and postpetition property of the DIP Loan Parties and all proceeds thereof (excluding Avoidance Actions but including, the Avoidance Proceeds).  The Superpriority 507(b) Claims shall be subject and subordinate only to the Carve Out and the DIP Superpriority Claims.

Except to the extent expressly set forth in this Final Order or the DIP Documents, the Prepetition Superpriority Secured Parties, shall not receive or retain any payments, property or other amounts in respect of the Superpriority 507(b) Claims unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and any claims having a priority superior to or *pari passu* with the DIP Superpriority Claims have indefeasibly been paid in cash in full and all DIP Commitments have been terminated.

(c)     *Superpriority Secured Parties Cash Payments*.  From and after entry of the Interim Order and until the deemed issuance of the DIP Roll-Up Letters of Credit under the DIP Roll-Up LC Facility upon entry of this Final Order, each of the Prepetition Superpriority Agents, for itself and for the benefit of the applicable Prepetition Superpriority Secured Parties, shall have received current payments in cash on the dates provided in the Prepetition Superpriority Loan Documents an amount equal to the sum of all outstanding and unpaid fees owing pursuant to Sections 2.15(c)(i), (c)(ii), (c)(iii), and (e) of the Prepetition Superpriority Credit Agreement in respect of letters of credit issued thereunder, in each case (x) whether accruing prior to, on or after the Petition Date, or (y) accruing, on and after the Petition Date, in each case, at the non-default rate and in the amounts specified in the Prepetition Superpriority Loan Documents.

(d)     *Superpriority Secured Parties Fees and Expenses*.  The DIP Loan Parties shall provide each of the Prepetition Superpriority Agents, for the benefit of the Prepetition Superpriority Secured Parties, the ad hoc committee of Prepetition Superpriority Term Loan Lenders and Prepetition Term Loan Lenders ("**Ad Hoc Group of Term Lenders**"), and the steering committee of Prepetition Superpriority Revolving Lenders, Prepetition LC Lenders, and Prepetition Revolving Lenders (the "**Steering Committee of RCF/LC Lenders**"), current cash payments of all reasonable and documented prepetition and postpetition fees and expenses,

including, but not limited to, the reasonable and documented fees and out-of-pocket expenses of (i) Davis Polk & Wardwell LLP, Porter Hedges LLP, Centerview Partners, Inc., Ankura Consulting Group, LLC and any other advisors retained by the Ad Hoc Group of Term Lenders, (ii) Latham & Watkins and Locke Lord LLP as legal counsel to the Prepetition Superpriority Term Loan Administrative Agent; and (iii) Linklaters LLP, Bracewell LLP, FTI Consulting, Inc., and any other advisors (including local and foreign legal counsel) retained by the Prepetition Superpriority Revolving and LC Administrative Agent and Prepetition Superpriority Collateral Agent (the "**Superpriority Facility Adequate Protection Fees and Expenses**"), subject to the review procedures set forth in paragraph 21 of this Final Order.

(e)     *Prepetition Shared Collateral Facilities Adequate Protection Liens*. The Prepetition Collateral Agent, for itself and for the benefit of the other Prepetition Shared Collateral Secured Parties, was granted by the Interim Order (effective and perfected upon the date of entry of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), and hereby is granted, in the amount of the Prepetition Shared Collateral Secured Parties Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the DIP Collateral (other than the Prepetition Cash Collateralized LC Collateral), in each case subject and subordinate only to (i) the DIP Liens and any liens to which the DIP Liens are junior, (ii) the Carve Out, and (iii) the Superpriority Adequate Protection Liens (the "**Shared Collateral Adequate Protection Liens**" and together with the Superpriority Adequate Protection Liens, the "**Adequate Protection Liens**").

(f)     *Prepetition Shared Collateral Facilities Section 507(b) Claims*.  Each of the Prepetition Shared Collateral Facilities Agents, for itself and for the benefit of the other Prepetition Credit Facility Secured Parties, was, by the Interim Order, and hereby is granted, subject to the

Carve Out, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Prepetition Credit Facility Secured Parties' Adequate Protection Claims, with, except as set forth in this Final Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Credit Facility 507(b) Claims**" and together with the Superpriority 507(b) Claims, the "**507(b) Claims**"); which Credit Facility 507(b) Claims shall have recourse to and be payable from all of the DIP Collateral (other than the Prepetition Cash Collateralized LC Collateral). The Credit Facility 507(b) Claims shall be subject and subordinate only to the Carve Out, the DIP Superpriority Claims, and the Superpriority 507(b) Claims. Except to the extent expressly set forth in this Final Order or the DIP Documents, the Prepetition Credit Facility Secured Parties, shall not receive or retain any payments, property or other amounts in respect of the Credit Facility 507(b) Claims unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and any claims having a priority superior to or *pari passu* with the DIP Superpriority Claims have indefeasibly been paid in cash in full and all DIP Commitments have been terminated. For the avoidance of doubt and in accordance with the Superpriority Intercreditor Agreement, each of the Prepetition Shared Collateral Facilities Agents (for itself and for the benefit of the respective Prepetition Shared Collateral Secured Parties it represents) shall not assert its Credit Facility 507(b) Claims until entry of the Final Order and the roll-up of the Prepetition Superpriority Credit Facility Debt has occurred.

