## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Case No. 20-30336 (DRJ) |
| MCDERMOTT INTERNATIONAL, INC., *et al*.,) | Chapter 11 |
| | ) | |
| Debtors | ) | (Joint Administration) |

## OBJECTION OF COLIGADO SHAREHOLDER GROUP TO DISCLOSURE STATEMENT AND PRE-PACKAGED CHAPTER 11 PLAN OF MCDERMOTT INTERNIATIONAL, INC.

The Coligado Shareholder Group, shareholders and creditors in the above case, file this Objection to the Disclosure Statement and Pre-Packaged Chapter 11 Plan of Reorganization filed by McDermott International, Inc. and all of its subsidiaries (collectively, "Debtor" or "McDermott" or "Company") and hereby show as follows:

1. The names and addresses of the objecting parties (the "Coligado Shareholder Group") and the amounts and nature of interest beneficially owned by such entities are set forth on Exhibit A attached hereto.  The ownership by all members is equity interests and for one member options interest for equity shares.

### COLIGADO SHAREHOLDER GROUP

2. The Coligado Shareholder Group ("CSG" or "Shareholder Group") are owners of common equity shares of the Debtor.

3. The Shareholders Group are classified as Class 14 in the Debtors' Chapter 11 Plan Prepacked Chapter 11 Plan of Reorganization ("Prepackaged Plan" or "Plan") filed in the United States Bankruptcy Court for the Southern District of Texas ("Bankruptcy Court").

4. The Plan designates that Class 14 are "Existing Common Equity Interests in McDermott"

with the Status of "Impaired" and as to Voting Rights, "Not Entitled to Vote (Deemed to Reject)."

5.   Under section 1129 (a) of the Bankruptcy Code, each class must either vote to "accept" the chapter 11 plan or be deemed to not be impaired.  See, Section 1129(a)(8).[1]

6.   If a class does not vote and is deemed impaired, then section 1129(b) must be used to obtain confirmation.  The Plan must satisfy the requirements of 1129(b) in order to be confirmed.

7.   The Shareholder Group alleges that the plan as proposed does not satisfy the requirements of section 1129(b).

## BACKGROUND

8.   McDermott is a multinational engineering, procurement, construction, and installation company incorporated under the laws of Panama and headquartered in Houston, Texas. McDermott's common stock has, historically, traded under the ticker symbol "MDR" on the New York Stock Exchange ("NYSE").  The once-strong Company has struggled with its debt load since making a series of acquisitions, including Chicago Bridge & Iron Co. ("CB&I").

9.   Over the course of the third and fourth quarters of 2019, McDermott's stock value neared freefall.  However, rather than consummate an opportunity to sell its valuable technology business, Lummus Technology ("Lummus"), as the Company led investors to believe it would, McDermott undertook a series of actions aimed at short term solvency, soliciting a

---

[1] Section 1129(a)(8) provides that

(8)   With respect to each class of claims or interests—
      (A) such class has accepted the plan; or
      (B) such class is not impaired under the plan.

new financing arrangement to keep the Company afloat.  While its public representations surrounding the financing were rosy, it is now appears that the financing was to sustain the Company as it prepared to enter bankruptcy.

10. While the bankruptcy offers new hope for priority creditors to recover their investment in McDermott – and even receive equity in the reorganized company – the bankruptcy will wipe out the Company's existing common stockholders.  Indeed, pursuant to the Plan existing holders of McDermott common stock will not receive any distribution and their interests in the Company will be canceled, released, and extinguished upon the Bankruptcy Court's approval of the Plan and McDermott's emergence from bankruptcy.

11. Contrary to McDermott's public disclosures, bankruptcy apparently had been the Company's plan during the fall of 2019.  Today, the Company's share price languishes below 5 cents in the OTC market and its equity shareholders have little hope of recovering their investment. Many others had no choice but to salvage whatever value they could when the stock immediately stopped trading on NYSE with announcement of plans to file for bankruptcy with price plummeting by over 90% when it eventually opened in the OTC market.

