**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MCDERMOTT INTERNATIONAL, INC., *et al.*,[1] | ) | Case No. 20-30336 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### SECOND AMENDED JOINT PREPACKAGED
### CHAPTER 11 PLAN OF REORGANIZATION OF
### ~~OF~~ MCDERMOTT INTERNATIONAL, INC. AND ITS DEBTOR AFFILIATES

| **JACKSON WALKER L.L.P.** | **KIRKLAND & ELLIS LLP** |
|---|---|
| Matthew D. Cavenaugh (TX Bar No. 24062656) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Jennifer F. Wertz (TX Bar No. 24072822) | Joshua A. Sussberg, P.C. (admitted *pro hac vice*) |
| Kristhy M. Peguero (TX Bar No. 24102776) | Christopher T. Greco, P.C. (admitted *pro hac vice*) |
| Veronica A. Polnick (TX Bar No. 24079148) | Anthony R. Grossi (admitted *pro hac vice*) |
| 1401 McKinney Street, Suite 1900 | 601 Lexington Avenue |
| Houston, Texas 77010 | New York, New York 10022 |

| | | | |
|---|---|---|---|
| Telephone: | (713) 752-4200 | Telephone: | (212) 446-4800 |
| Facsimile: | (713) 752-4221 | Facsimile: | (212) 446-4900 |
| Email: | mcavenaugh@jw.com | Email: | joshua.sussberg@kirkland.com |
| | jwertz@jw.com | | christopher.greco@kirkland.com |
| | kpeguero@jw.com | | anthony.grossi@kirkland.com |
| | vpolnick@jw.com | | |

~~Proposed~~ Co-Counsel to the Debtors
and Debtors in Possession

-and-

James H.M. Sprayregen, P.C.
John R. Luze (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654

| | |
|---|---|
| Telephone: | (312) 862-2000 |
| Facsimile: | (312) 862-2200 |
| Email: | james.sprayregen@kirkland.com |
| | john.luze@kirkland.com |

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated: ~~January 22~~March 11, 2020

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
claims and noticing agent at https://cases.primeclerk.com/McDermott.  The location of Debtor McDermott
International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757
North Eldridge Parkway, Houston, Texas 77079.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
GOVERNING LAW ............................................................................................ 1
A. Defined Terms. ........................................................................................... 1
B. Rules of Interpretation. ............................................................................. 1~~18~~19
C. Computation of Time. ................................................................................ ~~19~~20
D. Governing Law. .......................................................................................... ~~19~~20
E. Reference to Monetary Figures. ................................................................ ~~19~~20
F. Reference to the Debtors or the Reorganized Debtors. ............................ ~~19~~20
G. Controlling Document. .............................................................................. ~~19~~20
H. Consultation, Information, Notice, and Consent Rights. .......................... ~~19~~20

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS,  PRIORITY CLAIMS, AND
RESTRUCTURING EXPENSES ...................................................................... 2~~0~~1
A. Administrative Claims. .............................................................................. 2~~0~~1
B. DIP Claims. ................................................................................................ 2~~0~~1
C. Professional Claims. .................................................................................. 2~~1~~2
D. Priority Tax Claims. ................................................................................... 2~~2~~3
E. Payment of Restructuring Expenses, Consent Fee. .................................. 2~~2~~3

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ............. 2~~2~~3
A. Classification of Claims and Interests. ...................................................... 2~~2~~3
B. Treatment of Claims and Interests. ........................................................... 2~~3~~4
C. Special Provision Governing Unimpaired Claims. ................................... ~~29~~30
D. Elimination of Vacant Classes. ................................................................. ~~29~~30
E. Voting Classes, Presumed Acceptance by Non-Voting Classes. .............. ~~29~~30
F. Intercompany Interests. ............................................................................. ~~29~~30
G. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .......... ~~29~~30
H. Controversy Concerning Impairment. ....................................................... ~~29~~31
I. Subordinated Claims. ................................................................................. ~~29~~31

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ............................................ 3~~0~~1
A. General Settlement of Claims and Interests. ............................................. 3~~0~~1
B. Restructuring Transactions. ....................................................................... 3~~0~~1
C. Reorganized Debtors. ................................................................................. 3~~0~~2
D. Technology Business Sale. ......................................................................... 3~~1~~2
E. Pipes Business Sale. ................................................................................... 34
~~E~~F. Sources of Consideration for Plan Distributions. ..................................... 3~~2~~4
~~F~~G. Corporate Existence. .................................................................................. 3~~4~~7
~~G~~H. Vesting of Assets in the Reorganized Debtors. ......................................... 3~~5~~7
~~H~~I. Cancellation of Existing Securities and Agreements. ............................... 3~~5~~7
~~I~~J. Corporate Action. ....................................................................................... 3~~6~~8
~~J~~K. New Organizational Documents. ............................................................... 3~~6~~9
~~K~~L. Indemnification Obligations. ..................................................................... 3~~6~~9
~~L~~M. Directors and Officers of the Reorganized Debtors. ................................. 3~~7~~9
~~M~~N. Effectuating Documents; Further Transactions. ....................................... ~~37~~40
~~N~~O. Section 1146 Exemption. ........................................................................... ~~37~~40
~~O~~P. Director and Officer Liability Insurance. .................................................. ~~37~~40
~~P~~Q. Management Incentive Plan. ...................................................................... ~~38~~41
~~Q~~R. Employee and Retiree Benefits. ................................................................ ~~38~~41
~~R~~S. Preservation of Causes of Action. ............................................................. ~~38~~41

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..... ~~39~~42
A. Assumption and Rejection of Executory Contracts and Unexpired Leases. .......... ~~39~~42

i

| | | |
|---|---|---|
| B. | Claims Based on Rejection of Executory Contracts or Unexpired Leases. | 40~~3~~ |
| C. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases and Lummus Executory Contracts or Unexpired Leases. | 40~~3~~ |
| D. | Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. | 41~~4~~ |
| E. | Insurance Policies. | 41~~4~~ |
| F. | Reservation of Rights. | 41~~5~~ |
| G. | Nonoccurrence of Effective Date. | 42~~5~~ |
| H. | Employee Compensation and Benefits. | 42~~5~~ |
| I. | Contracts and Leases Entered Into After the Petition Date. | 42~~6~~ |
| J. | Assumption of Cameron LNG Project Obligations | 43~~6~~ |

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ............ 43~~6~~

| | | |
|---|---|---|
| A. | Distributions on Account of Claims Allowed as of the Effective Date. | 43~~6~~ |
| B. | Disbursing Agent. | 43~~6~~ |
| C. | Rights and Powers of Disbursing Agent. | 43~~7~~ |
| D. | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 44~~7~~ |
| E. | Manner of Payment. | 45~~8~~ |
| F. | Section 1145 Exemption. | 45~~9~~ |
| G. | Compliance with Tax Requirements. | 45~~9~~ |
| H. | Allocations. | 45~~9~~ |
| I. | No Postpetition Interest on Claims. | 45~~9~~ |
| J. | Foreign Currency Exchange Rate. | 45~~9~~ |
| K. | Setoffs and Recoupment. | 46~~9~~ |
| L. | Claims Paid or Payable by Third Parties. | ~~46~~50 |

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS ............ 4~~7~~50

| | | |
|---|---|---|
| A. | Disputed Claims Process. | 4~~7~~50 |
| B. | Allowance of Claims. | 4~~7~~51 |
| C. | Claims Administration Responsibilities. | 4~~7~~51 |
| D. | Estimation of Claims and Interests.~~.~~ | 4~~7~~51 |
| E. | Adjustment to Claims or Interests without Objection. | 4~~8~~51 |
| F. | Disallowance of Claims or Interests. | 4~~8~~52 |
| G. | No Distributions Pending Allowance. | 4~~8~~52 |
| H. | Distributions After Allowance. | 4~~8~~52 |
| I. | No Interest. | 4~~8~~52 |

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ............ 4~~8~~52

| | | |
|---|---|---|
| A. | Discharge of Claims and Termination of Interests. | 4~~8~~52 |
| **B.** | **Release of Liens.** | 4~~9~~53 |
| **C.** | **Releases by the Debtors.** | 4~~9~~53 |
| **D.** | **Releases by the Releasing Parties.** | 5~~1~~4 |
| **E.** | **Exculpation.** | 52~~6~~ |
| **F.** | **Injunction.** | 52~~6~~ |
| G. | Protections Against Discriminatory Treatment. | 53~~7~~ |
| H. | Document Retention. | 53~~7~~ |
| I. | Reimbursement or Contribution. | 53~~7~~ |

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ............ 53~~7~~

| | | |
|---|---|---|
| A. | Conditions Precedent to the Effective Date. | 53~~7~~ |
| B. | Waiver of Conditions. | 55~~9~~ |
| C. | Effect of Failure of Conditions. | 55~~9~~ |
| D. | Substantial Consummation | 55~~9~~ |

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ............ 55~~9~~

| | | |
|---|---|---|
| A. | Modification and Amendments. | 55~~9~~ |

|   |   |   |   |
|---|---|---|---|
| B. | Effect of Confirmation on Modifications. | | 5660 |
| C. | Revocation or Withdrawal of Plan. | | 5660 |

ARTICLE XI. RETENTION OF JURISDICTION ............................................................. 5660

ARTICLE XII. MISCELLANEOUS PROVISIONS ........................................................... 5862

| A. | Immediate Binding Effect. | | 5862 |
|---|---|---|---|
| B. | Additional Documents. | | 5862 |
| C. | Payment of Statutory Fees. | | 5862 |
| D. | Statutory Committee and Cessation of Fee and Expense Payment. | | 5862 |
| E. | Reservation of Rights. | | 5863 |
| F. | Successors and Assigns. | | 5963 |
| G. | Notices. | | 5963 |
| H. | Term of Injunctions or Stays. | | 6064 |
| I. | Entire Agreement. | | 6064 |
| J. | Plan Supplement. | | 6065 |
| K. | Nonseverability of Plan Provisions. | | 6165 |
| L. | Votes Solicited in Good Faith. | | 6165 |
| M. | Closing of Chapter 11 Cases. | | 6165 |
| N. | Waiver or Estoppel. | | 6165 |
| O. | Creditor Default | | 6165 |

**INTRODUCTION**

McDermott International, Inc. and the above-captioned debtors and debtors in possession (collectively, the "Debtors"), propose this joint prepackaged chapter 11 plan of reorganization (as modified, amended, or supplemented from time to time, the "Plan") for the resolution of the outstanding claims against, and equity interests in, the Debtors.  Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor.  Holders of Claims or Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, risk factors, a summary and analysis of this Plan, the Restructuring Transactions, and certain related matters.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.      *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

"*2018 Collateral Agent*" means Crédit Agricole Corporate and Investment Bank, in its capacity as Collateral Agent in respect of the Credit Agreement, the 2021 LC Facility, and the Lloyds LC Facility.

"*2021 LC Agreement*" means that certain letter of credit agreement dated as of October 30, 2018 by and among certain of the Debtors as applicants and guarantors thereto, and the 2021 LC Administrative Agent, as may be amended, supplemented, or otherwise modified from time to time.

"*2021 LC Administrative Agent*" means Barclays Bank PLC, as administrative agent for the 2021 LC Agreement.

"*2021 LC Facility*" means the $230,000,000.00 senior secured letter of credit facility under the 2021 LC Agreement.

"*2021 Letter of Credit Claims*" means any Claim for obligations arising under, or relating to, the 2021 LC Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*2021 Letters of Credit*" means the letters of credit issued under the 2021 LC Facility.

"*2023 LC Facility*" means the $1,440,000,000.00 senior secured letter of credit facility under the Credit Agreement.

"*2023 Letter of Credit Claims*" means any Claim for obligations arising under, or relating to, the 2023 LC Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*2023 Letters of Credit*" means the letters of credit issued under the 2023 LC Facility.

"*Achievement Target*" means the (i) final, binding signed documentation reflecting (x) positive value adjustment of $235 million in projected gross profit and (y) $285 million in letter of credit relief and (ii) project cost

savings of $560 million through the employment of risk mitigation strategies, in each case subject to the satisfaction of the Required Consenting Term Lenders and the Required Consenting Revolving Lenders in their sole discretion.

"*Additional Obligations*" shall have the meaning specified in the DIP Credit Facility Term Sheet.

"*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 327, 328, 330, 365, 503(b), 507(a), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors incurred on or after the Petition Date and through the Effective Date; (b) Allowed Professional Claims; and (c) all fees and charges assessed against the Estates under chapter 123 of the Judicial Code.

"*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

"*Agents*" means, collectively, the DIP Agents, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the 2021 LC Administrative Agent, the 2018 Collateral Agent, the Superpriority Revolving Administrative Agent, the Superpriority Term Loan Agent, the Superpriority Collateral Agent, and each administrative agent, collateral agent, trustee or other similar agent in respect of the Exit Facilities solely in its capacity as such.

"*Allowed*" means, as to a Claim or Interest, a Claim or Interest allowed under the Plan, under the Bankruptcy Code, or by a final order (including the DIP Financing Orders) as applicable.

"*Assumed Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, which shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time; *provided* that such schedule shall be in form and substance acceptable to the Required Consenting Lenders.

"*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time.

"*Barclays Advisors*" means Latham & Watkins LLP and any other local or foreign advisors.

"*Bidding Procedures*" means the procedures governing the auction and the Technology Business Sale, as approved by the Bankruptcy Court and as may be amended from time to time in accordance with their terms.

"*Bilateral Facilities*" means those certain bilateral facilities entered into by various Debtors and their affiliates and the individual lenders party thereto, including:

      (a) that certain facility agreement (as amended), dated April 13, 2016, between McDermott International, Inc., as borrower, McDermott Middle East, Inc., McDermott Eastern Hemisphere,

Ltd., McDermott Arabia Company Limited, as guarantors, and Abu Dhabi Commercial Bank PJSC, as lending bank;

(b)   that certain credit facility agreement (as amended), dated April 30, 2018, between CBI Eastern Anstalt, as borrower, and Mashreqbank PSC, as lending bank;

(c)   that certain credit agreement (as amended) dated as of July 19, 2018 between Arabian CBI Company Limited, as customer, McDermott International Inc., as guarantor, and Samba Financial Group, as lending bank;

(d)   that certain facility letter (as amended), dated as of January 29, 2018 between McDermott Middle East, Inc., and McDermott Eastern Hemisphere, Ltd., as applicants, McDermott International, Inc., as guarantor, and International Bank of Qatar, as lending bank;

(e)   that certain reimbursement agreement for letters of credit or guarantees, dated July 30, 2015 between McDermott International, Inc., as applicant and Riyad Bank, as lending bank;

(f)   that certain facility agreement between McDermott Middle East Inc., as borrower, McDermott International, Inc., as guarantor, and First Gulf Bank, as lending bank;

(g)   that certain letter of credit reimbursement agreement (as novated), dated August 1, 2007 between J. Ray McDermott S.A., as applicant and Standard Chartered Bank, as lending bank;

(h)   that certain master reimbursement agreement between J. Ray McDermott S.A., as applicant, McDermott International, Inc., as guarantor, and ICICI Bank Limited, as lending bank;

(i)   that certain reimbursement agreement between Chicago Bridge and Iron Company, N.V., as customer, and Europe Arab Bank PLC, as lending bank;

(j)   that certain credit facilities agreement, dated April 4, 2019 between McDermott Middle East, Inc. and McDermott Middle East, Inc. Panama, as borrowers, McDermott International, Inc., as guarantor, and Commercial Bank of Dubai PSC, as lending bank; and

(k)   that certain (a) indemnity and undertaking, dated as of June 28, 2019 between Comet II, B.V. as borrower and The Standard Bank of South African Limited as lending bank and (b) parent company guarantee, dated as of June 28, 2019 between McDermott International, Inc. as guarantor and The Standard Bank of South Africa Limited as lending bank.

"*Business Day*" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the State of New York.

"*Business Plan*" means the business plan for the Reorganized Debtors.

"*Cameron LNG Contractor*" means CCJV, an unincorporated joint venture the members of which are CB&I LLC (as successor in interest) and Chiyoda International Corporation.

"*Cameron LNG EPC Agreement*" means that certain Engineering, Procurement and Construction Contract, dated as of March 17, 2014, between Cameron LNG, LLC and the Cameron LNG Contractor (as amended).

