

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
05/20/2020

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 20-30336 |
| MCDERMOTT INTERNATIONAL, INC., | § | CHAPTER 11 |
| *et al.,* | § | (Jointly Administered) |
| | § | |
| Debtors. | § | DAVID R. JONES |

**MEMORANDUM OPINION**
**(Docket Nos. 434, 636 and 637)**

Before the Court are the Debtors' applications to employ (i) AlixPartners, LLP as the Debtors' financial advisor under 11 U.S.C. § 327(a) [Docket No. 636]; and (ii) AP Services, LLC to provide a chief transformation officer and other support personnel under 11 U.S.C. §§ 105 and 363(b)[1] [Docket No. 637]. The U.S. Trustee supports both applications solely under § 363(b). The Court approves both applications under 11 U.S.C. § 327(a). The Court issues this memorandum opinion to explain its analysis and to provide guidance for future applications filed in this district. A separate order approving the applications will issue consistent with this memorandum opinion.

**Relevant Procedural History**

1. By letter agreement dated October 22, 2019, McDermott International, Inc. and certain affiliates (collectively, "McDermott") and AP Services, LLC ("AP Services") entered into an agreement under which AP Services agreed to provide temporary personnel to McDermott to assist in a contemplated financial restructuring [Docket No. 434-1]. The October 22, 2019 engagement letter replaced a prior agreement dated September 17, 2019 between McDermott and AlixPartners, LLP ("AlixPartners"), an affiliate of AP Services. *Id.* Under the specific terms of the October 22 agreement, AP Services agreed to provide John Castellano on an hourly fee basis to provide professional services in the role of McDermott's chief transformation officer along with eight other identified professionals and various unidentified support personnel. *Id.* The October 22 agreement also provided for the payment of a $5 million success fee that was earned upon a successful restructuring. *Id.* The engagement agreement was amended on November 14, 2019 and again on January 20, 2020. *Id.* Interestingly, the January 20, 2020 amendment identifies AP Services as the "vendor," yet it is executed by AlixPartners as the "vendor." The November 14, 2019 amendment was not attached to the applications presented to the Court.

2. McDermott entered chapter 11 on January 21, 2020 [Docket No. 1]. On February 19, 2020, McDermott filed its application to employ AP Services and to designate Mr. Castellano

---

[1] Contrary to the pleadings and the arguments of the parties, McDermott does not seek to employ John Castellano. Mr. Castellano is the person designated to lead the engagement by AP Services/AlixPartners and has remained employed by AlixPartners at all relevant times.

as McDermott's chief transformation officer pursuant to the October 22, 2019 pre-petition agreement under 11 U.S.C. §§ 105 and 363 [Docket No. 434] (the "Original Application"). The Court did not schedule a hearing or otherwise issue a ruling on the Original Application. Instead, the Court indicated during a hearing on February 24, 2020 that it had concerns about the application but would schedule a hearing if requested. [Transcript, pgs. 71-73, Docket No. 507]. Alternatively, the Court invited McDermott to take a different approach and amend its pleading. *Id.* On March 2, 2020, McDermott filed a notice indicating that modified pleadings would be filed [Docket No. 525].

3.  On March 11, 2020, McDermott filed (i) an application to employ AlixPartners as the Debtors' financial advisor under section 11 U.S.C. § 327(a) [Docket No. 636]; and (ii) an amended application to employ AP Services under 11 U.S.C. §§ 105 and 363(b) [Docket No. 637].

4.  The Court confirmed McDermott's proposed second amended plan by order entered March 12, 2020 [Docket No. 665 as amended at Docket No. 684]. At the confirmation hearing, the Court noted that the success experienced by McDermott in the case was due, in no small part, to the extraordinary talent and skill of Mr. Castellano and his team [Transcript, pgs. 176-77, Docket No. 690].