(g)     *Prepetition Shared Collateral Facilities Cash Payments*. The Prepetition Revolving and LC Administrative Agent, for itself and for the benefit of the applicable Prepetition Credit Facility Secured Parties it represents, shall receive in cash on the dates provided in the Prepetition Credit Facility Loan Documents an amount equal to the sum of all outstanding and

unpaid fees owing pursuant to Sections 2.15(c)(i), (c)(iii) and (e) of the Prepetition Credit Agreement in respect of letters of credit issued thereunder, in each case (x) whether accruing prior to, on or after the Petition Date, or (y) accruing, on and after the Petition Date, in each case, at the non-default rate and in the amounts specified in the Prepetition Credit Facility Loan Documents. The Barclays Facility Agent for itself and for the benefit of the applicable Barclays Facility Secured Parties it represents, shall receive in cash on the dates provided in the Barclays Facility Documents an amount equal to the sum of all outstanding and unpaid fees owing pursuant to Sections 2.15(c)(i), (c)(iii) and (e) of the Barclays Facility Agreement in respect of letters of credit issued thereunder, in each case (x) whether accruing prior to, on or after the Petition Date, or (y) accruing, on and after the Petition Date, in each case, at the non-default rate and in the amounts specified in the Barclays Facility Documents.  Lloyds Bank for itself and for the benefit of the applicable Lloyds Facility Secured Party it represents, shall receive in cash on the dates provided in the Lloyds Facility Documents an amount equal to the sum of all outstanding and unpaid fees owing pursuant to Section 2(b) of the Lloyds Facility Agreement in respect of letters of credit issued thereunder, in each case (x) whether accruing prior to, on or after the Petition Date, or (y) accruing, on and after the Petition Date, in each case, at the non-default rate and in the amounts specified in the Lloyds Facility Documents.

(h)    *Prepetition Shared Collateral Facilities Secured Parties Fees and Expenses*. The DIP Loan Parties shall provide each of the Prepetition Shared Collateral Facilities Agents, for the benefit of the applicable Prepetition Shared Collateral Facilities it represents, the Ad Hoc Group of Term Lenders and the Steering Committee of RCF/LC Lenders, current cash payments of all reasonable and documented prepetition and postpetition fees and expenses, including, but not limited to, the reasonable and documented fees and out-of-pocket expenses of (i) Davis Polk

& Wardwell LLP, Porter Hedges LLP, Centerview Partners, Inc., Ankura Consulting Group, LLC and any other advisors retained by the Ad Hoc Group of Term Lenders, (ii) Latham & Watkins and Locke Lord LLP as legal counsel to the Barclays Facility Agent and the Prepetition Term Loan Administrative Agent; and (iii) Linklaters LLP, Bracewell LLP, FTI Consulting, Inc., and any other advisors (including local and foreign legal counsel) retained by the Prepetition Revolving and LC Administrative Agent and the Prepetition Collateral Agent (together with the Superpriority Facility Adequate Protection Fees and Expenses, the "**Adequate Protection Fees and Expenses**"), subject to the review procedures set forth in paragraph 21 of this Final Order.

(i)      *Milestones and Budget*. The Prepetition Secured Parties party to the Prepetition Shared Collateral Facilities and the Prepetition Superpriority Credit Agreement are hereby entitled to performance of those certain case milestones set forth in the DIP Credit Agreement and the Debtor's compliance with the Approved Budget.  Upon payment in full of all DIP Obligations and termination of all DIP Commitments, the Approved Budget shall continue to be updated in accordance with the terms and conditions of the DIP Credit Agreement, except that the approval of each of the Prepetition Superpriority Collateral Agent and the Prepetition Collateral Agent (in accordance with the Intercreditor Agreements) shall be substituted for the approval of the DIP Agents and/or the DIP Lenders.

(j)      *Prepetition Secured Parties' Information Rights*.  The Debtors shall promptly provide the Prepetition Secured Parties with all required written financial reporting and other periodic reporting that is required to be provided to the DIP Agents or the DIP Lenders under the DIP Documents, including but not limited to the reporting required under Article VI of the DIP Credit Agreement.

(k)     *Monitoring of Prepetition Collateral*.  Each of the Prepetition Agents shall be permitted to retain expert consultants and financial advisors at the expense of the Debtors, which consultants and advisors shall be given reasonable access for purposes of monitoring the business of the Debtors and the value of the applicable Prepetition Collateral.