*McDermott Engages AlixPartners*

12. On September 18, 2019, rumors emerged that McDermott had engaged a turnaround firm. The news caused a market panic and the stock plunged *49%* before trading was halted that morning, and a total of *63.3%* on the day.  Adding clarity to the rumors, the Wall Street Journal announced that the firm McDermott had engaged was AP Services, LLC ("AlixPartners"), known for its advisory work on some of the largest Chapter 11 reorganizations in United States history.  Upon information and belief, it was around this

time that McDermott hatched its plan to slow play what now appears to have been a plan to file for bankruptcy, while leading investors to believe it was taking steps to simply address short-term liquidity concerns.

13.   In the midst of the market panic, McDermott issued a two-sentence public statement on September 18, 2019, in which it simply stated that the Company "is taking positive and protractive measures, as we have done in the past, intended to improve [the Company's] capital structure and the long-term health of its balance sheet."   This deceptive and abbreviated statement effectively hid the dire financial straits that McDermott was facing, misleading investors into believing that McDermott was simply facing short term liquidity issues rather than impending financial ruin.   In fact, in a declaration in support of McDermott's First Day Motions as part of the bankruptcy proceeding, John R. Castellano, AlixPartners Managing Director and Chief Transformation Officer for McDermott, charged with leading the restructuring ("Castellano"), recently revealed that the Company was, in fact, facing an "acute liquidity crisis" in September 2019 and was asked to pivot immediately to "Contingency Planning" - in other words bankruptcy filing.   The Company went "radio silent" for the next two days, before making its next public statement, indicating that the Company had received an approach for Lummus and, with it, a potential path to continuing operations and potential solution to its liquidity and balance sheet concerns.

*Lummus Technology Bids*

14. Lummus is a leading licensor of proprietary petrochemicals, refining, gasification, and gas processing technologies, and a supplier of proprietary catalysts and related engineering. Lummus is, in many respects, the crown jewel of McDermott; indeed, McDermott claims

that Lummus "provides one of the industry's most diversified technology portfolios to the hydrocarbon processing sector."

15. On September 20, 2019, two days after the trading halt and news of McDermott's engagement of AlixPartners, McDermott announced that it had received unsolicited approaches for Lummus that valued the technology business at greater than $2.5 billion and that McDermott was "exploring strategic alternatives to unlock the value of Lummus . . . ." In the same press release, McDermott stated that it "plan[s] to use the proceeds from any transaction involving Lummus Technology to strengthen [its] balance sheet" and announced the retention of Evercore as the lead advisor on the "strategic alternatives process" for Lummus. All indications were that Lummus was McDermott's ticket to righting its balance sheet.

16. Not only did McDermott represent to investors that it was pursuing the sale of Lummus, but the emergency financing agreement that McDermott struck with its lenders, discussed in greater detail below, which was disclosed to shareholders on October 21, 2019, required McDermott to sell Lummus. The Superpriority Senior Secured Credit Agreement provided business plan milestones as conditions for that funding, which set forth a schedule to which McDermott was required to adhere with respect to the sale of Lummus.[2] Pursuant to the schedule, McDermott was obligated to, *inter alia*, solicit first round bids for the "sale or other disposition of all or substantially all of the assets of [Lummus]" by November 27, 2019, deliver the list of bidders to the lenders' advisors by December 15, 2019, deliver a draft purchase agreement for the sale to lenders' advisors by December 31, 2019, and enter

---

[2] See Superpriority Agreement, October 21, 2019, at Section 7.16 (Business Plan Milestones), https://www.sec.gov/Archives/edgar/data/708819/000119312519270495/d24467dex103.htm.

into a purchase agreement with respect to Lummus by January 31, 2020.  Despite these concrete deadlines, of which investors were made aware, upon information and belief, McDermott slowed its efforts to sell Lummus prior to bankruptcy.  If McDermott had met its obligations to solicit bidders and sell Lummus in November and December of 2019, not to mention earlier, including in response to the unsolicited approaches, the sale should have stabilized the Company and strengthened its balance sheet, as it led investors to believe.