"*Cameron LNG Project Obligations*" means, collectively, the obligations of any Debtor under:  (a) that certain EPC Joint Venture Agreement, dated March 17, 2014 between CB&I LLC (as successor in interest) and Chiyoda International Corporation (as amended); and (b) the Cameron LNG EPC Agreement.

"*Cameron LNG Replacement Guarantee*" means a guarantee, which Reorganized McDermott shall execute and deliver to Cameron LNG, LLC, guaranteeing on a joint and several basis on behalf of CB&I LLC the payment

and performance of the obligations of the Cameron LNG Contractor under the Cameron LNG EPC Agreement, whether arising prior to or after the execution of such guarantee.

"*Cash*" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

"*Cash Management Bank*" means any financial institution through which the Debtors have entered into "Cash Management Arrangements" (as defined in the Credit Agreement).

"*Cash Secured LC Exit Facility*" means a 4-year, cash secured letter of credit exit facility in an amount up to $371 million, and otherwise on terms satisfactory to the Required Consenting Lenders, and set forth in the Definitive Documents to be included in the Plan Supplement.

"*Cash Secured Letter of Credit Claims*" means any Claim for obligations arising under, or relating to, the Cash Secured Letters of Credit, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*Cash Secured Letters of Credit*" means the "Cash Secured Letters of Credit" issued under and on the terms set forth under the Credit Agreement.

"*Cause of Action*" or "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Avoidance Action.

"*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

"*Chiyoda Replacement Guarantee*" means a guarantee which Reorganized McDermott shall execute and deliver to Chiyoda International Corporation in accordance with Section 15.3 of the EPC Joint Venture Agreement, dated March 17, 2014 between CB&I LLC (as successor in interest) and Chiyoda International Corporation (as amended) as required by the Guaranty and Indemnity Agreement entered into by and between CB&I LLC, McDermott International and Chiyoda International Corporation.

"*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

"*Claims and Balloting Agent*" means Prime Clerk LLC, the notice, claims, and solicitation agent ~~proposed to be~~ retained by the Debtors in the Chapter 11 Cases.

"*Claims Register*" means the official register of Claims maintained by the Claims and Balloting Agent.

"*Class*" means a class of Claims or Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

"*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

"*Company Party*" has the meaning set forth in the Restructuring Support Agreement.

"*Compensation and Benefits Programs*" means all employment and severance agreements and policies, and all employment, compensation, and benefit plans, policies, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, life and accidental death and dismemberment insurance plans, and programs of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors and the employees, former employees and retirees of their subsidiaries, including all savings plans, retirement plans, health care plans, disability plans, severance benefit agreements, and plans, incentive plans, deferred compensation plans and life, accidental death, and dismemberment insurance plans.

"*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

"*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

"*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court on confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

"*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the consummation of the Technology Business Sale and the Pipes Business Sale.

"*Consenting 2021 LC Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting 2023 LC Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Cash Secured LC Issuers*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting LC Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Noteholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Revolving Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Stakeholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Superpriority LC Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Superpriority Term Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Term Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consummation*" means the occurrence of the Effective Date as to the applicable Debtor.

"*Credit Agreement*" means that certain credit agreement dated as of May 10, 2018, by and among certain of the Debtors as borrowers and guarantors thereto, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the Issuers (as defined in the Credit Agreement), and the lenders from time to time party thereto, as may be amended, supplemented, or otherwise modified from time to time.

"*Credit Agreement Hedging Claims*" means Claims in respect of Credit Agreement Hedging Obligations, which, for the avoidance of doubt, shall not include DIP Hedging Obligations.

"*Credit Agreement Hedging Obligations*" means mark-to-market obligations arising out of the termination of any "Hedging Obligations" (as defined under the Credit Agreement) prior to the Effective Date.

"*Cure*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

"*D&O Liability Insurance Policies*" means all insurance policies of any of the Debtors for directors', managers', and officers' liability existing as of the Petition Date (including any "tail policy") and all agreements, documents, or instruments relating thereto.

"*Definitive Documents*" means the documents listed in Section 3 of the Restructuring Support Agreement.

"*DIP Agents*" means the DIP LC Agent, the DIP Collateral Agent, and the DIP Term Loan Agent.

"*DIP Cash Secured Letter of Credit Claim*" means any Claim for obligations arising under, or relating to, the DIP Cash Secured LC Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*DIP Cash Secured Letters of Credit*" means the letters of credit issued pursuant to the DIP Cash Secured LC Facility.

"*DIP Cash Secured LC Facility*" means the cash secured letter of credit facility pursuant to which up to $100 million of the DIP Letter of Credit Facility may be allocated.

"*DIP Claims*" means all Claims (including adequate protection Claims) derived from, arising under, based upon, or secured pursuant to the DIP Credit Agreement, including all prepetition Claims rolled into the DIP Credit Facility and all other Claims in respect of principal amounts outstanding, interest, fees, expenses, costs, hedging obligations, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Credit Facility.

"*DIP Collateral Agent*" means Crédit Agricole Corporate and Investment Bank in its capacity as collateral agent under the DIP Credit Agreement.

"*DIP Credit Agreement*" means that certain superpriority secured debtor-in-possession credit agreement that governs the DIP Credit Facility (as may be amended, supplemented, or otherwise modified from time to time), among McDermott International, Inc., as parent, certain of the Debtors as borrowers, the lenders party thereto, the DIP Lenders, the DIP Letter of Credit Issuers, and the DIP Agents.

"*DIP Credit Facility*" means the superpriority committed credit facilities provided by the DIP Lenders, which includes the DIP Letter of Credit Facility, the DIP Term Loan Facility, the DIP Hedging Obligations, and any other obligations specified in the DIP Financing Orders.

"*DIP Credit Facility Term Sheet*" means the DIP Credit Facility Term Sheet attached as Exhibit 2 to the Restructuring Term Sheet.

"*DIP Financing Orders*" means the interim order approving the DIP Credit Facility and the final order approving the DIP Credit Facility, ~~to be filed and~~ approved by the Bankruptcy Court in the Chapter 11 Cases.

"*DIP Hedging Obligations*" means all hedging obligations subject to or deemed incurred under the DIP Credit Facility (including for the avoidance of doubt all obligations in respect of the Debtors' prepetition foreign

currency hedging transactions and $500 million notional amount of interest rate hedging transactions rolled into the DIP ~~c~~Credit ~~f~~Facility pursuant to the DIP Financing Orders and the Hedging Order~~s~~).

"*DIP LC Agent*" means Crédit Agricole Corporate and Investment Bank in its capacity as letter of credit administrative agent under the DIP Credit Agreement.

"*DIP LC Claim*" means any Claim of a DIP Lender, a DIP Letter of Credit Issuer, or the DIP Agents arising under or relating to the DIP Letter of Credit Facility pursuant to the DIP Credit Agreement.

"*DIP Lenders*" means the lenders party to the DIP Credit Agreement with respect to the DIP Credit Facility.

"*DIP Letter of Credit Facility*" means the senior secured superpriority letter of credit facility plus interest, fees, and other amounts due in respect of the ~~Superpriority~~DIP Letters of Credit (including the DIP Cash Secured LC Facility), provided under the DIP Credit Agreement and approved by the Bankruptcy Court pursuant to the DIP Financing Orders.

"*DIP Letter of Credit Issuers*" means the "Issuing Banks" under the DIP Credit Agreement.

"*DIP Letters of Credit*" means (i) the $543 million of new and incremental letters of credit to be provided under the DIP Letter of Credit Facility (including the DIP Cash Secured Letters of Credit) plus (ii) the DIP Roll-Up Letters of Credit.

"*DIP Roll-Up Letters of Credit*" means (i) those Superpriority Letters of Credit, including Claims for all reimbursement obligations outstanding, interest, fees, expenses, costs, and other charges arising thereunder or relating thereto, that are "rolled-up" and deemed issued under the DIP Letter of Credit Facility pursuant to the final DIP Financing Order and (ii) any obligations to be deemed outstanding under the DIP Letter of Credit Facility.

"*DIP Roll-Up Term Loans*" means the term loans outstanding under the Superpriority Term Loan Facility that upon entry of the final DIP Financing Order, shall be deemed to be issued under the DIP Term Loan Facility, including all of the Claims arising under, derived from, based upon, or secured pursuant to the Superpriority Credit Agreement, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, the Make Whole Amount, and other charges arising thereunder or related thereto, in each case, with respect to the Superpriority Term Loan Facility.

"*DIP Term Loan Agent*" means Barclays Bank PLC, in its capacity as term loan administrative agent under the DIP Credit Agreement.

"*DIP Term Loan Claim*" means any Claim of a DIP Lender or the DIP Agents arising under or relating to the DIP Term Loan Facility pursuant to the DIP Credit Agreement or the DIP Financing Orders.

"*DIP Term Loan Facility*" means a superpriority term loan facility, comprised of up to $1.2 billion principal amount of New DIP Term Loans plus $800 million principal amount of the Superpriority Term Loans rolled into the DIP Term Loan Facility plus the Make Whole Amount plus the Additional Obligations and approved by the Bankruptcy Court pursuant to the DIP Financing Orders.

"*DIP Term Loans*" means the New DIP Term Loans and the DIP Roll-Up Term Loans.

"*Disbursing Agent*" means the Reorganized Debtors or the Entity or Entities selected by the Debtors or the Reorganized Debtors, as applicable, to make or facilitate distributions pursuant to the Plan.

"*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, to be approved by the Confirmation Order.

"*Disputed*" means, as to a Claim or an Interest, any Claim or Interest:  (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law; (d) that is Filed in the Bankruptcy Court and not withdrawn, as to which a timely objection or request for estimation has been Filed; and (e) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

"*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Reorganized Debtors, on or after the Effective Date, with the first such date occurring on or as soon as is reasonably practicable after the Effective Date, upon which the Distribution Agent shall make distributions to holders of Allowed Claims entitled to receive distributions under the Plan.

"*Distribution Record Date*" means, other than with respect to publicly held Securities, the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be on or as soon as is reasonably practicable after the Effective Date.  For the avoidance of doubt, no distribution record date shall apply to holders of public securities.

"*DTC*" means the Depository Trust Company.

"*Effective Date*" means, as to the applicable Debtor, the date that is the first Business Day on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

"*Emergence Awards*" has the meaning set forth in Article IV.Q of the Plan.

"*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"*Estate*" means as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case.

"*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*, as amended from time to time.

"*Exculpated Parties*" means collectively, and in each case in its capacity as such: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; (c) the Consenting Stakeholders and any affiliated Hedge Banks; (d) each Agent and the Senior Notes Trustee, and (e) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

"*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Existing Common Equity Interests*" means the common stock of McDermott, which is traded and quoted on the New York Stock Exchange under the symbol "MDR," any and all outstanding and unexercised or unvested warrants, options, or rights to acquire such common stock existing prior to the Petition Date, and any Section 510(b) Claims.

"*Existing Preferred Equity Interests*" means all outstanding 12% Redeemable Preferred Stock in McDermott, issued on November 29, 2018, and the Series A Preferred Stock of McDermott, issued on December 2, 2019, and any Section 510(b) Claims.

"*Exit Facilities*" means, collectively, the Term Loan Exit Facility, ~~the Cash Secured LC Exit Facility,~~ and the Exit LC Facilities, as applicable.

"*Exit Facility Agents*" means each of the administrative agents, trustees, or other similar agents under the Exit Facility Agreement, solely in its capacity as such.

"*Exit Facility Agreement*" means that certain agreement to provide the Exit Facilities, if any, dated as of the Effective Date, by and among the Reorganized Debtors party thereto as borrowers, Reorganized McDermott, the Exit Facility Agents, the issuing banks party thereto, and the lender parties thereto, which shall be included in the Plan Supplement.

"*Exit Facility Documents*" means, collectively, the Exit Facility Agreement, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any amendments to existing loan or other finance documentation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, in each case if any, the terms of which documents shall be acceptable to the Debtors or the Reorganized Debtors, as applicable, and the Required Consenting Lenders.

"*Exit LC Facilities*" means the Super Senior Exit Facility, the Senior Exit LC Facility, the Cash Secured LC Exit Facility, and the Roll-Off LC Exit Facility.

"*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

"*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

"*Final Order*" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

"*Funded DIP Indebtedness*" means indebtedness under the DIP Credit Facility in respect of the DIP Term Loans (which for the avoidance of doubt includes the Superpriority Term Loans rolled up into the DIP Credit Facility, but excludes any DIP Hedging Obligations) and the Additional Obligations.

"*General Unsecured Claim*" means any Unsecured Claim against a Debtor other than the Bilateral Facility Claims and the Senior Notes Claims.

"*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

"*Hedge Bank*" means, with respect to any Consenting Lender, either such Consenting Lender or an affiliate of such Consenting Lender that has entered into "Hedging Obligations" (as defined in the Credit Agreement) with the Debtors.

"*Hedging Order*" means the *Order (I) Authorizing the Debtors to Enter into and Perform Under (A) Amended and Restated Hedge Agreements and (B) New Hedge Agreements, (II) Granting DIP Liens and DIP*

*Superpriority Claims, (III) Modifying the Automatic Stay and (IV) Granting Related Relief* entered by the Bankruptcy Court on January 23, 2020 at Docket No. 145 in the Chapter 11 Cases.

"*Impaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

"*Intercompany Claim*" means any Claim held by a Debtor or an Affiliate against a Debtor or an Affiliate of a Debtor.

"*Intercompany Interest*" means an Interest in a Debtor held by a Debtor or an Affiliate of a Debtor.

"*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, performance shares, performance units, redemption rights, repurchase rights, convertible, exercisable or exchangeable Securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

"*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time.

"*Lloyds LC Exit Facility*" means a senior secured letter of credit exit facility with Lloyds LC Bank pursuant to which each Lloyds Letter of Credit that is outstanding on the Effective Date under the Lloyds Letter of Credit Agreement will be deemed issued on the Effective Date and which will be secured by only the cash collateral that exclusively secured the Lloyds Letters of Credit as of the Effective Date and any standby letters of credit supporting the Lloyds Letters of Credit as of the Effective Date; *provided* that the cash collateral and/or standby letters of credit, as applicable, securing the Lloyds LC Exit Facility shall be reduced and/or released, as applicable, dollar-for-dollar upon the reduction, expiration, or termination of any Lloyds Letter of Credit in accordance with its terms from and after the Effective Date and upon any such release the applicable cash collateral shall become collateral securing obligations of the Reorganized Debtors under the Exit Facilities.  The definitive documentation for the Lloyds LC Exit Facility shall be substantially in the form of the Lloyds Letter of Credit Agreement, and otherwise on terms satisfactory to the Debtors and the Required Consenting Lenders, and set forth in the Definitive Documents to be included in the Plan Supplement.

"*Lloyds LC Bank*" means Lloyds Bank ~~PLC~~Corporate Markets plc (as successor to Lloyds Bank plc, formerly known as Lloyds TSB Bank plc), as the Bank under the Lloyds Letter of Credit Agreement.

"*Lloyds LC Facility*" means the $127,000,000.00 senior secured letter of credit facility under the Lloyds Letter of Credit Agreement.

"*Lloyds Letter of Credit Agreement*" means that certain master agreement for stand-by letters of credit originally dated as of June 10, 2013 by and among Lloyds LC Bank ~~plc (formerly known as Lloyds TSB Bank plc)~~ and Comet II B.V., CB&I, LLC, Chicago Bridge and Iron Company B.V., CBI Services, LLC, CB&I UK Limited, CBI Constructors PTY LTD, CB&I Group Inc., and Woodlands International Insurance Ltd, as amended and restated May 10, 2018 in connection with the Business Combination (as defined therein) with McDermott and certain of its subsidiaries, as may be amended, supplemented, or otherwise modified from time to time.

"*Lloyds Letter of Credit Claims*" means any Claim for obligations arising under, or relating to, the Lloyds LC Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*Lloyds Letters of Credit*" means the letters of credit issued under the Lloyds LC Facility.

"*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"*Liquidity Lender Steering Committee*" means those certain institutions comprising the steering committee of lenders under the Superpriority Revolving Facility, the Revolving Credit Facility, and the 2023 LC Facility.

"*Lummus Assets and Interests*" means the Debtors' rights, titles, and interests in the Lummus Entities and related assets, as described in the Purchase Agreement.