5.  No party filed a formal objection to either of the two applications. On April 8, 2020, the U.S. Trustee filed a statement regarding the applications [Docket No. 835]. In the statement, the U.S. Trustee argued that both applications should be granted only under § 363(b) and not § 327(a) based on its assertion that both AP Services and AlixPartners were statutorily ineligible to be employed under § 327(a). *Id.* In so doing, the U.S. Trustee sought to implement what has become widely known as the J. Alix Protocol. *See, e.g., In re Nine West Holdings, Inc.*, 588 B.R. 678, 691 (Bankr. S.D.N.Y. 2018). Concerned about the status of their employment, AlixPartners and AP Services also filed a joint statement in support of the applications on April 18, 2020 [Docket No. 848].

6.  Pursuant to the Court's *Protocol for Emergency Public Health or Safety Conditions* [General Order 2020-4], the Court conducted a video hearing on the two applications on April 28, 2020. During the hearing, the Court heard the testimony of Mr. Castellano. Mr. Castellano testified that AlixPartners and AP Services were engaged by McDermott to provide advice and services in connection with its restructuring and that he was not personally employed by McDermott at any time. [Transcript at 25-26, Docket No. 870]. Mr. Castellano further testified that his title as "chief transformation officer" was not magical and could have easily been "chief transformation person" or "head minion" [Transcript at 26, Docket No. 870].

7.  At the conclusion of the hearing, the Court announced that it would grant the applications but not on the legal basis requested by McDermott or the U.S. Trustee. [Transcript at 26, Docket No. 870]. The Court issues this memorandum opinion to explain its reasoning.

## Analysis

8. The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334. This contested matter is a core proceeding arising under title 11 pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (M). The Court has constitutional authority to enter a final order in this contested matter. *Stern v. Marshall*, 564 U.S. 462 (2011). To the extent necessary, the parties have consented to the entry of a final order by the Court. *Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932 (2015).

Employment under 11 U.S.C. § 327(a)

9. The employment of professional persons in a bankruptcy case is governed by 11 U.S.C. § 327. Section 327(a) provides:

> **§ 327. Employment of professional persons**
>
> (a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a). In a chapter 11 case, a debtor-in-possession is vested with the rights and powers of a trustee. 11 U.S.C. § 1107(a). *See also Asarco v. Americas Mining Corp.*, 396 B.R. 278, 435 fns. 21, 32 and 35 (S.D. Tex. 2008) (the terms "debtor in possession" and "trustee" used interchangeably). Bankruptcy Rule 2014 further requires that an application to employ a professional person must set forth "specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee." FED. R. BANKR. P. 2014.

10. To be eligible for employment under § 327(a), a professional person[2] must show that it (i) is disinterested; and (ii) does not hold or represent an interest adverse to the bankruptcy estate. *In re American Int'l Refinery, Inc.*, 676 F.3d 455, 461 (5th Cir. 2012); *In re W.F. Development Corp.*, 905 F.2d 883, 884 (5th Cir. 1990). A disinterested person is a person that (i) is not a creditor, an equity security holder or an insider; (ii) is not and was not, within two years prior to the petition date, a director, officer or employee of the debtor; and (iii) does not hold a material adverse interest to the bankruptcy estate or any class of creditors or interest holders by way of its relationship to the debtor or for any other reason. 11 U.S.C. § 101(14).

---

[2] The term "person" includes an individual, a partnership or a corporation. 11 U.S.C. § 101(41).

11. In addition to the requirements of § 327, § 1107(b) provides additional guidance on the employment of professional persons in chapter 11 cases:

> Notwithstanding section 327(a) of this title, a person is not disqualified for employment under section 327 of this title by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case.

11 U.S.C. § 1107(b).

Section 363(b)

12. Section 363(b) does not specifically address the employment of professional persons. Rather, § 363(b) provides, in relevant part:

> **§ 363. Use, sale, or lease of property.**
>
> . . .
>
> **(b)(1)** The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. . . .

This section expressly provides authorization for the use of estate property outside the ordinary course of business. *In re Asarco, L.L.C.,* 650 F.3d 593, 601 (5th Cir. 2011) (providing that section 363 of the Bankruptcy Code authorizes the use, sale, or lease of estate property subject to a business judgment standard). Although the above-cited language has been utilized as set forth below to authorize the retention of professional persons, the language itself deals only with the use of estate property not the conditions under which a professional person may be employed.