(l)     *Financial Reporting*.  The Debtors shall continue to provide the Prepetition Agents, the Steering Committee of RCF/LC Lenders and the Ad Hoc Group of Term Lenders (through its counsel) with financial and other reporting substantially in compliance with the Prepetition Secured Debt Documents and any reporting described in this Final Order or the other DIP Documents.

(m)     *Prepetition Secured Parties' Additional Adequate Protection*.  In the event the Debtors file, support, make a proposal or counterproposal to any party relating to, or take any other similar action in furtherance of, a plan that does not propose to pay all claims on account of the Prepetition Secured Debt (i) in cash or (ii) in accordance with the terms of the Restructuring Support Agreement, to the extent such Restructuring Support Agreement has not been terminated, each of the Prepetition Secured Parties shall have the right to immediately terminate Debtors' right to use Cash Collateral pursuant to this Final Order.

16.     *Adequate Protection Liens and Prepetition Intercreditor Agreements*. Notwithstanding anything to the contrary herein, the Adequate Protection Liens shall retain the same priority between and among the Prepetition Secured Parties as the liens the Prepetition Secured Parties held prior to the Petition Date as governed by the Intercreditor Agreements, and the Intercreditor Agreements shall continue in full force and effect and nothing herein shall be construed as modifying, amending, waiving or in any way impacting the effectiveness and enforceability thereof.  Each of the Prepetition Secured Parties are deemed to consent, to the extent

provided in this Final Order, to the priming of their Prepetition Shared Collateral Liens and Prepetition Superpriority Liens, as applicable, by the DIP Liens pursuant to the terms of the Intercreditor Agreements.

17.     *Reservation of Rights of Prepetition Secured Parties.*  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties and any other parties' holding interests that are secured by Primed Liens; *provided* that any of the Prepetition Agents, each acting on its own behalf or at the direction of the requisite Prepetition Secured Parties may request further or different adequate protection, subject to and consistent with the terms of the Intercreditor Agreements, and the Debtors or any other party in interest may contest any such request.

18.     *Perfection of DIP Liens and Adequate Protection Liens.*

(a)     Without in any way limiting the automatically effective perfection of the DIP Liens granted pursuant to paragraph 7 of the Interim Order and paragraph 7 hereof and the Adequate Protection Liens granted pursuant to paragraph 15 of the Interim Order and paragraph 15 hereof, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties are hereby authorized, but not required, to file or record (and to execute in the name of the DIP Loan Parties, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over cash or securities, or to amend or modify security documents, or to subordinate existing liens and any other similar action or action in connection therewith or take any other action in order to validate and perfect

the liens and security interests granted to them hereunder the ("**Perfection Actions**").  Whether or not the DIP Agent, on behalf of the DIP Lenders or the Prepetition Secured Parties shall, in their sole discretion, choose to take such Perfection Actions, the liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, from the time and on the date of entry of the Interim Order.  Upon the request of the DIP Agents or the Prepetition Agents, each of the Prepetition Secured Parties and the DIP Loan Parties, without any further consent of any party, is authorized (in the case of the DIP Loan Parties) and directed (in the case of the Prepetition Secured Parties) to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agents to further validate, perfect, preserve and enforce the DIP Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)     A certified copy of this Final Order may, in the discretion of the DIP Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept a certified copy of this Final Order for filing and/or recording, as applicable.  The Automatic Stay shall be modified to the extent necessary to permit the applicable DIP Agents to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

19.     *Preservation of Rights Granted Under the Final Order and the DIP Documents.*

(a)     Other than the Carve Out and other claims and liens expressly granted by this Final Order, no claim or lien having a priority superior to or *pari passu* with those granted by the Interim Order or this Final Order to the DIP Agents and the DIP Lenders or the Prepetition Agents and the Prepetition Secured Parties shall be permitted while any of the DIP Obligations or

the Adequate Protection Obligations remain outstanding, and, except as otherwise expressly provided in this Final Order, the DIP Liens and the Adequate Protection Liens shall not be: (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the DIP Loan Parties' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties; or (iv) subject or junior to any intercompany or affiliate liens or security interests of the DIP Loan Parties.

(b)     The occurrence of (i) any Event of Default (as defined in the DIP Credit Agreement) or (ii) any violation of any of the terms of this Final Order, shall, after notice by the DIP Agents (acting in accordance with the terms of this Final Order) in writing to the Borrower, constitute an event of default under this Final Order (each an "**Event of Default**") and, upon any such Event of Default, interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Credit Agreement.  Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code:  (A) the DIP Superpriority Claims, the 507(b) Claims, the DIP Liens, and the Adequate Protection Liens, and any claims related to the foregoing, shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations and Adequate Protection Obligations shall have been paid in full (and that such DIP Superpriority Claims, 507(b) Claims, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (B) the other rights granted by this Final Order shall not be affected;

64

and (C) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Final Order.