17. McDermott's next substantive announcement regarding Lummus came on November 7, 2019.  However, rather than providing an update regarding the bid that it had received or any other measure as part of the Company's "explor[ation] of strategic alternatives," McDermott simply announced that Lummus was awarded a contract from a company in some undisclosed amount less than $50 million.  Nowhere in this disclosure did McDermott discuss the strategic alternatives process for Lummus.  Through the time of McDermott's entrance into the bankruptcy process, which is discussed in greater detail below, McDermott declined to complete the sale of Lummus, to the great expense of its equity shareholders.  It is now appears that McDermott decided to sell Lummus after filing for bankruptcy, at the substantial expense of shareholders.

18. The import of McDermott's decision not to sell Lummus in order to stabilize the business comes into sharper relief when considered alongside the Company's actions in seeking emergency financing in order to facilitate continued operations.

*McDermott Seeks Bridge Loan*

19. On September 24, 2019, six days after the market panic and four days after McDermott announced that it had received a bid for Lummus, Bloomberg reported that McDermott was seeking a bridge loan to enable its continued operations ("Bridge Loan") in the face of

liquidity issues and a working-capital shortfall of about $1.7 billion.  The reporting speculated that McDermott would approach existing creditors for the bridge loan and that Evercore, previously engaged for purposes of the Lummus work, had begun to undertake the same.  The Bloomberg report confirmed the apparent reality that, in light of the recent plunge in share price, existing creditors would be unlikely to lend further money to McDermott unless there was a change to the capital structure such that these emergency lenders would be placed at the top.

*Announcement of Superpriority Facility*

20. On October 21, 2019, McDermott announced that it had received its Bridge Loan to help ward off short term liquidity issues, but that it would need bondholder agreement to access the next tranche of funding.  This loan was in the form of a $1.7 billion superpriority secured credit facility ("Superpriority Facility"), which was to provide for four tranches of funding, one of which would become immediately available and the remaining three of which would become available over time, upon certain conditions being met.  The Superpriority Facility came at a significant cost, with fees, expenses, and interest associated with the financing totaling more than $200 million.[3]

21. Under the terms of the agreement, McDermott gained immediate access to $650 million of financing, comprised of a $550 million Term Loan Facility and $100 million Letter of

---

[3] It should be further noted that several senior executives received significant "retention bonuses" related to the effective date of the financing agreement.  Under the arrangement, David Dickson, Chief Executive Officer, was awarded a $3.4 million bonus.  Among the other executives awarded retention bonuses was Stuart Spence, then-Chief Financial Officer, who received a $1.3 million bonus before resigning from the Company less than 3 weeks later, just after the announcement of McDermott's earnings for the third quarter of 2019.  The bonuses were to be paid in thirds, on the effective date of the financing agreement, the second tranche funding date, and the third tranche funding date, respectively. As part of the plan to exit Chapter 11, all management will be retained and will be given up to 7.5% in new equity while wiping out existing shareholder value completely.

Credit, before fees and expenses.  The Company indicated that it would use the funding to "finance working capital and support the issuance of required performance guarantees on new projects" and, again, that the remaining amounts of financing under the Agreement would be subject to various conditions at the discretion of the lenders.  In the same announcement, McDermott stated that it was continuing to pursue the strategic alternatives process for Lummus and withdrawing its previously stated guidance for full-year 2019.

22. According to Castellano in connection with the First Day Motions of the bankruptcy proceedings, McDermott's only viable source of "emergency" capital was its secured lenders, with whom it negotiated the Superpriority Facility.  At least in part, this purports to be because McDermott could only obtain further financing with a holder of its preferred equity, which had negotiated a consent over the incurrence of any future indebtedness. However, this ignores McDermott's ability at that point to consummate a sale of Lummus, an ability that the Company trumpeted to the investing public.  Indeed, in the presentation that McDermott and its advisors made to the prospective emergency lenders, entitled "Project Sprint," the Company touted that Lummus would support "strong interest from both financial and strategic buyers" and devoted a portion of the presentation to "Deleveraging Opportunities from Technology Business and Other Sales."[4] In the same presentation, they showed McDermott's cashflow projections, as turning cash flow positive by the 2nd half of 2020 with the use of the bridge loan to address remaining short term liquidity issues from the Cameron LNG and Freeport LNG legacy projects, both of which would be completed by second quarter of 2020.