"*Lummus Entities*" means Lummus Technology LLC; McDermott Technology (2), B.V.; McDermott Technology (3), B.V.; OOO Lummus Technology; CB&I Lummus Engineering & Technology China Co. Ltd.; Lummus Technology Heat Transfer B.V. (Netherlands); Lummus Technology Heat Transfer B.V. (India); Lummus Novolen Technology GmbH; Novolen Technology Holdings C.V.; Lummus Technology B.V.; Lummus Gasification Technology Licensing LLC; Lummus Engineered Products, LLC; Lummus Technology International LLC; Lummus Technology Services LLC; Chemical Research and Licensing, LLC; Lummus Technology Ventures LLC; Catalytic Distillation Technologies; Lummus Technology Overseas LLC, Chevron Lummus Global LLC, and CLG Technical Services, LLC.

"*Lummus Executory Contracts and Unexpired Leases*" means any Executory Contracts and Unexpired Leases of the Debtors proposed to be assumed or assumed and assigned in connection with the Technology Business Sale.

"*Make Whole Amount*" means the make whole amount payable under Section 2.11(b) of the Superpriority Credit Agreement solely with respect to the tranches of the Superpriority Term Loan Facility that were funded prior to the Petition Date.

"*Make Whole Tranche*" means that certain tranche under the Super Senior Exit Facility in an amount equal to the portion of the Make Whole Amount remaining (if any) after applying the Technology Business Sale Proceeds and proceeds from the Rights Offering, subject to the terms of the Exit Facilities Term Sheet.

"*Management Incentive Plan*" has the meaning set forth in ~~Article IV.P~~ Article IV.Q of the Plan.

"*Management Incentive Plan Pool*" has the meaning set forth in Article IV.P of the Plan.

"*McDermott*" means McDermott International, Inc. or any successor or assign, by merger, consolidation, or otherwise, prior to the Effective Date.

"*MIP Pool*" has the meaning set forth in Article IV.Q of the Plan.

"*New Board*" means the board of directors of Reorganized McDermott.  The identities of directors on the New Board shall be set forth in the Plan Supplement.

"*New Common Stock*" means, depending on the transaction structure and as detailed in the Restructuring Transactions Memorandum, common equity in one or more Reorganized Debtors.

"*New DIP Term Loans*" means the new money term loans to be provided under the DIP Term Loan Facility.

"*New Organizational Documents*" means the documents providing for corporate governance of the Reorganized Debtors, including charters, bylaws, operating agreements, or other organizational documents or shareholders' agreements, as applicable, which shall be consistent with the Restructuring Support Agreement (including Section 3.02 of the Restructuring Support Agreement), this Plan, and section 1123(a)(6) of the Bankruptcy Code (as applicable), and shall be included in the Plan Supplement.

"*New Tranche A Warrants*" means the 7-year warrants to purchase 10% of the New Common Stock at a strike price equal to (a) the Prepetition Funded Secured Claims (including, without limitation, principal and any

accrued prepetition or postpetition interest at the default rate as applicable) less (i) the proceeds of the Rights Offering, (ii) the aggregate amount of the loans evidenced by the Term Loan Exit Facility, and (iii) the Residual Prepetition Funded Secured Claims Pay Down, divided by (b) the initial allocation of 94% of the New Common Stock to the holders of Prepetition Funded Secured Claims minus an amount equal to (x) the aggregate proceeds of the Rights Offering divided by Plan Equity Value plus (y) the Prepetition Funded Secured Claims Excess Cash Adjustment. For the avoidance of doubt, the New Tranche A Warrants shall not be subject to dilution on account of the Management Incentive Plan.

"*New Tranche B Warrants*" means the 7-year warrants to purchase 10% of the New Common Stock at a strike price equal to (a) the Prepetition Funded Secured Claims (including, without limitation, principal and any accrued prepetition or postpetition interest at the default rate as applicable) multiplied by 125%, less (i) the proceeds of the Rights Offering, (ii) the aggregate amount of the loans evidenced by the Term Loan Exit Facility, and (iii) the Residual Prepetition Funded Secured Claims Pay Down, divided by (b) the initial allocation of 94% of the New Common Stock to the holders of Prepetition Funded Secured Claims minus an amount equal to (x) the aggregate proceeds of the Rights Offering divided by Plan Equity Value and (y) the Prepetition Funded Secured Claims Excess Cash Adjustment. For the avoidance of doubt, the New Tranche B Warrants shall not be subject to dilution on account of the Management Incentive Plan.

"*New Warrants*" means, collectively, the New Tranche A Warrants and the New Tranche B Warrants.

"*New Warrants Agreements*" means those certain agreements providing for, among other things, the issuance and terms of the New Warrants, which shall be included in the Plan Supplement and in form and substance acceptable to the Required Consenting Lenders and the Required Consenting Noteholders. The New Warrants Agreements shall provide for full anti-dilution and Black-Scholes protection.

"*Non-Pipes Debtors*" means any of the Debtors or Reorganized Debtors other than the Pipes Entities.

"*Other Prepetition Financing Claim*" means any Secured Claim arising under:

(a) that certain facility agreement dated September 30, 2010 among McDermott, as guarantor, and its subsidiary NO 105 AS, as borrower, the BNP Paribas, in its capacity as facility agent and security agent, and the lenders party thereto, as may be amended, supplemented, or otherwise modified from time to time, to pay a portion of the construction costs of the *NO 105*;

(b) that certain receivables factoring agreement dated November 25, 2016 among J. Ray McDermott de Mexico S.A. de C.V. and the financing intermediaries thereto, as may be amended, supplemented, or otherwise modified from time to time; or

(c) that certain re-invoicing service agreement dated May 2019 among Bramid Outsource Limited, as service provider, McDermott, as parent, and CB&I LLC, as customer.

"*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

"*Other Secured Claim*" means any Secured Claim other than a Revolving Credit Claim, a Term Loan Claim, a 2021 Letter of Credit Claim, a 2023 Letter of Credit Claim, a Lloyds Letter of Credit Claim, a Cash Secured Letter of Credit Claim, a Credit Agreement Hedging Claim, a Superpriority Term Loan Claim, a Superpriority Revolving Facility Claim, an Other Prepetition Financing Claim, a Bilateral Facility Claim, or a DIP Claim.

"*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

"*Pipes Business Sale*" means a sale of any or all of the Pipes Interests pursuant to the Pipes Business Sale Documents, and to be agreed to or consummated by one or more of the Debtors after the Confirmation Date.

"*Pipes Business Sale Documents*" means any executed purchase agreement for the sale of the Pipes Interests between certain of the Debtors and the Pipes Buyers for the sale of all or part of the Pipes Interests, and any transition services agreements, license agreements, supply agreements, and any other written ancillary agreements, documents, instruments and certificates executed under or in connection therewith. The Pipes Business Sale Documents shall be in form and substance satisfactory to the Required Consenting Lenders.

"*Pipes Buyers*" means those Entities that purchase the Pipes Interests pursuant to the Pipes Business Sale Documents.

"*Pipes Entities*" means CB&I Walker LA, LLC; CB&I Lake Charles LLC; CB&I Clearfield, Inc.; CB&I El Dorado, Inc.; CB&I Middle East Holding, Inc.; Shaw Overseas (Middle East) Ltd.; CB&I Nass Pipe Fabrication WLL; CB&I SKE&C Middle East Ltd.; Shaw Pipe Fabrication Holdings, LLC; and Shaw Emirates Pipes Manufacturing LLC, and any other Debtors or their non-Debtor Affiliates that may be identified in the Pipes Business Sale Documents.

"*Pipes Interests*" means all of the Debtors' rights, titles, and interests (whether direct or indirect) in the Pipes Entities and certain related assets, as described in the Pipes Business Sale Documents.

"*Plan Distribution*" means a payment or distribution to holders of Allowed Claims, Allowed Interests, or other eligible Entities under this Plan.

"*Plan Equity Value*" means $2,352,000,000.

"*Plan Objection Deadline*" means the date the Bankruptcy Court establishes as the deadline to File an objection to Confirmation of the Plan.

"*Plan Supplement*" means the compilation of documents and forms of documents, term sheets, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed prior to the Confirmation Hearing, to the extent available, and any additional documents Filed prior to the Effective Date as amendments to the Plan Supplement, including the following, as applicable: (a) the New Organizational Documents; (b) to the extent known, the identities of the members of the New Board; (c) the Assumed Executory Contracts and Unexpired Leases Schedule; (d) the Rejected Executory Contracts and Unexpired Leases Schedule; (e) the Schedule of Retained Causes of Action; (f) the Exit Facility Documents; (g) the definitive documentation related to the Management Incentive Plan; (h) the Restructuring Transactions Memorandum; (i) the New Warrants Agreements; and (j) to the extent availableapplicable, the form of any Technology Business Sale Documents distributed by the Debtors to potentially interested parties, if any. The Debtors shall have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement up to the Effective Date as set forth in this Plan and in accordance with the Restructuring Support Agreement (and subject to the applicable consent rights thereunder).

"*Prepetition Funded Secured Claims*" means Claims in respect of (i) the Term Loans and the Revolving Loans, (ii) any funded Prepetition Secured Letters of Credit, and (iii) the Credit Agreement Hedging Claims, but excluding any amounts being rolled into the DIP Credit Facility.

"*Prepetition Funded Secured Claims Excess Cash Adjustment*" has the meaning set forth in Article IV.D.4 of the Plan.

"*Prepetition Secured Letters of Credit*" means the 2021 Letters of Credit, the 2023 Letters of Credit, the Revolving LCs, the Lloyds Letters of Credit, and the Cash Secured Letters of Credit.

"*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, unless otherwise indicated.

"*Professional*" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

"*Professional Amount*" means the aggregate amount of Professional Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors as set forth in Article II.C of the Plan.

"*Professional Claim*" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

"*Professional Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Amount.

"*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

"*Purchase Agreement*" means, solely with respect to the Technology Business Sale, the share and asset purchase agreement between the Debtors and the Purchaser.

"*Purchaser*" means one or more Entities that are the purchasers with respect to the Technology Business Sale.

"*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall not be discharged hereunder and the holder's legal, equitable, and contractual rights on account of such Claim or Interest shall remain unaltered by Consummation in accordance with section 1124(1) of the Bankruptcy Code.

"*Rejected Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, which schedule shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time; *provided* that such schedule shall be in form and substance acceptable to the Required Consenting Lenders.

"*Related Party*" means, collectively, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, heirs, executors, and assigns, and other professionals, in each case solely in their capacities as such, together with their respective past and present directors, officers, shareholders, partners, members, employees, agents, attorneys, representatives, heirs, executors and assigns, in each case solely in their capacities as such.

"*Released Claims*" means any Claims or Interests that have been released, discharged, or are subject to exculpation pursuant to this Plan.

"*Released Parties*" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Company Party; (d) each DIP Lender and each DIP Letter of Credit Issuer; (e) each

14

Agent; (f) the Senior Notes Trustee; (g) each Consenting Stakeholder; (h) each Hedge Bank; (i) each Cash Management Bank; (j) each lender under the Superpriority Credit Agreement, Credit Agreement, the 2021 LC Agreement, and the Lloyds Letter of Credit Agreement; (k) each holder of an Obligation (as defined in the Superpriority Credit Agreement) under the Superpriority Credit Agreement; (l) each holder of an Obligation (as defined in the Credit Agreement) under the Credit Agreement; (m) each Issuer (as defined in the Superpriority Credit Agreement) under the Superpriority Credit Agreement; (n) each Issuer (as defined in the Credit Agreement) under the Credit Agreement; (o) the Term Loan Ad Hoc Group, the Liquidity Lender Steering Committee, and the Senior Notes Ad Hoc Group; (p) Illuminate Buyer LLC; (q) each current and former Affiliate of each Entity in clause (a) through (o̶p); and (q̶r) each Related Party of each Entity in clause (a) through (o̶p); *provided* that any holder of a Claim or Interest that opts out of the releases shall not be a "Released Party."

"*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Company Party; (d) each DIP Lender and each DIP Letter of Credit Issuer; (e) each Agent; (f) the Senior Notes Trustee; (g) each Consenting Stakeholder; (h) each Hedge Bank; (i) each Cash Management Bank; (j) each lender under the Superpriority Credit Agreement, Credit Agreement, the 2021 LC Agreement, and the Lloyds Letter of Credit Agreement; (k) each holder of an Obligation (as defined in the Superpriority Credit Agreement) under the Superpriority Credit Agreement; (l) each holder of an Obligation (as defined in the Credit Agreement) under the Credit Agreement; (m) each Issuer (as defined in the Superpriority Credit Agreement) under the Superpriority Credit Agreement; (n) each Issuer (as defined in the Credit Agreement) under the Credit Agreement; (o) the Term Loan Ad Hoc Group, the Liquidity Lender Steering Committee, and the Senior Notes Ad Hoc Group; (p) ~~all holders of Claims or Interests that vote to accept or are deemed to accept the Plan~~Illuminate Buyer LLC; (q) all holders of Claims or Interests that vote to accept the Plan; (r) all holders of Claims or Interests that are deemed to accept the Plan who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable Notice of Non-Voting Status indicating that they opt not to grant the releases provided in the Plan; (s) all holders of Claims or Interests that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (r̶t) all holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot or Notice of Non-Voting Status indicating that they opt not to grant the releases provided in the Plan; (s̶u) each current and former Affiliate of each Entity in clause (a) through (r̶t); and (t̶v) each Related Party of each Entity in clause (a) through (r̶t).

"*Reorganized Debtors*" means collectively, a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date, including any new entity established in connection with the implementation of the Restructuring Transactions.

"*Reorganized McDermott*" means McDermott, or any successor or assign, by merger, consolidation, or otherwise, on or after the Effective Date.

"*Required Consenting LC Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Lender*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Noteholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Revolving Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Stakeholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Term Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Residual Prepetition Funded Secured Claims Pay Down*" has the meaning set forth in Article IV.D.4 of the Plan.

"*Residual Technology Business Sale Proceeds*" means any Technology Business Sale Proceeds remaining after payment of items (a) through (d) of the Technology Business Sale Proceeds Waterfall for application in accordance with item (e) of the Technology Business Sale Proceeds Waterfall in accordance with the Plan.

"*Restructuring Expenses*" means the prepetition and postpetition reasonable and documented fees and expenses of the Revolving and LC Administrative Agent Advisors, the Term Loan Ad Hoc Group Advisors, the Senior Notes Ad Hoc Group Advisors, the Barclays Advisors, and the Senior Notes Trustee and its advisors, including local and foreign counsel (in each case, in accordance with the terms of their respective engagement letters with their respective clients, if any).

"*Restructuring Term Sheet*" means the Restructuring Term Sheet attached as Exhibit A to the Restructuring Support Agreement.

"*Restructuring Transactions*" means any transaction and any actions as may be necessary or appropriate to effect a corporate restructuring of the Debtors' and the Reorganized Debtors' respective businesses or a corporate restructuring of the overall corporate structure of the Debtors on the terms set forth in the Plan, Restructuring Support Agreement, and Restructuring Transactions Memorandum, including the issuance of all Securities, notes, instruments, certificates, and other documents required to be issued or executed pursuant to the Plan, one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions, as described in Article IV.B of the Plan.

"*Restructuring Transactions Memorandum*" means a document, in form and substance acceptable to the Required Consenting Lenders, to be included in the Plan Supplement that will set forth the material components of the Restructuring Transactions, including the identity of the issuer or issuers of the New Common Stock and any elections that must be made with respect to the receipt of the New Common Stock.

"*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of January 2̶0̶1, 2020, by and among the Debtors and the Consenting Stakeholders, as may be further amended, modified, or supplemented from time to time, in accordance with its terms.

"*Revolving and LC Administrative Agent*" means Crédit Agricole Corporate and Investment Bank, in its capacity as administrative agent for the Revolving Credit Facility and the 2023 LC Facility.

"*Revolving and LC Administrative Agent Advisors*" means Linklaters LLP, Bracewell LLP and FTI Consulting, Inc., as advisors to the DIP LC Agent, the DIP Collateral Agent, the Revolving and LC Administrative Agent, 2018 Collateral Agent, the Superpriority Revolving Administrative Agent and the Superpriority Collateral Agent, and any other local or foreign advisors.

"*Revolving Credit*" means the Revolving LCs and the Revolving Loans.

"*Revolving Credit Facility*" means the senior secured revolving credit facility under the Credit Agreement.