The Development of the J. Alix Protocol

13. As early as 2001, the United States Trustee Program began the implementation of a national settlement protocol to resolve its objections to debtors' applications to retain chief restructuring officers ("CROs") and their firms where the CRO had served in the role prior to the bankruptcy filing. *See In re Safety-Kleen Corp.*, Case No. 00-2303, Docket Nos. 2825, 2920 (Bankr. D. Del. 2000). The underlying premise of the protocol is that while § 327(a) would prohibit the employment of the financial advisory firm due to a lack of disinterestedness, § 363(b) contains no such restriction. The protocol necessarily assumes that the alleged lack of disinterestedness of the individual serving as the CRO is *per se* imputed to the CRO's firm. This approach has been become commonly known as the J. Alix Protocol (the "Alix Protocol"). The Alix Protocol has been both endorsed and criticized by various courts. *See In re Blue Stone Real Estate, Const. & Dev. Corp.,* 392 B.R. 897, 907 n.14 (Bankr. M.D. Fla. 2008) (noting the failure of the "Jay Alix" Protocol in that it does not provide the Court with the ability to meet the goals of section 327); *In re Saint Vincents Catholic Medical Ctrs. of New York,* Case No. 05-B-13945, 2007 WL 2492787 *14, 16 (Bankr. S.D.N.Y. August 29, 2007) (providing that the Jay Alix Protocol contains comprehensive disclosure requirements); *In re Adelphia Communications Corp.,* 336 B.R. 610, 667-668, 667 n.151 (Bankr. S.D.N.Y. 2006). The Alix Protocol is even now

embodied within Volume 3 of the official <u>United States Trustee Program Policy and Practices Manual</u>. *See* https://www.justice.gov/ust/file/volume_3_chapter_11_case_administration.pdf/download.

14. In its original form, the J. Alix Protocol provided:

**Protocol for Engagement of Jay Alix & Associates and Affiliates**

I. <u>Retention Guidelines</u>

A. Jay Alix & Associates ("JA&A") is a firm that provides turnaround and crisis management services, financial advisory services, management consulting services, information systems services and claims management services. In some cases the firm provides these services as advisors to management, in other cases one or more of its staff serve as corporate officers and other of its staff fill positions as full time or part time temporary employees ("crisis manager"), and in still other cases the firm may serve as a claims administrator as an agent of the Bankruptcy Court. JA&A and its affiliates will not act in more than one of the following capacities in any single bankruptcy case: (i) crisis manager retained under Sec. 363, (ii) financial advisor retained under Sec. 327, (iii) claims agent/claims administrator appointed pursuant to 28 U.S.C. § 156(c) and any applicable local rules or (iv) investor/acquirer; and upon confirmation of a Plan may only continue to serve in a similar capacity. Further, once JA&A or one of its affiliates is retained under one of the foregoing categories it may not switch to a different retention capacity in the same case. However, with respect to subsequent investments by Questor this prohibition is subject to the time limitations set forth in IV.B below.

B. Engagements involving the furnishing of interim executive officers whether prepetition or postpetition (hereinafter "crisis management" engagements) shall be provided through JA&A Services LLC ("JAS").

C. JAS shall seek retention under section 363 of the Bankruptcy Code. The application of JAS shall disclose the individuals identified for executive officer positions as well as the names and proposed functions of any additional staff to be furnished by JAS. In the event the Debtor or JAS seeks to assume additional or different executive officer positions, or to modify materially the functions of the persons engaged, a motion to modify the retention shall be filed. It is often not possible for JAS to know the extent to which full time or part time temporary employees will be required when beginning an engagement. In part this is because the extent of the tasks that need to be accomplished is not fully known and in part it is because JAS is not yet knowledgeable about the capability and depth of the client's existing staff. Accordingly, JAS shall file with the Court with copies to the UST and all official committees a report of staffing on the engagement for the previous month. Such report shall include the names and functions filled of individuals assigned. All staffing shall be subject to review by the Court in the event an objection is filed.

D. Persons furnished by JAS for executive officer positions shall be retained in such positions upon the express approval thereof by an independent Board of Directors whose members are performing their duties and obligations as required under applicable law ("Board"), and will act under the direction, control and guidance of

        the Board and shall serve at the Board's pleasure (*i.e.* may be removed by majority vote of the Board).