(c)     If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect: (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agents or the Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacatur or stay; or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens. Notwithstanding any reversal, modification, vacatur or stay of any use of Cash Collateral, any DIP Obligations, DIP Liens, Adequate Protection Obligations or Adequate Protection Liens incurred by the DIP Loan Parties to the DIP Agent, the DIP Lenders, the Prepetition Agents, or the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agents or the Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacatur or stay shall be governed in all respects by the original provisions of this Final Order, and the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges and benefits granted in sections 364(e) and 363(m) of the Bankruptcy Code, this Final Order and the DIP Documents with respect to all uses of Cash Collateral, DIP Obligations and Adequate Protection Obligations.

(d)     Except as expressly provided in this Final Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations, the 507(b) Claims and all other rights and remedies of the DIP Agent, the

DIP Lenders, the Prepetition Agents, and the Prepetition Secured Parties granted by the provisions of this Final Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases or terminating the joint administration of these Chapter 11 Cases or by any other act or omission; (ii) the entry of an order approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents); (iii) the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the DIP Loan Parties have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Final Order and the DIP Documents shall continue in these Chapter 11 Cases, in any Successor Cases if these Chapter 11 Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Secured Parties granted by the provisions of this Final Order and the DIP Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full in cash, as set forth herein and in the DIP Documents, and the Commitments have been terminated.

      20.    *Senior Notes Indenture Trustee and Ad Hoc Group Fees and Expenses*.  So long as the Restructuring Support Agreement has not been terminated with respect to the Consenting Noteholders (as defined in the Restructuring Support Agreement), the DIP Loan Parties shall provide UMB Bank, N.A., and its predecessors-in-interest, as indenture trustee for the Senior Notes (the "**Senior Notes Indenture Trustee**"), and each of those certain institutions comprising

the ad hoc groups of holders of the Senior Notes (collectively, the "**Senior Notes Ad Hoc Group**")

current cash payments of all reasonable and documented prepetition and postpetition advisor fees

and expenses as contemplated by the Restructuring Support Agreement, and not inconsistent with

the Restructuring Support Agreement or the Plan, including, but not limited to, the reasonable and

documented fees and out-of-pocket expenses of (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP,

(ii) Brown Rudnick LLP, (iii) Houlihan Lokey Capital, Inc., (iv) any other advisors retained by

the Senior Notes Ad Hoc Group (the "**Senior Notes Ad Hoc Group Fees and Expenses**"), (v) the

Senior Notes Indenture Trustee, (vi) Pryor Cashman LLP, as counsel to the Senior Notes Indenture

Trustee, and (vii) one local counsel to the Senior Notes Indenture Trustee, subject to the review

procedures set forth in paragraph 21 of this Final Order.  The Debtors shall also deliver to the

advisors of the Senior Notes Ad Hoc Group the information provided under clauses (j) and (l) of

Paragraph 15, *supra*.

21.     *Payment of Fees and Expenses*.  The Fee Letters and the Engagement Letter are

hereby approved, and the DIP Loan Parties are authorized to and shall pay the DIP Fees and

Expenses, as provided in the DIP Documents.  Subject to the review procedures set forth in this

paragraph 21, payment of all DIP Fees and Expenses and Adequate Protection Fees and Expenses

shall not be subject to allowance or review by the Court.  Professionals for the DIP Secured Parties,

the Prepetition Secured Parties, the Senior Notes Indenture Trustee, and the Senior Notes Ad Hoc

Group shall not be required to comply with the U.S. Trustee fee guidelines, however any time that

such professionals seek payment of fees and expenses from the Debtors prior to confirmation of a

chapter 11 plan, each professional shall provide summary copies of its invoices (which shall not

be required to contain time entries and which may be redacted or modified to the extent necessary

to delete any information subject to the attorney-client privilege, any information constituting

attorney work product, or any other confidential information, and the provision of their invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to the Debtors and the U.S. Trustee (together, the "**Review Parties**"). Any objections raised by any Review Party with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within ten (10) business days after the receipt by the Review Parties (the "**Review Period**"). If no written objection is received by 12:00 p.m., prevailing Eastern Time, on the end date of the Review Period, the DIP Loan Parties shall pay such invoices within five (5) business days. If an objection to a professional's invoice is received within the Review Period, the DIP Loan Parties shall promptly pay the undisputed amount of the invoice and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually. Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the Effective Date (as defined in the DIP Credit Agreement) the DIP Fees and Expenses and Adequate Protection Fees and Expenses incurred on or prior to such date without the need for any professional engaged by, or on behalf of, the DIP Secured Parties or the Prepetition Secured Parties to first deliver a copy of its invoice or other supporting documentation to the Review Parties (other than the Debtors). No attorney or advisor to the DIP Secured Parties, any Prepetition Secured Party, the Senior Notes Indenture Trustee, or the Senior Notes Ad Hoc Group shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court. Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to the (i) DIP Secured Parties in connection with or with respect to the DIP Facility; and (ii) Prepetition Secured Parties in connection or with respect to these matters, are hereby approved in full and shall

not be subject to recharacterization, avoidance, subordination, disgorgement or any similar form of recovery by the Debtors or any other person.