---

[4] See Project Sprint Lender Presentation, October 2019,
https://www.sec.gov/Archives/edgar/data/708819/000119312519270495/d24467dex992.htm.

*Tranche B Funding*

23. In the weeks following McDermott's announcement of the Superpriority Facility, the Company issued a number of press releases boasting of contracts and awards it had received as well as the largest backlog the company has ever had valued at over $20B and a healthy business pipeline of over $89B.  Then, on December 2, 2019, McDermott announced that it had been granted early access to Tranche B of the Superpriority Facility. Tranche B specifically provided the company a $250 million Term Loan Facility and a $100 million Letter of Credit Facility, which the Company stated, as with Tranche A, it would use to finance working capital and support the issuance of required performance guarantees on new projects.  It was touted by McDermott as evidence of lender's confidence in McDermott's plans and that they "continue collaborative discussions regarding a long-term balance sheet solution."

24. In connection with the announcement of the receipt of this funding, McDermott also announced that it had entered into a forbearance agreement with the holders of a certain class of the Company's senior notes, with the forbearance period extending through January 15, 2019, and perhaps longer pending additional negotiations.  Further yet, in the release announcing the grant of Tranche B funding, the Company announced that it was continuing to pursue the previously announced strategic alternatives process for Lummus Technology.

*Tranches C and D Funding*

25. The Superpriority Facility prospectively offered $1.7 billion in financing at the time of the agreement; however, Tranche C and D were never funded.  Despite knowing at least as early as December 1, 2019, that the Company would not receive the last two tranches –

together, over 40% of the entire bridge loan – the Company did not disclose the same to investors.

26. In his declaration in connection with the First Day Motions, McDermott Chief Transformation Officer and AlixPartners Managing Director Castellano stated that "[I]n connection with [the Tranche B] funding, the secured lenders stated that they did not expect to fund any additional amounts on an out-of-court basis. As such, McDermott's liquidity would drive the timing of any potential chapter 11 filing." Castellano went on to indicate that "McDermott projected that it only had five to six weeks to meet [lenders' restructuring] demands before exhausting its liquidity reserves." In other words, McDermott knew as early as December 1, 2019 that the Company would not receive the last two tranches of the Superpriority Facility, and, moreover, that it would almost certainly increase liquidity risks, yet made no such disclosure to investors or the public. In fact, the Company appears to have deliberately misled investors to believe that lenders had full confidence in the Company by offering early Tranche B funds release and made no disclosure that Tranche C & D was no longer available. Upon knowing that Tranches C&D were no longer available, the Company still made no attempt to accelerate the asset sale of Lummus, an option it had for addressing the liquidity and balance sheet issues since late September 2019, even before it took on the Superpriority loan. By taking on the Superpriority loan, the Debtor claimed it was not allowed to pay $69M interest to its bondholders as a condition even though they had more than sufficient cash available. This apparently poor decision resulted in default and unnecessary adversarial relations with bond holders and eventually a down grade in the Debtors credit rating, which further dimmed chances for the Debtor to achieve any favorable alternative source of financing.

*SEC Investigation*

27. On July 26, 2019, McDermott received subpoenas in connection with an ongoing investigation by the United States Securities and Exchange Commission ("SEC") concerning the reporting of projected losses associated with the Cameron LNG project. However, despite releasing its quarterly report for the second quarter of 2019 just days later and issuing numerous press releases and 8-Ks in the weeks and months that followed, McDermott failed to make any public disclosure concerning, or even mentioning, the investigation.