"*Revolving LCCredit Claims*" means any Claim for obligations arising under, or relating to, the Revolving LCs or the Revolving Loans issued under the Revolving Credit Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*Revolving Credit Facility*" means the senior secured revolving credit facility under the Credit Agreement.

"*Revolving LCs*" means the letters of credit issued under and on the terms set forth under the Revolving Credit Facility.

"*Revolving Lenders*" means the lenders under the Revolving Credit Facility.

"*Revolving Loans*" means the revolving loans issued under and on the terms set forth under the Revolving Credit Facility.

"*Rights Offering*" means a rights offering providing for the Consenting Noteholders with the right to purchase up to $150 million of the New Common Stock otherwise earmarked for the holders of Prepetition Funded Secured Claims valued at the Plan Equity Value in connection with the Restructuring Transactions and in accordance with the Rights Offering Procedures and Section 12 of the Restructuring Support Agreement.

"*Rights Offering Procedures*" means the procedures governing the Rights Offering, as approved by the Bankruptcy Court.

"*Rights Offering Shares*" means the shares of New Common Stock issued in accordance with the Rights Offering and subject to the terms of the Rights Offering Procedures and the Restructuring Support Agreement.

"*Roll-Off LC Exit Facility*" means a~~each~~ senior secured letter of credit ~~exit~~ facility ~~pursuant to which each outstanding Prepetition~~(other than in respect of the Cash Secured Letters of Credit ~~will be deemed issued on the Effective Date,~~) under the Credit Agreement and the 2021 LC Agreement, each as amended by the Exit Facility Agreement, each of which will be ranked junior to the Senior Exit LC Facility, and otherwise ~~on~~contain terms consistent with the Exit Facilities Term Sheet and satisfactory to the Required Consenting Lenders, ~~and~~which shall be set forth in the Definitive Documents to be included in the Plan Supplement.

"*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.

"*Section 510(b) Claim*" means any Claim or Interest against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code, whether by operation of law or contract.

"*Secured Claim*" means a Claim:  (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

"*Secured Creditor Equity Distribution*" means 94% of the New Common Stock less the percentage of New Common Stock to be turned over on account of (i) the Prepetition Funded Secured Claims Excess Cash Adjustment and (ii) the Rights Offering, and subject to dilution on account of the Management Incentive Plan and the New Warrants.

"*Secured Creditor Funded Debt Distribution*" means (a) Cash in an amount equal to the Residual Technology Business Sale Proceeds; (b) Cash in an amount equal to any proceeds of the Rights Offering; (c) the Secured Creditor Equity Distribution; and (d) the new term loans evidenced by the Term Loan Exit Facility.

"*Secured Creditor Pro Rata Share*" means with respect to any recipient of any distribution from the Secured Creditor Funded Debt Distribution under the Plan, such recipient's pro rata share thereof measured by reference to the aggregate amount of: (a) all Allowed Term Loan Claims, (b) all Allowed Revolving Credit Claims consisting of (x) all Revolving Loans and (y) funded Revolving LCs, (c) all Allowed 2021 Letter of Credit Claims consisting of funded 2021 Letters of Credit, (d) all Allowed 2023 Letter of Credit Claims consisting of funded 2023 Letters of Credit, (e) all Allowed Lloyds Letter of Credit Claims consisting of funded Lloyds Letters of Credit, and (f) all Credit Agreement Hedging Claims consisting of Credit Agreement Hedging Obligations, that are not being rolled into the DIP Credit Facility, in each case as of the date of such distribution.

"*Secured Letter of Credit Cap*" has the meaning ascribed to it in the Exit Facilities Term Sheet.

"*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

"*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

"*Senior Exit LC Facility*" means a 4-year, senior secured letter of credit exit facility in an amount up to $1.326 billion, ranked junior to the Super Senior Exit Facility, on terms satisfactory to the Debtors or the Reorganized Debtors, as applicable, and otherwise on terms satisfactory to the Required Consenting Lenders; and set forth in the Definitive Documents to be included in the Plan Supplement; *provided* that the amount of the Senior Exit LC Facility shall be reduced dollar-for-dollar for each Prepetition Secured Letter of Credit or Lloyds Letter of Credit that is drawn and not reimbursed in full in Cash during or after the Chapter 11 Cases.

"*Senior Notes*" means the 10.625% senior notes due 2024 issued by certain of the Debtors pursuant to the Senior Notes Indenture.

"*Senior Notes Ad Hoc Group*" means, collectively, those certain institutions comprising the ad hoc groups of holders of the Senior Notes represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP and Brown Rudnick LLP.

"*Senior Notes Ad Hoc Group Advisors*" means Paul, Weiss, Rifkind, Wharton & Garrison LLP, Brown Rudnick LLP, Houlihan Lokey Capital, Inc., counsel to the Senior Notes Trustee, and any local or foreign advisors.

"*Senior Notes Claims*" means all principal and interest outstanding as of the Petition Date under the Senior Notes.

"*Senior Notes Indenture*" means that certain indenture dated as of April 18, 2018, by and among certain of the Debtors and the Senior Notes Trustee, as may be amended, supplemented, or otherwise modified from time to time.

"*Senior Notes Trustee*" means UMB Bank, N.A., in its capacity as trustee for the Senior Notes Indenture.

"*Severance Arrangements*" has the meaning set forth in Article IV.Q of the Plan.

"*Superpriority Agreement Agents*" means the Superpriority Revolving Administrative Agent, the Superpriority Collateral Agent and the Superpriority Term Loan Agent.

"*Superpriority Collateral Agent*" means Crédit Agricole Corporate and Investment Bank, in its capacity as Collateral Agent under the Superpriority Credit Agreement.

"*Superpriority Credit Agreement*" means that certain superpriority senior secured credit agreement, dated October 21, 2019, between certain of the Debtors as borrowers and guarantors, a syndicate of lenders and letter of credit issuers, the Superpriority Term Loan Agent, and the Superpriority Revolving Administrative Agent, as amended from time to time.

"*Superpriority Facility*" means, collectively, the Superpriority Term Loan Facility and the Superpriority Revolving Facility.

"*Superpriority Letters of Credit*" means the superpriority letters of credit issued under the Superpriority Revolving Facility.

"*Superpriority Revolving Administrative Agent*" means Crédit Agricole Corporate and Investment Bank, in its capacity as administrative agent for the Superpriority Revolving Facility.

"*Superpriority Revolving Facility*" means the superpriority secured letter of credit facility under the Superpriority Credit Agreement.

"*Superpriority Term Loan Agent*" means Barclays Bank PLC in its capacity as administrative agent for the Superpriority Term Loan Facility.

"*Superpriority Term Loan Facility*" means the superpriority secured term loan credit facility under the Superpriority Credit Agreement.

"*Superpriority Term Loans*" means the superpriority term loans issued under and on the terms set forth under the Superpriority Term Loan Facility.

"*Super Senior Exit Facility*" means a 4-year, super senior secured exit facility consisting of a letter of credit facility in an amount of $743 million and the Make Whole Tranche (which Make Whole Tranche will be subordinate in right of payment to the obligations with respect to the letters of credit under the Super Senior Exit Facility on the terms provided therein), on terms satisfactory to the Required Consenting Lenders and set forth in the Definitive Documents to be included in the Plan Supplement.

"*Technology Business Sale*" means a sale of the Lummus Assets and Interests under this Plan, pursuant to the Purchase Agreement, and to be agreed to or consummated by the Debtors on the Effective Date.

"*Technology Business Sale Proceeds*" means Cash proceeds received from the Technology Business Sale, net of (a) the reasonable transaction costs in connection with the Technology Business Sale, (b) taxes paid or reasonably estimated to be payable by the Debtors or Reorganized Debtors as a result of the Technology Business Sale, (c) any debt service payments due under the DIP Credit Agreement which are required to be repaid or otherwise becomes due in connection with the Technology Business Sale, and (d) payment of $210 million of prepetition accounts payable.

"*Technology Business Sale Proceeds Waterfall*" means the distribution waterfall for the Technology Business Sale Proceeds, as described in Article IV.D.3 of this Plan.

"*Term Lenders*" means the lenders under the Term Loan Facility.

"*Term Loan Ad Hoc Group*" means certain institutions comprising the ad hoc group of lenders in respect of the Superpriority Term Loans and the lenders in respect of the Term Loan Facility.

"*Term Loan Ad Hoc Group Advisors*" means Davis Polk & Wardwell LLP, Porter Hedges LLP, Centerview Partners, Inc., Ankura Consulting Group, LLC, and any other local or foreign advisors.

"*Term Loan Administrative Agent*" means Barclays Bank PLC, in its capacity as administrative agent for the Term Loan Facility.

"*Term Loan Claims*" means any Claim for obligations arising under, or relating to, the Term Loan Facility.

"*Term Loan Exit Facility*" means a 5-year senior secured term loan facility in an amount equal to $500 million of take-back debt, ranked *pari passu* with the Roll-Off LC Exit Facility, and otherwise on terms satisfactory to the Required Consenting Lenders, and set forth in Definitive Documents to be included in the Plan Supplement.

"*Term Loan Exit Facility Lenders*" means those lenders party to the Exit Facility Agreement.

"*Term Loans*" means the term loans issued and on the terms set forth under the Term Loan Facility.

"*Term Loan Facility*" means the senior secured term loan facility under the Credit Agreement.

"*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

"*Unsecured Claim*" means any Claim that is not a Secured Claim.

"*Voting Deadline*" means, subject to the approval of the Bankruptcy Court, February 189, 2020, or such other date as ordered by the Bankruptcy Court.

B.      *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (2) shall affect any parties' consent rights over any of the Definitive Documents or any amendments thereto, as provided for in the Restructuring Support Agreement; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan or Confirmation Order, as applicable; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (15) references to "Proofs of Claim," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like, as applicable; (16) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (17) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

H.      *Consultation, Information, Notice, and Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement set forth in the Restructuring Support Agreement (including the exhibits thereto) with respect to the form and substance of this Plan, all exhibits to the Plan, and the Plan Supplement, and all other Definitive Documents (as defined in the Restructuring Support Agreement), including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.

Failure to reference the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the Restructuring Support Agreement shall not impair such rights and obligations.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS,
## PRIORITY CLAIMS, AND RESTRUCTURING EXPENSES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims.*

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, or otherwise provided for under the Plan or the Restructuring Support Agreement, each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

B.      *DIP Claims.*

As set forth in Article IV.D of this Plan, certain of the Technology Business Sale Proceeds shall be used to pay Allowed DIP Claims (including Allowed DIP Claims with respect to the Make Whole Amount pursuant to the Technology Business Sale Proceeds Waterfall) outstanding on the Effective Date.  Except to the extent that a holder of an Allowed DIP Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each holder of an Allowed DIP Claim shall receive the following treatment:

(a)     to the extent not paid in full in accordance with the Technology Business Sale Proceeds Waterfall, each holder of an Allowed DIP Term Loan Claim (other than the Make Whole Amount, but including all principal, accrued and unpaid interest, fees and expenses and non-contingent indemnity claims) shall receive payment in full in Cash;

(b)     to the extent not paid in full in accordance with the Technology Business Sale Proceeds Waterfall or the proceeds of the Rights Offering, each holder of an Allowed DIP Term Loan Claim constituting the Make Whole Amount shall receive its Pro Rata share of the term loans arising under the Make Whole Tranche;

(c)     to the extent not paid in full in accordance with the Technology Business Sale Proceeds Waterfall, each holder of an Allowed DIP LC Claim with respect to drawn DIP Letters of Credit that have not been reimbursed in full in Cash as of the Effective Date shall receive payment in full in Cash;

(d)     each holder of an Allowed DIP LC Claim (other than in respect of DIP Cash Secured Letters of Credit) shall receive participation in the Super Senior Exit Facility in an amount equal to each such holder's DIP Letter of Credit Facility commitments;

(e)     each holder of a DIP Cash Secured Letter of Credit Claim shall receive participation in the Cash Secured Exit LC Facility in an amount equal to such holder's DIP Cash Secured Letter of Credit Claim; *provided* that any cash collateral in the DIP Cash Secured LC Account (as defined in the DIP Credit Facility Term Sheet) shall collateralize the Cash Secured LC Exit Facility; and

(f)     all DIP Hedging Obligations shall be rolled into and deemed incurred under the Super Senior Exit Facility.

To the extent the Funded DIP Indebtedness is repaid in full prior to the Effective Date, the Debtors shall not make any payments to trade vendors for penalty interest payments (excluding, for the avoidance of doubt, customary liquidated damages to customers) unless such payments had otherwise been specified in the Approved Budget (as defined in the DIP Credit Agreement) or authorized pursuant to the DIP Financing Orders.

C.     *Professional Claims.*

1.     Final Fee Applications and Payment of Professional Claims.

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Amount on the Effective Date.

2.     Professional Escrow Account.

On the Effective Date, the Reorganized Debtors shall, in consultation with the Required Consenting Lenders, establish and fund the Professional Escrow Account with Cash equal to the Professional Amount, which shall be funded by the Reorganized Debtors.  The Professional Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.  The amount of Allowed Professional Claims shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Escrow Account as soon as reasonably practicable after such Professional Claims are Allowed.  When such Allowed Professional Claims have been paid in full, any remaining amount in the Professional Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

3.     Professional Amount.

Professionals shall reasonably estimate their unpaid Professional Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases.  If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

4.     Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

D.     *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax

Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

E.       *Payment of Restructuring Expenses, Consent Fee.*

   The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, and noteholder consent fees payable under Section 12 of the Restructuring Support Agreement payable in Cash, which, for the avoidance of doubt, shall include the Noteholder Consent Fee (as defined in the Restructuring Support Agreement), shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses and Cash consent fees to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On or as soon as practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post-Effective Date, when due Restructuring Expenses related to implementation, consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date.

### ARTICLE III.
### CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.       *Classification of Claims and Interests.*

   This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fits within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

   The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | Other Prepetition Financing Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 4 | Bilateral Facility Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 5 | 2021 Letter of Credit Claims | Impaired | Entitled to Vote |
| Class 6A | 2023 Letter of Credit Claims | Impaired | Entitled to Vote |
| Class 6B | Revolving Credit Claims | Impaired | Entitled to Vote |
| Class 6C | Term Loan Claims | Impaired | Entitled to Vote |
| Class 6D | Credit Agreement Hedging Claims | Impaired | Entitled to Vote |

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 7 | Cash Secured Letter of Credit Claims | Impaired | Entitled to Vote |
| Class 8 | Lloyds Letter of Credit Claims | ~~I~~Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 9 | Senior Notes Claims | Impaired | Entitled to Vote |
| Class 10 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 11 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 12 | Existing Equity Interests Other Than in McDermott | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 13 | Existing Preferred Equity Interests in McDermott | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 14 | Existing Common Equity Interests in McDermott | Impaired | Not Entitled to Vote (Deemed to Reject) |

*B.     Treatment of Claims and Interests.*

Each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.  The Claims in Classes 5, 6A, 6B, 6C, 6D, and 7 shall be Allowed to the extent provided in the DIP Financing Orders.

1.   Class 1 – Other Secured Claims

    (a)   *Classification*: Class 1 consists of all Other Secured Claims.

    (b)   *Treatment*: Each holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor:

        (i)   payment in full in Cash of its Allowed Other Secured Claim;

        (ii)   the collateral securing its Allowed Other Secured Claim;

        (iii)   Reinstatement of its Allowed Other Secured Claim; or

        (iv)   such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

    (c)   *Voting*: Class 1 is Unimpaired under the Plan. Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

2. <u>Class 2 – Other Priority Claims</u>

 (a) *Classification*:  Class 2 consists of all Other Priority Claims.

 (b) *Treatment*:  Each holder of an Allowed Other Priority Claim shall receive payment in full in Cash.

 (c) *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

3. <u>Class 3 – Other Prepetition Financing Claims</u>

 (a) *Classification*:  Class 3 consists of all Other Prepetition Financing Claims.

 (b) *Treatment*:  Each Allowed Other Prepetition Financing Claim shall be Reinstated.

 (c) *Voting:* Class 3 is Unimpaired under the Plan.  Holders of Other Prepetition Financing Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

4. <u>Class 4 – Bilateral Facility Claims</u>

 (a) *Classification*:  Class 4 consists of all Bilateral Facility Claims.