E.     The application to retain JAS shall make all appropriate disclosures of any and all facts that may have a bearing on whether JAS, its affiliates, and/or the individuals working on the engagement have any conflict of interest or material adverse interest, including but not necessarily limited to the following:

    1.     Connection, relationship or affiliation with secured creditors, postpetition lenders, significant unsecured lenders, equity holders, current or former officers and directors, prospective buyers, or investors.

    2.     Involvement as a creditor, service provider or professional of any entity with which JA&A or any affiliate has an alliance agreement, marketing agreement, joint venture, referral arrangement or similar agreement.

    3.     Any prepetition role as officer, director, employee or consultant, but service as a pre-petition officer will not *per se* cause disqualification.

    4.     Any prepetition involvement in voting on the decision to engage JA&A or JAS in the bankruptcy case, and/or any prepetition role carrying the authority to decide unilaterally to engage JA&A or JAS.

    5.     Information regarding the size, membership and structure of the Board so as to enable the UST and other interested parties to determine that the Board is independent.

    6.     Whether the executive officers and other staff for the engagement are expected to be engaged on a full time or part time basis, and if part-time whether any simultaneous or prospective engagement exists that may be pertinent to the question of conflict or adverse interest.

    7.     The existence of any unpaid balances for prepetition services.

    8.     The existence of any asserted or threatened claims against JA&A, JAS or any person furnished by JA&A/JAS arising from any act or omission in the course of a prepetition engagement.

F.     Disclosures shall be supplemented on a timely basis as needed throughout the engagement.

G.     Where JA&A does not act as a crisis manager its retention will be sought as a financial advisor under section 327 of the Code or as a Court appointed claims representative.

II.     <u>Compensation</u>

A.     Compensation in crisis management engagements shall be paid to JAS.

B.  The application to retain JAS shall disclose the compensation terms including hourly rates and the terms under which any success fee or back-end fee may be requested.

C.  JAS shall file with the Court, and provide notice to the UST and all official committees, reports of compensation earned and expenses incurred on at least a quarterly basis. Such reports shall summarize the services provided, identify the compensation earned by each executive officer and staff employee provided, and itemize the expenses incurred. The notice shall provide a time period for objections. All compensation shall be subject to review by the Court in the event an objection is filed (*i.e.*, a "negative notice" procedure).

D.  Success fees or other back-end fees shall be approved by the Court at the conclusion of the case on a reasonableness standard and shall not be pre-approved under section 328(a). No success fee or back-end fee shall be sought upon conversion of the case, dismissal of the case for cause or appointment of a trustee.

III. <u>Indemnification</u>

A.  Debtor is permitted to indemnify those persons serving as executive officers on the same terms as provided to the debtor's other officers and directors under the corporate bylaws and applicable state law, along with insurance coverage under the debtor's D&O policy.

B.  There shall be no other indemnification of JA&A, JAS or affiliates.

IV. <u>Subsequent Engagements</u>

A.  Pursuant to the "one hat" policy as stated above, after accepting an engagement in one capacity, JA&A and affiliates shall not accept another engagement for the same or affiliated debtors in another capacity.

B.  For a period of three years after the conclusion of the engagement, Questor shall not make any investments in the debtor or reorganized debtor where JA&A, JAS or another affiliate has been engaged.

Certain footnotes omitted.

[2] "Executive officers" shall include but is not necessarily limited to Chief Executive Officer, President, Chief Operating Officer, Treasurer, Chief Financial Officer, Chief Restructuring Officer, Chief Information Officer, and any other officers having similar roles, power or authority, as well as any other officers provided for in the company's bylaws.

https://www.justice.gov/sites/default/files/ust/legacy/2014/08/11/J_Alix_Protocol_Engagement.pdf.