22.     *Texas Tax Liens*.  Notwithstanding any provisions of the Motion, the Interim Order, this Final Order, or the other DIP Documents, any valid, binding, perfected, enforceable, and non-avoidable liens currently held by the Texas Taxing Authorities[10] for state or local taxes on any DIP Collateral that under applicable non-bankruptcy law are granted priority over a prior perfected security interest or lien (the "**Texas Tax Liens**") shall neither be primed by nor subordinated to any DIP Liens or Adequate Protection Liens granted under the Interim Order or this Final Order, and the Texas Tax Liens shall attach to any proceeds of any sale of DIP Collateral subject to the Texas Tax Liens in accordance with such priority.  All parties' rights (a) to object to the priority, validity, amount, and extent of the claims and liens, including any Texas Tax Liens, asserted by the Texas Taxing Authorities and (b) with respect to any rights of the Texas Taxing Authorities to request an *ad valorem* tax reserve from the proceeds of the sale of any DIP Collateral that is secured by the Texas Tax Liens are fully preserved.

23.     *Limits to Lender Liability*.  Nothing in this Final Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties (in each case, in their capacities as such) of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts.  So long as the DIP Secured Parties comply with their obligations under the DIP Documents and their obligations, if

---

[10]     For purposes of this Final Order, the term "**Texas Taxing Authorities**" shall refer to Cleveland ISD, Cypress Fairbanks ISD, Dallas County, Fort Bend County, Galveston County, Harris County, Jefferson County, Live Oak Cad, Montgomery County, Nueces County, Smith County, and any taxing authorities represented by Perdue, Brandon, Fielder, Collins & Mott LLP.

any, under applicable law (including the Bankruptcy Code), (a) the DIP Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person and (b) all risk of loss, damage or destruction of the Collateral shall be borne by the DIP Loan Parties.

24.     *Effect of Stipulations on Third Parties.*   The Debtors' stipulations, admissions, agreements and releases contained in this Final Order shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors) in all circumstances and for all purposes.  The Debtors' stipulations, admissions, agreements and releases contained in this Final Order shall be binding upon all parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless: (a) such committee or any other party in interest with requisite standing (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so) has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in this paragraph) by (i) the earlier of (x) the Final Hearing and (y) 45 calendar days after entry of the Interim Order; *provided* that, solely with respect to the Consenting Noteholders (as defined in the Restructuring Support Agreement), the foregoing clause (i) shall be the earlier of (x) 20 calendar days after the termination of the Restructuring Support Agreement with respect to the Consenting Noteholders and (y) first day of the hearing to consider confirmation

70

of any plan of reorganization, (ii) any later date as has been agreed to, in writing, by the Prepetition

Agents (with the consent of the Requisite Lenders (as defined in the Prepetition Credit

Agreement)), the DIP Agent, the Prepetition Agents, a majority of the Ad Hoc Group of Term

Lenders and a majority of the Steering Committee of RCF/LC Lenders, as applicable, and (iii) any

later date as has been ordered by the Court for cause upon a motion filed and served within any

applicable period of time set forth in this paragraph (the time period established by the foregoing

clauses (i), (ii), and (iii), the "**Challenge Period**"), (A) objecting to or challenging the amount,

validity, perfection, enforceability, priority or extent of the Prepetition Secured Debt or the

Prepetition Liens, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent

transfers or conveyances, other avoidance power claims or any other claims, counterclaims or

causes of action, objections, contests or defenses (collectively, the "**Challenges**") against the

Prepetition Secured Parties or their respective subsidiaries, affiliates, officers, directors, managers,

principals, employees, agents, financial advisors, attorneys, accountants, investment bankers,

consultants, representatives and other professionals and the respective successors and assigns

thereof, in each case in their respective capacity as such (each, a "**Representative**" and,

collectively, the "**Representatives**") in connection with matters related to the Prepetition Secured

Debt Documents, the Prepetition Secured Debt, the Prepetition Liens and the Prepetition Collateral;

and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge

in any such timely filed adversary proceeding or contested matter; *provided*, *however*, that any

pleadings filed in connection with any Challenge shall set forth with specificity the basis for such

challenge or claim and any challenges or claims not so specified prior to the expiration of the