28. Finally, on November 4, 2019, McDermott released its 10-Q quarterly report for the third quarter of 2019.  In the report, McDermott made its first mention of the investigation, despite receiving subpoenas more than three months earlier:

> ***SEC Investigation***—By letter dated July 26, 2019, together with accompanying subpoenas, the U.S. Securities and Exchange Commission (the "SEC") notified us that it is conducting an investigation related to disclosures we made concerning the reporting of projected losses associated with the Cameron LNG project.  We have been and intend to continue cooperating with the SEC in this investigation, including by producing documents requested by the SEC. (emphasis in original).

29. The timing appears curious, until considered alongside the Bridge Loan, which McDermott needed to stay afloat.  Indeed, on information and belief, McDermott apparently decided to delay any announcement of the SEC investigation until after it had secured the Bridge Loan so as not to jeopardize that financing, which was critical to the Company's continued operations as a going concern.  Numerous analysts and publications made the link between the timing of this announcement and the Bridge Loans and reported on consequent frustration among McDermott's lenders.

*Cameron LNG and Freeport LNG Projects*

30. On information and belief, McDermott's liquidity crisis was, in large part, the result of the Company's ill-fated acquisition of CB&I. McDermott acquired CB&I in May 2018 for a total of $4.1 billion in cash and stock. The CB&I acquisition saddled McDermott with a number of CB&I legacy projects – including the Cameron LNG and Freeport LNG projects – which would prove to be enormous drags on McDermott's balance sheet, compromising the Company's operations.

31. Cameron LNG is a joint venture between McDermott and Chiyoda International Corporation ("Chiyoda"), a Japanese engineering company, involving the construction of natural gas liquefaction and export facilities and infrastructure in Louisiana.

32. Freeport LNG is a joint venture between McDermott, Chiyoda, and Zachary Group involving the design and construction of gas pretreatment facilities and transportation infrastructure in Texas.

33. Throughout the fourth quarter of 2019, McDermott issued a series of press releases lauding the progress of the Cameron LNG and Freeport LNG projects[5], when, in reality, the projects represented significant losses to the Company. Indeed, during a time period in which McDermott's press releases reflected that the projects were reaching milestones, McDermott substantially increased cost estimates and recognized catastrophic losses related to both projects.

---

[5] *See e.g.* December 2, 2019 press release titled *McDermott and Chiyoda Introduce Feed Gas to Train 2 at Cameron LNG*; December 6, 2019 press release titled *McDermott, Chiyoda and Zachry Group Announce First Liquid from Freeport LNG Train 2*; December 9, 2019 press release titled *Freeport LNG Train 1 Begins Commercial Operation*; December 18, 2019 press release titled *McDermott, Chiyoda and Zachry Group Announce First Cargo from Freeport LNG Train 2*; and December 23, 2019 press release *McDermott and Chiyoda Announce First Liquid from Cameron LNG Train 2. On, January 17, 2019 last trading day before Chapter 11 filing, press released announced Freeport LNG Train 2 started Commercial Operations.*

34. In the "Project Sprint" presentation to lenders, McDermott and its advisors indicated that over $375 million of the Bridge Loan would be necessary to fund cash outflows for the completion of the Cameron LNG and Freeport LNG projects.  Further, McDermott's 10-Q quarterly report for the third quarter of 2019 listed Cameron LNG and Freeport LNG as loss projects, with hundreds of millions of dollars in losses attributable to each project and announced the recognition of unfavorable changes in the cost estimates of each project.

35. Upon information and belief, McDermott's positive disclosures regarding Cameron LNG and Freeport LNG were additional measures aimed at slow playing McDermott's descent into bankruptcy and acted to mislead investors regarding the Company's financial status.

*Delisting*

36. On December 13, 2019, the NYSE sent McDermott a notice of noncompliance, as the Company's common stock had traded at below $1.00 for 30 consecutive days.  In response, McDermott issued a press release stating, "The Company plans to notify the NYSE of its intent to cure the deficiency and return to compliance with the NYSE's continued listing requirements," and further indicating that the notification would not affect any of the Company's reporting requirements or debt obligations.

37. On January 23, 2020, in connection with the announcement of its bankruptcy filing, McDermott indicated that its common stock would be delisted by the NYSE and trade on over-the counter (OTC) markets.  The share price of McDermott's common stock today is less than 5 cents.