 (b) *Treatment*:  Each Allowed Bilateral Facility Claim shall be Reinstated.

 (c) *Voting*:  Class 4 is Unimpaired under the Plan.  Holders of Bilateral Facility Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

5. <u>Class 5 – 2021 Letter of Credit Claims</u>

 (a) *Classification:* Class 5 consists of all 2021 Letter of Credit Claims.

 (b) *Treatment*:  Each holder of an Allowed 2021 Letter of Credit Claim shall receive:

  (i) with respect to any 2021 Letter of Credit Claims on account of unfunded 2021 Letters of Credit, participation in the Roll-Off LC Exit Facility in an amount equal to each such holder's ~~Allowed~~participation in any such unfunded 2021 Letters of Credit ~~Claim~~,

  (ii) with respect to any 2021 Letter of Credit Claims on account of funded 2021 Letters of Credit, its Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution, and

(iii) payment in full in Cash of any amounts accrued and unpaid as of the Petition Date due to such holder of an Allowed 2021 Letter of Credit Claim pursuant to Section 2.15 of the 2021 LC Agreement.

(c) *Voting:* Class 5 is Impaired under the Plan. Holders of 2021 Letter of Credit Claims are entitled to vote to accept or reject the Plan.

6. <u>Class 6A – 2023 Letter of Credit Claims</u>

(a) *Classification:* Class 6A consists of all 2023 Letter of Credit Claims.

(b) *Treatment*: Each holder of an Allowed 2023 Letter of Credit Claim shall receive:

(i) with respect to any 2023 Letter of Credit Claims on account of unfunded 2023 Letters of Credit, participation in the Roll-Off LC Exit Facility in an amount equal to each such holder's ~~Allowed~~participation in any such unfunded 2023 Letters of Credit ~~Claim~~,

(ii) with respect to any 2023 Letter of Credit Claims on account of funded 2023 Letters of Credit, its Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution, and

(iii) payment in full in Cash of any amounts accrued and unpaid as of the Petition Date due to such holder of an Allowed 2023 Letter of Credit Claim pursuant to Section 2.15 of the Credit Agreement.

(c) *Voting:* Class 6A is Impaired under the Plan. Holders of 2023 Letter of Credit Claims are entitled to vote to accept or reject the Plan.

7. <u>Class 6B – Revolving Credit Claims</u>

(a) *Classification:* Class 6B consists of all Revolving Credit Claims.

(b) *Allowed Amount:* As of the Effective Date, the Revolving Credit Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Revolving Credit Facility, including all principal, accrued and unpaid interest at the applicable default rate, and all accrued and unpaid fees, expenses, and noncontingent indemnity payable under the Revolving Credit Facility and the DIP Financing Orders.

(c) *Treatment*: Each holder of an Allowed Revolving Credit Claim shall receive:

(i)     with respect to any Revolving Credit Claims on account of unfunded Revolving LCs, participation in the Roll-Off LC Exit Facility in an amount equal to each such holder's ~~Allowed~~participation in any such unfunded Revolving ~~Credit Claim~~LCs,

(ii)    with respect to any Revolving Credit Claims on account of (x) Revolving Loans or (y) funded Revolving LCs, its Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution, and

(iii)   payment in full in Cash of any amounts accrued and unpaid as of the Petition Date due to such holder of an Allowed Revolving Credit Claim pursuant to Section 2.15 of the Credit Agreement.

(d)     *Voting:* Class 6B is Impaired under the Plan.  Holders of Revolving Credit Claims are entitled to vote to accept or reject the Plan.

8.  Class 6C – Term Loan Claims

(a)     *Classification*: Class 6C consists of all Term Loan Claims.

(b)     *Allowed Amount*: As of the Effective Date, the Term Loan Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Term Loan Facility, including all principal, accrued and unpaid interest at the applicable default rate, and all accrued and unpaid fees, expenses, and noncontingent indemnity payable under the Term Loan Facility and the DIP Financing Orders.

(c)     *Treatment*:  Each holder of an Allowed Term Loan Claim shall receive its Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution.

(d)     *Voting*:  Class 6C is Impaired under the Plan.  Holders of Term Loan Claims are entitled to vote to accept or reject the Plan.

9.  Class 6D – Credit Agreement Hedging Claims

(a)     *Classification*:  Class 6D consists of all Credit Agreement Hedging Claims.

(b)     *Treatment*:  Each holder of an Allowed Credit Agreement Hedging Claim that remains unpaid as of the Effective Date shall receive for any Allowed Credit Agreement Hedging Claims such holder's Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution.

(c)     *Voting*:  Class 6D is Impaired under the Plan.  Holders of Credit Agreement Hedging Claims are entitled to vote to accept or reject the Plan.

10. Class 7 – Cash Secured Letter of Credit Claims

(a)     *Classification:*  Class 7 consists of all Cash Secured Letter of Credit Claims.

(b)     *Treatment*:  Each holder of an Allowed Cash Secured Letter of Credit Claim outstanding as of such date shall:

> > > (i)  be deemed to reissue its Cash Secured Letters of Credit under the Cash Secured LC Exit Facility which shall be secured by the same cash collateral which secured the Cash Secured Letters of Credit prior to the Petition Date, and

> > > (ii)  receive payment in full in Cash of any amounts accrued and unpaid as of the Petition Date due to such holder of an Allowed Cash Secured Letter of Credit Claim pursuant to Section 2.15 of the Credit Agreement.

> > (c)  *Voting:*  Class 7 is Impaired under the Plan.  Holders of Cash Secured Letter of Credit Claims are entitled to vote to accept or reject the Plan.

> 11.  Class 8 – Lloyds Letter of Credit Claims

> > (a)  *Classification:*  Class 8 consists of all Lloyds Letter of Credit Claims.

> > (b)  *Treatment*:  Each holder of an Allowed Lloyds Letter of Credit Claim shall ~~receive~~:

> > > ~~(i) with respect to any Lloyds Letter of Credit Claims on account of unfunded Lloyds Letters of Credit, participation in the Roll-Off LC Exit Facility in amount equal to such Allowed Lloyds Letter of Credit Claim,~~

> > > (i)  be deemed to issue on the Effective Date its Lloyds Letters of Credit under the Lloyds LC Exit Facility, which from and after the Effective Date shall be secured on a senior and exclusive basis by the cash collateral held by Lloyds LC Bank and/or its affiliates that secured the Lloyds Letters of Credit as of the Effective Date and any standby letters of credit supporting the Lloyds Letters of Credit as of the Effective Date; *provided* that the cash collateral and/or standby letters of credit, as applicable, securing the Lloyds LC Exit Facility shall be reduced and/or released, as applicable, dollar-for-dollar upon the reduction, expiration, or termination of any Lloyds Letter of Credit in accordance with its terms from and after the Effective Date and upon any such release the applicable cash collateral shall become collateral securing the obligations of the Reorganized Debtors under the Exit Facilities;

> > > (ii)  with respect to any Lloyds Letter of Credit Claims on account of funded Lloyds Letters of Credit, ~~its Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution~~receive payment in full in Cash of such amounts from cash collateral and/or standby letters of credit which secure the Lloyds Letters of Credit, and

> > > (iii)  receive payment in full in Cash of any amounts accrued and unpaid as of the ~~Petition~~Effective Date due to such holder of an Allowed Lloyds Letter of Credit Claim pursuant to Section 1, Section 2(b), and Section 6 of the Lloyds Letter of Credit Agreement.

> > (c)  *Voting:*  Class 8 is ~~I~~Unimpaired under the Plan.  Holders of Lloyds Letter of Credit Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

12. Class 9 – Senior Notes Claims

    (a)    *Classification*:  Class 9 consists of all Senior Notes Claims.

    (b)    *Allowed Amount*:  $[   ]As of the Effective Date, the Senior Notes Claims shall be Allowed and deemed to be Allowed Claims in the principal amount outstanding under the Senior Notes, together with all accrued but unpaid interest as of the Petition Date.

    (c)    *Treatment*:  Each holder of an Allowed Senior Notes Claim shall receive its pro rata share of:

        (i)    6% of the New Common Stock, plus additional shares of New Common Stock as a result of the Prepetition Funded Secured Claims Excess Cash Adjustment, subject to dilution on account of the New Warrants and the Management Incentive Plan; and

        (ii)    the New Warrants.

    (d)    *Voting:*  Class 9 is Impaired under the Plan.  Holders of Senior Notes Claims are entitled to vote to accept or reject the Plan.

13. Class 10 – General Unsecured Claims

    (a)    *Classification:*  Class 10 consists of all General Unsecured Claims.

    (b)    *Treatment:*  Each holder of an Allowed General Unsecured Claim shall receive, at the option of the applicable Debtor:

        (i)    payment in full in Cash; or

        (ii)    Reinstatement.

    (c)    *Voting:*  Class 10 is Unimpaired under the Plan.  Holders of General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

14. Class 11 – Intercompany Claims

    (a)    *Classification*:  Class 11 consists of all Intercompany Claims.

    (b)    *Treatment*:  Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor (with the consent of the Required Consenting Lenders), either:

        (i)    Reinstated;

        (ii)    canceled, released, and extinguished, and will be of no further force or effect; or

        (iii)    otherwise addressed at the option of each applicable Debtor such that holders of Intercompany Claims will not receive any distribution on account of such Intercompany Claims.

(c) *Voting*:  Class 11 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 11 is not entitled to vote to accept or reject the Plan.

15.  Class 12 – Existing Equity Interests Other Than in McDermott

(a) *Classification*:   Class 12 consists of all Existing Equity Interests Other Than in McDermott.

(b) *Treatment:*  Each Existing Equity Interests Other Than in McDermott shall be, at the option of the applicable Debtor, either:

(i) Reinstated;

(ii) canceled, released, and extinguished, and will be of no further force or effect; or

(iii) otherwise addressed at the option of each applicable Debtor such that holders of Existing Equity Interests Other Than in McDermott will not receive any distribution on account of such Existing Equity Interests Other Than in McDermott.

(c) *Voting*:  Class 12 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 12 is not entitled to vote to accept or reject the Plan.

16.  Class 13 – Existing Preferred Equity Interests

(a) *Classification*:  Class 13 consists of all Existing Preferred Equity Interests.

(b) *Treatment:*  Holders of Existing Preferred Equity Interests will not receive any distribution on account of such Interests, which will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect.

(c) *Voting*:  Class 13 is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 13 is not entitled to vote to accept or reject the Plan.

17.  Class 14 – Existing Common Equity Interests

(a) *Classification*:  Class 14 consists of all Existing Common Equity Interests.

(b) *Treatment*:  Holders of Existing Common Equity Interests will not receive any distribution on account of such Interests, which will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect.

(c) *Voting*:  Class 14 is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 14 is not entitled to vote to accept or reject the Plan.

C. *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including, all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.      *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.      *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.      *Intercompany Interests.*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the holders of New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims.

G.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors reserve the right, subject to the prior consent of the Required Consenting Lenders, which shall not be unreasonably withheld, to modify the Plan in accordance with Article X hereof and the Restructuring Support Agreement to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Any such contractual, legal, or equitable subordination rights shall be settled, compromised, and released pursuant to the Plan.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved

pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority or extent of the DIP Claims, Superpriority Term Loan Claims, Superpriority Revolving Facility Claims, 2021 Letter of Credit Claims, 2023 Letter of Credit Claims, Revolving LCCredit Claims, Revolving Loan Claims, Term Loan Claims, Cash Secured Letter of Credit Claims, Credit Agreement Hedging Claims, and Senior Notes Claims and (2) any claim to avoid, subordinate, or disallow any DIP Claims, Superpriority Term Loan Claims, Superpriority Revolving Facility Claims, 2021 Letter of Credit Claims, 2023 Letter of Credit Claims, Revolving LCCredit Claims, Revolving Loan Claims, Term Loan Claims, Cash Secured Letter of Credit Claims, Credit Agreement Hedging Claims, and Senior Notes Claims, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. Subject to Article VI hereof, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.      *Restructuring Transactions.*

On or before the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into and shall take any actions as may be necessary or appropriate to effect the Restructuring Transactions, including as set forth in the Restructuring Transactions Memorandum. The actions to implement the Restructuring Transactions may include:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan. The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan. On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions.

C.      *Reorganized Debtors.*

On the Effective Date, the New Board shall be established, and the Reorganized Debtors shall adopt their New Organizational Documents. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan. Cash payments to be made pursuant to the Plan will be made by the Debtors or Reorganized Debtors. The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or Reorganized Debtors, as applicable, to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing, subject to the New Organizational Documents and the Exit Facility Documents, as the boards of directors of the applicable Reorganized Debtors deem appropriate.

D.      *Technology Business Sale.*

      1.      Technology Business Sale Process.

Following the Petition Date, in consultation with the Consultation Parties (as defined in the Bidding Procedures), the Debtors shall continue their sale and marketing process and solicit bids for the sale or other disposition of all or substantially all of the Technology Business Sale, in accordance with the terms and conditions of the Restructuring Support Agreement (including the Milestones (as defined in the Restructuring Support Agreement)) and in a manner acceptable to the Required Consenting Lenders. For the avoidance of doubt, the Debtors may only execute an agreement for the sale or other disposition of any part of the Technology Business with the consent of the Required Consenting Lenders.

The Consultation Parties shall have the right to review all information, diligence, documents and other materials provided by the Debtors or their advisors to any bidder or prospective bidder in connection with the Technology Business Sale and to consult with the Debtors and their advisors with respect to the Technology Business Sale. The Debtors shall provide to the Consultation Parties all term sheets, letters, proposals, offers, bids and other materials, whether non-binding or not, that are received by the Debtors or their advisors in connection with the Technology Business Sale within one (1) day of receipt by the Debtors or their advisors, as applicable.

      2.      Closing of the Technology Business Sale.

On or before the Effective Date, the Debtors shall be authorized to consummate the Technology Business Sale and, among other things, the Lummus Assets and Interests (including Executory Contracts and Unexpired Leases assumed and assigned pursuant to Article V hereof) shall be transferred to and vest in the Purchaser free and clear of all Liens, Claims, charges, or other encumbrances pursuant to the terms of the Purchase Agreement and, as applicable, in accordance with the DIP Credit Agreement, the Confirmation Order or an order approving the Technology Business Sale; *provided* that, to the extent the Technology Business Sale is to be consummated pursuant to the Confirmation Order, the Debtors may request entry of any order supplementing the Confirmation Order that the Debtors believe is necessary or appropriate to implement the terms and conditions of the Technology Business Sale. On and after the Effective Date, except as otherwise provided in the Plan, the Debtors or the Purchaser, as applicable, may operate the Debtors' businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action, in each case relating to the Lummus Assets and Interests, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

      3.      Technology Business Sale Proceeds Waterfall.

~~Any~~On the Effective Date, any Technology Business Sale Proceeds that have not otherwise been applied in accordance with the DIP Credit Agreement shall be applied as follows:

          (a)      first, to fund the minimum Cash balance of $820 million, as required by the Business Plan,

          (b)      second, to repay Funded DIP Indebtedness (other than the Make Whole Amount);

          (c)      third, payment of the Make Whole Amount; and

          (d)      fourth, to fund cash to support new or additional letters of credit sufficient to meet the $2.44 billion letter of credit capacity contemplated by the Exit Facilities Term Sheet; and

          (e)      fifth, the repayment of Prepetition Funded Secured Claims on a Pro Rata basis.

4.    Residual Prepetition Funded Secured Claims Pay Down.

On the Effective Date, the Prepetition Funded Secured Claims will be repaid on a pro rata basis from (i) the Residual Technology Sale Proceeds and (ii) any available Cash (such available Cash shall exclude Cash held in variable interest entities associated with joint venture and consortium arrangements, Cash trapped in foreign jurisdictions, and insurance captive Cash) in excess of $820 million available cash at emergence after payment of all fees and transaction expenses ((i) and (ii) together the "Residual Prepetition Funded Secured Claims Pay Down").