15. While innovative at its inception, the Alix Protocol has become a tool to avoid transparency and create inequity. Based on the Court's observations, applicants selectively comply with the protocol's requirements in a majority of cases. The protocol's suggestion that separate entities be utilized as artificial barriers creates confusion. Applicants routinely push more and more services under the auspices of § 363(b) to avoid court oversight through the fee application process and the accompanying public transparency. Invoices are provided to limited parties in lumped fashion and kept from public scrutiny. Financial advisory services are

inappropriately categorized as "back office" support services. Success fees are mentioned only in a back-page disclosure. Even the U.S. Trustee has not been above the fray. Contrary to its published position, the U.S. Trustee asserted in *In re Nine West Holdings, Inc.*, that the protocol was not applicable to an application where the financial advisory firm seeking retention was providing a temporary chief executive officer as opposed to a chief reorganization officer. 588 B.R. 678 (Bankr. S.D.N.Y. 2018). These examples are but a sampling and tarnish the sanctity of a process that demands complete transparency. Moreover, the protocol is completely unnecessary.

The AlixPartners/AP Services Applications

16. The applications in this case serve as an illustrative example of why a re-examination of the process is required. In its original application, McDermott sought only to employ AP Services on an hourly fee basis under § 363(b) to provide a range of financial advisory services [Docket No. 434]. Mr. Castellano was designated to serve as the chief transformation officer in the engagement with support provided by other AP Services personnel [Docket No. 434]. No mention is made of services to be provided by AlixPartners. As the employment was under § 363(b), no fee applications would be required. It is unclear whether the $5 million success fee would be the subject of a future pleading as court approval was described as needed only "as applicable" [Docket No. 434]. The cases cited for authority of the employment under § 363(b) have little to do with the employment of professional persons [Docket No. 434, para. 34]. Notably, no objections were filed to the original application.

17. After the Court indicated concern with the application, the Debtors filed two applications. The first application sought the employment of AlixPartners as a financial advisor on an hourly fee basis under § 327(a) [Docket No. 636]. The application is supported by an affidavit pursuant to Bankruptcy Rule 2014 and makes clear that all compensation, including the $5 million success fee, is subject to the fee application process under 11 U.S.C. § 330 [Docket No. 636]. The second application sought the retention of AP Services under § 363(b) and to designate Mr. Castello as chief transformation officer under the engagement [Docket No. 637]. The unbundling of the triangular relationship between the parties added a much appreciated level of transparency to the process.

18. In response to the two applications, the U.S. Trustee filed a statement asserting that while AlixPartners was ineligible to be employed under § 327, it had no objection to its employment under § 363(b) [Docket No. 835]. The U.S. Trustee continued to have no objection to AP Services' employment under § 363(b) [Docket No. 835]. At the core of the U.S. Trustee's position is the notion that Mr. Castellano's pre-petition consulting services as McDermott's "chief transformation officer" prevent both AP Services and AlixPartners from being disinterested under 11 U.S.C. § 101(14)(B) [Docket No. 835]. The U.S. Trustee further asserts that Mr. Castellano is an insider due to his pre-petition status. To complete the circle, the U.S. Trustee asserts that Mr. Castellano's status is *per se* imputed to both AP Services and AlixPartners. The Court disagrees.

19. First, the Court notes that Mr. Castellano has never been employed by McDermott. Both the pre-petition and post-petition relationships involved McDermott on one hand and AP Services/AlixPartners on the other. The prepetition employment by McDermott of AP Services/AlixPartners does not prevent their employment during the bankruptcy case. *See* 11

U.S.C. § 1107(b). Second, and assuming *arguendo*, that providing financial advisory services with a title of chief transformation officer rendered Mr. Castellano not disinterested[3] under § 101(14), the Court questions whether that lack of disinterestedness is *per se* imputed to AP Services and AlixPartners.

20.     In *In re: Cygnus Oil and Gas Corp.*, the Court examined whether a *per se* rule imputing a single member's disinterestedness to the member's firm is appropriate. No. 07-32417, 2007 WL 1580111 (Bankr. S.D. Tex. May 29, 2007). Noting that the operative sections of the Bankruptcy Code were silent on the issue, Judge Isgur applied the plain reading of §§ 101(14) and (41) and determined that no *per se* rule existed. *Id.* at *3. A majority of courts agree with this determination. *See U.S. Trustee v. S.S. Retail Stores Corp. (In re S.S. Retail Stores Corp.),* 211 B.R. 699, 703 (B.A.P. 9th Cir. 1997); *Vergos v. Timber Creek, Inc.,* 200 B.R. 624, 627 (W.D. Tenn. 1996); *Capen Wholesale, Inc. v. Michel (In re Capen Wholesale, Inc.),* 184 B.R. 547, 551 (N.D. Ill. 1995); *In re Young Mens Christian Assoc.*, 570 B.R. 64, 68 (Bankr. W.D. Mich. 2017); *In re Sea Island Co.*, No. 10-21034, 2010 WL 4386855, *2 (Bankr. S.D. Ga. Oct. 20, 2010); *In re Creative Rest. Mgmt., Inc.,* 139 B.R. 902, 913 (Bankr. W.D. Mo. 1992).