Challenge Period shall be deemed forever, waived, released and barred.  If no such Challenge is

timely and properly filed during the Challenge Period or the Court does not rule in favor of the

plaintiff in any such proceeding then: (1) the Debtors' stipulations, admissions, agreements and releases contained in this Final Order shall be binding on all parties in interest; (2) the obligations of the DIP Loan Parties under the Prepetition Secured Debt Documents, including the Prepetition Secured Debt, shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination, recoupment, offset or avoidance, for all purposes in the Chapter 11 Cases, and any subsequent chapter 7 case(s); (3) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance or other defense; and (4) the Prepetition Secured Debt and the Prepetition Liens on the Prepetition Collateral shall not be subject to any other or further claim or challenge by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defenses, claims, causes of action, counterclaims and offsets by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives arising out of or relating to any of the Prepetition Secured Debt Documents, the Prepetition Secured Debt, the Prepetition Liens and the Prepetition Collateral shall be deemed forever waived, released and barred.  If any such Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in this Final Order shall

nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.  Nothing in this Final Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Prepetition Secured Debt Documents, the Prepetition Secured Debt or the Prepetition Liens, and any ruling on standing, if appealed, shall not stay or otherwise delay the Chapter 11 Cases or confirmation of any plan of reorganization.

25.     *Limitation on Use of DIP Financing Proceeds and Collateral.*  Notwithstanding any other provision of this Final Order or any other order entered by the Court, no DIP Loans, DIP Letters of Credit, DIP Collateral, Prepetition Collateral (including Cash Collateral) or any portion of the Carve Out, may be used directly or indirectly, (a) in connection with the investigation, threatened initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the DIP Secured Parties, or the Prepetition Secured Parties, or their respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors, in each case in their respective capacity as such, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens, DIP Superpriority Claims, Prepetition Secured Debt, the Prepetition Shared Collateral Liens, and/or the Adequate Protection Obligations and Adequate Protection Liens granted to the Prepetition Secured Parties, as applicable, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or

offset with respect to the DIP Obligations, the Prepetition Secured Debt and/or the liens, claims, rights, or security interests securing or supporting the DIP Obligations granted under the Interim Order, this Final Order, the DIP Documents or the Prepetition Secured Debt Documents in respect of the Prepetition Secured Debt, including, in the case of each (i) and (ii), without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise (provided that, notwithstanding anything to the contrary herein, the Debtors may use the proceeds of the DIP Loans and/or DIP Collateral or Prepetition Collateral (including Cash Collateral) to investigate but not to prosecute (A) the claims and liens of the Prepetition Secured Parties and (B) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties up to an aggregate cap of no more than $50,000), (b) to prevent, hinder, or otherwise delay or interfere with the Prepetition Secured Parties', the DIP Agent's, or the DIP Lenders', as applicable, enforcement or realization on the Prepetition Secured Debt, Prepetition Collateral, DIP Obligations, DIP Collateral, and the liens, claims and rights granted to such parties under the Interim Order or this Final Order, as applicable, each in accordance with the DIP Documents, the Prepetition Secured Debt Documents, the Interim Order, or this Final Order; (c) to seek to modify any of the rights and remedies granted to the Prepetition Secured Parties, the DIP Agents, or the DIP Lenders under the Interim Order, this Final Order, the Prepetition Secured Debt Documents or the DIP Documents, as applicable; (d) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens permitted pursuant to the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens and 507(b) Claims granted to the Prepetition Secured Parties; or (e) to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such

payments are approved or authorized by the Court, agreed to in writing by the DIP Lenders, expressly permitted under this Final Order or permitted under the DIP Documents (including the Approved Budget), in each case unless all DIP Obligations, Prepetition Secured Debt, Adequate Protection Obligations, and claims granted to the DIP Agent, DIP Lenders or Prepetition Secured Parties under this Final Order, have been refinanced or paid in full in cash (including the cash collateralization of any letters of credit) or otherwise agreed to in writing by the DIP Secured Parties.

26.    *North Ocean 105 Financing*.   Notwithstanding any other provision of this Final Order, the DIP Loans, DIP Letters of Credit, DIP Collateral, or Prepetition Collateral (including Cash Collateral), may be used to make payments (by way of adequate protection or otherwise) of principal, interest or other amounts, including, without limitation, any fees and expenses (including legal fees) of the Lenders and Administrative Parties (collectively, the "**NO 105 Secured Parties**") under (and as defined in) the North Ocean 105 Credit Agreement (as defined in the DIP Credit Agreement), as and when they become due on account of, and in accordance with the terms of, the NO 105 Facility, in accordance with the Approved Budget.   Notwithstanding anything to the contrary herein or in the other DIP Documents, (x) the DIP Collateral shall not include, and no DIP Liens are or shall be granted with respect to, any NO 105 Collateral prior to the repayment in full in cash of all loans, commitments, guarantees, insurance, credit insurance, interest, premium, fees (including professional fees), and other amounts payable under the North Ocean 105 Credit Agreement and the other Finance Documents (as defined in the North Ocean 105 Credit Agreement), and (y) all rights of the NO 105 Secured Parties under the North Ocean 105 Credit Agreement and the other Finance Documents to seek adequate protection or assert the interests of

any of the NO 105 Secured Parties (and the rights of any other party in interest, including the Debtors, to object to any such relief ) are hereby preserved.