*Bankruptcy and Lummus Sale*

38. On January 21, 2020, McDermott and 225 of its direct and indirect subsidiaries commenced proceedings under Chapter 11 of the United States Bankruptcy Code, which the Company

likewise announced that day.  The bankruptcy is a prepackaged restructuring that will enable McDermott to continue operating, but, *inter alia*, has the effect of *wiping out all of the equity shareholders*.

39. Under the terms of the Plan, the exit financing for which is already in place, McDermott would receive an aggregate $2.81 billion debtor-in-possession credit facility provided by McDermott's senior secured lenders, including new credit and a "roll up" of the Superpriority Facility.  Additionally, the Plan would equitize more than $3 billion in funded debt in exchange for equity in the reorganized McDermott.  This, while the interests of the existing equity shareholders are completely eliminated.

40. Also, on January 21, 2020, McDermott announced that it had entered an agreement pursuant to which The Chatterjee Group and Rhône Group ("Chatterjee Group") will serve as the "stalking-horse bidder" in a court-supervised sale process for Lummus.  The Chatterjee Group agreed to acquire Lummus for $2.725 billion, subject to a higher bid during the auction process.  According to SEC filings, Chatterjee is an owner of at least 10% of the outstanding shares of McDermott.  Pursuant to the Plan, the proceeds of the sale will be used to support McDermott's operations going forward and repay obligations under the debtor-in-possession credit facility.

41. On January 23, 2020, the Bankruptcy Court entered an order restating and enforcing the automatic worldwide stay ("Stay Order") and an order scheduling a hearing for the approval of the combined Plan disclosure statement and confirmation of the Plan ("Hearing Order").  The Stay Order stayed, restrained, and enjoined all litigation for claims arising prior to the bankruptcy filing from commencing or continuing against McDermott and/or its subsidiaries, but also provides McDermott and its subsidiaries the "sole discretion" to

allow pre-existing litigation or contested matters to proceed.

42. By agreeing to the Plan and the restraints placed upon shareholders as a result of its implementation, McDermott plans to eliminate the interests and claims of the shareholders and limited their recourse to challenge that decision including third party non-Debtor releases that would prevent current and past shareholders from pursuing and cause or action even in cases of actual fraud, willful misconduct, and gross negligence. The Shareholders allege that the Debtor's decision to enter bankruptcy acted to benefit itself, its management, directors and officers, certain insiders, and its creditors at the expense of the shareholders.

*Letters from Shareholders and Need for Equity Holders Committee*

43. In contrast to other large chapter 11 cases, numerous shareholders had written and submitted letters to this court expressing frustration with the actions of the company and management. To the knowledge of the Shareholder Group, there is no known individual, company or group asking shareholders to submit letters to this court. The letters appear to be expressions of many shareholders with actions they perceive as unfair, incorrect, misleading and wrong.

44. The many letters demonstrate the need for this court to appoint an equity holders' committee that can review the actions of the Debtor, management and others to determine what rights or actions the equity holders may have.[6]

## LEGAL AND FACTUAL BASIS FOR THE OBJECTION

45. Under the proposed plan, Class 14 gets nothing. The Disclosure Statement indicates that there are over 193,000,000 shares of equity common shares. Under the proposed plan, nothing is paid to the owners of over 193,000,000 equity shares.

---

[6] See for example recent letters at dockets 488, 489, 490, 491, 492, and 493.

46. The Shareholders Group alleges that the officers and directors of the Debtor have improperly acted to defeat and remove the interest of the Shareholders Group and all other shareholders commonly situated.

47. The Shareholder Group alleges that the Plan has not been proposed in good faith as required by Section 1129(a)(3).

48. The Shareholders Group alleges that the actions regarding the sale of Lummus Technology ("Lummus") by management has resulted in the total and complete loss of the common equity holders of the Debtor under the proposed Plan.