If the Residual Prepetition Funded Secured Claims Pay Down amount is greater than $0, the initial allocation of 94% of the New Common Stock to the holders of Prepetition Funded Secured Claims shall be reduced, and the initial allocation of 6% of the New Common Stock to holders of Senior Notes Claim shall be increased, by the percentage calculated by dividing:

(a)    the Residual Prepetition Funded Secured Claims Pay Down amount by

(b)    an amount equal to:

(i)    the aggregate amount of Prepetition Funded Secured Claims (including, without limitation, principal and any accrued prepetition or postpetition interest at the default rate as applicable) minus an amount equal to the sum of (y) the aggregate amount of the loans to be issued under the Term Loan Exit Facility and (z) any proceeds of the Rights Offering up to $150 million; divided by

(ii)    94% minus an amount equal to (y) the aggregate proceeds of the Rights Offering up to $150 million divided by (z) Plan Equity Value

(such adjustment of initial allocations, the "Prepetition Funded Secured Claims Excess Cash Adjustment").

For the avoidance of doubt, if the Technology Business Sale Proceeds paid pursuant to the Technology Business Sale Proceeds Waterfall have not paid the Make Whole Amount in full, all proceeds of the Rights Offering will (a) first go to the pay down of the Make Whole Amount and (b) once the Make Whole Amount is paid in full, the Prepetition Funded Secured Claims will be repaid on a pro rata basis from such remaining proceeds of the Rights Offering.

E.    *Pipes Business Sale.*

Following the Confirmation Date, the Debtors shall be authorized to consummate the Pipes Business Sale with the consent of the Required Consenting Lenders pursuant to the terms of the Pipes Business Sale Documents, the DIP Credit Agreement, the Plan, and the Confirmation Order.  Pursuant to the consummation of the Pipes Business Sale, the Debtors shall, among other things, transfer all or part of the Pipes Interests to the Pipes Buyers free and clear of all Liens, Claims, Interests, charges, and other encumbrances (other than any assumed liabilities) pursuant to sections 363, 365, and/or 1123 of the Bankruptcy Code, this Plan, and the Confirmation Order; *provided* that all Liens, Claims, Interests, charges and other encumbrances on Pipes Interests securing any obligations of the Debtors prior to the closing of the Pipes Business Sale shall attach to the proceeds of the Pipes Business Sale, in the order of their priority, with the same validity, force, and effect, if any, which they had against such Pipes Interests prior to the closing of the Pipes Business Sale.  The proceeds of the Pipes Business Sale shall be applied (i) prior to the Effective Date, in accordance with the DIP Credit Agreement; and (ii) on the Effective Date, including to the extent any Pipes Business Sale proceeds were applied as cash collateral securing the DIP Letters of Credit in accordance with the DIP Credit Agreement, to fund Cash to the Debtors' balance sheet to satisfy the conditions precedent for emergence under Article IX.A of the Plan.

Pursuant to Article IX hereof, if the conditions precedent to the closing of the Pipes Business Sale shall have been satisfied in accordance with the Pipes Business Sale Documents (as approved by the Required Consenting Lenders), then the conditions set forth in Article IX (other than in Article IX.A.b) shall be deemed automatically waived with respect to the Pipes Entities without notice, leave, or order of the Bankruptcy Court, or any further

action by the Debtors, the Reorganized Debtors, or any Consenting Stakeholder. Notwithstanding anything to the contrary herein, upon the closing of the Pipes Business Sale, (x) the Pipes Entities shall not retain any liability arising out of or in connection with (i) Professional Claims incurred by the Pipes Entities prior to the closing of the Pipes Business Sale or the funding of the Professional Fee Escrow, (ii) Restructuring Expenses and any fees or obligations thereunder, (iii) the Restructuring Support Agreement and any fees or obligations thereunder, (iv) the Exit Facilities or the Lloyds LC Exit Facility, (v) the DIP Cash Secured Letter of Credit Claims or the DIP Claims, and (iv) any adequate protection claims under the DIP Financing Orders, Bankruptcy Code § 507(b), or otherwise; (y) any consent or consultation rights in the Restructuring Support Agreement, the Plan, or the Confirmation Order of any Person or Entity other than the Pipes Entities as Reorganized Debtors shall not be enforceable against or apply to the Pipes Entities; and (z) the Pipes Interests shall be Reinstated pursuant to Article III of the Plan.

*F.* ~~E.~~ *Sources of Consideration for Plan Distributions.*

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with: (1) Cash on hand, including Cash from operations, and the proceeds of the Rights Offering, ~~or~~ the Technology Business Sale (in accordance with the Technology Business Sale Proceeds Waterfall) and the Pipes Business Sale, as applicable; (2) the New Common Stock; (3) the ~~proceeds from the Rights Offering; (4) the~~ New Warrants; and (5~~4~~) the ~~proceeds from~~distributions under the Exit Facilities, as applicable.

1. Exit Facilities.

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities, (the terms of which will be set forth in the Exit Facility Documents).

To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the Exit Facilities (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Bankruptcy Court previously, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Exit Facilities, including the Exit Facility Documents, and incur and pay any fees and expenses in connection therewith, and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit Facilities.

Notwithstanding anything in the Plan or the Confirmation Order to the contrary: (x) on the Effective Date, the cash collateral securing the Cash Secured Letters of Credit outstanding under the Credit Agreement and the cash collateral securing the DIP Credit Facility shall be transferred to the collateral agent in respect of the Exit Facilities for the benefit of the secured parties in respect of the Cash Secured LC Exit Facility on a first-priority basis and the secured parties in respect of the other Exit Facilities as set forth in the Exit Facility Documents; and (y) all Liens securing the Debtors' obligations under the DIP Credit Agreement, the Superpriority Credit Agreement, the Credit Agreement, and the 2021 LC Agreement: (i) shall be unaltered by the Plan, (ii) except as otherwise provided in the Confirmation Order regarding the release of Liens over Lummus Assets and Interest and the Pipes Interests upon consummation of the Technology Business Sale and the Pipes Business Sale, shall continue and remain attached to the property of the Reorganized Debtors and their Affiliates after the Effective Date to the same extent such Liens were attached to the property of the Debtors prior to the Effective Date, and (iii) shall be deemed assigned on the Effective Date to the collateral agent in respect of the Exit Facilities for the benefit of the secured parties in respect of the Exit Facilities (other than the Cash Secured LC Exit Facility) to secure the joint and several obligations of the Reorganized Debtors under the Exit Facilities as set forth in the Exit Facility Documents; *provided* that (a) such Liens shall not secure the Lloyds LC Exit Facility as of the Effective Date and (b) on and after the Effective Date, the granting, attachment, perfection, priority, and continuation of such Liens shall be governed by the terms of the Exit Facilities.

As of the Effective Date, upon the granting or continuation of Liens in accordance with the Plan and the Exit Facility Documents, such Liens shall constitute valid, binding, enforceable, and automatically perfected Liens in the collateral specified in the Exit Facility Documents. ~~To the extent provided in the~~ The Exit Facility ~~Documents, the Exit Facility~~ Agents or holder(s) of Liens under the Exit Facility Documents are authorized to file with the

appropriate authorities mortgages, financing statements, and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests. The guarantees, mortgages, pledges, Liens, and other security interests granted to secure the obligations arising under the Exit Facility Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extentd credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law, and the priorities of such Liens and security interests shall be as set forth in the Exit Facility Documents. The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

In no event shall the sum of (v) the face amount of letters of credit issued and outstanding at any time under the Senior Exit LC Facility, plus (w) the face amount of letters of credit issued and outstanding at any time under the Super Senior Exit Facility, plus (x) the face amount of letters of credit issued or deemed issued and outstanding at any time under the Roll-Off LC Exit Facility, plus (y) the face amount of letters of credit issued and outstanding at any time under the Cash Secured LC Exit Facility, plus (z) the face amount of letters of credit issued or deemed issued and outstanding at any time under the Lloyds LC Exit Facility, exceed the Secured Letter of Credit Cap plus permitted incremental capacity set forth in the Exit Facilities Term Sheet.

2. Issuance of New Common Stock.

The issuance of the New Common Stock, including the Rights Offering Shares and any options or other equity awards, if any, reserved for the Management Incentive Plan and the New Warrants (including the New Common Stock that may be issuable upon exercise of the New Warrants), by the Reorganized Debtors (as set forth in the Restructuring Transactions Memorandum) shall be authorized without the need for any further corporate action or without any further action by the holders of Claims or Interests. The Reorganized Debtors shall be authorized to issue a certain number of shares, units or equity interests (as the case may be based on how the New Common Stock is denominated and the identity of the Reorganized Debtor issuing such shares, units, or equity interests) of New Common Stock required to be issued under the Plan and pursuant to their New Organizational Documents. On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall issue all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.

All of the shares, units, or equity interests (as the case may be based on how the New Common Stock is denominated) of New Common Stock issued or authorized to be issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date or as soon as reasonably practicable thereafter, the New Common Stock will be distributed in accordance with the Plan.

3. Rights Offering.

In accordance with the Restructuring Support Agreement, the applicable Reorganized Debtor shall consummate the Rights Offering, through which each Consenting Noteholder shall have the opportunity, subject to the terms and conditions set forth in the Plan and the Rights Offering Procedures, to purchase the Rights Offering Shares.

The Rights Offering Procedures shall be approved within 5 days of Petition Date and shall provide for a subscription deadline of no later than the Voting Deadline.  Subscription rights to participate in the Rights Offering shall be distributed to the Consenting Noteholders in accordance with the Restructuring Support Agreement, the Restructuring Term Sheet, and the Plan, and the issuance of such subscription rights will be exempt from SEC registration under applicable law.  Proceeds of the Rights Offering to be used (a) first, for Cash pay down of any portion of the Make Whole Amount that is not paid in full in Cash from Technology Business Sale Proceeds in accordance with the Technology Business Sale Proceeds Waterfall and (b) second, for Cash pay down of Prepetition Funded Secured Claims.

4. Issuance of New Warrants.

On the Effective Date, the applicable Reorganized Debtor (as set forth in the Restructuring Transactions Memorandum) will issue the New Warrants only to the extent required to provide for distributions to holders of the Senior Notes Claims, as contemplated by this Plan.  All of the New Warrants issued pursuant to the Plan and the shares of New Common Stock that may be issued upon exercise of the New Warrants shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable, validly issued, fully paid, and non-assessable.  Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Restructuring Support Agreement, the Plan, and the New Warrant Agreements applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance without the need for execution by any party thereto other than the applicable Reorganized Debtor(s).

The New Warrants shall be distributed to holders of Senior Notes Claims in accordance with the Restructuring Support Agreement and the Plan.  The New Warrants shall have full customary anti-dilution and Black-Scholes protection.

5. Lloyds LC Exit Facility.

On the Effective Date, the Reorganized Debtors and Lloyds LC Bank shall enter into the Lloyds LC Exit Facility.  To the extent applicable, entry of the Confirmation Order shall be deemed (a) approval of the Lloyds LC Exit Facility and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Lloyds LC Exit Facility, and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person as may be necessary to consummate the Lloyds LC Exit Facility.  Liens on the cash collateral held by Lloyds LC Bank and/or its affiliates that exclusively secures the Debtors' obligations under the Lloyds Letter of Credit Agreement: (i) shall be unaltered by the Plan, (ii) shall continue and remain  (to the extent continued under the Lloyds LC Exit Facility) attached to the property of the Reorganized Debtors after the Effective Date to the same extent such Liens were attached to the property of the Debtors prior to the Effective Date, and (iii) shall continue to secure the joint and several obligations of the Reorganized Debtors under the Lloyds LC Exit Facility.

G. F. Corporate Existence.

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, in each case, consistent with the Plan and the Restructuring Support Agreement, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).  After the Effective Date, the respective certificate of incorporation and bylaws (or other formation

documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. After the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

## *H.* ~~G.~~ *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Confirmation Order, the Plan (including, for the avoidance of doubt, the Restructuring Transactions Memorandum), or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

## *I.* ~~H.~~ *Cancellation of Existing Securities and Agreements.*

On the Effective Date, except to the extent otherwise provided in the ~~Plan or the~~Exit Facility Documents, the Plan (including, without limitation, under Article IV.F.1 of the Plan) and the Confirmation Order, all notes, instruments, certificates, credit agreements, indentures, and other documents evidencing Claims or Interests shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect. Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to this Plan or the Confirmation Order. Notwithstanding anything to the contrary herein, but subject to any applicable provisions of Article VI hereof, to the extent cancelled pursuant to this paragraph, the ~~DIP Credit Agreement, 2021 LC Agreement, the Credit Agreement, and the~~ Senior Notes Indenture shall continue in effect solely to the extent necessary to: (1) permit holders of Claims under the Senior Notes Indenture to receive their respective Plan Distributions, if any; (2) permit the Reorganized Debtors and the Disbursing Agent, as applicable, to make Plan Distributions on account of the Allowed Claims under the Senior Notes Indenture; (3) permit the Senior Notes Trustee to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of this Plan; (4) allow the Senior Notes Trustee to enforce its rights, claims, and interests against any party other than the Debtors; (5) preserve any rights of the Senior Notes Trustee to payment of fees, expenses, and indemnification obligations as against any money or property distributable to holders of Claims under the Senior Notes Indenture, including any rights to priority of payment and/or to exercise charging liens; and (6) permit the Senior Notes Trustee to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to the Senior Notes Trustee or other holders of Claims under Senior Notes Indenture. Notwithstanding anything to the contrary herein, but subject to any applicable provisions of Article VI hereof and the Confirmation Order, the DIP Credit Agreement, the Superpriority Credit Agreement, 2021 LC Agreement, and the Credit Agreement shall continue in effect to: (1) permit holders of Claims under the DIP Credit Agreement, the 2021 LC Agreement, and the Credit Agreement~~, and the Senior Notes Indenture~~ to receive their respective Plan Distributions, if any; (2) permit the Reorganized Debtors and the Disbursing Agent, as applicable, to make Plan Distributions on account of the Allowed Claims under the DIP Credit Agreement, the 2021 LC Agreement, and the Credit Agreement, ~~and the Senior Notes Indenture,~~ as applicable; (3) permit each of the DIP Agents, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the 2021 LC Administrative Agent, the Superpriority Term Loan Agent, and the ~~Senior Notes Trustee~~Superpriority Revolving Administrative Agent to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of this Plan; ~~and (4~~ and the Confirmation Order; (4) allow each of (x) the Revolving and LC Administrative Agent and any issuer of a letter of credit under the Credit Agreement to enforce its rights, claims, and interests against any Defaulting Lender (as defined in the Credit Agreement); and (y) the 2021 LC Administrative Agent and any issuer of 2021 Letters of Credit to enforce its rights, claims and interests against any Defaulting Participant (as defined in the 2021 LC Agreement); (5) permit each of the DIP Agent, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the 2021 LC Administrative Agent, Superpriority Term Loan Agent, and the ~~Senior Notes Trustee~~Superpriority Revolving

Administrative Agent, to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to the DIP Agent, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the 2021 LC Administrative Agent, and the Superpriority Term Loan Agent, and the Senior Notes Trustee, or or other holders of Claims under the DIP Credit Agreement, the Superpriority Credit Agreement, the 2021 LC Agreement, and the Credit Agreement, and the Senior Notes Indenture(6) preserve the rights and obligations of the parties under the Exit Facility Documents. Except as provided in this Plan (including Article VI hereof), the Confirmation Order and the Exit Facilities, on the Effective Date, the DIP Agents, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the 2021 LC Administrative Agent, the Superpriority Term Loan Agent, the Superpriority Revolving Administrative Agent and the Senior Notes Trustee, and their respective agents, successors, and assigns, shall be automatically and fully discharged of all of their duties and obligations associated with the DIP Credit Agreement, the Superpriority Credit Agreement, the 2021 LC Agreement, the Credit Agreement, and the Senior Notes Indenture, as applicable. To the extent cancelled in accordance with this paragraph, the commitments and obligations (if any) of the holders of the Senior Notes and the lenders under the DIP Credit Agreement, the Superpriority Credit Agreement, the Credit Agreement, and the 2021 LC Agreement to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries or any of their respective successors or assigns under the DIP Credit Agreement, the 2021 LC Agreement, the Superpriority Credit Agreement the Credit Agreement, and the Senior Notes Indenture, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

*J.*   ~~I.~~ *Corporate Action.*

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the Compensation and Benefit Programs; (2) selection of the directors and officers for the Reorganized Debtors; (3) the issuance and distribution of the New Common Stock; (4) implementation of the Restructuring Transactions, including the Rights Offering, the Pipes Business Sale, and the Technology Business Sale; (5) issuance and distribution of the New Warrants; (6) entry into the New Warrants Agreements and the Exit Facility Documents, as applicable; (7) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (8) adoption of the New Organizational Documents; (9) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (10) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, the New Organizational Documents, the Exit Facility Documents, the New Warrants, the New Warrants Agreements (as applicable), the Pipes Business Sale Documents, the Purchase Agreement, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this ~~Article IV.I~~ Article IV.J shall be effective notwithstanding any requirements under non-bankruptcy law.