21.     The Court agrees with Judge Isgur's analysis. The Court must presume that Congress meant what it said and will not infer that which clearly does not exist. *See Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253–54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says [].").  In so doing, the Court notes that Congress has not been reluctant to impute one person's status to such person's firm when it determined it was appropriate to do so. *See, e.g.* FED. R. BANKR. P. 5002 (prohibiting the employment of a professional person related to the bankruptcy judge as well as any members of such person's firm). The above analysis is equally applicable to the U.S. Trustee's argument that Mr. Castellano's alleged insider status must be imputed to AP Services/AlixPartners.

22.     The Court has reviewed the decision in *In re Essential Therapeutics, Inc.* cited by the U.S. Trustee in support of a *per se* rule. 295 B.R. 203 (Bankr. D. Del. 2003). The "current climate of distrust of officers and directors" cited by the court as the basis for imposing a *per se* rule is simply insufficient to legislate an otherwise nonexistent condition into the Bankruptcy Code. Moreover, it leads one to consider whether such a rule would be required in a different "climate." If such a consideration is appropriate, then the *Essential Therapeutics* rule is not really a *per se* rule.

23.     At the hearing on the applications, no party offered any evidence that AP Services or AlixPartners is a creditor, an equity security holder or an insider of McDermott. Likewise, no evidence was offered to suggest that AP Services or AlixPartners was an officer, director or employee of McDermott within two years of the petition date. No evidence was offered to suggest that Mr. Castellano's alleged disinterestedness should be imputed to AP Service or AlixPartners. Under § 101(14)(C), the Court is further required to ensure that AP Services and AlixPartners do not hold a material interest adverse to McDermott or any class of creditors or interest holders. No party alleges and the Court has no evidence of any such adverse interest. Based on the record

---

[3] The Court expresses no opinion whether an outside chief transformation officer not employed by the debtor constitutes an officer under § 101(14)(B).

presented, the Court finds that AP Services and AlixPartners are disinterested persons as the term is defined under § 101(14).

## Conclusion

24.     The two primary goals of § 327(a) are to ensure the impartiality of the professional and to provide court oversight in the determination of the reasonableness of the professional's compensation.  *In re Ajubeo*, No. 17-17924-JGR, 2017 WL 5466655, at *3 (D. Col. Sept. 27, 2017);  *In re Blue Stone Real Estate, Const. & Dev. Corp.,* 392 B.R. 897, 907 n.14 (Bankr. M.D. Fla. 2008).  These goals are best achieved through the transparent process of § 327(a) that governs the employment of all professional persons employed by a debtor.  The case-by-case approach to the imputation of a lack of disinterestedness harmonizes the expressed concerns all parties.  The Court maintains the necessary discretion to address the inevitable unusual case.  Both the Court's analysis and the professional's performance are publicly available for all to see.  All relevant code sections work in harmony to promote efficiency without the need for artificial constructs to achieve a specific result.

25.     In this case, the U.S. Trustee acknowledges the skill and contribution made by the applicants.  Likewise, the Court previously noted that the case would not have been a success without their guidance.  Their contributions deserve more than an obfuscated process designed to skirt the bankruptcy process implemented by Congress.  In the future, the Court expects to see a single application for employment under § 327(a) seeking to employ the best financial advisory professionals to render the best financial advisory services for the benefit of debtors who so need their talents.  The applications of AP Services and AlixPartners are approved pursuant to 11 U.S.C. § 327(a).  Mr. Castellano is designated as McDermott's chief restructuring officer.

**Signed:  May 20, 2020.**

_____
**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**