27. *Final Order Governs*.  In the event of any inconsistency between the provisions of the Interim Order, this Final Order and the DIP Documents (including, but not limited to, with respect to the Adequate Protection Obligations) or any other order entered by this Court, the provisions of this Final Order shall govern.  Notwithstanding anything to the contrary in any other order entered by this Court, any payment made pursuant to any authorization contained in any other order entered by this Court shall be consistent with and subject to the requirements set forth in the Interim Order, this Final Order and the DIP Documents, including, without limitation, the Approved Budget.

28. *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Agents, the DIP Lenders, the Prepetition Secured Parties, any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agents, the DIP Lenders, the Prepetition Secured Parties and the Debtors and their respective successors and assigns; *provided* that the DIP Agents, the DIP Lenders and the Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) by, or to extend any

financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

29.     *Exculpation*.   Nothing in this Final Order, the DIP Documents, the Prepetition Secured Debt Documents or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon any DIP Secured Party or Prepetition Secured Party any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts.  In addition, (a) the DIP Secured Parties and Prepetition Secured Parties shall not, in any way or manner, be liable or responsible for: (i) the safekeeping of the DIP Collateral or Prepetition Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (b) all risk of loss, damage, or destruction of the DIP Collateral and Prepetition Collateral shall be borne by the Debtors.

30.     *Limitation of Liability*.  In determining to make any loan or other extension of credit under the DIP Documents, to permit the use of the Prepetition Collateral (including the Cash Collateral) or in exercising any rights or remedies as and when permitted pursuant to this Final Order or the DIP Documents, none of the DIP Secured Parties or Prepetition Secured Parties shall (a) be deemed to be in "control" of the operations of the Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors, so long as the DIP Agents' and the DIP Lenders' actions do not constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management or operational affairs

of a vessel or facility owned or operated by a Debtor, or otherwise cause liability to arise to the federal or state government or the status of "responsible person" or "managing agent" to exist under applicable law (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, as amended, or any other federal or state statute, including the Internal Revenue Code).  Furthermore, nothing in this Final Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties, Prepetition Agents or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the DIP Loan Parties and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

31.     *Master Proof of Claim.*  The Prepetition Agents and/or any other Prepetition Secured Parties shall not be required to file proofs of claim in the Chapter 11 Cases or any Successor Case in order to assert claims on behalf of themselves or the Prepetition Secured Parties for payment of the Prepetition Secured Debt arising under the Prepetition Secured Debt Documents, including, without limitation, any principal, unpaid interest, fees, expenses, Credit Agreement Hedging Claims and other amounts under the Prepetition Secured Debt Documents.  The statements of claim in respect of such indebtedness set forth in this Final Order, together with any evidence accompanying the DIP Motion and presented at the Interim Hearing and the Final Hearing, are deemed sufficient to and do constitute proofs of claim in respect of such debt and such secured status.  However, in order to facilitate the processing of claims, to ease the burden upon the Court and to reduce an unnecessary expense to the Debtors' estates, each of the Prepetition Agents is authorized to file in the Debtors' lead chapter 11 case *In re McDermott International, Inc.*, Case No. 20-30336 (DRJ), a master proof of claim on behalf of its respective Prepetition Secured Parties on account of any and all of their respective claims arising under the

applicable Prepetition Secured Debt Documents and hereunder (each, a "**Master Proof of Claim**") against each of the Debtors.  Upon the filing of a Master Proof of Claim by any of the Prepetition Agents, it shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors of any type or nature whatsoever with respect to the applicable Prepetition Secured Debt Documents, and the claim (including any Credit Agreement Hedging Claims) of each applicable Prepetition Secured Party (and each of its respective successors and assigns), named in a Master Proof of Claim shall be treated as if it had filed a separate proof of claim in each of these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to identify whether any Prepetition Secured Party acquired its claim from another party and the identity of any such party or to be amended to reflect a change in the holders of the claims set forth therein or a reallocation among the holders of the claims asserted therein resulting from the transfer of all or any portion of such claims.  The provisions of this paragraph 30 and each Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or its successors in interest) to vote separately on any plan proposed in these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the Prepetition Agents.  The DIP Agents and the DIP Lenders shall similarly not be required to file proofs of claim with respect to their DIP Obligations under the DIP Documents, and the evidence presented with the DIP Motion and the record established at the Interim Hearing and the Final Hearing are deemed sufficient to, and do, constitute proofs of claim with respect to their obligations, secured status, and priority.   For the purposes of this paragraph 30 only,

"Prepetition Secured Debt Documents" shall include the hedging agreements executed by the Debtors and the Continuing Hedging Lenders (as defined in the Hedging Order) prior to the Petition Date solely to the extent such hedging agreements give rise to the Credit Agreement Hedging Claims identified on Schedule A hereto.