49. The Shareholder Group alleges that the statements made by management to the public regarding the financial issues of the Debtor, especially those made in 2019, were misleading and deceptive.  If the statements are determined to be misleading and deceptive, the actions of management and the Debtor may not be deemed to be in good faith under section 1129 (a)(3).[7]

50. In addition, if the statements, financial statements and other information provided by management to the public in 2019 (and possibly earlier) were not correct or were misleading, then the Shareholder Group and others similarly situated may have claims under the federal securities laws.  The Plan as currently proposed appears to totally eliminate such claims and causes of action (unless the opt out provisions are available and leave the claims and causes of action fully available).[8]

51. The Shareholders Group alleges that the equity interest holders of the Debtor have not been

---

[7] The Shareholders Group believes that the Plan has not been proposed in good faith since the elimination of all equity in the Debtor is not a necessary ingredient to a successful reorganization plan, notwithstanding the financial information presented by the Debtor as part of the Disclosure Statement.

[8] The Shareholders Group is concerned that the "opt out" provisions may not fully and completely leave these claims and causes of action against all non-debtor entities completely in place and viable.

provided sufficient time to review and object to the Plan.  On Saturday, February 29, 2020, the Debtor filed a Notice of Plan Supplement that is over 170 pages.  At this time, the Shareholders Group has not had the opportunity to review the large "supplement" to determine what it may or may not change or how it may affect the Class 14 equity interest holders.

*UNDER SECTION 1129(b), THE PLAN CANNOT DISCRIMINATE UNFAIRLY, AND MUST BE FAIR AND EQUITABLE WITH RESPECT TO CLASS 14.*

52. The Plan provides that the Shareholder Group, as part of Class 14, not only gets nothing but releases all potential claims against the Debtor, its non-debtor directors and officers and many others.

53. The Shareholder Group is provided no consideration for such releases.[9]

54. The Shareholder Group has had no practical time period to review and make determinations as to potential claims that exist.

55. The Shareholders Group is being "tossed out of the boat" with no life jacket and nothing to get.  The Shareholders Group is being told that it gets nothing and can do nothing.

56. Such a result does not comply with the requirements of section 1129(b).

57. The release provisions of the Plan are unfair. Even if the members of the Shareholder Group have elected to "opt out, the "opt out" may or may not fully protect such persons or entities.

58. The Shareholders Group adopts the position of the Securities and Exchange Commission ("SEC") filed at docket #517 on February 28, 2020.  The Shareholders Group adopts the factual and legal arguments and the proposed changes to the Plan.

---

[9] To the extent that the shareholders have opted out of the releases, the Shareholders Group seeks to have the Plan specify that the releases are not valid, the Shareholders Group is fully allowed to pursue any and all claims and causes of action against any non-debtor person or entity and that there are no provisions in the Plan that might otherwise jeopardize the ability of the Shareholders Group to pursue any and all claims against any non-debtor entities.

59. To the extent that any doubt may exist, the Plan should be revised to clearly and specifically allow the Shareholders Group to pursue claims against officers, directors, management and any parties that participated in the allegations of the Shareholders Group.

60. The Shareholders Group should be allowed to pursue any claims or causes of action against any non-Debtor persons or entities in any court or jurisdiction where such actions against such individuals or entities may be pursued.

61. The Disclosure Statement has insufficient information to satisfy the requirements that the total cancelation of all interests of the equity shareholders is necessary or required.[10]  To the contrary, the information available to the Shareholder Group at this time indicates that the proceeds from the sale of Lummus would have been sufficient to address the short-term liquidity shortfall of the Debtor in September 20, 2019 with the first unsolicited bid for $2.5B. The Shareholder Group alleges that management's decision to delay such sale resulted in the further destruction of shareholder value and worsening of the Debtor's liquidity problem.

62. The Shareholders Group has approached a well-known company to possibly provide expert analysis and an expert opinion as to the necessity to eliminate the equity shareholders due to the pending sale of Lummus.  Unfortunately, due to the very quick time to review and address the issues, the Shareholder Group has not had the opportunity to obtain an expert report from the company.