*K.*   ~~J.~~ *New Organizational Documents.*

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors. To the extent required under the Plan or applicable non-bankruptcy law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state or country of organization if and to the extent required in accordance with the applicable laws of the respective state or country of organization. The New Organizational Documents will (a) prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code and (b) provide for customary minority shareholder protections and

information and reporting requirements subject to the consent rights set forth in Section 3.02 of the Restructuring Support Agreement.

After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents in accordance with the terms thereof, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents.

L.     K. Indemnification Obligations.

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date[; *provided* that the Reorganized Debtors shall not indemnify current or former officers, directors, managers, employees, attorneys, accountants, investment bankers, or other professionals of the Debtors for any claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct.] Notwithstanding the foregoing, in the event of the closing of the Pipes Business Sale, the Pipes Entities shall maintain such indemnification obligations only to the extent required under the Pipes Business Sale Documents.

M.     L. Directors and Officers of the Reorganized Debtors.

As of the Effective Date, the terms of the current members of the board of directors of McDermott shall expire and the new directors and officers of the Reorganized McDermott shall be appointed. The New Board will consist of [ ]seven (7) directors: (i) the Chief Executive Officer of Reorganized McDermott, (ii) [ ]six (6) directors selected by thecertain Required Consenting Term Lenders, and (iii) [ ] directors selected by the Required Consenting Revolving Lenders and the Required Consenting LCRevolving Lenders. The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing. Corporate governance for Reorganized McDermott, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall: (a) be consistent with the Restructuring Term Sheet, Section 3 of the Restructuring Support Agreement, and section 1123(a)(6) of the Bankruptcy Code; and (b) provide for customary minority shareholder protections and information and reporting requirements reasonably acceptable to the Debtors and the Required Consenting Stakeholders.

N.     M. Effectuating Documents; Further Transactions.

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Exit Facilities entered into, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

O.     N. Section 1146 Exemption.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New Common Stock and the New Warrants (including the New Common Stock that may be

issuable upon exercise of the New Warrants); (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit Facilities; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## P. ~~O.~~ Director and Officer Liability Insurance.

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date. Notwithstanding the foregoing, in the event of the closing of the Pipes Business Sale, the Pipes Entities shall maintain such D&O Liability Insurance Policies (including any "tail policy") only to the extent required under the Pipes Business Sale Documents.

## Q. ~~P.~~ Management Incentive Plan.

Effective on the Effective Date, the Reorganized Debtors will (i) reserve 7.5% of New Common Stock (on a fully diluted and fully distributed basis, but subject to dilution on account of the New Warrants) which may be granted in the form of options, restricted stock, restricted stock units, warrants, stock appreciations rights or any combination thereof (each an "**Award**" and such reserve, the "**MIP Pool**") for grant to management employees and members of the New Board ~~and~~in accordance with the terms of this Article IV.Q and as set forth in the Plan Supplement and (ii) enter into severance and change in control arrangements ("**Severance Arrangements**") with senior executives of the Debtors that are insiders pursuant to Section 16 of the Exchange Act ("**Senior Executives**") in amounts and on terms and conditions to be agreed and approved by the Required Consenting Lenders. The New Board shall grant no less than 53.33% of the MIP Pool to the employees of the Debtors no later than 60 days following the Effective Date (the "**Emergence Awards**") with the terms of the Emergence Awards to be determined as set forth ~~below~~in the Plan Supplement and the remainder of the MIP Pool will be available for future grants to management, employees, and members of the New Board with allocations, terms, and conditions to be determined by the New Board. ~~From the Petition Date through entry of the Confirmation Order, the Debtors, the Required Consenting Lenders and any consultants or advisors engaged by the Required Consenting Lenders will use~~

~~commercially reasonable efforts to agree on an allocation schedule and the terms, conditions, vesting and composition (including, for the avoidance of doubt, which may be in any form of Award) of the Emergence Awards (together, the "**MIP Proposal**"), and during this period the Debtors will use commercially reasonable efforts to facilitate meetings between the Required Consenting Lenders and the Debtors' key management personnel. As soon as reasonably practicable following the Effective Date but no later than 60 days following the Effective Date, the New Board shall consider the MIP Proposal for approval and New Board shall determine the final terms and conditions of the actual grants.~~  A Senior Executive will be permitted to voluntarily terminate for "Good Reason" and receive the severance benefits under the Severance Arrangements if the Senior Executive does not receive an Emergence Award.

<u>R.</u>    ~~Q.~~ *Employee and Retiree Benefits.*

Unless otherwise provided herein, and subject to Article V hereof, all employee wages, compensation, and benefit programs in place as of the Effective Date with the Debtors shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans.  For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.  ~~On~~<u>Notwithstanding the foregoing, on</u> the Effective Date, the Debtors shall enter into severance and change in control arrangements with Senior Executives in amounts and on terms and conditions to be agreed with and approved by the Required Consenting Lenders~~:~~ <u>which, to the extent provided therein, shall supersede and replace any severance or change of control agreements with such Senior Executives existing prior to the Effective Date and the long-term components of any key employee retention plan or key employee incentive plan existing on the Effective Date shall be subject to modification or termination, as applicable, by the New Board upon adoption of the Management Incentive Plan.</u>

<u>S.</u>    ~~R.~~ *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII hereof.  Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date.  Any such objection that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.**  The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court.  If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objection party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court.  Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata,

collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII hereof.   The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided in Article V.H.1 and elsewhere herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor (and assigned to the party(ies) set forth in the Technology Business Sale Documents, as applicable) in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that are: (1) identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (2) previously expired or terminated pursuant to their own terms; (3) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (4) are the subject of a motion to reject that is pending on the Effective Date; or (5) have an ordered or requested effective date of rejection that is after the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Leases Schedule, or the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule and the Rejected Executory Contracts and Unexpired Leases Schedule at any time up to forty-five (45) days after the Effective Date, so long as such allocation, amendment, modification, or supplement is consistent with the Restructuring Support Agreement; *provided* that the Cameron LNG Project Obligations shall be assumed as of the Effective Date in accordance with Article V.J.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

        Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.**  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.13 of this Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases* _and Lummus Executory Contracts or Unexpired Leases_.

        No later than seven (7) calendar days before the Confirmation Hearing, the Debtors shall provide notices of proposed ~~Cure amounts~~assumptions to the counterparties to the agreements listed on the Assumed Executory Contracts and Unexpired Leases Schedule, which shall include a description of the procedures for ~~objecting~~resolving disputes related to the proposed ~~Cure amounts or the Reorganized Debtors' ability to provide "adequate assurance of future performance thereunder" (within the meaning of~~assumption of applicable Executory Contracts and Unexpired Leases.  Absent any pending dispute, the monetary and nonmonetary defaults existing as of the assumption of the Executory Contract(s) and Unexpired Lease(s) assumed pursuant to this Article V will be satisfied by the Debtors in compliance with section 365(b)(1) of the Bankruptcy Code~~)~~.  ~~Unless otherwise agreed in writing by the parties in the applicable~~ To the extent there is a dispute related to any cures of defaults arising under such Executory Contract(s) and Unexpired Lease(s) (other than Lummus Executory Contracts or Unexpired Leases), payment of any such disputed Cure amounts and the cure of any nonmonetary defaults shall be reconciled in the ordinary course of the Debtors' business and all parties' rights shall be reserved with respect thereto, including all rights to receive payment in full of any such Cures whether arising before or after the Effective Date and the right to object prior to or after the Effective Date to any assumption or cures relating thereto.  The reconciliation, settlement, and payment of any monetary defaults over $7.5 million in respect of any single Executory Contract or Unexpired Lease, ~~any objection by a counterparty to a~~nor group of related Executory Contracts or Unexpired Leases ~~to a proposed assumption or related Cure amount must be Filed, served, and actually received by the counsel to the Debtor no later than the date and time specified in the notice.  Any counterparty~~ prior to or on the Effective Date shall be subject to the approval of the Required Consenting Lenders.

        ~~to an~~Except with regard to Lummus Executory Contracts or Unexpired Leases~~that fails to object timely to the proposed assumption or Cure amount will be deemed to have assented to such assumption or Cure amount~~, there shall be no need to file an objection to reserve rights with respect to disputes relating to monetary and nonmonetary cures and such cures will be reconciled in the ordinary course of the Debtors' business.  Notwithstanding anything herein to the contrary, except with regard to Lummus Executory Contracts or Unexpired Leases, in the event that any Executory Contract or Unexpired Lease is added to the Assumed Executory Contracts and Unexpired Leases Schedule after ~~such seven-day deadline~~the provision of notices of proposed assumptions described above, a notice of proposed ~~Cure amounts~~assumption with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof.

        With regard to any Lummus Executory Contracts or Unexpired Leases, no later than thirty (30) days before the Effective Date of the Plan, the Debtors shall provide notices of proposed assumptions to the counterparties to any assumed Lummus Executory Contracts or Unexpired Leases, which shall include, with respect to each such Lummus Executory Contract or Unexpired Lease, the Debtors' good faith estimate of the amount of any cure.  Each notice of proposed assumption shall state whether the applicable Lummus Executory Contract or Unexpired Lease is being assumed by the Debtors or assumed and assigned to the Lummus Buyer.  To the extent there is a dispute

related to either a monetary Cure amount or nonmonetary default, the Debtors, with consent of the Lummus Buyer and in accordance with the Stalking Horse SAPA, may elect to: (i) not assume or assume and assign to the Buyer the relevant Lummus Executory Contract or Unexpired Lease; (ii) postpone the assumption of such Lummus Executory Contract or Unexpired Lease until the resolution of such objection; or (iii) reserve the disputed portion of the Cure of the monetary default and, and subject to cure of any nonmonetary defaults, assume such Lummus Executory Contract or Unexpired Lease on the Effective Date. The assumption or assumption and assignment of the assumed Lummus Executory Contracts or Unexpired Leases is subject to the cure of all nonmonetary defaults (other than defaults triggered by the filing of the Chapter 11 Cases by the Debtors) prior to the Effective Date of the Plan.

Unless otherwise agreed ~~upon~~ in writing by the parties ~~to~~in the applicable Lummus Executory Contract or Unexpired Lease, ~~all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; *provided* that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure amount. The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.~~ any objection by a counterparty to a Lummus Executory Contract or Unexpired Lease to a proposed assumption must be Filed, served, and actually received by the counsel to the Debtor no later than the date and time specified in the notice. Any counterparty to a Lummus Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have assented to such assumption.

The Debtors or the Reorganized Debtors, as applicable, shall pay the Cure amounts, if any, and satisfy all nonmonetary defaults on the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may agree.~~;~~ *provided* that the Debtors shall pay or satisfy, as applicable, any cures, or establish a reserve for any disputed portion of a Cure for any Lummus Executory Contract or Unexpired Lease on or prior the Effective Date.

Any Cure shall be deemed fully satisfied, released, and discharged upon payment or satisfaction by the Debtors or the Reorganized Debtors of the Cure. If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the applicable Cure amount shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.

The Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any ~~Cures, Claims, or defaults, whether monetary or~~ nonmonetary defaults arising from or triggered by the filing of these chapter 11 cases, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (2) the effective date of such assumption or (3) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

D.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

E.      *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

F.      *Reservation of Rights.*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

G.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.      *Employee Compensation and Benefits.*

1.      <u>Compensation and Benefit Programs</u>.

Subject to the provisions of the Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:

a.      all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Program that provide for rights to acquire Existing Equity Interests in any of the Debtors;

b.      the change in control agreements entered into with current employees, unless otherwise determined by the Required Consenting Lenders prior to the Effective Date;

c.      Compensation and Benefits Programs that have been rejected pursuant to an order of a Bankruptcy Court; and

d.      Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any employee benefit plan or contract.

Any assumption of Compensation and Benefits Programs pursuant to the terms herein <u>and the Restructuring Transactions and related matters contemplated by the Plan</u> shall be deemed not to trigger (i) any applicable change

of control, immediate vesting, termination (similar provisions therein) and (ii) an event of "Good Reason" (or a term of like import), in each case as a result of the consummation of the Restructuring Transactions. No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

~~On~~Notwithstanding the foregoing, on the Effective Date, the Debtors shall enter into severance and change in control arrangements with Senior Executives in amounts and on terms and conditions to be agreed with and approved by the Required Consenting Lenders~~.~~ which, to the extent provided therein, shall supersede and replace any severance or change of control agreements with such Senior Executives existing prior to the Effective Date and the long-term components of any key employee retention plan or key employee incentive plan existing on the Effective Date shall be subject to modification or termination, as applicable, by the New Board upon adoption of the Management Incentive Plan.

2.      Workers' Compensation Programs.

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (a) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance. All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs, and plans; *provided further* that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

*I.      Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

*J.      Assumption of Cameron LNG Project Obligations*

The Cameron LNG Project Obligations shall be assumed by the applicable Reorganized Debtor effective as of the Effective Date, and the Cameron LNG Project Obligations shall not be subject to the provision of Section V.A. hereof authorizing the Debtors or Reorganized Debtors, as applicable, to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule and the Rejected Executory Contracts and Unexpired Leases Schedule at any time up to forty-five (45) days after the Effective Date. Within three Business Days after the Effective Date, Reorganized McDermott shall issue the Cameron LNG Replacement Guarantee and the Chiyoda Replacement Guarantee.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

*A.      Distributions on Account of Claims Allowed as of the Effective Date.*

Except as otherwise provided herein, in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the holder of the applicable Allowed Claim on the first Distribution Date, the Reorganized Debtors shall make initial distributions under the Plan on account of Claims Allowed on or before the Effective Date, subject to the Reorganized Debtors' right to object to Claims; *provided* that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of

dealing, course of business, or industry practice, (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.D of the Plan, and (3) Allowed General Unsecured Claims shall be paid in accordance with Article III.B.13 of the Plan.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.  Thereafter, a Distribution Date shall occur no less frequently than once in every ninety (90) day period, as necessary, in the Reorganized Debtors' sole discretion.

B.      *Disbursing Agent.*

All distributions under the Plan shall be made by the Reorganized Debtors.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

Distributions in respect of all Claims under Classes 6A, 6B, 6D, and 7 shall be made based upon a distribution schedule provided to the Debtors by Revolving and LC Administrative Agent after consultation with the holders of such Claims.

C.      *Rights and Powers of Disbursing Agent.*

1.      Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.      Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim, other than one based on a publicly traded Security, is transferred twenty (20) or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.      Delivery of Distributions in General.

Except as otherwise provided herein, the Disbursing Agent shall make distributions to holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

3.   Minimum Distributions.

No fractional shares of New Common Stock or New Warrants shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of New Common Stock or New Warrants that is not a whole number, the actual distribution of shares of New Common Stock or New Warrants shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of New Common Stock or New Warrants to be distributed to holders of Allowed Claims hereunder shall be adjusted as necessary to account for the foregoing rounding.

4.   Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

5.   Surrender of Canceled Instruments or Securities.

On the Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with ~~Article IV.H~~ Article IV.I hereof shall be deemed to have surrendered such certificate or instrument to the Distribution Agent.  Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the holder of a Claim or Interest, which shall continue in effect for purposes of allowing holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights.  Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under the Plan or Claims in respect of Classes 5, 6A, 6B (in respect of Revolving LCs), 7 or 8 to the extent such certificates or instruments are reinstated or amended on the Effective Date under the terms of the Plan.