32.     *Insurance*.  To the extent that any of the Prepetition Agents is listed as loss payee under the Borrowers' or DIP Guarantors' insurance policies, the applicable DIP Agents are also deemed to be the loss payee under the insurance policies and shall act in that capacity and distribute any proceeds recovered or received in respect of the insurance policies, to the payment in full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted), and to the payment of the applicable Prepetition Secured Debt (consistent with the Prepetition Intercreditor Agreements).

33.     *Effectiveness*.  This Final Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

34.     *Modification of DIP Documents and Approved Budget*.  The DIP Loan Parties are hereby authorized, without further order of this Court, to enter into agreements with the DIP Secured Parties providing for any consensual non-material modifications to the Approved Budget or the DIP Documents, or of any other modifications to the DIP Documents necessary to conform the terms of the DIP Documents to this Final Order, in each case consistent with the

amendment provisions of the DIP Documents *provided*, *however*, that notice of any material modification or amendment to the DIP Documents shall be provided to the U.S. Trustee which shall have five (5) days from the date of such notice within which to object, in writing, to the modification or amendment.  If the U.S. Trustee timely objects to any material modification or amendment to the DIP Documents, the modification or amendment shall only be permitted pursuant to an order of the Court.  The foregoing shall be without prejudice to the Debtors' right to seek approval from the Court of a material modification on an expedited basis.

35.     *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

36.     *Payments Held in Trust*.  Except as expressly permitted in this Final Order or the DIP Documents, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Documents, and termination of the Commitments in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the applicable DIP Agents and the DIP Lenders and shall immediately turn over the proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Final Order.

37.     *Miscellaneous*.  Upon request of any of the DIP Agents, the Prepetition Agents, the Ad Hoc Group of Term Lenders, or the Steering Committee of RCF/LC Lenders, the Debtors' advisors shall make themselves reasonably available (including for reasonable weekly telephone conferences) to discuss significant items and developments in the Chapter 11 Cases, including

with respect to any material contracts, any material litigation, and any material operational or regulatory items.

       38.    *Credit Bidding.*

       (a)    (i) The DIP Secured Parties shall have the right to credit bid, in accordance with the DIP Documents, up to the full amount of the DIP Obligations in any sale of the DIP Collateral, and (ii) subject to the Intercreditor Agreements, the Prepetition Secured Parties shall have the right to credit bid up to the full amount of the Prepetition Secured Debt in any sale of the DIP Collateral, in each case, as provided for in section 363(k) of the Bankruptcy Code and subject to any successful Challenge, without the need for further Court order authorizing the same and whether any such sale is effectuated through section 363(k) or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

       (b)    Notwithstanding paragraph 37(a) of this Final Order, the DIP Secured Parties and the Prepetition Secured Parties shall not directly or indirectly knowingly transfer any DIP Obligations or Prepetition Secured Debt to a non-affiliated party for the purpose of enabling or effectuating a credit bid by such non-affiliated party for the Debtors' technology business in connection with the Technology Business Sale (as defined in the Dickson Declaration).

       39.    *Chubb Reservation of Rights.*  For the avoidance of doubt, (a) to the extent ACE American Insurance Company, Federal Insurance Company and/or any of their affiliates (collectively, and together with each of their successors, "**Chubb**") had valid, enforceable, perfected, and non-avoidable liens and/or security interests on property of the Debtors as of the Petition Date, which liens and/or security interests were senior to the liens and/or security interests of each of the Prepetition Secured Parties (collectively, the "**Chubb Liens**"), the DIP Liens shall not prime or otherwise have priority over the Chubb Liens; and (ii) nothing, including the DIP

Documents and/or this Final Order, alters or modifies the terms and conditions of any surety bonds, insurance policies or respective related agreements issued by Chubb.

40. *Bankruptcy Rules*. The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the DIP Motion.

41. *No Third Party Rights*. Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

42. *Necessary Action*. The Debtors, the DIP Secured Parties and the Prepetition Secured Parties are authorized to take all actions as are necessary or appropriate to implement the terms of this Final Order. In addition, the Automatic Stay is modified to permit affiliates of the Debtors who are not debtors in these Chapter 11 Cases to take all actions as are necessary or appropriate to implement the terms of this Final Order.

43. *Interim Order*. Except as specifically amended or otherwise modified hereby, all of the provisions of the Interim Order and any actions taken by the Debtors, the DIP Secured Parties or the Prepetition Secured Parties in accordance therewith shall remain in effect and are hereby ratified by this Final Order.

44. *Retention of Jurisdiction*. The Court shall retain jurisdiction to enforce the provisions of this Final Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

**Signed:  February 24, 2020.**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

## Schedule A

## Credit Agreement Hedging Claims

| Continuing Hedging Lender | Termination Amount |
|---|---|
| CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK | $16,459,000.00 |
| ABN AMRO BANK N.V. | $12,205,000.00 |
| BARCLAYS BANK PLC | $11,599,000.00 |
| J. ARON & COMPANY LLC | $6,935,300.00 |