63. The Shareholder Group has also approached a very well-known international litigation firm

---

[10] The Disclosure Statement is only directed to the creditors or parties that are voting on the Plan.  While certain financial information indicates that there is no value to the holders of equity interests, the Shareholders Group does not believe that the limited, summary presentation of the financial information is accurate or correct.  The Shareholders Group should be allowed a time to engage and have an expert review the financial information to determine if the financial information is accurate for purposes of eliminating the equity holders.

to review and analyze the possible claims and causes of action that may exist by the Shareholder Group against McDermott, its officers and directors and others.  Again, due to the extremely short time frame for addressing and reviewing possible claims and causes of action, the Shareholders Group has not had the opportunity to obtain an expert report at this time.

64. The Plan should be revised to allow claims and causes of action against and including any insurance policies that may or could cover such claims or causes of action.

### VALUE IS PROVIDED TO THE MANAGEMENT IN THE PLAN BUT NOT TO EQUITY SECURITY HOLDERS

65. The Plan provides that the current management will have reserved 7.5% of the newly issued equity in the restructured company.  This reservation of interests to the current management, including officers and directors, that receive equity in the new entity while leaving the equity shareholders with nothing appears to violate the absolute priority rule Further, such reservation of equity to management does not appear to be fair and equitable to class 14.

66. The current management has received significant compensation for continuing to work for the Debtor.  The Shareholders Group is concerned that the management incentives and bonuses as granted in this case may adversely affect claims and causes of action against such management in the future.[11]

67. Such a structure is not fair and equitable to the current equity holders.

68. The Shareholders Group alleges that the financial problems of the Debtor are directly related to the acts and omissions of the management of the Debtor.

---

[11] If management did something wrong, then why did management receive such significant incentives to continue to work?  The management incentives to certain highly compensated executives is significant.

69. The value provided to the current management under the Plan is not fair or equitable due to the fact that the current financial issues of the Debtor are directly related to the wrongful actions of the management of the Debtor.[12]

70. While the financial information put forth by the Debtor shows that the class 14 interest holders are not entitled to any value, the Shareholders Group contends that such financial statements do not account for the Lummus sale correctly nor the financing that was or could have been achieved in the second half of 2019.

71. The Debtor has had months to prepare its version of the financial information and to place the financial information in the best view to support the positions of the Debtor.

72. The Debtor filed on January 22, 2020. The Debtor had months to prepare its financial information for the Plan.  The Shareholder Group and others similarly situated have had practically no time or opportunity to engage an expert, provide the same financial information to an engaged expert and to determine if the financial information of the Debtor is accurate, correct or misleading.

73. The Shareholders Group believes that an equity committee should be allowed and that the Equity Committee should be allowed to engage an expert to review and analyze the financial information of the Debtor to determine if the financial information does support the re-structure that completely eliminates the equity holders or if the financial position will allow the sale of Lummus and other assets to satisfy the financial issues of the Debtor.

**CONCLUSIONS**

---

[12] The Shareholder Group notes that a shareholder, Van Deelen, filed an objection with references to financial issues at docket #510. While not adopting the report of findings of Van Deelen, the Shareholders Group alleges that the Van Deelen report demonstrates that the financial information provided by the Debtor to support its Plan may be flawed. The Shareholders Group seeks time to engage an expert to review and analyze the financial information of the Debtor.

74. For the reasons set forth above, the Shareholder Group requests that this court deny confirmation of the Plan, require the Debtor to restructure the Plan to provide that no non-Debtors are released from any possible claims or causes of action, require that all insurance is available for any claims or liabilities asserted by any equity shareholders, not allow management to have a right to 7.5% of the new equity while current shareholders get nothing, to allow for the appointment of an equity holders committee to review and analyze potential claims and causes of action that may exist, and for such other and further relief as to which the Shareholder Group is entitled.

Dated: March 2, 2020

/s/ Reese W. Baker
Reese W. Baker
Baker & Associates
950 Echo Lane, Suite 300
Houston, Texas 77024
Email:  igo@bakerassociates.net

Counsel for Coligado Shareholders Group