6.   Delivery of Distributions on Senior Notes Claims.

Except as otherwise reasonably requested by the Senior Notes Trustee, all distributions to holders of Allowed Senior Notes Claims shall be deemed completed when made to the Senior Notes Trustee.  The Senior Notes Trustee shall hold or direct such distributions for the benefit of the holders of Allowed Senior Notes Claims.  As soon as practicable in accordance with the requirements set forth in this Article VI, the Senior Notes Trustee shall arrange to deliver such distributions to or on behalf of its holders, subject to the Senior Notes Trustee's charging lien.  If the Senior Notes Trustee is unable to make, or consents to the Debtors or the Reorganized Debtors, as applicable, making such distributions, the Debtors or the Reorganized Debtors, as applicable, with the Senior Notes Trustee's cooperation, shall make such distributions to the extent practicable to do so; *provided* that until such distributions are made, the Senior Notes Trustee's charging lien shall attach to the property to be distributed in the same manner as if such distributions were made through the Senior Notes Trustee.  The Senior Notes Trustee shall have no duties or responsibility relating to any form of distribution that is not DTC eligible and the Debtors or the Reorganized Debtors, as applicable, shall seek the cooperation of DTC so that any distribution on account of an Allowed Senior Notes Claim that is held in the name of, or by a nominee of, DTC shall be made through the facilities of DTC on the Effective Date or as soon as practicable thereafter.

E.    *Manner of Payment.*

1.    All distributions of the New Common Stock ~~and~~, the New Warrants, participations in the Roll-Off LC Exit Facilities, and the debt in respect of the Term Loan Exit Facility and the Make Whole Tranche (to the extent applicable) to the holders of the applicable Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the Debtors or Reorganized Debtors, as applicable.

2.    All distributions of Cash to the holders of the applicable Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor or Reorganized Debtor.

3.    At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.    *Section 1145 Exemption.*

Pursuant to section 1145 of the Bankruptcy Code or any other applicable exemption, the offering, issuance, and distribution of the New Common Stock (including the Rights Offering Shares) and the New Warrants, as contemplated by Article III.B hereof, and the issuance of the New Common Stock upon exercise of the New Warrants, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities. In addition, under section 1145 of the Bankruptcy Code, the New Common Stock, the New Warrants, and the New Common Stock to be issued upon exercise of the New Warrants will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of (i) section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (ii) compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments, and (iii) any restrictions in the Reorganized Debtors' New Organizational Documents.

G.    *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors, Reorganized Debtors, Disbursing Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

H.    *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

I.    *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the DIP Financing Orders, the Plan, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim.

J.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

K.      *Setoffs and Recoupment.*

Except as expressly provided in this Plan, and the DIP Financing Orders, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable holder. In no event shall any holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

L.      *Claims Paid or Payable by Third Parties.*

1.      Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers

under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.     *Disputed Claims Process.*

There is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to have a Claim Allowed for the purposes of the Plan, except as provided in Article V.B of the Plan.  On and after the Effective Date, except as otherwise provided in this Plan, all Allowed Claims shall be satisfied in the ordinary courtse of business ofby the Reorganized Debtors.  The Debtors and the Reorganized Debtors, as applicable, shall have the exclusive authority to (i) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a claim subject to any Proof of Claim that is Filed is Allowed and (ii) file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan.  If the Debtors or Reorganized Debtors dispute any Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; *provided* that the Debtors or Reorganized Debtors may elect, at their sole option, to object to any Claim (other than Claims expressly Allowed by this Plan) and to have the validity or amount of any Claim adjudicated by the Bankruptcy Court; *provided further* that holders of Claims may elect to resolve the validity or amount of any Claim in the Bankruptcy Court.  If a holder makes such an election, the Bankruptcy Court shall apply the law that would have governed the dispute if the Chapter 11 Cases had not been filed.  All Proofs of Claim Filed in the Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors.  **Except as otherwise provided herein, all Proofs of Claim Filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.     *Allowance of Claims.*

After the Effective Date, except as otherwise expressly set forth herein, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

C.     *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.R Article IV.S of the Plan.

D.     *Estimation of Claims and Interests.*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party in interest previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during

the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

E.       *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.       *Disallowance of Claims or Interests.*

Except as otherwise expressly set forth herein, all Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

G.       *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

H.       *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

I.       *No Interest.*

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Definitive Documents, the Plan, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than the Reinstated Claims) and Interests (other than the Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date.

B.      **Release of Liens.**

**Except as otherwise provided in the Exit Facility Documents, the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.  Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**To the extent that any holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or Exit Facility Agents that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such holder's behalf.**

*C.*     *Releases by the Debtors.*

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, their Estates, and any person seeking to exercise the rights of the Debtors or their Estates, including any successors to the Debtors or any Estates representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates, including any successors to the Debtors or any Estates representative appointed or selected pursuant to section 1123(b) of the Bankruptcy Code, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:

1.   **the Debtors (including the capital structure, management, ownership, or operation thereof), the business or contractual arrangement between the Debtors and any Released Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Company Party and another Company Party, the Superpriority Credit Agreement, the Credit Agreement, the <u>Hedge Agreements (as defined in the Hedging Order), the</u> 2021 LC Agreement, the Lloyds Letter of Credit Agreement, the Senior Notes Indenture, the Senior Notes, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Credit Agreement, the Exit Facility Documents, or the Plan (including, for the avoidance of doubt, the Plan Supplement);**

2.   **any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Rights Offering, the Disclosure Statement, the DIP Credit Agreement, the New Warrants Agreements, the Exit Facility Documents, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases;**

3.   **the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Disclosure Statement or the Plan, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, the Rights Offering, or the distribution of property under the Plan or any other related agreement; or**

4.   **any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases.**

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, any Definitive Document, or any other document, instrument, or agreement (including those set

forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility Documents, the New Warrants Agreements, or any Claim or obligation arising under the Plan, or (ii) the rights of any holder of Allowed Claims to receive distributions under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Debtor release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the foregoing Debtor release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the foregoing Debtor release; (c) in the best interests of the Debtors and their Estates and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the foregoing Debtor release.

### D.    *Releases by the Releasing Parties.*

Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:

1.  the Debtors (including the capital structure, management, ownership, or operation thereof), the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Company Party and another Company Party, the Superpriority Credit Agreement, the Credit Agreement, the **Hedge Agreements (as defined in the Hedging Order), the** 2021 LC Agreement, the Lloyds Letter of Credit Agreement, Senior Notes Indenture, the Senior Notes, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Credit Agreement, the Exit Facility Documents, or the Plan (including, for the avoidance of doubt, the Plan Supplement);

2.  any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Rights Offering, the Disclosure Statement, the DIP Credit Agreement, the New Warrants Agreements, the Exit Facility Documents, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases;;

3.  the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Disclosure Statement, or the Plan, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or

distribution of Securities pursuant to the Plan, the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

4.  any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facility Documents, or any other financing document under and as defined therein), (ii) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, any Definitive Document, or any agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility Documents, the New Warrants Agreements, or any Claim or obligation arising under the Plan, ~~or~~ (iii) the rights of holders of Allowed Claims to receive distributions under the Plan~~.~~**, or (iv) current and former directors, officers, managers, or employees of the Debtors from any Claim or Cause of Action related to an act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud.**

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing third-party release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the foregoing third-party release is:  (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for a substantial contribution and for the good and valuable consideration provided by the Released Parties that is important to the success of the Plan; (d) a good faith settlement and compromise of the Claims released by the foregoing third-party release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the foregoing third-party release.

*E.    Exculpation.*

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party shall be released and exculpated from any Claims and Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions (including the Superpriority Credit Agreement, the Credit Agreement, the Senior Notes Indenture or Senior Notes, the 2021 LC Agreement, and the Lloyds Letter of Credit Agreement), the Disclosure Statement, the Plan, the DIP Credit Facility, the Exit Facility Documents, the New Warrants Agreements, the Plan Supplement, the Rights Offering, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), including any Definitive Document, created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

*F.      Injunction.*

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations or distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold the Released Claims are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Released Claims; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any Released Claims; (3) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any Released Claims; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or the Estates of such Entities on account of or in connection with or with respect to any Released Claims unless such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Released Claims released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. **Except as otherwise set forth in the Confirmation Order, E**each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F hereof.

*G.      Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

*H.      Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

I.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

a.      the Debtors shall have achieved the Achievement Target; and

b.      the Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order, in form and substance consistent in all respects with the Restructuring Support Agreement (including any consent rights thereunder) and otherwise in form and substance acceptable to the Debtors and the Required Consenting Stakeholders, and which shall:

   i.      authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

   ii.     decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;

   iii.    authorize the Debtors, as applicable/necessary, to:    (a) implement the Restructuring Transactions, including the Rights Offering; (b) distribute the New Common Stock and the New Warrants, and to issue the New Common Stock upon exercise of the New Warrants, pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or such other applicable exemption from such registration or pursuant to one or more registration statements; (c) make all distributions and issuances as required under the Plan, including Cash and the New Common Stock; and (d) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the Management Incentive Plan, in each case, in a manner consistent with the terms of the Restructuring Support Agreement and subject to the consent rights set forth therein;

   iv.     authorize the implementation of the Plan in accordance with its terms; and

   v.      provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

c.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

d.   the final version of each of the Plan, the Definitive Documents, and all documents contained in any supplement to the Plan, including Plan Supplement and any exhibits, schedules, amendments, modifications, or supplements thereto or other documents contained therein shall have been executed or filed, as applicable in form and substance consistent in all respects with the Restructuring Support Agreement, the Restructuring Term Sheet, and the Plan, and comply with the applicable consent rights set forth in the Restructuring Support Agreement and/or the Plan for such documents and shall not have been modified in a manner inconsistent with the Restructuring Support Agreement;

e.   the ~~Exit~~definitive documents in respect of the Lloyds LC Exit Facility and the Exit Facility Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the Exit Facilities shall have been satisfied or duly waived in writing in accordance with the terms of each of the Exit Facilities and the closing of each of the Exit Facilities and the Lloyds LC Exit Facility shall have occurred;

f.   the Final Order approving the DIP Credit Facility shall have been entered and shall remain in full force and effect and no event of default shall have occurred and be continuing thereunder;

g.   no more than $50 million principal amount of Prepetition Secured Letters of Credit ~~or~~, the Lloyds Letters of Credit, or the DIP Letters of Credit (other than cash collateralized letters of credit) shall have been drawn and unreimbursed in full in Cash as of the Effective Date; *provided* that this condition may be waived solely with the written consent of the Required Consenting LC Lenders;

h.   Reorganized McDermott shall have a minimum of $820 million of Cash on its balance sheet (which amount shall not include Cash held by the Debtors' joint-venture affiliates or cash collateral securing the Cash Secured Letters of Credit, the Lloyds Letters of Credit, and the DIP Cash Secured Letters of Credit) assuming normal working capital; *provided* that this condition may be waived solely with the written consent of the ~~[~~Required Consenting Lenders~~]~~;

i.   all professional fees and expenses of retained professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in a professional fee escrow account pending the Bankruptcy Court's approval of such fees and expenses;

j.   the Technology Business Sale shall have been consummated;

k.   the Debtors' shall have Filed a *Notice of Anticipated Effective Date* at least five (5) days in advance of such Effective Date;

l.   ~~k.~~ to the extent invoiced in accordance with the terms of the Plan, the payment in Cash in full of the Restructuring Expenses; and

m.   ~~l.~~ the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated in the Restructuring Term Sheet in a manner consistent with the Restructuring Support Agreement (and subject to, and in accordance with, the consent rights set forth therein), the Restructuring Term Sheet, and the Plan.

**B.**   *Waiver of Conditions.*

Except as otherwise specified in the Plan or the Restructuring Support Agreement, any one or more of the conditions to Consummation (or component thereof) set forth in this Article IX may be waived by the Debtors with the prior written consent of the Required Consenting Stakeholders (not to be withheld unreasonably), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan. Notwithstanding the foregoing, if the conditions precedent to the closing of the Pipes Business Sale shall have been satisfied in accordance with the Pipes Business Sale Documents (as approved by the Required Consenting

Lenders), then the conditions set forth in this Article IX (other than in Article IX.A.b) shall be deemed automatically waived solely with respect to the Pipes Entities, as applicable, without notice, leave, or order of the Bankruptcy Court, or any further action by the Debtors, the Reorganized Debtors, or the Required Consenting Stakeholders.

C.      *Effect of Failure of Conditions.*

If Consummation does not occur as to any Debtor, the Plan shall be null and void in all respects as to such Debtor and nothing contained in the Plan, the Disclosure Statement, or Restructuring Support Agreement as to such Debtor shall:  (1) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests, or any other Entity.

D.      *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

**ARTICLE X.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

A.      *Modification and Amendments.*

Except as otherwise specifically provided in this Plan and subject to the consent rights set forth in the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

To the extent permitted by the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

**ARTICLE XI.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

a.   allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

a.   decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

b.   resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

c.   ensure that distributions to holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan, including with respect to the New Warrants;

d.   adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

e.   adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

f.   enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

g.   enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

h.   resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

i.   issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

j.   resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

k. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.L hereof;

l. enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

m. determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

n. enter an order concluding or closing the Chapter 11 Cases;

o. adjudicate any and all disputes arising from or relating to distributions under the Plan;

p. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

q. determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

r. hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

s. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

t. hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII hereof, regardless of whether such termination occurred prior to or after the Effective Date;

u. enforce all orders previously entered by the Bankruptcy Court; and

v. hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the New Organizational Documents and the Exit Facilities and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all holders of Claims or Interests (irrespective of whether such holders of Claims or Interests have, or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.      *Additional Documents.*

On or before the Effective Date, and consistent in all respects with the terms of the Restructuring Support Agreement, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan and the Restructuring Support Agreement.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the earlier of entry of a final decree closing such Chapter 11 Cases or an order of dismissal or conversion, whichever comes first.

D.      *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Confirmation Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Confirmation Date.

E.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| McDermott International, Inc.<br>757 North Eldridge Parkway<br>Houston, Texas 77079<br>Attention:  John Freeman | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention: Joshua A. Sussberg, P.C., Christopher T. Greco, P.C., and Anthony R. Grossi |

| | and |
|---|---|
| | Kirkland & Ellis LLP<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Attention:  John R. Luze |
| | and |
| | Jackson Walker L.L.P.<br>1401 McKinney Street, Suite 1900<br>Houston, Texas 77010<br>Attention: Elizabeth C. Freeman and Matthew D. Cavenaugh |
| **United States Trustee** | **Counsel to the Consenting Superpriority Term Lenders and the Consenting Term Lenders** |
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002 | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, NY 10017<br>Attention:  Damian S. Schaible and Natasha Tsiouris |
| **Counsel to the DIP LC Agent, the DIP Collateral Agent, the Revolving and LC Administrative Agent, the 2018 Collateral Agent, the Superpriority Revolving Administrative Agent and the Superpriority Collateral Agent** | **Counsel to the ~~proposed~~ DIP Term Loan Agent, the 2021 LC Administrative Agent, the Superpriority Term Loan Agent, and the Term Loan Administrative Agent** |
| Linklaters LLP<br>1345 Avenue of the Americas<br>New York, New York 10105<br>Attention:  Margot Schonholtz and Penelope Jensen<br><br>and<br><br>Bracewell LLP<br>711 Louisiana Street<br>Houston, Texas 77002<br>Attention: William A. (Trey) Wood III | Latham & Watkins LLP<br>885 Third Avenue<br>New York, NY 10022<br>Attention: Andrew Parlen and Anupama Yerramalli |
| **Counsel to the Consenting Noteholders** | |
| Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019<br>Attention: Andrew N. Rosenberg and Alice B. Eaton<br><br>-and-<br><br>Brown Rudnick LLP<br>7 Times Square<br>New York, NY 10036<br>Attention: Robert J. Stark and Bennett S. Silverberg | |

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      *Entire Agreement.*

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, the Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      *Plan Supplement.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://cases.primeclerk.com/McDermott or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

K.      *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

L.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the

solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

M.      *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N.      *Waiver or Estoppel.*

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

O.      *Creditor Default*

An act or omission by a holder of a Claim or an Interest in contravention of the provisions of this Plan shall be deemed an event of default under this Plan. Upon an event of default, the Reorganized Debtors may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs of the Reorganized Debtors in remedying such default.  Upon the finding of such a default by a creditor, the Bankruptcy Court may:  (a) designate a party to appear, sign and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (b) enforce the Plan by order of specific performance; (c) award judgment against such defaulting creditor in favor of the Reorganized debtor in an amount, including interest, to compensate the Reorganized Debtors for the damages caused by such default; and (d) make such other order as may be equitable that does not materially alter the terms of the Plan.

Dated: ~~January 22~~March 11, 2020

MCDERMOTT INTERNATIONAL, INC.

on behalf of itself and all other Debtors

*/s/ John Castellano*

John Castellano
Chief Restructuring Officer